Datatreasury Corporation v. Wells Fargo & Company et al — Doc. 209 Att. 1
Case 2:06-cv-00072-DF-CMC   Document 209   Filed 06/23/2006   Page 1 of 10
UB 10-K 12/31/2005                                                SNL Financial

# UB 10-K 12/31/2005

**Section 1:**
(ANNUAL REPORT PURSUANT TO SECTION 13 AND 15(D))

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

# FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2005

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from             to

Commission file number 1-15081

# UnionBanCal Corporation

(Exact name of registrant as specified in its charter)

| **Delaware** | **94-1234979** |
|---|---|
| (State of Incorporation) | (I.R.S. Employer Identification No.) |

400 California Street
San Francisco, California 94104-1302

(Address and zip code of principal executive offices)

Registrant's telephone number: (415) 765-2969

Securities registered pursuant to Section 12(b) of the Act:
Common Stock, $1 par value per share
(Title of each class)

New York Stock Exchange
(Name of each exchange on which registered)

Securities registered pursuant to Section 12(g) of the Act:
None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer" and "large accelerated filer" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☒        Accelerated filer ☐        Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

As of June 30, 2005, the aggregate market value of voting and non-voting common equity held by non-affiliates of the registrant was $3,744,112,701. The aggregate market value was computed by reference to the last sales price of such stock.

As of January 31, 2006, the number of shares outstanding of the registrant's Common Stock was 144,300,456.

**DOCUMENTS INCORPORATED BY REFERENCE**

| Incorporated Document | Location in Form 10-K |
|---|---|
| Portions of the Proxy Statement for our April 26, 2006 Annual Meeting of Stockholders | Part III |

**Employees**

At January 31, 2006, we had 10,410 full-time equivalent employees.

**Competition**

Banking is a highly competitive business. We compete actively for loan, deposit, and other financial services business in California, Oregon and Washington, as well as nationally and internationally. Our competitors include a large number of state and national banks, thrift institutions, credit unions, finance companies, mortgage banks and major foreign-affiliated or foreign banks, as well as many financial and nonfinancial firms that offer services similar to those offered by us, including many large securities firms. Some of our competitors are community or regional banks that have strong local market positions. Other competitors include large financial institutions that have substantial capital, technology and marketing resources, which are well in excess of ours. Such large financial institutions may have greater access to capital at a lower cost than us, which may adversely affect our ability to compete effectively.

Technology and other changes increasingly allow parties to complete financial transactions electronically, and in many cases, without banks. For example, consumers can pay bills and transfer funds over the internet and by telephone without banks. Many non-bank financial service providers have lower overhead costs and are subject to fewer regulatory constraints. If consumers do not use banks to complete their financial transactions, we could potentially lose fee income, deposits and income generated from those deposits.

Changes in federal law have made it easier for out-of-state banks to enter and compete in the states in which we operate. The Riegle-Neal Interstate Banking and Branching Efficiency Act of 1994 (the Riegle-Neal Act), among other things, eliminated substantially all state law barriers to the acquisition of banks by out-of-state bank holding companies. A bank holding company may acquire banks in states other than its home state, without regard to the permissibility of such acquisitions under state law, but subject to any state requirement that the acquired bank has been organized and operating for a minimum period of time (not to exceed five years), and the requirement that the acquiring bank holding company, prior to or following the proposed acquisition, controls no more than 10 percent of the total amount of deposits of the insured depository institutions in the United States and no more than 30 percent of such deposits in that state (or such lesser or greater amount as may be established by state law). The Riegle-Neal Act also permits banks to acquire branches located in another state by purchasing or merging with a bank chartered in that state or a national banking association having its headquarters located in that state.

Banks, securities firms, and insurance companies can now combine as a "financial holding company." Financial holding companies can offer virtually any type of financial service, including banking, securities underwriting, insurance (both agency and underwriting), and merchant banking. Many of our competitors have elected to become financial holding companies. Recently, a number of foreign banks have attained financial holding company status in the U.S., further increasing competition in the U.S. market. Under current regulatory interpretations, Mitsubishi UFJ Financial Group, Inc. would be required to attain financial holding company status in order for us to be able to become a financial holding company. Mitsubishi UFJ Financial Group, Inc. is not presently a financial holding company.

We believe that continued emphasis on enhanced services and distribution systems, an expanded customer base, increased productivity and strong credit quality, together with a substantial capital base, will position us to meet the challenges provided by this competition.

**Monetary Policy and Economic Conditions**

Our earnings and businesses are affected not only by general economic conditions (both domestic and international), but also by the monetary policies of various governmental regulatory authorities of the United States and foreign governments and international agencies. In particular, our earnings and growth

6

may be affected by actions of the Federal Reserve Board in connection with its implementation of national monetary policy through its open market operations in United States Government securities, control of the discount rate and establishment of reserve requirements against both member and non-member financial institutions' deposits. These actions have a significant effect on the overall growth and distribution of loans and leases, investments and deposits, as well as on the rates earned on securities, loans and leases or paid on deposits. It is difficult to predict future changes in monetary policies and their effect on our business.

**Supervision and Regulation**

*Overview.* Bank holding companies and banks are extensively regulated under both federal and state law. This regulation is intended primarily for the protection of depositors, the deposit insurance fund, and other clients of the institution, and not for the benefit of the investors of the bank holding company. Set forth below is a summary description of the material laws and regulations that relate to our operation and those of our subsidiaries, including Union Bank of California, N.A.

*Bank Holding Company Act.* We, Mitsubishi UFJ Financial Group, Inc. and The Bank of Tokyo-Mitsubishi UFJ, Ltd., are subject to regulation under the Bank Holding Company Act of 1956, as amended, (BHCA) which subjects us to Federal Reserve Board reporting and examination requirements. Generally, the BHCA restricts our ability to invest in non-banking entities, and we may not acquire more than 5 percent of the voting shares of any domestic bank without the prior approval of the Federal Reserve Board. Our activities are limited, with some exceptions, to banking, the business of managing or controlling banks, and other activities, which the Federal Reserve Board deems to be so closely related to banking as to be a proper incident thereto.

Under Federal Reserve Board regulations, a bank holding company is required to serve as a source of financial and managerial strength to its subsidiary banks and may not conduct its operations in an unsafe or unsound manner. Under this policy, the Federal Reserve Board may require a holding company to contribute additional capital to an undercapitalized subsidiary bank.

*Comptroller of the Currency.* Union Bank of California, N.A., as a national bank association, is subject to broad federal regulation and oversight extending to all its operations by the Office of the Comptroller of the Currency, its primary regulator, and also by the Federal Reserve Board and the Federal Deposit Insurance Corporation. As part of this authority, Union Bank of California, N.A., is required to file periodic reports with the Comptroller of the Currency and is subject to periodic examination by the Comptroller of the Currency.

The Comptroller of the Currency has extensive enforcement authority over all national banks. If, as a result of an examination of a bank, the Comptroller of the Currency determines that the financial condition, capital resources, asset quality, earnings prospects, management, liquidity, or other aspects of the bank's operations are unsatisfactory or that the bank or its management is violating or has violated any law or regulations, various remedies are available to the Comptroller of the Currency. These remedies include the power to enjoin "unsafe or unsound" practices, to require affirmative action to correct any conditions resulting from any violation or practice, to issue an administrative order that can be judicially enforced to direct an increase in capital, to restrict the growth of the bank, to assess civil monetary penalties, to remove officers and directors, and ultimately to terminate the bank's deposit insurance. The Comptroller of the Currency, as well as other federal agencies, have adopted regulations and guidelines establishing safety and soundness standards, including but not limited to such matters as loan underwriting and documentation, internal controls and audit systems, interest rate risk exposure, asset quality and earnings and compensation and other employee benefits.

*Other Regulatory Oversight.* Our subsidiaries are also subject to extensive regulation, supervision, and examination by various other federal and state regulatory agencies. In addition, Union Bank of California, N.A. and its subsidiaries are subject to certain restrictions under the Federal Reserve Act, including restrictions on affiliate transactions. As a holding company, the principal source of our cash has

7

services to our customers and otherwise to conduct our business. Replacing these third-party vendors could also entail significant delay and expense.

*Our business could suffer if we fail to attract and retain skilled personnel*

Our success depends, in large part, on our ability to attract and retain key personnel, including executives. Any of our current employees, including our senior management, may terminate their employment with us at any time. Competition for qualified personnel in our industry can be intense. We may not be successful in attracting and retaining *sufficient qualified personnel*. We may also incur increased expenses and be required to divert the attention of other senior executives to recruit replacements for the loss of any key personnel.

*Significant legal actions could subject us to substantial uninsured liabilities*

We are from time to time subject to claims related to our operations. These claims and legal actions, including supervisory or enforcement actions by our regulators, could involve large monetary claims and significant defense costs. To protect ourselves from the cost of these claims, we maintain insurance coverage in amounts and with deductibles that we believe are appropriate for our operations. However, our insurance coverage may not cover all claims against us or continue to be available to us at a reasonable cost. As a result, we may be exposed to substantial uninsured liabilities, which could adversely affect our business, prospects, results of operations and financial condition.

*Changes in our tax rates could affect our future results*

The State of California requires us to file our franchise tax returns as a member of a unitary group that includes Mitsubishi UFJ Financial Group and either all worldwide affiliates or only U.S. affiliates. Our future effective tax rates could be favorably or unfavorably affected by increases or decreases in Mitsubishi UFJ Financial Group's taxable profits, which in turn are affected by changes in the worldwide economy, especially in Japan, and decisions that they may make about the timing of the recognition of credit losses or other matters. Our effective tax rates could also be affected by changes in the valuation of our deferred tax assets and liabilities, changes in tax laws or their interpretation, or by the outcomes of examinations of our income tax returns by the Internal Revenue Service and other tax authorities.

## Item 1B.  Unresolved Staff Comments

None.

## Item 2.  Properties

At December 31, 2005, we operated 315 full service branches in California, 4 full service branches in Oregon and Washington, and 20 international offices, which will be closed during 2006. We own the property occupied by 104 of the domestic offices and lease the remaining properties for periods of five to twenty years.

We own two administrative facilities in San Francisco, two in Los Angeles, and three in San Diego. Other administrative offices in Arizona, California, Illinois, Nevada, New York, Oregon, Virginia, Texas and Washington operate under leases expiring in one to twenty-six years.

Rental expense for branches and administrative premises is described in Note 6 to our Consolidated Financial Statements included in this Annual Report.

16

**EXECUTIVE OFFICERS OF THE REGISTRANT**

The following information pertains to our executive officers as of December 31, 2005:

| Executive Officer | Age | Principal Occupations For The Past Five Years |
|---|---|---|
| Tetsuo Shimura | 67 | Mr. Shimura has served as Chairman of UnionBanCal Corporation and Union Bank of California, N.A. since October 2003. He previously served on the Boards of Directors of UnionBanCal Corporation and Union Bank of California, N.A. from June 1997 to July 1998. Mr. Shimura has served in the following positions at The Bank of Tokyo-Mitsubishi UFJ, Ltd.: Deputy President from July 2001 to June 2003, Chief Executive, Global Corporate Banking Business Unit from July 2000 to July 2001 and Senior Managing Director from June 1998 to July 2001. Mr. Shimura has been a director of UnionBanCal Corporation and Union Bank of California, N.A. since October 2003. |
| Takashi Morimura | 53 | Mr. Morimura has served as President and Chief Executive Officer of UnionBanCal Corporation and Union Bank of California, N.A., since May 2005 and served as Vice Chairman of UnionBanCal Corporation and Union Bank of California, N.A., from July 2004 to May 2005. Mr. Morimura served as General Manager, Global Corporate Banking IT Planning Office of The Bank of Tokyo-Mitsubishi UFJ, Ltd. from July 2000 to June 2004, and as Deputy General Manager, Overseas Planning Division of The Bank of Tokyo-Mitsubishi UFJ, Ltd. from September 1999 to June 2000. Mr. Morimura was elected a non-board member Director of The Bank of Tokyo-Mitsubishi UFJ, Ltd. in June 2002 and a non-board member Managing Director of The Bank of Tokyo-Mitsubishi UFJ, Ltd. in May 2005. Mr. Morimura has been a Director of UnionBanCal Corporation and Union Bank of California, N.A. since July 2004. |
| Philip B. Flynn | 48 | Mr. Flynn has served as Vice Chairman and Chief Operating Officer of UnionBanCal Corporation and Union Bank of California, N.A., since March 2005. He served as Vice Chairman and head of the Commercial Financial Services Group of UnionBanCal Corporation and Union Bank of California, N.A., from April 2004 to March 2005. He served as Executive Vice President and Chief Credit Officer of UnionBanCal Corporation and Union Bank of California, N.A., from September 2000 to April 2004, as Executive Vice President and head of Specialized Lending from May 2000 to September 2000 and as Executive Vice President and head of the Commercial Banking Group from June 1998 to May 2000. Mr. Flynn has been a Director of UnionBanCal Corporation and Union Bank of California, N.A. since April 2004. |
| David I. Matson | 61 | Mr. Matson has served as Vice Chairman and Chief Financial Officer of UnionBanCal Corporation and Union Bank of California, N.A. since March 2005 and served as Executive Vice President and Chief Financial Officer of UnionBanCal Corporation and Union Bank of California, N.A. from July 1998 to March 2005. |

18

| Executive Officer | Age | Principal Occupations For The Past Five Years |
|---|---|---|
| Masashi Oka | 50 | Mr. Oka has served as Vice Chairman, Administration & Support of UnionBanCal Corporation and Union Bank of California, N.A., since July 2005. Beginning in 1998, Mr. Oka held the following positions with The Bank of Tokyo-Mitsubishi UFJ, Ltd.: Chief Manager, Corporate Banking Division No. 2 until April 2001; General Manager, Syndications Office, Structured Finance Division until October 2002; General Manager, Global Syndications Office, Debt Finance Division until June 2004; and General Manager & Global Head, Syndicated Finance Division until May 2005. From April 2005 until June 2005, Mr. Oka was Chairman of the Japan Syndication and Loan-Trading Association. Mr. Oka has been a non-board member Director of The Bank of Tokyo-Mitsubishi UFJ, Ltd. since June 2005. Mr. Oka has been a Director of UnionBanCal Corporation and Union Bank of California, N.A. since October 2005. |
| Linda F. Betzer | 59 | Ms. Betzer has served as Executive Vice President and head of the Operations and Customer Services Group of UnionBanCal Corporation and Union Bank of California, N.A. since January 2000. |
| JoAnn M. Bourne | 50 | Ms. Bourne has served as Executive Vice President since April 2000 and as head of the Commercial Deposits and Treasury Management Group of UnionBanCal Corporation and Union Bank of California, N.A. since April 2003. She served as head of the Commercial Banking Group from January 2002 to April 2003 and managed the Commercial Deposit Services Division from June 1997 to January 2002. |
| Bruce H. Cabral | 50 | Mr. Cabral has served as Executive Vice President since March 2000 and as Chief Credit Officer of UnionBanCal Corporation and Union Bank of California, N.A. since April 2004. He served as Deputy Chief Credit Officer from November 2002 until April 2004. Prior to this position, Mr. Cabral was a Senior Credit Officer responsible for Real Estate Lending and National Banking. |
| Paul E. Fearer | 62 | Mr. Fearer has served as Executive Vice President and Director of Human Resources of UnionBanCal Corporation and Union Bank of California, N.A. since April 1996. |
| Ronald H. Kendrick | 64 | Mr. Kendrick has served as Executive Vice President and head of the Community Banking Group of UnionBanCal Corporation and Union Bank of California, N.A. since December 2000. He served as Executive Vice President and Southern California Area Executive of Union Bank of California, N.A. from March 1994 to December 2000. |
| John H. McGuckin, Jr. | 59 | Mr. McGuckin has served as Executive Vice President, General Counsel and Secretary of UnionBanCal Corporation and Union Bank of California, N.A. since September 2000. He served as Executive Vice President and General Counsel of UnionBanCal Corporation from January 1998 to September 2000 and served as Executive Vice President and General Counsel of Union Bank of California, N.A. from April 1996 until September 2000. |

19

| Executive Officer | Age | Principal Occupations For The Past Five Years |
|---|---|---|
| James Yee | 52 | Mr. Yee has served as Executive Vice President and Chief Information Officer for UnionBanCal Corporation and Union Bank of California, N.A. since May 2005. Prior to joining UnionBanCal Corporation, he served as Senior Vice President, Information Technology, for Charles Schwab & Company from April 2004 to April 2005 and Senior Vice President and Chief Information Officer of Pacific Exchange, Inc. from April 2000 to March 2003. |

The term of office of an executive officer extends until the officer resigns, is removed, retires, or is otherwise disqualified for service. There are no family relationships among the executive officers.

**PART II**

## Item 5. Market for Registrant's Common Equity, Related Stockholder Matters, and Issuer Purchases of Equity Securities

Our common stock is traded on the New York Stock Exchange under the symbol UB. As of January 31, 2006, our common stock was held by 3,032 stockholders of record. At December 31, 2005, The Bank of Tokyo-Mitsubishi UFJ held approximately 63 percent of our common stock. During 2004 and 2005, the average daily trading volume of our common stock was 263,184 shares and 308,178 shares, respectively. At December 31, 2003, 2004 and 2005, our common stock closed at $57.54 per share, $64.48 per share, and $68.72 per share, respectively. The following table presents stock quotations for each quarterly period for the two years ended December 31, 2004 and 2005.

|  | 2004 | | 2005 | |
|---|---|---|---|---|
|  | High | Low | High | Low |
| First quarter | $58.26 | $50.80 | $63.99 | $59.70 |
| Second quarter | 57.59 | 49.51 | 68.00 | 58.00 |
| Third quarter | 59.79 | 56.24 | 71.97 | 66.38 |
| Fourth quarter | 64.78 | 59.10 | 70.45 | 65.68 |

The following table presents quarterly per share cash dividends declared for 2004 and 2005:

|  | 2004 | 2005 |
|---|---|---|
| First quarter | $0.31 | $0.36 |
| Second quarter | 0.36 | 0.41 |
| Third quarter | 0.36 | 0.41 |
| Fourth quarter | 0.36 | 0.41 |

On October 26, 2005, our Board of Directors approved a quarterly common stock dividend of $0.41 per share for the fourth quarter of 2005. Future dividends will depend upon our earnings, financial condition, capital requirements and other factors as our Board of Directors may deem relevant.

We offer a dividend reinvestment and stock purchase plan that allows stockholders to reinvest dividends in our common stock at market price. The Bank of Tokyo-Mitsubishi UFJ did not participate in the plan during 2004 and 2005. For further information about this plan, see Note 15 to our Consolidated Financial Statements included in this Annual Report.

Our ability to declare and pay dividends is affected by certain regulatory restrictions. See *Note 20 to our Consolidated Financial Statements* included in this Annual Report.

20

**UnionBanCal Corporation and Subsidiaries**

Notes to Consolidated Financial Statements
December 31, 2003, 2004, and 2005

Note 1—Summary of Significant Accounting Policies and Nature of Operations

*Introduction*

UnionBanCal Corporation is a commercial bank holding company and has, as its major subsidiary, a banking subsidiary, Union Bank of California, N.A. (the Bank). UnionBanCal Corporation and its subsidiaries (the Company) provide a wide range of financial services to consumers, small businesses, middle-market companies and major corporations, primarily in California, Oregon, and Washington, and also nationally.

The Bank of Tokyo-Mitsubishi UFJ, Ltd. (BTMU), which is a wholly-owned subsidiary of Mitsubishi UFJ Financial Group, Inc. (MUFG), owned approximately 63 percent of the Company's outstanding common stock at December 31, 2005.

*Basis of Financial Statement Presentation*

The accounting and reporting policies of the Company conform to accounting principles generally accepted in the United States of America (US GAAP) and general practice within the banking industry. Those policies that materially affect the determination of financial position, results of operations, and cash flows are summarized below.

The Consolidated Financial Statements include the accounts of the Company, and all material intercompany transactions and balances have been eliminated. The preparation of financial statements in conformity with US GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates. Certain amounts for prior periods may have been reclassified to conform with current financial statement presentation.

*Cash and Cash Equivalents*

For purposes of reporting cash flows, cash and cash equivalents include cash and due from banks, interest bearing deposits in banks, and federal funds sold and securities purchased under resale agreements, which have original maturities less than 90 days.

*Resale and Repurchase Agreements*

Transactions involving purchases of securities under agreements to resell (reverse repurchase agreements or reverse repos) or sales of securities under agreements to repurchase (repurchase agreements or repos) are accounted for as collateralized financings except where the Company does not have an agreement to sell (or purchase) the same or substantially the same securities before maturity at a fixed or determinable price. The Company's policy is to obtain possession of collateral with a market value equal to or in excess of the principal amount loaned under resale agreements. Collateral is valued daily, and the Company may require counterparties to deposit additional collateral or return collateral pledged, when appropriate.

F-53

**Section 11:**
**(906 CERTIFICATION)**

EXHIBIT 32.1

CERTIFICATION PURSUANT TO

18 U.S.C. SECTION 1350,

AS ADOPTED PURSUANT TO

SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with this Annual Report of UnionBanCal Corporation (the "Company") on Form 10-K for the year ending December 31, 2005 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Takashi Morimura, Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

(1)     The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: March 1, 2006

By:     /s/ Takashi Morimura
        Takashi Morimura
        Chief Executive Officer