UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| DATATREASURY CORPORATION, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 2-06CV-72 |
| | ) |
| v. | ) |
| | ) |
| WELLS FARGO & COMPANY, et al., | ) |
| | ) |
| Defendants. | ) |

**DEFENDANT UNIONBANCAL CORPORATION'S REPLY
TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS
PLAINTIFF'S COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(2)**

Defendant UnionBanCal Corporation ("UnionBanCal") is a bank holding company that does not engage in any business in Texas, nor does it have any contacts with Texas. Those facts have been established by sworn Affidavit. Accordingly, UnionBanCal filed a Motion to Dismiss Plaintiff's Complaint Pursuant to Fed. R. Civ. P. 12(b)(2) ("Motion to Dismiss") requesting dismissal of this case against it for lack of personal jurisdiction.[1]

**I.   INTRODUCTION**

Plaintiff DataTreasury Corporation's ("DataTreasury") Response to Defendant UnionBanCal's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) ("Opposition")[2] merely restates the same vague and conclusory allegations that it recited in its First Amended Complaint in support of this Court's exercise of specific personal jurisdiction over UnionBanCal. None of

---

[1] UnionBanCal's operating subsidiary, Union Bank of California, N.A. is also named as a defendant in this matter and it does not contest this Court's jurisdiction over its person.

[2] To respond to DataTreasury's Motion To Authorize Jurisdictional Discovery Against UnionBanCal, which was filed concurrently with DataTreasury's Opposition, UnionBanCal will file a separate Opposition.



those arguments are further supported by any specific facts, sworn affidavits or declarations under oath. DataTreasury simply mischaracterizes the nature of UnionBanCal's business by quoting statements out of context from UnionBanCal's Annual Report. As explained below, a review of these statements in their proper contexts clearly shows UnionBanCal's lack of contacts with Texas. Accordingly, this Court should dismiss this case against UnionBanCal.

## II.    ARGUMENT

UnionBanCal's Annual Report explicitly identifies it as "a California-based, commercial bank holding company." UnionBanCal, Annual Report (Form 10-K), at F-2 (Mar. 1, 2006) ("Form 10-K") (attached hereto as Exhibit A). Bank holding companies are authorized by federal statute, 12 U.S.C.A. §§ 1841-1850 (West 2006), and are highly regulated, *Bd. of Governors v. Dimension Fin. Corp.*, 474 U.S. 361, 365 (1986). They are clearly defined as companies that own stock in banking institutions but that are not themselves banks or depository institutions. UnionBanCal therefore, is by definition, a creature of statute that does not actively engage in banking operations; thus, its limited activities as a holding company in California do not result in *any* contact with Texas. To describe further the nature of UnionBanCal's business as a holding company and to demonstrate specifically its lack of ties to Texas, UnionBanCal filed the affidavit of David A. Anderson, Executive Vice President and Controller at UnionBanCal ("Anderson Affidavit"), with its Motion to Dismiss. No statement in the Anderson Affidavit contradicts the Form 10-K, and more importantly, no statement in either document supports this Court's exercise of either general or specific personal jurisdiction over UnionBanCal.

DataTreasury's attempt to confuse UnionBanCal's operations with those of its subsidiary, Union Bank of California, N.A., likewise provide no basis for this Court to assert jurisdiction.

Although many of the factors relevant to an analysis of whether a parent corporation should be liable for the actions of its subsidiary, the determination whether two corporate entities are one and the same for jurisdictional purposes is distinct. *See Jones v. Beech Aircraft,* 995 S.W.2d 767, 771 (Tex. App. 1999); *Hargrave v. Fibreboard Corp.,* 710 F.2d 1154, 1159 (5th Cir.1983); *Wells Fargo & Co. v. Wells Fargo Express Co.,* 556 F.2d 406, 425 (9th Cir.1977). The operative question here is whether Union Bank of California, N.A., is in fact a mere "division" or "branch" of a larger whole, such that its contacts with Texas should be attributed to UnionBanCal. *See Wells Fargo & Co.,* 556 F.2d at 425. UnionBanCal has asserted by sworn Affidavit that there is no basis for this Court to disregard the separate corporate entities and, therefore, there is no reason for this Court to treat the holding company and the operating subsidiary bank as a single entity.[3] In short, there is no colorable basis for this Court's exercise of jurisdiction over UnionBanCal.

> **A.   There is No Inconsistency Between the Anderson Affidavit and UnionBanCal's Form 10-K**
>
> **1.   The Form 10-K Does Not Support this Court's Exercise of Personal Jurisdiction Over UnionBanCal.**

The complete context of the Form 10-K excerpts selected by DataTreasury for quotation in its Opposition, establish that UnionBanCal is a "California-based, commercial bank holding company," Form 10-K at F-2, and accordingly is not engaged in any activities in Texas. The Form 10-K explains that UnionBanCal is a holding company that "through its banking subsidiary, Union Bank of California, N.A., provides a wide range of financial services." *Id.* at 5. Moreover, UnionBanCal explained that, "[a]s a holding company, the principal source of [its]

---

[3] DataTreasury has not alleged any fraud, undercapitalization, or other wrongdoing that would justify piercing the corporate veil. Moreover, bank holding company regulations require UnionBanCal to ensure adequate capitalization of its subsidiary banks. *See* Part II.D (explaining responsibilities of bank holding companies for obligations of its subsidiaries).

3

cash has been dividends and interest received from Union Bank of California, N.A." *Id.* at 7-8, 15 ("As a holding company, a substantial portion of our cash flow typically comes from dividends our bank and nonbank subsidiaries pay to us. Various statutory provisions restrict the amount of dividends our subsidiaries can pay to us without regulatory approval."). UnionBanCal's business is collecting dividends from its subsidiary, Union Bank of California, N.A., while the provision of financial services and bank operations is the province of the operating subsidiary.

DataTreasury's Opposition ignores these clear statements and lifts partial quotes out of context in an attempt to paint limited Form 10-K descriptions of activities clearly conducted through Union Bank of California, N.A., as contradictory to statements in the Anderson Affidavit, which concerned only UnionBanCal. Reading the Form 10-K as a whole, however, resolves the supposed contradictions because the distinctions between descriptions of UnionBanCal and Union Bank of California, N.A., activities are clear.

### 2. The Anderson Affidavit Does Not Contradict the Form 10-K

The Anderson Affidavit says nothing to contradict the Form 10-K; nevertheless, by juxtaposing portions of the Form 10-K that concern Union Bank of California, N.A., with statements from the Anderson Affidavit that concern only UnionBanCal, the Opposition attempts to create apparent inconsistencies. For instance, DataTreasury quotes the Form 10-K list of UnionBanCal's property, which includes an administrative office in Texas. Form 10-K at 16. DataTreasury does not, however, quote the preceding paragraph, which contains the following disclosure: "we operated 315 full service branches in California, 4 full services branches in Oregon and Washington, and 20 international offices . . . ." *Id.* The Form 10-K is explicit, however, that UnionBanCal does not itself operate any branches. The Texas office is clearly a

subsidiary operation. It is entirely inappropriate and factually and legally incorrect to suggest as DataTreasury does that Union Bank of California's subsidiary operations can be attributed to the parent UnionBanCal. The Form 10-K statements do not contradict the Anderson Affidavit statement that UnionBanCal never owned property in Texas.

Other alleged contradictions cited by DataTreasury result from similar failures to read the Form 10-K as a whole. For instance, "we compete actively for loan, deposit, and other financial services business," *id.* at 6, is clearly shorthand for "our subsidiaries compete . . . ." Also clear from the context of the Form 10-K as a whole is that the "10,410 full-time equivalent employees," *id.*, are staffing the "315 full service branches," *id.* at 16, operated by UnionBanCal subsidiaries, not the holding company itself. Similarly, while UnionBanCal "controls" Union Bank of California, N.A., in the sense that it owns its shares, it does not "control" its subsidiaries' operations; thus, there is nothing contradictory in the Anderson Affidavit more specific factual assertion that UnionBanCal is not involved in the day-to-day management of its subsidiaries.

All of the supposed contradictions identified by DataTreasury's Opposition result from narrowly reading excerpts of the Form 10-K out of context. By reading each of the quoted statements in its original context, it is clear that both the Form 10-K and the Anderson Affidavit support treating UnionBanCal and Union Bank of California, N.A., as distinct entities.

**B.   UnionBanCal Does Not Engage In Any Activities In Texas**

Neither "Plaintiff's Pleadings" nor UnionBanCal's activities are sufficient to confer personal jurisdiction over UnionBanCal. The proposition that a plaintiff could *confer* jurisdiction by properly pleading jurisdiction is simply not true. To the contrary, "[t]he party seeking to invoke the court's jurisdiction has the burden of establishing jurisdiction, by making a

5

prima facie showing of the facts upon which it may be based." *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1159 (5th Cir. 1983); *see also Quick Techs., Inc. v. Sage Group PLC*, 313 F.3d 338, 343 (5th Cir. 2002). In this case, DataTreasury has totally failed to make a prima facie showing of the facts upon which jurisdiction may be based.

Only the defendant's deliberate actions may subject it to the jurisdiction of a particular court. The touchstone for a court's exercise of specific personal jurisdiction over an out-of-state defendant is whether the defendant purposefully directed its activities at residents of the forum state and whether the litigation results from injuries that arose from or relate to those activities. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985). DataTreasury's attempt to satisfy the elements of the *Burger King* test in its Opposition by alleging that UnionBanCal engaged in the same activities that it alleged in its First Amended Complaint does not overcome this basic deficiency: UnionBanCal does not engage in *any* activities in Texas. It owns shares in its subsidiary companies but it does not provide services or sell products. Moreover, UnionBanCal does not engage in any activities with Small Value Payments Co., LLC, or The Clearing House Payments Company, LLC. Thus, UnionBanCal engaged in none of the activities that DataTreasury alleges support this Court's exercise of specific personal jurisdiction. It has offered a sworn affidavit to that effect. Data Treasury cannot supply evidentiary proof for any of its general allegations and cannot fall back on its unsupported and unsupportable pleadings.

### C.     UnionBanCal And Union Bank of California, N.A., Are Separate Entities

Bank holding companies, such as UnionBanCal, are required by regulation to file consolidated reports with their operating subsidiaries. *See, e.g., CBC, Inc. v. Bd. of Governors*, 855 F.2d 688 (10th Cir. 1988). UnionBanCal's statutory and regulatory relationship with its operating banking subsidiary, Union Bank of California, N.A., fails to justify this Court's

exercise of personal jurisdiction over UnionBanCal. As expected in a parent-subsidiary relationship, and as required by banking regulations, UnionBanCal and Union Bank of California, N.A., share resources, including capital and directors. Nevertheless, they are distinct and separate legal entities.

A complete review of the Form 10-K clearly shows that, consistent with the law, UnionBanCal earns dividends from its subsidiaries but does not engage in any banking activities. The Anderson Affidavit's characterization of UnionBanCal's activities is entirely consistent with these Form 10-K representations and the regulatory requirements. Because of the highly regulated nature of the banking industry, however, UnionBanCal has a continuing responsibility to adequately capitalize its banking subsidiaries and to answer for their obligations in case of default. That, however, does not justify piercing the corporate veil or support an *alter ego* theory; for a bank holding company, such a relationship with its subsidiary is required by law. Thus, UnionBanCal and Union Bank of California, N.A., are legally separate entities to the extent permitted by banking regulations and should be treated as such by this Court.

### D. The "Source of Strength" Doctrine Is Not Relevant To The Exercise Of Personal Jurisdiction

DataTreasury's unsupported contention that "UnionBanCal should be held liable for the infringing activities of Union Bank" pursuant to the "source of strength" doctrine misapplies a Federal Reserve Board policy designed to distribute the burden of bank failures across the failed bank and affiliates to a jurisdictional inquiry on which it has no bearing. The "source of strength" doctrine is a policy choice, consistent with historical regulation of banks, to suspend the principle of limited corporate liability in exchange for safer banks. 12 C.F.R. § 225.4 (2006). The Federal Reserve Board explained that "'in seeking the advantages flowing from the ownership of a commercial bank, bank holding companies have an obligation to serve as sources

of strength and support to their subsidiary banks,' and that a bank holding company's failure to assist a troubled or failing subsidiary bank 'would generally be viewed as an unsafe and unsound banking practice' and as a violation of the Board's banking regulations." *Branch v. U.S.*, 69 F.3d 1571, 1581 (Fed. Cir. 1995) (quoting Responsibility of Bank Holding Companies to Act as Sources of Strength to Their Subsidiary Banks, 52 Fed. Reg. 15,707 (Apr. 30, 1987)).

UnionBanCal's responsibilities as a bank holding company to stand behind the obligations of its subsidiary banks are consistent with the "source of strength" doctrine. Form 10-K at 7 ("Under Federal Reserve Board regulations, a bank holding company is required to serve as a source of financial and managerial strength to its subsidiary banks . . . . Under this policy, the Federal Reserve Board may require a holding company to contribute additional capital to an undercapitalized subsidiary bank."). These responsibilities, however, have no bearing on the jurisdictional inquiry. An administrative regulation promulgated to prevent catastrophic bank failures does not replace the due process requirement that a nonresident defendant establish "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). In this case, the requirement that UnionBanCal "serve as a source of financial and managerial strength," Form 10-K at 7, to its subsidiaries fails to satisfy the due process requirement of minimum contacts with the forum state of Texas. Not only do UnionBanCal's responsibilities as a holding company fail to result in contact with Texas, but also because these responsibilities are mandated by federal regulation, if there were any resulting contact with Texas, it would certainly not be voluntary.

## III. CONCLUSION

For these reasons and the reasons set forth in UnionBanCal's Motion to Dismiss, this Court should dismiss this action against UnionBanCal for lack of personal jurisdiction.

Respectfully submitted,

June 30, 2006

/s/ *Jennifer Parker Ainsworth*
Jennifer Parker Ainsworth
Texas Bar No. 00784720
WILSON, SHEEHY, KNOWLES, ROBERTSON & CORNELIUS, P.C.
909 ESE Loop 323
Suite 400
Tyler, Texas 75701
T: (903) 509-5000
F: (903) 509-5092
jainsworth@wilsonlawfirm.com

Richard Hogan
Texas Bar No. 09802010
PILLSBURY WINTHROP SHAW PITTMAN LLP
2 Houston Center
909 Fannin Street 22nd Floor
Houston TX 77010
T: (713) 425-7327
F: (713) 425-7373
richard.hogan@pillsburylaw.com

Raymond L. Sweigart (pro hac vice submitted)
Scott J. Pivnick (pro hac vice submitted)
PILLSBURY WINTHROP SHAW PITTMAN LLP
1650 Tysons Blvd.
McLean, VA 22102-4859
T: (703) 770-7900
F: (703) 905-2500
raymond.sweigart@pillsburylaw.com
scott.pivnick@pillsburylaw.com

*Attorneys for Defendant,
UnionBanCal Corporation*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on June 30, 2006. Any other counsel of record will be served by facsimile transmission and first class mail.

*/s/ Jennifer Parker Ainsworth*
Jennifer Parker Ainsworth

700485138v7

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2005

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from          to

Commission file number 1-15081

# UnionBanCal Corporation
(Exact name of registrant as specified in its charter)

| Delaware | 94-1234979 |
|---|---|
| (State of Incorporation) | (I.R.S. Employer Identification No.) |

400 California Street
San Francisco, California 94104-1302
(Address and zip code of principal executive offices)

Registrant's telephone number: (415) 765-2969

Securities registered pursuant to Section 12(b) of the Act:
Common Stock, $1 par value per share
(Title of each class)

New York Stock Exchange
(Name of each exchange on which registered)

Securities registered pursuant to Section 12(g) of the Act:
None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒  No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐  No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒  No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer" and "large accelerated filer" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☒      Accelerated filer ☐      Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐  No ☒

As of June 30, 2005, the aggregate market value of voting and non-voting common equity held by non-affiliates of the registrant was $3,744,112,701. The aggregate market value was computed by reference to the last sales price of such stock.

As of January 31, 2006, the number of shares outstanding of the registrant's Common Stock was 144,300,456.

## DOCUMENTS INCORPORATED BY REFERENCE

| Incorporated Document | Location in Form 10-K |
|---|---|
| Portions of the Proxy Statement for our April 26, 2006 Annual Meeting of Stockholders | Part III |

EXHIBIT A

PART I

## Item 1. Business

All reports that we file electronically with the Securities and Exchange Commission (SEC), including the Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, and current reports on Form 8-K, as well as any amendments to those reports, are accessible at no cost on our internet website at www.uboc.com as soon as reasonably practicable after we electronically file such reports with, or furnish them to, the SEC. These filings are also accessible on the SEC's website at www.sec.gov.

### General

UnionBanCal Corporation through its banking subsidiary, Union Bank of California, N.A., provides a wide range of financial services to consumers, small businesses, middle-market companies and major corporations, primarily in California, Oregon, and Washington, and nationally and internationally as well. In January 2006, The Bank of Tokyo-Mitsubishi, Ltd. and UFJ Bank Limited merged to form The Bank of Tokyo-Mitsubishi UFJ, Ltd. At December 31, 2005, The Bank of Tokyo-Mitsubishi UFJ, Ltd., our majority owner, which is a wholly-owned subsidiary of Mitsubishi UFJ Financial Group, Inc., formerly known as Mitsubishi Tokyo Financial Group, Inc., owned approximately 63 percent of our outstanding common stock.

### Banking Lines of Business

Our operations are divided into two primary segments, which are described more fully in "Business Segments" of our Management's Discussion and Analysis of Financial Condition and Results of Operations and in Note 26 to our Consolidated Financial Statements included in this Annual Report.

*The Community Banking and Investment Services Group.*   This group offers its customers a broad spectrum of financial products under one convenient umbrella. With a diverse line of checking and savings, investment, loan and fee-based banking products, individual and business clients can all have their specific needs met. These products are offered in 319 full-service branches, primarily in California, as well as in Oregon and Washington. In addition, the group offers international and settlement services, e-banking through our website, check cashing services at our Cash & Save® locations and loan and investment products tailored to our high net worth individual customers through our offices of The Private Bank. Institutional customers are offered employee benefit, 401(k) administration, corporate trust, securities lending and custody (global and domestic) services. The group also includes a registered broker-dealer and a registered investment advisor, which provide securities brokerage and investment advisory services and manage a proprietary mutual fund family. Our insurance services group offers our customers a variety of cost-effective risk management services and insurance products.

*The Commercial Financial Services Group.*   This group offers a variety of commercial financial services, including commercial loans and project financing, real estate financing, asset-based financing, trade finance and letters of credit, lease financing, customized cash management services and selected capital markets products. The group's customers include middle-market companies, large corporations, real estate companies and other more specialized industry customers. In addition, specialized depository services are offered to title and escrow companies, retailers, domestic financial institutions, bankruptcy trustees and other customers with significant deposit volumes.

In September 2005, we signed a definitive agreement to sell our international correspondent banking business to Wachovia Bank, N.A. The principal legal closing took place on October 6, 2005 with us receiving $245 million in cash from Wachovia. We will continue to operate the business over a transition period which is expected to extend into the second quarter of 2006, during which we expect the majority of our international correspondent bank customers will transfer to Wachovia.

**Employees**

At January 31, 2006, we had 10,410 full-time equivalent employees.

**Competition**

Banking is a highly competitive business. We compete actively for loan, deposit, and other financial services business in California, Oregon and Washington, as well as nationally and internationally. Our competitors include a large number of state and national banks, thrift institutions, credit unions, finance companies, mortgage banks and major foreign-affiliated or foreign banks, as well as many financial and nonfinancial firms that offer services similar to those offered by us, including many large securities firms. Some of our competitors are community or regional banks that have strong local market positions. Other competitors include large financial institutions that have substantial capital, technology and marketing resources, which are well in excess of ours. Such large financial institutions may have greater access to capital at a lower cost than us, which may adversely affect our ability to compete effectively.

Technology and other changes increasingly allow parties to complete financial transactions electronically, and in many cases, without banks. For example, consumers can pay bills and transfer funds over the internet and by telephone without banks. Many non-bank financial service providers have lower overhead costs and are subject to fewer regulatory constraints. If consumers do not use banks to complete their financial transactions, we could potentially lose fee income, deposits and income generated from those deposits.

Changes in federal law have made it easier for out-of-state banks to enter and compete in the states in which we operate. The Riegle-Neal Interstate Banking and Branching Efficiency Act of 1994 (the Riegle-Neal Act), among other things, eliminated substantially all state law barriers to the acquisition of banks by out-of-state bank holding companies. A bank holding company may acquire banks in states other than its home state, without regard to the permissibility of such acquisitions under state law, but subject to any state requirement that the acquired bank has been organized and operating for a minimum period of time (not to exceed five years), and the requirement that the acquiring bank holding company, prior to or following the proposed acquisition, controls no more than 10 percent of the total amount of deposits of the insured depository institutions in the United States and no more than 30 percent of such deposits in that state (or such lesser or greater amount as may be established by state law). The Riegle-Neal Act also permits banks to acquire branches located in another state by purchasing or merging with a bank chartered in that state or a national banking association having its headquarters located in that state.

Banks, securities firms, and insurance companies can now combine as a "financial holding company." Financial holding companies can offer virtually any type of financial service, including banking, securities underwriting, insurance (both agency and underwriting), and merchant banking. Many of our competitors have elected to become financial holding companies. Recently, a number of foreign banks have attained financial holding company status in the U.S., further increasing competition in the U.S. market. Under current regulatory interpretations, Mitsubishi UFJ Financial Group, Inc. would be required to attain financial holding company status in order for us to be able to become a financial holding company. Mitsubishi UFJ Financial Group, Inc. is not presently a financial holding company.

We believe that continued emphasis on enhanced services and distribution systems, an expanded customer base, increased productivity and strong credit quality, together with a substantial capital base, will position us to meet the challenges provided by this competition.

**Monetary Policy and Economic Conditions**

Our earnings and businesses are affected not only by general economic conditions (both domestic and international), but also by the monetary policies of various governmental regulatory authorities of the United States and foreign governments and international agencies. In particular, our earnings and growth

6

may be affected by actions of the Federal Reserve Board in connection with its implementation of national monetary policy through its open market operations in United States Government securities, control of the discount rate and establishment of reserve requirements against both member and non-member financial institutions' deposits. These actions have a significant effect on the overall growth and distribution of loans and leases, investments and deposits, as well as on the rates earned on securities, loans and leases or paid on deposits. It is difficult to predict future changes in monetary policies and their effect on our business.

**Supervision and Regulation**

*Overview.* Bank holding companies and banks are extensively regulated under both federal and state law. This regulation is intended primarily for the protection of depositors, the deposit insurance fund, and other clients of the institution, and not for the benefit of the investors of the bank holding company. Set forth below is a summary description of the material laws and regulations that relate to our operation and those of our subsidiaries, including Union Bank of California, N.A.

*Bank Holding Company Act.* We, Mitsubishi UFJ Financial Group, Inc. and The Bank of Tokyo-Mitsubishi UFJ, Ltd., are subject to regulation under the Bank Holding Company Act of 1956, as amended, (BHCA) which subjects us to Federal Reserve Board reporting and examination requirements. Generally, the BHCA restricts our ability to invest in non-banking entities, and we may not acquire more than 5 percent of the voting shares of any domestic bank without the prior approval of the Federal Reserve Board. Our activities are limited, with some exceptions, to banking, the business of managing or controlling banks, and other activities, which the Federal Reserve Board deems to be so closely related to banking as to be a proper incident thereto.

Under Federal Reserve Board regulations, a bank holding company is required to serve as a source of financial and managerial strength to its subsidiary banks and may not conduct its operations in an unsafe or unsound manner. Under this policy, the Federal Reserve Board may require a holding company to contribute additional capital to an undercapitalized subsidiary bank.

*Comptroller of the Currency.* Union Bank of California, N.A., as a national bank association, is subject to broad federal regulation and oversight extending to all its operations by the Office of the Comptroller of the Currency, its primary regulator, and also by the Federal Reserve Board and the Federal Deposit Insurance Corporation. As part of this authority, Union Bank of California, N.A., is required to file periodic reports with the Comptroller of the Currency and is subject to periodic examination by the Comptroller of the Currency.

The Comptroller of the Currency has extensive enforcement authority over all national banks. If, as a result of an examination of a bank, the Comptroller of the Currency determines that the financial condition, capital resources, asset quality, earnings prospects, management, liquidity, or other aspects of the bank's operations are unsatisfactory or that the bank or its management is violating or has violated any law or regulations, various remedies are available to the Comptroller of the Currency. These remedies include the power to enjoin "unsafe or unsound" practices, to require affirmative action to correct any conditions resulting from any violation or practice, to issue an administrative order that can be judicially enforced to direct an increase in capital, to restrict the growth of the bank, to assess civil monetary penalties, to remove officers and directors, and ultimately to terminate the bank's deposit insurance. The Comptroller of the Currency, as well as other federal agencies, have adopted regulations and guidelines establishing safety and soundness standards, including but not limited to such matters as loan underwriting and documentation, internal controls and audit systems, interest rate risk exposure, asset quality and earnings and compensation and other employee benefits.

*Other Regulatory Oversight.* Our subsidiaries are also subject to extensive regulation, supervision, and examination by various other federal and state regulatory agencies. In addition, Union Bank of California, N.A. and its subsidiaries are subject to certain restrictions under the Federal Reserve Act, including restrictions on affiliate transactions. As a holding company, the principal source of our cash has

been dividends and interest received from Union Bank of California, N.A. Dividends payable by Union Bank of California, N.A. to us are subject to restrictions under a formula imposed by the Office of the Comptroller of the Currency unless express approval is given to exceed these limitations. For more information regarding restrictions on loans and dividends by Union Bank of California, N.A. to its affiliates and on transactions with affiliates, see Notes 20 and 25 to our Consolidated Financial Statements included in this Annual Report.

The Federal Deposit Insurance Corporation Improvement Act of 1991 (FDICIA) requires federal bank regulatory authorities to take "prompt corrective action" in dealing with inadequately capitalized banks. FDICIA established five tiers of capital measurement ranging from "well-capitalized" to "critically undercapitalized." It is our policy to maintain capital ratios above the minimum regulatory requirements for "well-capitalized" institutions for both Union Bank of California, N.A. and us. Management believes that, at December 31, 2005, Union Bank of California, N.A. and we met the requirements for "well-capitalized" institutions.

The activities of Union Bank of California, N.A. subsidiaries, HighMark Capital Management, Inc. and UnionBanc Investment Services LLC are subject to the rules and regulations of the SEC, as well as those of state securities regulators. UnionBanc Investment Services LLC is also subject to the rules and regulations of the National Association of Securities Dealers (NASD).

UnionBanc Insurance Services, Inc., (formerly Armstrong/Robitaille, Inc., John Burnham & Company, and Tanner Insurance Brokers, Inc.) is an indirect subsidiary of Union Bank of California, N.A., and is subject to the rules and regulations of the California Department of Insurance, as well as insurance regulators of other states.

Deposits of Union Bank of California, N.A. are insured up to statutory limits by the Federal Deposit Insurance Corporation (FDIC) and, accordingly, are subjected to deposit insurance assessments to maintain the Bank Insurance Fund (BIF) and the Savings Association Insurance Fund (SAIF) administered by the FDIC. The Safe and Fair Deposit Insurance Act of 2005, signed into law on February 8, 2006, provides for the merger of the BIF and the SAIF into a single insurance fund called the Deposit Insurance Fund. Union Bank of California, N.A. currently pays no insurance assessments on these deposits under the FDIC's risk-related assessment system.

There are additional requirements and restrictions in the laws of the United States and the states of California, Oregon, and Washington, as well as other states in which Union Bank of California, N.A. and its subsidiaries may conduct operations. These include restrictions on the levels of lending and the nature and amount of investments, as well as activities as an underwriter of securities, the opening and closing of branches and the acquisition of other financial institutions. The consumer lending and finance activities of Union Bank of California, N.A. are also subject to extensive regulation under various Federal and state laws. These statutes impose requirements on the making, enforcement and collection of consumer loans and on the types of disclosures that need to be made in connection with such loans.

Union Bank of California, N.A. is also subject to the Community Reinvestment Act (CRA). The CRA generally requires the federal banking agencies to evaluate the record of a financial institution in meeting the needs of local communities, including low- and moderate-income neighborhoods. In addition to substantive penalties and corrective measures that may be required for a violation of certain fair lending laws, the federal banking agencies may take compliance with such laws and CRA into account when regulating and supervising other activities, and in evaluating whether to approve applications for permission to engage in new activities or for acquisitions of other banks or companies. An unsatisfactory rating may be the basis for denying the application. Based on the most current examination report dated March 31, 2001, Union Bank of California, N.A. was rated "satisfactory."

The remaining international activities of Union Bank of California, N.A. are subject to the laws and regulations of the jurisdiction where business is being conducted, which may change from time to time and

8

UFJ. Our ability to do so may be limited for various reasons, including The Bank of Tokyo-Mitsubishi UFJ's aggregate exposure and marketing policies.

Certain directors' and officers' ownership interests in Mitsubishi UFJ Financial Group's common stock or service as a director or officer or other employee of both us and The Bank of Tokyo-Mitsubishi UFJ could create or appear to create potential conflicts of interest, especially since both of us compete in U.S. banking markets.

*Restrictions on dividends and other distributions could limit amounts payable to us*

As a holding company, a substantial portion of our cash flow typically comes from dividends our bank and nonbank subsidiaries pay to us. Various statutory provisions restrict the amount of dividends our subsidiaries can pay to us without regulatory approval. In addition, if any of our subsidiaries were to liquidate, that subsidiary's creditors will be entitled to receive distributions from the assets of that subsidiary to satisfy their claims against it before we, as a holder of an equity interest in the subsidiary, will be entitled to receive any of the assets of the subsidiary.

*Our ability to make acquisitions is subject to regulatory constraints and risks associated with potential acquisitions or divestitures or restructurings may adversely affect us*

Our ability to obtain regulatory approval of acquisitions is subject to constraints related to the Bank Secrecy Act and the CRA, as described above in "Business—Supervision and Regulation" and below in "Management's Discussion and Analysis of Financial Condition and Results of Operations—Regulatory Matters." Subject to our ability to address successfully these regulatory concerns, we may seek to acquire or invest in financial and non-financial companies that complement our business. We may not be successful in completing any such acquisition or investment as this will depend on the availability of prospective target opportunities at valuation levels we find attractive and the competition for such opportunities from other parties. In addition, we continue to evaluate the performance of all of our businesses and business lines and may sell a business or business line. Any acquisitions, divestitures or restructurings may result in the issuance of potentially dilutive equity securities, significant write-offs, including those related to goodwill and other intangible assets, and/or the incurrence of debt, any of which could have a material adverse effect on our business, results of operations and financial condition. Acquisitions, divestitures or restructurings could involve numerous additional risks including difficulties in obtaining any required regulatory approvals and in the assimilation or separation of operations, services, products and personnel, the diversion of management's attention from other business concerns, higher than expected deposit attrition, divestitures required by regulatory authorities, the disruption of our business, the potential loss of key employees and unexpected contingent liabilities arising from any business we might acquire. We may not be successful in addressing these or any other significant risks encountered.

*Privacy restrictions could adversely affect our business*

Our business model relies, in part, upon cross-marketing the services offered by us and our subsidiaries to our customers. Laws that restrict our ability to share information about customers within our corporate organization could adversely affect our business, results of operations and financial condition.

*We rely on third parties for important products and services*

Third-party vendors provide key components of our business infrastructure such as internet connections, network access and mutual fund distribution and we do not control their actions. Any problems caused by these third parties, including as a result of their not providing us their services for any reason or their performing their services poorly, could adversely affect our ability to deliver products and

15

services to our customers and otherwise to conduct our business. Replacing these third-party vendors could also entail significant delay and expense.

*Our business could suffer if we fail to attract and retain skilled personnel*

Our success depends, in large part, on our ability to attract and retain key personnel, including executives. Any of our current employees, including our senior management, may terminate their employment with us at any time. Competition for qualified personnel in our industry can be intense. We may not be successful in attracting and retaining sufficient qualified personnel. We may also incur increased expenses and be required to divert the attention of other senior executives to recruit replacements for the loss of any key personnel.

*Significant legal actions could subject us to substantial uninsured liabilities*

We are from time to time subject to claims related to our operations. These claims and legal actions, including supervisory or enforcement actions by our regulators, could involve large monetary claims and significant defense costs. To protect ourselves from the cost of these claims, we maintain insurance coverage in amounts and with deductibles that we believe are appropriate for our operations. However, our insurance coverage may not cover all claims against us or continue to be available to us at a reasonable cost. As a result, we may be exposed to substantial uninsured liabilities, which could adversely affect our business, prospects, results of operations and financial condition.

*Changes in our tax rates could affect our future results*

The State of California requires us to file our franchise tax returns as a member of a unitary group that includes Mitsubishi UFJ Financial Group and either all worldwide affiliates or only U.S. affiliates. Our future effective tax rates could be favorably or unfavorably affected by increases or decreases in Mitsubishi UFJ Financial Group's taxable profits, which in turn are affected by changes in the worldwide economy, especially in Japan, and decisions that they may make about the timing of the recognition of credit losses or other matters. Our effective tax rates could also be affected by changes in the valuation of our deferred tax assets and liabilities, changes in tax laws or their interpretation, or by the outcomes of examinations of our income tax returns by the Internal Revenue Service and other tax authorities.

## Item 1B.   Unresolved Staff Comments

None.

## Item 2.   Properties

At December 31, 2005, we operated 315 full service branches in California, 4 full service branches in Oregon and Washington, and 20 international offices, which will be closed during 2006. We own the property occupied by 104 of the domestic offices and lease the remaining properties for periods of five to twenty years.

We own two administrative facilities in San Francisco, two in Los Angeles, and three in San Diego. Other administrative offices in Arizona, California, Illinois, Nevada, New York, Oregon, Virginia, Texas and Washington operate under leases expiring in one to twenty-six years.

Rental expense for branches and administrative premises is described in Note 6 to our Consolidated Financial Statements included in this Annual Report.

*This report includes forward looking statements, which include forecasts of our financial results and condition, expectations for our operations and business, and our assumptions for those forecasts and expectations. Do not rely unduly on forward-looking statements. Actual results might differ significantly from our forecasts and expectations. Please refer to Part I Item 1A "Risk Factors" for a discussion of some factors that may cause results to differ.*

You should read the following discussion and analysis of our consolidated financial position and results of our operations for the years ended December 31, 2003, 2004 and 2005 together with our Consolidated Financial Statements and the Notes to Consolidated Financial Statements included in this Annual Report. Averages, as presented in the following tables, are substantially all based upon daily average balances.

## Introduction

We are a California-based, commercial bank holding company with consolidated assets of $49.4 billion at December 31, 2005. At December 31, 2005, The Bank of Tokyo-Mitsubishi UFJ our majority owner, owned approximately 63 percent of our outstanding common stock.

## Executive Overview

We are providing you with an overview of what we believe are the most significant factors and developments that impacted our 2005 results and that could impact our future results. We ask that you carefully read the rest of this document for more detailed information that will complete your understanding of trends, events and uncertainties that impact us.

We experienced strong growth in loans and deposits during 2005. Average loans grew by $5.4 billion with a balanced portfolio mix while average core deposits grew by over $3.5 billion. Core deposits are noninterest and interest bearing deposits, excluding large time deposits. During 2005, we were one of the very few large banks to expand our net interest margin which increased by 14 basis points for the full year. Our deposit gathering and the resultant net interest margin are hallmarks of our franchise. While deposit-gathering were challenges for most banks, we maintained our high level of average deposit balances throughout 2005.

Throughout 2005, our overall credit quality continued its improving trend, which allowed us to reverse $47 million of our provision for credit losses (provision for loan and off-balance sheet commitment losses combined) even while average loans grew 21 percent over December 31, 2004. Our nonaccrual loans total $59 million compared to $143 million at December 31, 2004. Loan payoffs and charge-offs, loans sales, the resumption to accrual status and a decline in new inflows contributed to the decline in nonaccrual loans.

For the year ended December 31, 2005, our net interest income rose 13 percent compared to the year ended December 31, 2004. Our net interest income growth reflects the impact of higher interest rates and increased average loan balances primarily from strong loan demand and the Jackson Federal Bank acquisition in October 2004 and a substantial increase in deposits, offset by lower income from our derivative hedges. During 2005, we sold $1.5 billion in agency securities with an average yield of 2.66 percent in order to rebalance our securities portfolio. We are reinvesting $1 billion of the proceeds into AAA-rated non-agency mortgage-backed securities, which was completed in February 2006. This action and gradual increases in interest rates coupled with anticipated growth in our commercial loan portfolio should continue to positively impact our net interest income in 2006.

Noninterest income declined in 2005 compared with 2004. Excluding the $102 million in gains related to the sale of our merchant card portfolio and a building in 2004, our noninterest income declined by $6 million as a result of lower service charges on our deposit accounts, card processing fees and a $50 million loss on sales of securities available for sale offset by increases in trust and investment management fees and merchant banking fees.