Cause No.: 2:06-CV-72 DF

DataTreasury Corporation

v.

Wells Fargo & Company, et al.

# Transcript of the Testimony of
# **David Anderson**

February 7, 2007

By: Lisa Gretarsson, CSR

Gretchen Shore Court Reporting & Litigation Support
Phone:(903) 758-2183
Fax:(903) 758-4890
Email:gretchenshore@gretchenshore.com
Internet: www.gretchenshore.com

Dockets.Justia.com

David Anderson            CONFIDENTIAL
February 7, 2007 FOR ATTORNEYS' EYES ONLY

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

DATATREASURY CORPORATION,   )(
                            )(
        Plaintiff,          )(
                            )(
VS                          )(      CIVIL ACTION NO.
                            )(      2:06-CV-72 (DF)
WELLS FARGO & COMPANY,      )(
et al.,                     )(
                            )(
        Defendants.         )(


VIDEOTAPED ORAL DEPOSITION OF DAVID ANDERSON

FEBRUARY 7, 2007


        VIDEOTAPED ORAL DEPOSITION OF DAVID ANDERSON,

produced as a witness at the instance of the Plaintiff,

and duly sworn, was taken in the above-styled and

above-numbered cause on the 7th day of February, 2007,

from 9:21 a.m. to 4:27 p.m., before Lisa J. Gretarsson,

CSR in and for the state of Texas, reported by machine

shorthand, at the offices of Pillsbury, Winthrop, Shaw,

Pittman, LLP, 50 Fremont, Suite 400, located in the city

of San Francisco, state of California, pursuant to the

Federal Rules of Civil Procedure and the provisions

stated on the record.

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson                CONFIDENTIAL
February 7, 2007 FOR ATTORNEYS' EYES ONLY

---

Page 2

```
 1         A P P E A R A N C E S
 2
 3  FOR THE PLAINTIFF:
 4    Mr. R. Benjamin King, Esq.
       NIX PATTERSON & ROACH, L.L.P.
 5     2900 St. Michael Drive, Suite 500
       Texarkana, Texas  75503
 6     Telephone:  903-223-3999
       Facsimile:  902-223-8520
 7     E-mail:  benking@nixlawfirm.com
 8  FOR THE DEFENDANT, UNIONBANCAL CORP.
 9    Mr. Raymond L. Sweigart, Esq.
      Mr. Brian Harris, Esq.
10    PILLSBURY, WINTHROP, SHAW, PITTMAN LLP
      1650 Tysons Boulevard
11    McLean, Virginia  22102
      Telephone:  703-770-7900
12    Facsimile:  703-770-7901
      E-mail:  raymond.sweigart@pillsburylaw.com
13
14  ALSO PRESENT:
15    Mr. Steve Ballot, Video Technician
16    Ms. Cheryl Toles, Document Technician
    LIVENOTE TRANSCRIPT AND/OR VIDEO STREAM:
17    Karl Rupp
      Michael Speed
18    Nita Hanson
      David Tatem
19    Kellie Goolsby
      John Hiles
20    CiCi Williams
      Ben King
21    George Shipley
      Moni King
22    Dalton Young
      Kelli Hearne
23    Ed Hohn
      Don Mullineau
24    Anthony Bruster
      Nick Nicholas
25
```

---

Page 4

```
 1         E X H I B I T S
 2
    NUMBER               MARKED
 3
100  Document entitled UnionBanCal Corporation
 4    Union Bank of California, N.A. Board
      of Directors as of July 26, 2006
 5    (Bates stamped UBC-JURIS-0000009)............  43
 6  101  UnionBanCal Proxy Statement
      (not Bates stamped)........................  70
 7
    102  Union Bank of California website printout
 8    listing officers and directors
      (not Bates stamped)........................ 150
 9
    103  Union Bank of California website printout
10    listing corporate profile
      (not Bates stamped)........................ 150
11
    104  UnionBanCal Corporation Form 10-K
12    (not Bates stamped)........................ 153
13  105  UnionBanCal Corporation 2005 Annual Report
      (not Bates stamped)........................ 158
14
    106  Affidavit of David A. Anderson In Support
15    of Defendant UnionBanCal Corporation's
      Motion to Dismiss
16    (not Bates stamped)........................ 188
17  107  UnionBanCal Corporation Form 4
      (not Bates stamped)........................ 197
18
19       (exhibit index concluded)
20
21
22
23
24
25
```

---

Page 3

```
 1         I N D E X
 2                    PAGE
 3  Appearances..........................   2
 4  WITNESS:  DAVID ANDERSON
 5    Examination by Mr. King...............   5
 6  Corrigendum Page.................... 201
    Reporter's Certificate.............. 203
 7
 8
 9  REPORTER'S NOTE:  Transcript sent to Raymond L. Sweigart
10  for witness review and signature, to be returned in 30
11  days.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 5

```
10:37  1         P R O C E E D I N G S
09:21  2         THE VIDEOGRAPHER:  Good morning.  Today
09:21  3  is February 7th, 2007.  We're on the record at 9:21 to
09:21  4  take the videotaped deposition of David Anderson.
09:21  5         DAVID ANDERSON,
09:21  6  having been first duly sworn, testified as follows, to
09:21  7  wit:
09:21  8         EXAMINATION
09:21  9  BY MR. KING:
09:21 10    Q.  Good morning, Mr. Anderson.  My name is Ben
09:21 11  King.  I'm an attorney with Nix, Patterson & Roach, in
09:21 12  Texarkana, Texas, and I represent the DataTreasury
09:21 13  Corporation in a lawsuit that's been brought in the
09:21 14  Eastern District of Texas.  Do you understand that?
09:21 15    A.  Yes.
09:21 16    Q.  Okay.  If you could real quick for the record,
09:21 17  could you please state your full name and your home and
09:21 18  work address, please.
09:22 19    A.  Yes.  It's David Allen Anderson, 20201
09:22 20  Kilbride Drive, Saratoga, California 95070.  Business
09:22 21  address, 400 California Street, San Francisco,
09:22 22  California 94107, I think, on the ZIP code, nothing
09:22 23  else.  The rest was accurate.
09:22 24    Q.  Thank you very much.
09:22 25         Mr. Anderson, have you ever given a
```

2 (Pages 2 to 5)

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson                  CONFIDENTIAL
February 7, 2007FOR ATTORNEYS' EYES ONLY

Page 6

09:22 1  deposition before?
09:22 2      A. Yes, I have.
09:22 3      Q. When did you -- when have you previously given
09:22 4  a deposition?
09:22 5      A. 1992.
09:22 6      Q. And do you recall why you were giving a
09:22 7  deposition in that matter?
09:22 8      A. Yes. It was a lawsuit filed -- boy, one of
09:23 9  the public accounting firms against a predecessor
09:23 10  company of UnionBanCal Corporation relative to a tax
09:23 11  dispute.
09:23 12      Q. And in that deposition, were you testifying on
09:23 13  behalf of the predecessor of UnionBanCal Corporation?
09:23 14      A. Yes, I was.
09:23 15      Q. Okay. Do you know if you were testifying as a
09:23 16  30(b)(6) witness in that deposition?
09:23 17      A. I have no idea.
09:23 18      Q. Okay. Have you given any deposition since
09:23 19  that 1992 deposition?
09:23 20      A. I do not believe so.
09:23 21      Q. Okay. Well, just to go over a couple of quick
09:23 22  things, so far you're doing a fantastic job, but just so
09:23 23  our discussion can proceed in an orderly fashion today,
09:23 24  I'm going to be asking a series of questions, and when I
09:23 25  ask a question I would appreciate it, and so would the

Page 7

09:23 1  lovely lady over here typing down everything we say, if
09:24 2  you'd wait until I finish asking the question before you
09:24 3  begin to answer the question.
09:24 4      A. Okay.
09:24 5      Q. And, in turn, I will try to allow you to make
09:24 6  a conscious effort to allow you to finish answering the
09:24 7  question before I jump in and ask another question.
09:24 8          Also, if you can please answer verbally,
09:24 9  as opposed to nodding or shaking your head, that
09:24 10  would -- that would help the record out to be clear as
09:24 11  to what the answer was. If you can do that for us, we'd
09:24 12  appreciate it.
09:24 13      A. Certainly.
09:24 14      Q. And if also -- I don't know why I have a
09:24 15  horrible problem with this, but if we can avoid
09:24 16  answering with "uh-huhs" and "huh-uhs" and instead use
09:24 17  "yes" or "no" when answering a question that would also
09:24 18  help us out a good bit. Does that sound fair?
09:24 19      A. I understand.
09:24 20      Q. What is your current job title, Mr. Anderson?
09:24 21      A. I'm executive vice president and controller of
09:24 22  UnionBanCal Corporation.
09:25 23      Q. Do you hold any position with Union Bank of
09:25 24  California?
09:25 25      A. Yes, I do.

Page 8

09:25 1      Q. And what position do you hold with Union Bank
09:25 2  of California?
09:25 3      A. Executive vice president and controller.
09:25 4      Q. Do you hold the same position with both
09:25 5  UnionBanCal and Union Bank of California? That's --
09:25 6  that's correct?
09:25 7      A. I'm an officer of both companies.
09:25 8      Q. Okay. When did you start -- when did you
09:25 9  start working for UnionBanCal?
09:25 10      A. September of 1997.
09:25 11      Q. And when did you --
09:25 12      A. Let me -- if you would, let me clarify. I am
09:26 13  an officer of UnionBanCal.
09:26 14      Q. Okay.
09:26 15      A. I'm an employee of Union Bank of California.
09:26 16  So I started as an employee with Union Bank of
09:26 17  California in September of 1997. I was appointed as an
09:26 18  officer of UnionBanCal Corporation at the same date.
09:26 19      Q. So your employment as executive vice president
09:26 20  and controller of Union Bank of California in September
09:26 21  of 1997 occurred simultaneously with your appointment as
09:26 22  an officer, being the executive vice president and
09:26 23  controller of UnionBanCal.
09:26 24      A. I had a previous title of, when I first
09:26 25  started with Union Bank, of a vice president.

Page 9

09:26 1      Q. And what was -- what was your role prior to
09:26 2  September of '97 as a vice president?
09:27 3      A. I was not employed by Union Bank prior to
09:27 4  1997.
09:27 5      Q. Okay. Were you an officer in your vice
09:27 6  president role?
09:27 7      A. I was made an officer of UnionBanCal some
09:27 8  months after joining Union Bank as an employee.
09:27 9      Q. Okay. I'm sorry. Maybe I misunderstood your
09:27 10  question [sic]. You began your employment with Union
09:27 11  Bank of California in September of 1997, correct?
09:27 12      A. Yes.
09:27 13      Q. But at that time you held a different title.
09:27 14      A. Right. I was hired as a vice president.
09:27 15      Q. Okay. I'm sorry. I was confused about your
09:27 16  answer.
09:27 17          And when you were hired as a vice
09:27 18  president, what were your -- what role did you perform
09:27 19  as vice president at that time?
09:28 20      A. I was hired as the vice president and
09:28 21  controller, typical controllership responsibilities.
09:28 22      Q. As a controller, what are some of your typical
09:28 23  controllership responsibilities?
09:28 24          MR. SWEIGART: Object to the form.
09:28 25      Q. (BY MR. KING) You may answer.

3 (Pages 6 to 9)

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson                CONFIDENTIAL
February 7, 2007FOR ATTORNEYS' EYES ONLY

Page 10

09:28  1       A.  Relative to UnionBanCal?  Would you please
09:28  2   clarify which company --
09:28  3       Q.  Well --
09:28  4       A.  -- you're talking about?
09:28  5       Q.  As controller of Union Bank of California,
09:28  6   what are, as you defined them, controllership
09:28  7   responsibilities?
09:28  8       A.  Keeping the books and records of the
09:28  9   organization, financial records.
09:29 10       Q.  And as the controller of UnionBanCal, what are
09:29 11   your controllership responsibilities?
09:29 12       A.  Keeping the financial books and records of the
09:29 13   UnionBanCal Corporation.
09:29 14       Q.  And how does -- how does your position as an
09:29 15   officer and controller of UnionBanCal Corporation differ
09:29 16   from your role as controller of Union Bank of
09:29 17   California?
09:29 18       A.  Relative to UnionBanCal Corporation, keeping
09:29 19   the books and records of a -- of a company where the
09:29 20   scope of -- given its scope of operations other than the
09:30 21   amount of activity, the -- the function would be
09:30 22   basically the same.
09:30 23       Q.  How did you come to work for Union Bank of
09:30 24   California in September of '97?
09:30 25       A.  Applied for the job and was hired.

Page 11

09:30  1       Q.  Where had you worked prior to that?
09:30  2       A.  Going backwards in -- in time, it was a
09:30  3   savings and loan, Southern Pacific Savings & Loan, for
09:30  4   about four months prior to that time.  Prior to that, it
09:30  5   was a company called Fresh Choice Public Restaurant
09:31  6   Company for three years.  Would you like me to keep on
09:31  7   going back?
09:31  8       Q.  Well, let me -- let me stop you there.
09:31  9           In your position with Southern Pacific --
09:31 10   is that correct?
09:31 11       A.  Yes.
09:31 12       Q.  -- what role did you have?
09:31 13       A.  I was executive vice president and controller.
09:31 14       Q.  Okay.  And was Southern Pacific Savings & Loan
09:31 15   an operating entity?
09:31 16       A.  Yes, it was.
09:31 17       Q.  Did it have any parent corporations that
09:31 18   you're aware of?
09:31 19       A.  Yes, it did.
09:32 20       Q.  And what was its parent corporation?
09:32 21       A.  Imperial Credit Industries, Inc.
09:31 22       Q.  Did you serve in any capacity?
09:31 23       A.  No.
09:31 24       Q.  And with -- the other company you named was
09:31 25   Fresh Choice Public Restaurants Company?

Page 12

09:32  1       A.  Yes.
09:32  2       Q.  And what position did you hold with Fresh
09:32  3   Choice?
09:32  4       A.  Chief financial officer.
09:32  5       Q.  Did you interview for the job when you applied
09:32  6   with Union Bank of California?
09:32  7       A.  Yes.
09:32  8       Q.  Do you recall who you interviewed with?
09:32  9       A.  Yes, I do.
09:32 10       Q.  And who was that?
09:32 11       A.  David Matson.
09:32 12       Q.  And what was David Matson's role?
09:32 13       A.  Chief financial officer.
09:32 14       Q.  And was Mr. Matson -- who was Mr. Matson
09:32 15   chief -- what entity was Mr. Matson the chief financial
09:32 16   officer of at that time?
09:32 17       A.  Union Bank of California as an officer and
09:32 18   employee and an officer -- chief financial officer of --
09:33 19   as an officer of UnionBanCal Corporation.
09:33 20       Q.  Did you interview with anybody else at that
09:33 21   time?
09:33 22       A.  Paul Fear.  I'm not sure of his title, but
09:33 23   director of human resources.
09:33 24       Q.  Do you know what entity Mr. Fear was the
09:33 25   director of human resources for?

Page 13

09:33  1       A.  He was an employee of Union Bank, an officer
09:33  2   of Union Bank, and an officer of UnionBanCal
09:33  3   Corporation.
09:33  4       Q.  Did you interview with anybody else?
09:33  5       A.  Yes, I did.
09:33  6       Q.  Who else did you interview with?
09:33  7       A.  Mr. Moriguchi.
09:33  8       Q.  Moriguchi?
09:33  9       A.  Yes.  Would you like me to spell that?
09:34 10       Q.  If you can, please.
09:34 11       A.  M-o-r-i-g-u-c-h-i.
09:34 12       Q.  The spelling is lot more important to our
09:34 13   court reporter than it is to me, but thank you very
09:34 14   much.
09:34 15           And what role did Mr. Moriguchi have?
09:34 16   What was his position?
09:34 17       A.  His position with the bank was president and
09:34 18   CEO of Union Bank of California.
09:34 19       Q.  Did he hold any positions with UnionBanCal?
09:34 20       A.  Yes, I believe he did, president and -- and
09:34 21   CEO of UnionBanCal Corporation, and director, I'm sorry
09:34 22   director also of UnionBanCal Corporation.
09:34 23       Q.  Other than Mr. Matson, Mr. Fear and
09:34 24   Mr. Moriguchi, did you interview with anybody else?
09:35 25       A.  No.

4 (Pages 10 to 13)

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson             CONFIDENTIAL
February 7, 2007 FOR ATTORNEYS' EYES ONLY

Page 14

09:35  1      Q.  How was it that you, at that time, also became
09:35  2  appointed as an officer of UnionBanCal?
09:35  3      A.  As part of my -- my job responsibilities was
09:35  4  to administer the books, the financial records of
09:35  5  UnionBanCal Corporation as an employee of Union Bank of
09:35  6  California.
09:35  7      Q.  How were your responsibilities described to
09:36  8  you when you were hired as an employee of Union Bank of
09:36  9  California and appointed as an officer of UnionBanCal
09:36  10 Corporation in September of '97?  And let me --
09:36  11     A.  Can -- can you -- that's an awfully broad
09:36  12 question to -- could you be more specific in your
09:36  13 question?
09:36  14     Q.  Like, I can try.
09:36  15         When you were hired as executive vice
09:36  16 president and controller of Union Bank of California and
09:37  17 appointed as executive vice president and controller of
09:37  18 UnionBanCal in 1997, did Mr. Matson, Mr. Fear or
09:37  19 Mr. Moriguchi describe to you what your responsibilities
09:37  20 as controller would be at that time?
09:37  21     A.  In very broad terms, Mr. Matson did.
09:37  22     Q.  Okay.  And do you recall how Mr. Matson
09:37  23 described that to you?
09:37  24     A.  Certainly, I do.
09:37  25     Q.  And how did he describe that to you?

Page 15

09:37  1      A.  He described the departments that I would be
09:37  2  in charge of and the general roles and responsibilities
09:37  3  that would go to administer those departments.
09:38  4      Q.  And at that time what departments did
09:38  5  Mr. Matson indicate that you would be in charge of?
09:38  6      A.  Controller's department, accounts payable and
09:38  7  payroll department.
09:38  8      Q.  And what entity were those departments of?
09:38  9  Were those -- let me rephrase that.  Were those
09:38  10 departments of UnionBanCal or Union Bank of California?
09:38  11     A.  Union Bank.
09:38  12     Q.  Okay.  Is there a controller's department of
09:38  13 UnionBanCal?
09:38  14     A.  No.
09:38  15     Q.  Is there an accounts payable department of
09:38  16 UnionBanCal?
09:39  17     A.  No.
09:39  18     Q.  Is there a payroll department of UnionBanCal?
09:39  19     A.  No.  UnionBanCal has no employees.
09:39  20     Q.  You also indicated that Mr. Matson -- you'd
09:39  21 also indicated that Mr. Matson stated that your general
09:39  22 roles and responsibility would be to administer those
09:39  23 departments.  What were your general roles and
09:39  24 responsibilities, as Mr. Matson laid them out, in
09:39  25 regards to administering the controller's department?

Page 16

09:39  1      A.  Administer the staff of the -- of the
09:39  2  department, prepare the internal and external financial
09:39  3  statements, make sure people get paid on time and
09:40  4  accurately and vendors get paid accurately and on time.
09:40  5      Q.  Any other roles and responsibilities to
09:40  6  administer the controller's department that you recall?
09:40  7      A.  In a -- in a broad sense, I think that that
09:40  8  covers it.
09:40  9      Q.  In the accounts payable department or with
09:40  10 regards to the accounts payable department, what were
09:40  11 your general roles and responsibilities to administer it
09:40  12 as laid out by Mr. Matson?
09:40  13     A.  Pay vendors on time and accurately.
09:41  14     Q.  Anything else?
09:41  15     A.  In a general sense, I think that that covers
09:41  16 the responsibilities.
09:41  17     Q.  In regards to your roles and responsibilities
09:41  18 in administering the payroll department, what were those
09:41  19 roles and responsibilities as Mr. Matson laid them out
09:41  20 to you?
09:41  21     A.  Pay employees on time and accurately.
09:41  22     Q.  Anything else?
09:41  23     A.  No.  I think that -- that covers the -- the
09:41  24 broad responsibilities of that position.
09:42  25     Q.  Who do you report to, Mr. Anderson?

Page 17

09:42  1      A.  I report to David Matson.
09:42  2      Q.  And what role does Mr. Matson currently have
09:42  3  with Union Bank of California?
09:42  4      A.  Chief financial officer.
09:42  5      Q.  And does Mr. Matson continue to hold the role
09:42  6  of chief financial officer for UnionBanCal?
09:42  7      A.  He currently does, yes.
09:42  8      Q.  So in your role as EVP and controller for both
09:42  9  Union Bank of California and UnionBanCal, you report to
09:42  10 Mr. Matson, who serves as chief financial officer for
09:42  11 those two entities as well.
09:42  12     A.  As an employee, I report to David Matson as
09:42  13 chief financial officer of Union Bank.  I'm an officer
09:42  14 of the holding company, UnionBanCal, and he is an
09:42  15 officer of the -- of the holding company.
09:43  16     Q.  And in your respective roles as an employee of
09:43  17 Union Bank of California and an officer of UnionBanCal,
09:43  18 you report to Mr. Matson in his similar roles as chief
09:43  19 financial officer of those two entities, correct?
09:43  20     A.  I do.
09:43  21     Q.  Okay.  And Mr. Matson, is this the same
09:43  22 Mr. Matson that hired you in September of 1997?
09:43  23     A.  Yes.
09:43  24     Q.  Who reports to you, Mr. Anderson?  Let me stop
09:43  25 before you -- before you answer that question.  Is there

5 (Pages 14 to 17)

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson            CONFIDENTIAL
February 7, 2007 FOR ATTORNEYS' EYES ONLY

**Page 18**

```
09:43   1    anybody else, other than Mr. Matson, that you report to?
09:43   2        A.  No.
09:43   3        Q.  Who reports to you as the executive vice
09:43   4    president and controller of Union Bank of California?
09:44   5        A.  I have four direct reports.
09:44   6        Q.  And who are they?
09:44   7        A.  Would you like them by name or by position?
09:44   8        Q.  Both, please.
09:44   9        A.  Jackie Bean, she's a senior vice president of
09:44  10    -- and employee of Union Bank; David Hanson, senior vice
09:44  11    president and employee of Union Bank; Barbara Cosner,
09:44  12    senior vice president and employee of Union Bank;
09:44  13    Charles Haegel, H-a-e-g-e-l, senior vice president and
09:45  14    employee of Union Bank.
09:45  15        Q.  And as a senior vice president and employee of
09:45  16    Union Bank of California, what does Ms. Bean do?  What
09:45  17    are her job duties?
09:45  18        A.  Relative to their -- that person's job
09:45  19    function at the bank, they're in charge of or in the
09:45  20    preparation of financial statements.
09:45  21        Q.  Do all four of these individuals that report
09:45  22    to you, Ms. Bean, Mr. Haegel, Ms. Cosner and -- is that
09:46  23    Mr. Hanson?
09:46  24        A.  Haegel.  Well, there was a Hanson there.
09:46  25        Q.  Okay.
```

**Page 19**

```
09:46   1        A.  There's a Hanson and a Haegel.
09:46   2        Q.  Okay.  Well, these four individuals that
09:46   3    report to you, that you mentioned earlier, do they all
09:46   4    have the same role within Union Bank of California and
09:46   5    the same job duties?
09:46   6        A.  I think you -- you asked me relative to the
09:46   7    people that reported to me at Union Bank, and then
09:46   8    you've asked me do they have the same role in Union
09:46   9    Bank.  Each one have the same role?
09:46  10        Q.  Yes.
09:46  11        A.  No.  They're different functions.
09:46  12        Q.  Okay.  And what -- what specific functions
09:46  13    does Ms. Bean perform?
09:46  14        A.  I think you asked me that question.
09:46  15        Q.  Okay.  And she performs ...
09:46  16        A.  Preparation of financial statements.
09:46  17        Q.  Okay.  Thank you very much.
09:47  18            How about Mr. Hanson?
09:47  19        A.  In charge of general accounting.
09:47  20        Q.  Ms. Cosner?
09:47  21        A.  In charge of the tax department.
09:47  22        Q.  And what is Mr. -- what are Mr. Haegel's
09:47  23    duties?
09:47  24        A.  Financial systems.
09:47  25        Q.  What are financial systems?  Can you --
```

**Page 20**

```
09:47   1        A.  Operating the general ledger.
09:47   2        Q.  Okay.
09:47   3        A.  System interfaces.
09:47   4        Q.  In your role as executive vice president,
09:47   5    controller of UnionBanCal, does anyone report to you?
09:48   6        A.  No.
09:48   7        Q.  Does the term commercial financial services
09:48   8    have any particular meaning to you in your role as
09:48   9    executive vice president or controller of either
09:48  10    UnionBanCal or Union Bank of California?
09:48  11        A.  Relative to UnionBanCal, it does not have any
09:48  12    relevance to -- to that position.
09:48  13        Q.  How about with regards to Union Bank of
09:48  14    California?
09:49  15        A.  I believe in the public documents that it is a
09:49  16    division within Union Bank.
09:49  17        Q.  And do you know what activities that division
09:49  18    comprises?
09:49  19        A.  In my role as a -- as an officer of
09:49  20    UnionBanCal Corporation, no, I'm not familiar with that.
09:49  21        Q.  How about as your role as an employee of Union
09:49  22    Bank of California?
09:49  23        A.  I'm somewhat familiar with the operations.
09:49  24        Q.  And can you tell me what those operations
09:49  25    comprise?
```

**Page 21**

```
09:49   1        A.  Commercial services.
09:49   2        Q.  And what are examples of commercial services?
09:49   3        A.  Servicing customers.
09:49   4        Q.  How?
09:49   5        A.  Loans and deposits.
09:50   6        Q.  And these would be loans and deposits to
09:50   7    commercial entities?  Would that be correct?
09:50   8        A.  In my role as an officer of UnionBanCal, I'm
09:50   9    not familiar with the specifics.
09:50  10        Q.  In your role as an employee of Union Bank of
09:50  11    California, would this be loans and deposits to
09:50  12    commercial entities, to the best of your understanding?
09:50  13        A.  To the best of my understanding.
09:50  14        Q.  Does the term "commercial banking" have any
09:50  15    relevance to you in your role as either an officer of
09:50  16    UnionBanCal or an employee of Union Bank of California?
09:50  17        A.  There are no commercial banking services of
09:51  18    UnionBanCal Corporation.
09:51  19        Q.  Does commercial banking have any meaning to
09:51  20    you as an employee of Union Bank of California?
09:51  21        A.  Certainly.
09:51  22        Q.  And what is your understanding of commercial
09:51  23    banking as an employee of Union Bank of California?
09:51  24        A.  Making loans and -- and servicing deposits.
09:51  25        Q.  In your role as an employee of Union Bank of
```

6 (Pages 18 to 21)

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson                CONFIDENTIAL
February 7, 2007 FOR ATTORNEYS' EYES ONLY

---

**Page 22**

| | | |
|---|---|---|
| 09:51 | 1 | California, to the best of your understanding is that |
| 09:51 | 2 | similar to commercial financial services, that we just |
| 09:51 | 3 | talked about, or is there a difference? |
| 09:51 | 4 | A. I think it's fairly similar to that. |
| 09:51 | 5 | Q. Can you think of any differences, as you sit |
| 09:51 | 6 | here today? |
| 09:52 | 7 | A. Could you repeat the question? |
| 09:52 | 8 | Q. Are there any differences between the |
| 09:52 | 9 | functions of commercial financial services group and the |
| 09:52 | 10 | commercial banking group of Union Bank of California? |
| 09:52 | 11 | A. I don't think there's any differences |
| 09:52 | 12 | between -- between that. I -- I think one is -- is a |
| 09:52 | 13 | segment of that major division. |
| 09:52 | 14 | Q. Would you consider commercial financial |
| 09:52 | 15 | services to be a banking activity? |
| 09:52 | 16 | A. Yes. |
| 09:52 | 17 | Q. Would you consider commercial banking to be a |
| 09:52 | 18 | banking activity? |
| 09:52 | 19 | A. Yes. |
| 09:53 | 20 | Q. Does the term "operations" have any relevant |
| 09:53 | 21 | meaning to you as an officer of UnionBanCal or an |
| 09:53 | 22 | employee of Union Bank of California? |
| 09:53 | 23 | A. Relative to UnionBanCal, UnionBanCal has no |
| 09:53 | 24 | operations. Let me clarify that, has no products and |
| 09:53 | 25 | services, obviously has operations. |

**Page 23**

| | | |
|---|---|---|
| 09:54 | 1 | Q. In your role as an employee of Union Bank of |
| 09:54 | 2 | California, does the term "operations" have any relevant |
| 09:54 | 3 | meaning to you? |
| 09:54 | 4 | A. Of course. |
| 09:54 | 5 | Q. And in what way does that have a relevant |
| 09:54 | 6 | meaning to you? |
| 09:54 | 7 | A. It's overly broad a question of operations. |
| 09:54 | 8 | Could you clarify that for me? |
| 09:54 | 9 | Q. What type of operations is Union Bank of |
| 09:54 | 10 | California involved in? |
| 09:54 | 11 | A. Commercial banking. |
| 09:54 | 12 | Q. Anything else? |
| 09:54 | 13 | A. As broadly defined, that's -- |
| 09:54 | 14 | Q. Would personal bank accounts be contained |
| 09:54 | 15 | within your understanding of commercial banking as you |
| 09:54 | 16 | just -- |
| 09:54 | 17 | A. Sure. |
| 09:54 | 18 | Q. -- defined it? |
| 09:54 | 19 | A. Yes. |
| 09:55 | 20 | Q. Would this include making loans to individuals |
| 09:55 | 21 | or entities? |
| 09:55 | 22 | A. Yes. |
| 09:55 | 23 | Q. Would it include servicing those loans that |
| 09:55 | 24 | were made to individuals or entities? |
| 09:55 | 25 | A. Yes. |

**Page 24**

| | | |
|---|---|---|
| 09:55 | 1 | Q. Would it include providing savings accounts to |
| 09:55 | 2 | individuals or entities? |
| 09:55 | 3 | A. Yes. |
| 09:55 | 4 | Q. Would you consider those things to be banking |
| 09:55 | 5 | activities? |
| 09:55 | 6 | A. Yes. |
| 09:55 | 7 | Q. As an officer of UnionBanCal, does the term |
| 09:55 | 8 | "customer service" have any meaning to you? |
| 09:55 | 9 | A. No. UnionBanCal has no customers. |
| 09:56 | 10 | Q. As an employee of Union Bank of California, |
| 09:56 | 11 | does the term "customer service" have any relevant |
| 09:56 | 12 | meaning to you? |
| 09:56 | 13 | A. Yes. |
| 09:56 | 14 | Q. Does Union Bank of California have a |
| 09:56 | 15 | customer-service department? |
| 09:56 | 16 | A. I believe it does. |
| 09:56 | 17 | Q. And what are the functions of the |
| 09:56 | 18 | customer-service department of Union Bank of California? |
| 09:56 | 19 | A. Service customers; process transactions; |
| 09:56 | 20 | respond to inquiries; open accounts; close accounts; |
| 09:56 | 21 | typical, as described in our public documents, what a |
| 09:56 | 22 | commercial bank does. |
| 09:56 | 23 | Q. Would you consider those to be banking |
| 09:56 | 24 | activities? |
| 09:56 | 25 | A. Yes. |

**Page 25**

| | | |
|---|---|---|
| 09:57 | 1 | Q. In your role as an officer of UnionBanCal, |
| 09:57 | 2 | does the term "commercial deposits" have any meaning to |
| 09:57 | 3 | you? |
| 09:57 | 4 | A. UnionBanCal has no commercial deposits, has no |
| 09:57 | 5 | products or services. |
| 09:57 | 6 | Q. In your role as an employee of Union Bank of |
| 09:57 | 7 | California, does the term "commercial deposits" have any |
| 09:57 | 8 | particular meaning to you? |
| 09:57 | 9 | A. Yes. |
| 09:57 | 10 | Q. And what is that understanding? How is |
| 09:57 | 11 | that -- let me rephrase that. How is that relevant to |
| 09:57 | 12 | Union Bank of California? |
| 09:57 | 13 | A. It's a product. |
| 09:57 | 14 | Q. What kind of product? |
| 09:57 | 15 | A. It's a product or service of a commercial |
| 09:58 | 16 | bank. |
| 09:58 | 17 | Q. Can you describe what a -- in more detail what |
| 09:58 | 18 | a commercial deposit is? |
| 09:58 | 19 | A. I'm not involved in that area. |
| 09:58 | 20 | Q. Do you have any understanding as to what a |
| 09:58 | 21 | commercial deposit is? |
| 09:58 | 22 | A. As any individual would. |
| 09:58 | 23 | Q. And as an individual, what is your |
| 09:58 | 24 | understanding of what a commercial deposit is? |
| 09:58 | 25 | A. Opening accounts for customers who want to |

7 (Pages 22 to 25)

Gretchen Shore Court Reporting & Litigation Support
(903) 758-2183 * (903) 758-4890 Fax      E-mail: gretchenshore@gretchenshore.com

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson                CONFIDENTIAL
February 7, 2007 FOR ATTORNEYS' EYES ONLY

---

Page 26

09:58  1    deposit their funds.
09:58  2        Q.  Would that include a checking account?
09:58  3        A.  It could.
09:58  4        Q.  Would it include a savings account?
09:58  5        A.  It could.
09:58  6        Q.  Would it include certificates of deposit?
09:58  7        A.  Certainly could.
09:58  8        Q.  Anything else that you can think of?
09:58  9        A.  Not at the moment.
09:58 10        Q.  Would you consider this to be banking -- a
09:58 11    banking activity?
09:58 12        A.  Yes.
09:58 13        Q.  In your role as an officer of UnionBanCal,
09:59 14    does the term "treasury management" have any meaning to
09:59 15    you?
09:59 16        A.  No.
09:59 17        Q.  In your role as an employee of Union Bank of
09:59 18    California, does the term "treasury management" have any
09:59 19    meaning to you?
09:59 20        A.  I'm not familiar with the specific term.
09:59 21        Q.  Have you ever heard the term before, treasury
09:59 22    management?
09:59 23        A.  Yes, I probably have.
09:59 24        Q.  But as you sit here today, you wouldn't know
09:59 25    how to define treasury management?

---

Page 27

09:59  1        A.  Well, that's -- that's a pretty broad
09:59  2    question.  If you could be more specific as to some
09:59  3    reference to that phrase somewhere.
09:59  4        Q.  Well, how do -- you've heard the term before.
09:59  5    In what context have you heard the term "treasury
09:59  6    management" used?
09:59  7        A.  I've heard it in many companies, just in
10:00  8    general business, it's the movement of funds.
10:00  9        Q.  And when you say "movement of funds," what do
10:00 10    you mean?
10:00 11        A.  Could be on the corporation's behalf or -- or
10:00 12    on behalf of customers.
10:00 13        Q.  Would you have that same understanding as an
10:00 14    employee of Union Bank of California?
10:00 15        A.  Same understanding as what?
10:00 16        Q.  Well, you had just said that you've heard the
10:00 17    term "treasury management" used within many different
10:00 18    companies --
10:00 19        A.  Right.
10:00 20        Q.  -- or multiple different companies.  I don't
10:00 21    recall what your exact terminology was.  Would you have
10:00 22    that same understanding in the context of Union Bank of
10:00 23    California, that it relates to the movement of funds on
10:00 24    a corporation's behalf or on behalf of customers?
10:01 25            MR. SWEIGART:  Object to the form.

---

Page 28

10:01  1        A.  That's, once again, quite -- quite broad.  But
10:01  2    treasury management and -- as a bank employee, I would
10:01  3    still answer the same question, it's the movement of
10:01  4    funds either for the customer -- for the company itself
10:01  5    or for customers.
10:01  6        Q.  (BY MR. KING)  Would you consider that to be a
10:01  7    banking activity?
10:01  8        A.  It is done in banks, as well as many other
10:01  9    companies.
10:01 10        Q.  And if it's done within a bank, would you
10:01 11    consider that to be a banking activity?
10:01 12        A.  Certain aspects of it certainly are -- is a
10:01 13    banking activity.
10:01 14        Q.  And what aspects of it would be a banking
10:01 15    activity?
10:01 16        A.  Movement of funds for customers at the
10:01 17    customer's request.
10:01 18        Q.  Would that potentially be a -- I'm just trying
10:01 19    to get a better understanding here.  Would that be -- an
10:02 20    example of that, could it be an automatic debit from a
10:02 21    customer's checking account?  Is that an example of a
10:02 22    movement of funds?
10:02 23        A.  It's probably more of a deposit function.
10:02 24        Q.  What type of movement of a customer's funds
10:02 25    would fall under the treasury management?

---

Page 29

10:02  1        A.  Wire transfer instructions.
10:02  2        Q.  Can you think of any other examples?
10:02  3        A.  I suppose writing and depositing, anything
10:02  4    else that can go on in a customer's account initiated by
10:02  5    the customer.  So I suppose maybe that example of your
10:02  6    debit to that account is a transaction.  I'm not sure
10:03  7    I'd consider it a treasury-management function.  That's
10:03  8    a customer-initiated transaction.
10:03  9        Q.  And these examples that you just gave, would
10:03 10    you consider those to be banking activities?
10:03 11        A.  Servicing a customer's account is a banking
10:03 12    activity.
10:03 13        Q.  In your role as an officer of UnionBanCal,
10:03 14    does the term "real estate lending" have any meaning to
10:03 15    you?
10:03 16        A.  No.  The UnionBanCal has no products or
10:03 17    services for customers.
10:03 18        Q.  In your role as an employee of Union Bank of
10:03 19    California, does the term "real estate lending" have any
10:03 20    meaning to you?
10:03 21        A.  Yes.  It's a -- a product of -- of a
10:04 22    commercial bank.
10:04 23        Q.  And would this encompass the loan of funds to
10:04 24    purchase real estate, I presume?
10:04 25        A.  I think that that's a common reason why people

---

8 (Pages 26 to 29)

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson                    CONFIDENTIAL
February 7, 2007FOR ATTORNEYS' EYES ONLY

Page 30

10:04 1    would like to have a loan from a commercial bank.
10:04 2       Q.  And that would fall under the heading of real
10:04 3    estate lending?
10:04 4       A.  I think that's a good definition for it.
10:04 5       Q.  And would you consider that to be a banking
10:04 6    activity?
10:04 7       A.  Yes, I do.
10:04 8       Q.  In your role as an officer of UnionBanCal,
10:04 9    does the term "national banking" have any relevant
10:04 10   meaning to you?
10:04 11      A.  No, I don't believe so.
10:05 12      Q.  In your role as an employee of Union Bank of
10:05 13   California, does the term "national banking" have any
10:05 14   relevant meaning to you?
10:05 15      A.  Union Bank is a national bank.
10:05 16      Q.  And why do you say Union Bank is a national
10:05 17   bank?
10:05 18      A.  Well, because that's what it is.  It's
10:05 19   registered as a national bank.  It's not a state bank,
10:05 20   it is a national bank.
10:05 21      Q.  Does the term "community banking" have any
10:05 22   relevant meaning to you in your role as an officer of
10:05 23   UnionBanCal?
10:05 24      A.  No.
10:06 25      Q.  In your role as an employee of Union Bank of

Page 31

10:06 1    California, does the term "community banking" have any
10:06 2    relevant meaning?
10:06 3       A.  Community banking is a -- a business segment
10:06 4    within Union Bank.
10:06 5       Q.  Well, do you consider the activities that
10:06 6    occur within the community banking segment of Union Bank
10:06 7    to be banking activities?
10:06 8       A.  Yes, I do.
10:07 9       Q.  Does UnionBanCal have a parent corporation?
10:07 10      A.  No, it does not have a parent corporation.
10:07 11      Q.  Does Union Bank --
10:07 12      A.  It has shareholders.
10:07 13      Q.  That was my next question.  You beat me to it.
10:07 14          Does UnionBanCal have any shareholders?
10:07 15      A.  Yes.
10:07 16      Q.  Do you know how many shareholders UnionBanCal
10:07 17   has?
10:07 18      A.  I don't recall the exact amount.
10:08 19      Q.  Is UnionBanCal a publicly traded company?
10:08 20      A.  Yes, it is.
10:08 21      Q.  Does Union Bank of California have any parent
10:08 22   corporations?
10:08 23      A.  Union Bank of California is 100 percent owned
10:08 24   by UnionBanCal Corporation, so it's one shareholder.
10:08 25      Q.  So UnionBanCal Corporation owns 100 percent of

Page 32

10:08 1    the stock in Union Bank of California?
10:08 2       A.  Yes, it does.
10:08 3       Q.  There are no other shareholders of Union Bank
10:09 4    of California stock.
10:09 5       A.  No, there's not.
10:09 6       Q.  Is Union Bank of California a publicly traded
10:09 7    company?
10:09 8       A.  No.
10:09 9       Q.  Does the term "vertical" or "horizontal
10:09 10   integration" have any relevant meaning to you?
10:09 11      A.  No, it doesn't.
10:09 12      Q.  Have you ever heard those terms before?
10:09 13      A.  I believe so.
10:09 14      Q.  And do you recall what context you've heard
10:09 15   those terms?
10:09 16      A.  No, I don't.
10:09 17      Q.  Do you have any understanding of what vertical
10:09 18   integration is?
10:10 19      A.  I'm not sure I could do justice to the
10:10 20   definition.  Maybe you could clarify it for me.
10:10 21      Q.  Well, in the -- in the business context --
10:10 22      A.  Uh-huh (affirmative).
10:10 23      Q.  -- do you have any understanding of
10:10 24   vertical -- of what vertical integration is?
10:10 25          MR. SWEIGART:  I'm going to object to the

Page 33

10:10 1    form.
10:10 2       A.  I don't feel that -- that that's something
10:10 3    within my expertise.
10:10 4       Q.  (BY MR. KING)  Well, just as a -- as an
10:10 5    individual employee of Union Bank of California, officer
10:10 6    of UnionBanCal, do you have any understanding?
10:10 7       A.  I'm not sufficiently knowledgeable of that to
10:10 8    be able to comment on it.
10:11 9       Q.  Okay.  Do you believe, one way or another,
10:11 10   whether or not UnionBanCal and its subsidiaries are
10:11 11   vertically or horizontally integrated?
10:11 12      A.  They're separate companies, so in that -- in
10:11 13   that sense, it's 100 percent ownership.
10:11 14      Q.  Are there any -- other than Union Bank of
10:11 15   California, are there any other subsidiaries of
10:11 16   UnionBanCal that you are aware of?
10:11 17      A.  Yes.
10:11 18      Q.  What are those?
10:12 19      A.  Let's see.  Let me start with -- one is
10:12 20   Business Commercial Corporation, one is UnionBanCal
10:12 21   Equities, one is UnionBanCal Financial Corporation,
10:12 22   let's see, Cal First Properties Corporation.  I think
10:12 23   those are the only active, 100-percent-owned other
10:13 24   subsidiaries of UnionBanCal Corporation.
10:13 25      Q.  Do you have any role similar -- of any kind

9 (Pages 30 to 33)

Gretchen Shore Court Reporting & Litigation Support
(903) 758-2183 * (903) 758-4890 Fax     E-mail: gretchenshore@gretchenshore.com

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson               CONFIDENTIAL
February 7, 2007 FOR ATTORNEYS' EYES ONLY

---

Page 34

```
10:13  1    with these other subsidiaries that you've just listed?
10:13  2        A.  Yes, I do.
10:13  3        Q.  And what is that role?  Well, let me -- let me
10:13  4    break it down.  What is your role with Business
10:13  5    Commercial Corporation?
10:13  6        A.  I'm an officer of that company.
10:13  7        Q.  And as an officer, what position do you hold?
10:13  8        A.  I keep the financial books of the company.
10:13  9        Q.  Are you the controller of Business Commercial
10:13 10    Corporation?
10:13 11        A.  No, I do not believe so.
10:14 12        Q.  Does Business Commercial Corporation have a
10:14 13    controller?
10:14 14        A.  I do not believe so.
10:14 15        Q.  As an officer that keeps the financial books
10:14 16    of Business Commercial Corporation, do you report to
10:14 17    anyone?
10:14 18        A.  No, I do not.
10:14 19        Q.  The financial books and records that you --
10:14 20    that you keep, who are those reported to or provided to?
10:14 21        A.  To the officers and directors of the company.
10:14 22        Q.  To the officers and directors of Business
10:14 23    Commercial Corporation?
10:14 24        A.  Yes.
10:15 25        Q.  Do you know who the directors of Business
```

Page 35

```
10:15  1    Commercial Corporation are?
10:15  2        A.  I don't recall.  I wasn't prepared to answer
10:15  3    any questions on that company today.
10:15  4        Q.  Do you know if any of the officers or
10:15  5    directors of Business Commercial Corporation also serve
10:15  6    as officers or directors of UnionBanCal Corporation?
10:15  7        A.  No, I'm -- I'm not sure.
10:15  8        Q.  You don't have any idea as you sit here today?
10:15  9        A.  I -- as I said, I wasn't prepared to answer
10:15 10    the questions on Business Commercial.
10:15 11        Q.  Have you at any time in the past known who the
10:15 12    officers or directors of Business Commercial Corporation
10:15 13    are?
10:15 14        A.  Yes.  Certainly, I have been aware of -- of
10:15 15    who they are.  I'm just not prepared to recite them to
10:16 16    you today.
10:16 17        Q.  Well, I'm not asking for a complete list here.
10:16 18    I'm just -- I would like to know if there's any overlap,
10:16 19    based on your -- has there -- based on your prior
10:16 20    knowledge, have you ever been aware of any overlap
10:16 21    between the officers and directors of Business
10:16 22    Commercial Corporation and officers and directors of
10:16 23    UnionBanCal Corporation?
10:16 24        A.  Yes.
10:16 25        Q.  To the best of your knowledge, was that a
```

Page 36

```
10:16  1    complete overlap of officers and directors?
10:16  2        A.  No.
10:16  3        Q.  Based on your previous understanding of who
10:16  4    the officers and directors were of Business Commercial
10:16  5    Corporation -- well, let me back up.
10:16  6            Do you know how many directors of
10:16  7    Business Commercial Corporation there are?
10:16  8        A.  No, I do not.
10:16  9        Q.  Do you have prior understanding of how many
10:16 10    there were -- have been in the past?
10:16 11        A.  Oh, absolutely, I have been.  I'm just not
10:17 12    prepared to -- to give you that number today.
10:17 13        Q.  Would it be approximately ten?  Can you
10:17 14    give --
10:17 15        A.  Less.
10:17 16        Q.  -- an approximation?
10:17 17        A.  Less than ten.
10:17 18        Q.  Less than ten?  More than -- more or less than
10:17 19    five?
10:17 20        A.  My recollection would be five or less.
10:17 21        Q.  Okay.  And out of those five or less
10:17 22    individuals that you recall from your prior
10:17 23    understanding --
10:17 24        A.  Right.
10:17 25        Q.  -- and not necessarily as you sit here today,
```

Page 37

```
10:17  1    I understand that, how many of those directors also
10:17  2    served as directors of UnionBanCal Corporation?
10:17  3        A.  None.
10:17  4        Q.  None?
10:17  5        A.  None.
10:17  6        Q.  Okay.  So there was no overlap between the
10:17  7    directors of Business Commercial Corporation and
10:17  8    UnionBanCal Corporation.
10:17  9        A.  And the directors of UnionBanCal Corporation,
10:17 10    that's correct.
10:17 11        Q.  Okay.  Do you have any type of role with
10:17 12    UnionBanCal Equities?
10:18 13        A.  An officer of that company.
10:18 14        Q.  And in your role as an officer of UnionBanCal
10:18 15    Equities, what is your role?
10:18 16        A.  Oh, same role as in BCC.  I'm involved in
10:18 17    keeping the financial records of that company.
10:18 18        Q.  And who do you provide -- who do you report to
10:18 19    in your role as an officer of UnionBanCal Equities?
10:18 20        A.  I don't.
10:18 21        Q.  Who do you provide -- the financial books and
10:18 22    records that you keep, who do you provide those to?
10:18 23        A.  Those are provided to the officers and
10:18 24    directors of UnionBanCal Equities.
10:18 25        Q.  As you sit here today, do you recall who the
```

10 (Pages 34 to 37)

Gretchen Shore Court Reporting & Litigation Support
(903) 758-2183 * (903) 758-4890 Fax     E-mail: gretchenshore@gretchenshore.com

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson            CONFIDENTIAL
February 7, 2007 FOR ATTORNEYS' EYES ONLY

---

Page 38

```
10:18   1   officers and directors of UnionBanCal Equities are?
10:18   2      A.  Not specifically, no.
10:18   3      Q.  Have you, in the past, had an understanding of
10:18   4   who the officers and directors of UnionBanCal --
10:18   5      A.  Yes.
10:18   6      Q.  -- or Union Bank Equities are --
10:18   7      A.  Yes.
10:18   8      Q.  -- or were, I should say.  Sorry.
10:18   9          Did any of the officers and -- or any of
10:18  10   the directors, that you recall, of UnionBanCal Equities
10:19  11   also serve as directors or officers of UnionBanCal
10:19  12   Corporation?
10:19  13      A.  They do not serve as directors of UnionBanCal
10:19  14   Corporation.  Some, I'm sure, have served as officers of
10:19  15   UnionBanCal Corporation.
10:19  16      Q.  So it's your understanding, based on your
10:19  17   prior knowledge of UnionBanCal former and possibly current --
10:19  18   tell me if I'm mistaken --
10:19  19      A.  Sure.
10:19  20      Q.  -- directors of UnionBanCal Equities were,
10:19  21   some of those directors have been officers of
10:19  22   UnionBanCal Corporation.
10:19  23      A.  Yes.
10:19  24      Q.  Would you say -- how many of the directors of
10:19  25   UnionBanCal Equities, based on your understanding, were
```

Page 39

```
10:19   1   also officers of UnionBanCal Corporation?
10:19   2      A.  It's -- it's hard for me to recall.  I just
10:20   3   don't recall.
10:20   4      Q.  Do you know how many officers or direct -- I'm
10:20   5   sorry.  Do you know how many directors of UnionBanCal
10:20   6   Equities were, based on your prior -- previous
10:20   7   understanding?
10:20   8      A.  Five or less would be a -- a guess.
10:20   9      Q.  I promise I'm not going to hold you to that
10:20  10   number.
10:20  11      A.  Good.  Thank you.
10:20  12      Q.  Of those five or less --
10:20  13      A.  Uh-huh (affirmative).
10:20  14      Q.  -- do you know how many of those with officers
10:20  15   of UnionBanCal Corporation?
10:20  16      A.  Some could've been, or some are.
10:20  17      Q.  Some are.
10:20  18      A.  Yes.  Not sure.
10:20  19      Q.  Let me go back to Business Commercial
10:20  20   Corporation.  The directors of Business Commercial
10:20  21   Corporation, based on your prior understanding, did any
10:20  22   of those directors also serve as officers of UnionBanCal
10:20  23   Corporation?
10:20  24      A.  Say again.  I'm sorry.  Just repeat that
10:20  25   again.
```

Page 40

```
10:20   1      Q.  Earlier you had said that, to the best of your
10:21   2   recollection, there were no directors of Business
10:21   3   Commercial Corporation that were also directors of
10:21   4   UnionBanCal Corporation.
10:21   5      A.  Yes, right.
10:21   6      Q.  Is that correct?
10:21   7      A.  Yes, I believe that's correct.
10:21   8      Q.  Were -- based on your understanding, were any
10:21   9   of the directors of Business Commercial Corporation also
10:21  10   officers of UnionBanCal Corporation?
10:21  11      A.  Yes, I believe some of them might be.
10:21  12      Q.  Okay.  But you don't know how many would be.
10:21  13      A.  No, I'm sorry, I don't --
10:21  14      Q.  Okay.
10:21  15      A.  -- have those specifics with me today.
10:21  16      Q.  I understand.
10:21  17          UnionBanCal Financial Corporation, do you
10:21  18   play any role -- have any role with that entity?
10:21  19      A.  No, I don't believe I do.
10:21  20      Q.  Cal First Properties Corporation, do you have
10:21  21   any role with that entity?
10:21  22      A.  Yes, I do.
10:21  23      Q.  And what is your role with that entity?
10:22  24      A.  I'm a director and officer.
10:22  25      Q.  In your role as a director and officer of Cal
```

Page 41

```
10:22   1   First Properties Corporation, what roles do you have?
10:22   2      A.  Once again, to keep the books and records,
10:22   3   financial records of that company.
10:22   4      Q.  Do you report to anyone in -- in your role as
10:22   5   an officer or director?
10:22   6      A.  No.
10:22   7      Q.  Do you provide the financial books and records
10:22   8   that you keep to the board of directors of that entity?
10:22   9      A.  The controller's department provides the books
10:22  10   and records to that.
10:22  11      Q.  So you changed it up on me here.
10:22  12      A.  Yes.
10:23  13      Q.  That's what I get for making an assumption.
10:23  14          Cal -- with Cal First Properties
10:23  15   Corporation, who do you provide your books and records
10:23  16   to?
10:23  17      A.  Say that again.  I'm sorry.  Just clarify.
10:23  18      Q.  In your role with Cal First Properties
10:23  19   Corporation --
10:23  20      A.  Yes.
10:23  21      Q.  -- who do you provide the books and records
10:23  22   that you maintain?
10:23  23      A.  To the officers and directors of that entity.
10:23  24      Q.  And does that entity have a controller?
10:23  25      A.  No.
```

11 (Pages 38 to 41)

Gretchen Shore Court Reporting & Litigation Support
(903) 758-2183 * (903) 758-4890 Fax    E-mail: gretchenshore@gretchenshore.com

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson            CONFIDENTIAL
February 7, 2007 FOR ATTORNEYS' EYES ONLY

---

Page 42

10:23  1     Q.  How many directors of Cal First Properties
10:23  2  Corporation are there?
10:23  3     A.  Once again, I -- I think it's less than five.
10:23  4     Q.  Okay.  Other than yourself, do any of the
10:23  5  other directors serve as an officer or director of
10:23  6  UnionBanCal Corporation?
10:23  7     A.  I don't believe so.
10:24  8        MR. KING:  Do you guys want to take a
10:24  9  little break?
10:24 10        MR. SWEIGART:  That'll be fine.
10:24 11        MR. KING:  Good deal.
10:24 12        THE VIDEOGRAPHER:  We're off the record
10:24 13  at 10:24.
10:24 14        (Recess taken 10:24 to 10:41)
10:40 15        THE VIDEOGRAPHER:  We're back on the
10:40 16  record at 10:41.
10:40 17     Q.  (BY MR. KING)  Mr. Anderson, we're back on the
10:40 18  record after a short break, and we had just finished up
10:41 19  talking about officers and directors of other
10:41 20  subsidiaries of UnionBanCal -- I'm sorry -- UnionBanCal
10:41 21  Corporation other than Union Bank of California, and now
10:41 22  I'd like to talk about Union Bank of California and its
10:41 23  officers and directors.
10:41 24        Are you familiar with the identity of the
10:41 25  officers and directors of Union Bank of California?

---

Page 43

10:41  1     A.  Familiar with the directors of Union Bank of
10:41  2  California.  There's a limited number of those.  Union
10:41  3  Bank of California have a -- has a number of officers.
10:41  4     Q.  How many officers would you say Union Bank of
10:41  5  California has?
10:41  6     A.  In the thousands.  I haven't been personally
10:41  7  introduced to every one of them yet and haven't
10:41  8  committed them to memory.
10:42  9     Q.  Well, I certainly understand that.
10:42 10        As you sit here today, are you aware of
10:42 11  who the directors of Union Bank of California are?
10:42 12     A.  Yes, I believe I -- I am.
10:42 13     Q.  Can you name the directors?
10:42 14     A.  I -- I think that was provided to you.
10:42 15     Q.  Okay.
10:42 16     A.  I'm not sure that I could recite them all
10:42 17  right now.
10:42 18     Q.  I understand.
10:42 19        MR. KING:  Can we pull this up?  It's
10:42 20  going to be page one, I believe.
10:42 21        (Exhibit Number 100 marked.)
10:42 22     Q.  (BY MR. KING)  Can you see what's on your
10:42 23  screen there in front of you?
10:42 24     A.  Yes, I can.  Thank you.
10:42 25     Q.  Okay.  I believe this was a --

---

Page 44

10:42  1        MR. KING:  I'm sorry.  Let me wait until
10:42  2  you guys get it pulled up.
10:42  3        MR. SWEIGART:  Again, now I've got a --
10:43  4  can you do that over there, get me up on the same
10:43  5  document?
10:43  6        MS. TOLES:  Yes, I'm pulling it up.
10:43  7        MR. SWEIGART:  Thank you.  Optimal mode,
10:43  8  recommended mode, what do I do about that?
10:43  9     Q.  (BY MR. KING)  Mr. Anderson, I believe you
10:43 10  have the --
10:43 11     A.  You -- you -- you and I can both move this?
10:43 12     Q.  We can both look -- if you just want to go
10:43 13  ahead and look through this while we're getting
10:43 14  straightened out on the other side here, feel free to --
10:43 15        MR. SWEIGART:  It looks like we're in
10:43 16  business over here, too.  And we'll get the Diet Coke
10:43 17  brought around.
10:43 18        MR. KING:  Take a quasi break here.
10:43 19        THE VIDEOGRAPHER:  Go off the record?
10:43 20        MR. KING:  No.
10:43 21     Q.  (BY MR. KING)  Mr. Anderson, does this
10:43 22  document look familiar to you?
10:43 23     A.  Yes.
10:43 24     Q.  Did you provide this document to counsel?
10:44 25     A.  I certainly have seen it provided by

---

Page 45

10:44  1  counsel -- to counsel was -- somebody is moving
10:44  2  something around over here.  I'm certainly familiar with
10:44  3  this.  It was provided by the bank.
10:44  4     Q.  So you've seen this document before.
10:44  5     A.  Yes.
10:44  6     Q.  And if you can scroll down to the bottom of
10:44  7  the document, do you see where it is -- there's a Bates
10:44  8  stamp at the bottom of the document, I believe,
10:44  9  UBC-JURIS, series of zeros, and the number 9?
10:44 10     A.  Yeah.
10:44 11     Q.  Okay.  Does this document accurately reflect,
10:44 12  as of today's date, the officers and directors of -- I'm
10:45 13  sorry -- the directors of -- I'm going to take control
10:45 14  of it real quick.
10:45 15     A.  Okay.  Go ahead.
10:45 16     Q.  -- UnionBanCal Corporation and Union Bank of
10:45 17  California?
10:45 18     A.  I believe so.
10:45 19     Q.  As you sit here today, there are no other
10:45 20  directors that you are aware of that should be or should
10:45 21  not be included on this list?
10:45 22     A.  I'm not aware of any.
10:45 23     Q.  I'd like to go through some of these and ask
10:45 24  for your understanding of some of these particular
10:45 25  designations and their roles with the company or with

---

12 (Pages 42 to 45)

Gretchen Shore Court Reporting & Litigation Support
(903) 758-2183 * (903) 758-4890 Fax    E-mail: gretchenshore@gretchenshore.com

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson              CONFIDENTIAL
February 7, 2007FOR ATTORNEYS' EYES ONLY

---

### Page 46

10:46 1 the Union -- I'm sorry -- their role with UnionBanCal
10:46 2 and Union Bank of California.
10:46 3        Ms. Aida Alvarez?
10:46 4    A. Yes.
10:46 5    Q. Is that correct?
10:46 6    A. Yes.
10:46 7    Q. Is Ms. Alvarez -- what is her role with
10:46 8 UnionBanCal and Union Bank of California?
10:46 9    A. As stated in here, director of both companies.
10:46 10   Q. Does Ms. Alvarez serve in any other capacity
10:46 11 with either UnionBanCal Corporation or Union Bank of
10:46 12 California, to the best of your knowledge?
10:46 13   A. No.
10:46 14   Q. And down here to the left there is a
10:46 15 designation of non -- of NM/O.
10:47 16   A. Uh-huh (affirmative).
10:47 17   Q. And down at the bottom it indicates that that
10:47 18 stands for non-management, the NM?
10:47 19   A. Right.
10:47 20   Q. And the O stands for outside?
10:47 21   A. Yes.
10:47 22   Q. Can you explain what those designations are or
10:47 23 mean?
10:47 24   A. I can try. Non-management means doesn't have
10:47 25 a management responsibility. Outside is does not have

### Page 47

10:47 1 any position within the organization other than as
10:47 2 indicated or related organizations.
10:47 3    Q. So Ms. Alvarez does not serve in any other
10:47 4 position with any of the subsidiaries that we listed
10:48 5 earlier? Would that be correct?
10:48 6    A. It is indicated here a director of UnionBanCal
10:48 7 and Union Bank.
10:48 8    Q. Okay. And would the -- over to the right-hand
10:48 9 column, you see the column that has UNBC at the top?
10:48 10   A. Uh-huh (affirmative).
10:48 11   Q. What does UNBC stand for?
10:48 12   A. UnionBanCal Corporation.
10:49 13   Q. And then below there there's a series of
10:49 14 designations by various directors' names of independent.
10:49 15 Can you explain what independent means?
10:49 16   A. I believe I can.
10:49 17   Q. Okay.
10:49 18   A. It means that they have no other affiliation
10:49 19 with a company, no officership, no employment with the
10:49 20 company. In other words, they are only directors.
10:49 21   Q. Back over on the left-hand side there's also a
10:49 22 designation with the letter "I," which, down there
10:50 23 below, represents inside. Can you explain what inside
10:50 24 means in this regard, pertaining to this document?
10:50 25   A. Yes, I believe I can interpret that. It means

### Page 48

10:50 1 that they are an officer or employee of one of those
10:50 2 companies, an officer of UnionBanCal Corporation or an
10:50 3 officer of Union Bank of California, possibly an
10:50 4 employee of Union Bank of California, or an officer or
10:50 5 an employee of an organization that's affiliated with
10:50 6 UnionBanCal Corporation.
10:51 7    Q. How many directors are there on the
10:51 8 UnionBanCal Corporation board?
10:51 9    A. I'm sorry, how many --
10:51 10   Q. Directors.
10:51 11   A. -- directors? I think it's indicated here on
10:51 12 the piece of paper.
10:51 13   Q. And what is that number?
10:51 14   A. It says on here 17 members.
10:51 15   Q. And how many members are there on the board of
10:51 16 directors for Union Bank of California?
10:51 17   A. There are 16 members, as indicated by this
10:51 18 list.
10:51 19   Q. And of the 17 members that are -- or the 17
10:52 20 individuals listed here that are members of the board of
10:52 21 directors for UnionBanCal Corporation, how many of those
10:52 22 also serve as directors for Union Bank of California?
10:52 23   A. I think, as indicated on here, that 16 members
10:52 24 of the board of directors of UNBC also serve as
10:52 25 directors of Union Bank of California.

### Page 49

10:52 1    Q. Who determines the membership of the board of
10:52 2 directors for Union Bank of -- for UnionBanCal
10:52 3 Corporation?
10:52 4    A. They're voted by the shareholders of
10:53 5 UnionBanCal Corporation relative to UnionBanCal
10:53 6 Corporation.
10:53 7    Q. You said they're voted by the shareholders of
10:53 8 UnionBanCal Corporation relative to UnionBanCal
10:53 9 Corporation.
10:53 10   A. Uh-huh (affirmative).
10:53 11   Q. What -- what do you mean?
10:53 12   A. Well, they're -- they're submitted in the
10:53 13 proxy for the UnionBanCal Corporation to be members of
10:53 14 the board of directors and the shareholders vote on it
10:53 15 at its annual shareholders meeting.
10:54 16   Q. How often does the board of directors for
10:54 17 UnionBanCal Corporation meet?
10:54 18   A. It's -- it's different every year, just given
10:54 19 their schedules, but they meet somewhere between six and
10:54 20 eight times a year. It's listed in our proxy statement
10:54 21 every year.
10:54 22   Q. How often does UnionBanCal Corporation hold a
10:54 23 shareholders meeting?
10:54 24   A. Annually.
10:54 25   Q. Just one a year?

13 (Pages 46 to 49)

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson           CONFIDENTIAL
February 7, 2007 FOR ATTORNEYS' EYES ONLY

---

Page 50

| | | |
|---|---|---|
| 10:54 | 1 | A. One a year. |
| 10:54 | 2 | Q. When is that shareholder meeting held? |
| 10:54 | 3 | A. Last year it was in April. In 2007 it will be |
| 10:55 | 4 | in May. |
| 10:55 | 5 | Q. Do you know when the last time the board of |
| 10:55 | 6 | directors for UnionBanCal Corporation met? |
| 10:55 | 7 | A. Yes, I do, January of 2007. |
| 10:55 | 8 | Q. Do you know what the purpose of that meeting |
| 10:55 | 9 | was? |
| 10:55 | 10 | A. Regularly scheduled board meeting to -- I |
| 10:55 | 11 | don't attend the meetings so I'm not -- I don't have |
| 10:56 | 12 | specific knowledge of the agenda of that particular |
| 10:56 | 13 | meeting. |
| 10:56 | 14 | Q. Do you receive a copy of the agenda of the |
| 10:56 | 15 | meeting? |
| 10:56 | 16 | A. No, I do not. |
| 10:56 | 17 | Q. Do you receive a copy of any of the materials |
| 10:56 | 18 | that are provided to the directors? |
| 10:56 | 19 | A. Yes, I do. |
| 10:56 | 20 | Q. And what materials, that are provided to the |
| 10:56 | 21 | directors for the board meeting, do you receive a copy |
| 10:56 | 22 | of? |
| 10:56 | 23 | A. The financial statements. |
| 10:56 | 24 | Q. Was the financial statement presented to the |
| 10:56 | 25 | board of directors, or the financial statements that you |

Page 51

| | | |
|---|---|---|
| 10:56 | 1 | received a copy of, were they presented to the board of |
| 10:56 | 2 | directors at its January 2007 meeting? |
| 10:56 | 3 | A. Financial results of the corporation were |
| 10:56 | 4 | presented. |
| 10:56 | 5 | Q. And why were they presented at the -- that |
| 10:56 | 6 | board of directors meeting? |
| 10:56 | 7 | A. I'm sorry. |
| 10:56 | 8 | Q. Why were -- why were those financial |
| 10:56 | 9 | statements presented? |
| 10:56 | 10 | A. It's regularly done at all board meetings. |
| 10:57 | 11 | Q. Who presented the financial statements to the |
| 10:57 | 12 | board? |
| 10:57 | 13 | A. They're included in the package. I'm not sure |
| 10:57 | 14 | that I'd call it presented, but they're included in the |
| 10:57 | 15 | package. |
| 10:57 | 16 | Q. So the board members are just provided a copy. |
| 10:57 | 17 | A. Right. |
| 10:57 | 18 | Q. Do the board members have to sign off, in any |
| 10:57 | 19 | way, on the financial statements, for the financial |
| 10:57 | 20 | statements that are provided to them? |
| 10:57 | 21 | A. Once a year they sign the Form 10-K, which is |
| 10:57 | 22 | filed with the Securities & Exchange Commission. |
| 10:57 | 23 | Q. Do you know when their -- the last 10-K was |
| 10:57 | 24 | filed? |
| 10:57 | 25 | A. March of 2006. |

Page 52

| | | |
|---|---|---|
| 10:57 | 1 | Q. Do you know when this year's 10-K will be |
| 10:57 | 2 | filed? |
| 10:57 | 3 | A. Yeah. |
| 10:57 | 4 | Q. And when is that? |
| 10:57 | 5 | A. Probably March the 2nd of 2007 or prior. It's |
| 10:57 | 6 | required within 60 days of the end of the calendar year, |
| 10:58 | 7 | 60 days, which gets it in to March 2nd. It has not been |
| 10:58 | 8 | filed yet. |
| 10:58 | 9 | Q. And that 10-K will cover the fiscal year |
| 10:58 | 10 | 2006 -- |
| 10:58 | 11 | A. Yes. |
| 10:58 | 12 | Q. -- is that correct? |
| 10:58 | 13 | A. And prior years, as required by the securities |
| 10:58 | 14 | regulations. |
| 10:58 | 15 | Q. How are the directors of Union Bank of |
| 10:58 | 16 | California selected? |
| 10:59 | 17 | A. I'm not a party to that so I'm not familiar |
| 10:59 | 18 | with that process. |
| 10:59 | 19 | Q. Do you know if the shareholders of Union Bank |
| 10:59 | 20 | of California vote on the directors? |
| 10:59 | 21 | A. No, they do not. The shareholder of -- I'm |
| 10:59 | 22 | sorry. Did you say the shareholder or the -- would you |
| 10:59 | 23 | ask the question again? I'm sorry. I want to make sure |
| 10:59 | 24 | I've got it right. |
| 10:59 | 25 | Q. I believe I said -- I believe the question |

Page 53

| | | |
|---|---|---|
| 10:59 | 1 | was, do the shareholders of Union Bank of California |
| 10:59 | 2 | elect -- |
| 10:59 | 3 | A. Yes, the shareholder. |
| 10:59 | 4 | Q. So shareholders in the singular here. |
| 10:59 | 5 | A. Yes. There is one shareholder. |
| 10:59 | 6 | Q. And that shareholder is UnionBanCal |
| 10:59 | 7 | Corporation, correct? |
| 11:00 | 8 | A. Yes, it is. |
| 11:00 | 9 | Q. Do you know who votes on behalf of UnionBanCal |
| 11:00 | 10 | Corporation for the directors of Union Bank of |
| 11:00 | 11 | California? |
| 11:00 | 12 | A. The directors of UnionBanCal Corporation vote |
| 11:00 | 13 | on behalf of the -- of the shareholder of Union Bank of |
| 11:00 | 14 | California. |
| 11:00 | 15 | Q. So the directors of UnionBanCal Corporation |
| 11:00 | 16 | vote on UnionBanCal Corporation's behalf as the sole |
| 11:00 | 17 | shareholder of Union Bank of California. |
| 11:00 | 18 | A. I believe that's the case. |
| 11:00 | 19 | Q. How many directors of Union Bank of California |
| 11:00 | 20 | are also directors of UnionBanCal Corporation? |
| 11:01 | 21 | A. According to this list, 16. |
| 11:01 | 22 | Q. So all 16 members of the board of directors |
| 11:01 | 23 | for Union Bank of California also serve as the board of |
| 11:01 | 24 | -- on the board of directors for Union Bank of |
| 11:01 | 25 | California. Is that your understanding? |

14 (Pages 50 to 53)

Gretchen Shore Court Reporting & Litigation Support
(903) 758-2183 * (903) 758-4890 Fax     E-mail: gretchenshore@gretchenshore.com

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson                CONFIDENTIAL
February 7, 2007 FOR ATTORNEYS' EYES ONLY

Page 54

| | | |
|---|---|---|
| 11:01 | 1 | A. Yes. |
| 11:02 | 2 | Q. When does the board of directors for Union |
| 11:02 | 3 | Bank of California meet? |
| 11:02 | 4 | A. What do you mean, when? Time? Is that a -- |
| 11:02 | 5 | could you be more specific? |
| 11:02 | 6 | Q. Well, how often does the board of directors |
| 11:02 | 7 | for Union Bank of California meet? |
| 11:02 | 8 | A. I believe somewhere around six to -- six to |
| 11:02 | 9 | eight times a year. I'm not associated with that part |
| 11:02 | 10 | of the meeting or those meetings. |
| 11:02 | 11 | Q. Do you know when the last time the board of |
| 11:02 | 12 | directors for Union Bank of California met? |
| 11:02 | 13 | A. Yeah. I believe it was January. |
| 11:02 | 14 | Q. Do you know where they met? |
| 11:03 | 15 | A. Yes, I think I do, 400 California Street, |
| 11:03 | 16 | San Francisco. |
| 11:03 | 17 | Q. Do you know what time they met or what the |
| 11:03 | 18 | exact date was that they met in January of 2007? |
| 11:03 | 19 | A. No, I do not know the exact time and I don't |
| 11:03 | 20 | recall the -- date. |
| 11:03 | 21 | Q. The board of directors for UnionBanCal |
| 11:03 | 22 | Corporation, you said they met in January of 2007. |
| 11:03 | 23 | A. Right. |
| 11:03 | 24 | Q. Do you know where they met at? |
| 11:03 | 25 | A. Yeah, 400 California Street. |

Page 55

| | | |
|---|---|---|
| 11:03 | 1 | Q. Do you know what date they met on? |
| 11:03 | 2 | A. No, I don't. |
| 11:03 | 3 | Q. Do you know what time they met? |
| 11:03 | 4 | A. No. I don't know the exact day. |
| 11:04 | 5 | Q. Do you know approximately? |
| 11:04 | 6 | A. Yeah. I think it was -- I think it was |
| 11:04 | 7 | January 23rd, I believe. |
| 11:04 | 8 | Q. Do you know approximately what time on |
| 11:04 | 9 | approximately January 23rd that the board of directors |
| 11:04 | 10 | for UnionBanCal Corporation met? |
| 11:04 | 11 | A. I'm sorry, did you say the approximate time? |
| 11:04 | 12 | Q. Uh-huh, yes, sir. |
| 11:04 | 13 | A. Oh, I -- I think they met starting in the |
| 11:04 | 14 | morning. |
| 11:04 | 15 | Q. Do you know how long that meeting lasted? |
| 11:04 | 16 | A. No, I do not. |
| 11:04 | 17 | Q. Do you know the approximate date that the -- |
| 11:04 | 18 | in January that the Union Bank of California held its |
| 11:04 | 19 | January board meeting? |
| 11:04 | 20 | A. Yes. I believe that it was January 23rd. |
| 11:05 | 21 | Q. Do you know approximately what time on January |
| 11:05 | 22 | 23rd that -- |
| 11:05 | 23 | A. I do not, same -- same as with UnionBanCal |
| 11:05 | 24 | Corporation. I believe it started in the morning. |
| 11:05 | 25 | Q. Does UnionBanCal Corporation have an office at |

Page 56

| | | |
|---|---|---|
| 11:05 | 1 | 400 California Street in San Francisco? |
| 11:05 | 2 | A. Its offices are at 400 California Street. |
| 11:06 | 3 | Q. Do you know how many offices there are for |
| 11:06 | 4 | UnionBanCal Corporation at 400 California Street? |
| 11:06 | 5 | A. There are none that are specifically |
| 11:06 | 6 | designated as UnionBanCal Corporation offices. |
| 11:06 | 7 | Q. But UnionBanCal Corporation does maintain |
| 11:06 | 8 | offices at 400 California Street; is that correct? |
| 11:06 | 9 | A. That is the mailing address and its corporate |
| 11:06 | 10 | headquarters. |
| 11:06 | 11 | Q. Okay. |
| 11:06 | 12 | A. There are no separate designated offices that |
| 11:06 | 13 | are only for UnionBanCal Corporation as UnionBanCal |
| 11:06 | 14 | Corporation has no employees. |
| 11:07 | 15 | Q. Does Union Bank of California have any offices |
| 11:07 | 16 | at 400 California Street? |
| 11:07 | 17 | A. Yes. |
| 11:07 | 18 | Q. And do you know approximately how many people |
| 11:07 | 19 | are office for Union Bank of California at 400 |
| 11:07 | 20 | California Street? |
| 11:07 | 21 | A. Eighteen floors, 50 people on a floor, |
| 11:07 | 22 | approximately. I'll let you do the math. |
| 11:07 | 23 | Q. I would defer on the math right now. |
| 11:08 | 24 | If I were to send a -- if I were to send |
| 11:08 | 25 | correspondence to UnionBanCal Corporation at 400 |

Page 57

| | | |
|---|---|---|
| 11:08 | 1 | California Street in San Francisco, who's going to open |
| 11:08 | 2 | that letter that I sent? |
| 11:08 | 3 | A. Who's it addressed to? |
| 11:08 | 4 | Q. If the -- if the letter was addressed to |
| 11:08 | 5 | UnionBanCal Corporation, 400 California Street, who |
| 11:08 | 6 | would open that letter? |
| 11:08 | 7 | A. It would probably be -- well, that's only |
| 11:08 | 8 | speculation. It could go to the corporate secretary's |
| 11:08 | 9 | office. |
| 11:08 | 10 | Q. And who is the corporate secretary? |
| 11:08 | 11 | A. It's listed in the information we gave you, |
| 11:08 | 12 | but it's John McGuckin. This is a list of the |
| 11:08 | 13 | directors. |
| 11:08 | 14 | Q. Okay. I'm sorry. His name is what, John |
| 11:09 | 15 | what? |
| 11:09 | 16 | A. John McGuckin, M-c-G-u-c-k-i-n. |
| 11:09 | 17 | Q. Thank you. |
| 11:09 | 18 | And as corporate secretary, who does |
| 11:09 | 19 | Mr. McGuckin -- who is he employed by? |
| 11:09 | 20 | A. Union Bank of California. |
| 11:09 | 21 | Q. Does Mr. McGuckin hold any roles with |
| 11:09 | 22 | UnionBanCal Corporation? |
| 11:09 | 23 | A. He's an officer of UnionBanCal Corporation. |
| 11:09 | 24 | Q. And as an officer of UnionBanCal Corporation, |
| 11:09 | 25 | what is his role? |

15 (Pages 54 to 57)

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson              CONFIDENTIAL
February 7, 2007 FOR ATTORNEYS' EYES ONLY

---

Page 58

11:09 1      A. You'd have to -- I mean, he's the corporate
11:09 2   secretary. I'm not real familiar with all of his
11:09 3   functions. One might be to open up a letter that
11:09 4   arrives.
11:09 5      Q. Do you know if Mr. McGuckin's function as an
11:10 6   officer of UnionBanCal Corporation differ from his role
11:10 7   as an employee of Union Bank of California?
11:10 8      A. Certainly.
11:10 9      Q. You do know?
11:10 10     A. I would assume so.
11:10 11     Q. Okay. And how would -- how would his roles as
11:10 12  an officer of UnionBanCal Corporation differ from his
11:10 13  role as an employee of Union Bank of California?
11:10 14     A. I don't know the specifics of his role in
11:10 15  Union Bank, but relative to UnionBanCal Corporation he
11:10 16  would handle the corporate secretary function of
11:10 17  UnionBanCal Corporation.
11:10 18     Q. And what would his function as a corporate
11:10 19  secretary of UnionBanCal Corporation be?
11:10 20     A. One function is, is to be a signor on the
11:10 21  proxy statement; another function at the UnionBanCal
11:11 22  Corporation would be the secretary of the board of
11:11 23  directors meetings; filings with Delaware State, where
11:11 24  UnionBanCal Corporation is incorporated. Specifically,
11:11 25  that's all I'm aware of.

Page 59

11:11 1      Q. Do you know if Mr. McGuckin serves as a
11:11 2   secretary at the board of directors meetings for Union
11:12 3   Bank of California?
11:12 4      A. I'm not specifically aware of what his
11:12 5   functions are at the bank.
11:12 6      Q. So as you sit here today, you don't know
11:12 7   specifically, in any way, that his roles differ between
11:12 8   UnionBanCal Corporation and Union Bank of California; is
11:12 9   that correct?
11:12 10     A. I came prepared to answer questions relative
11:12 11  to UnionBanCal Corporation.
11:12 12     Q. And as you sit here today, you do not know
11:12 13  specifically, in any way, how Mr. McGuckin's roles
11:12 14  differ between UnionBanCal Corporation and the Union
11:12 15  Bank of California; isn't that correct?
11:12 16     A. I have no specific knowledge of -- of his
11:12 17  role.
11:13 18     Q. Are you aware of any committees that serve or
11:13 19  were created at the discretion of the board of directors
11:13 20  of UnionBanCal Corporation?
11:13 21     A. Yes.
11:13 22     Q. And what committees are you aware of that are
11:14 23  created at the discretion of the board of directors of
11:14 24  UnionBanCal Corporation?
11:14 25     A. Audit committee, public policy committee,

Page 60

11:14 1   executive -- a nominating committee. It's listed in the
11:14 2   proxy. I believe there's an executive comp and benefit
11:14 3   committee. And I think that's it, but there might be
11:14 4   others that are listed in the proxy.
11:14 5      Q. Is there a corporate governance committee?
11:14 6      A. Oh, yes.
11:15 7      Q. Is there a credit review and management
11:15 8   committee?
11:15 9      A. I do not believe so.
11:15 10     Q. Is there a finance and capital committee?
11:15 11     A. Oh, yes, there is. Thank you for pointing
11:15 12  that out.
11:15 13     Q. Do you have any knowledge of any committees
11:16 14  that may be formed at the discretion of the board of
11:16 15  directors of Union Bank of California?
11:16 16     A. I do not know if -- if there are committees at
11:16 17  the Union Bank of California. I believe they're only at
11:16 18  the -- at the UnionBanCal Corporation level. I think
11:16 19  that's accurate.
11:17 20     Q. The audit committee for UnionBanCal
11:17 21  Corporation, what's its role?
11:17 22     A. To meet with the outside independent auditors;
11:17 23  to meet with regulators, such as the OCC and Federal
11:17 24  Reserve Bank auditors; to receive reports of -- from
11:17 25  various departments from its subsidiary Union Bank.

Page 61

11:18 1      Q. What kind of reports does it receive from its
11:18 2   subsidiary Union Bank? I presume you mean Union Bank of
11:18 3   California?
11:18 4      A. Union Bank of California.
11:18 5      Q. Okay.
11:18 6      A. Internal audit, credit. I think those are the
11:18 7   general -- or the ones that are specifically on the
11:18 8   agenda.
11:18 9      Q. How about the public policy committee of
11:18 10  UnionBanCal Corporation? What are its roles?
11:18 11     A. Primarily to -- to -- it's probably better
11:19 12  said in the proxy, where it has a description of it, but
11:19 13  I think it's to make sure that the organization,
11:19 14  UnionBanCal Corporation, is a -- is a well-regarded
11:19 15  organization in the public's view.
11:19 16     Q. Does the public policy committee of
11:19 17  UnionBanCal Corporation establish policies and
11:19 18  guidelines that are to be followed by its subsidiaries?
11:20 19     A. It would review policies of a subsidiary
11:20 20  organization.
11:20 21     Q. Does Union Bank of California, to the best of
11:20 22  your knowledge, have any policies that the public policy
11:20 23  committee of UnionBanCal Corporation would review?
11:20 24     A. Could you repeat that again?
11:20 25     Q. I'll try to. That may have been a bad

16 (Pages 58 to 61)

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson            CONFIDENTIAL
February 7, 2007 FOR ATTORNEYS' EYES ONLY

Page 62

11:20 1    question.
11:20 2        Does Union Bank of California, to the
11:20 3    best of your knowledge, have any policies that the
11:20 4    UnionBanCal Corporation public policy committee would
11:20 5    review?
11:20 6        A. I believe it would in its role of a committee
11:21 7    of the board of directors.
11:21 8        Q. So would it be fair to say, then, that there
11:21 9    is a -- some type of policy committee that is created by
11:21 10   the board of directors for Union Bank of California?
11:21 11       MR. SWEIGART: Object to the form.
11:21 12       A. I'm prepared to discuss the UnionBanCal
11:21 13   Corporation board of directors and committees.
11:21 14       Q. (BY MR. KING) So you have -- is it fair to
11:21 15   say you have absolutely no knowledge whatsoever of any
11:21 16   committees that are created at the discretion of the
11:21 17   board of directors of the Union Bank of California?
11:21 18       A. As an officer of UnionBanCal Corporation, I do
11:22 19   not know of the workings of the separate committees of
11:22 20   Union Bank.
11:22 21       Q. As an employee of Union Bank of California,
11:22 22   are you aware of any committees that are created at the
11:22 23   discretion or at the direction of the board of directors
11:22 24   for Union Bank of California?
11:22 25       A. Could you repeat that again? As an employee

Page 63

11:22 1    of Union -- say that again.
11:22 2        Q. As an employee of Union Bank of California --
11:22 3        A. Right.
11:22 4        Q. -- are you aware of any committees that are
11:22 5    created at the discretion or at the direction of the
11:22 6    board of directors of the Union Bank of California?
11:22 7        A. I know committees exist at the Union Bank of
11:23 8    California, or I believe that they exist at the Union
11:23 9    Bank of California because of the -- I just don't know
11:23 10   the legal status of that.
11:23 11       Q. What committees do you believe may exist at
11:23 12   the Union Bank of California?
11:23 13       A. Once again, I'm here prepared to discuss
11:23 14   UnionBanCal Corporation committees that are established
11:23 15   and their oversight of -- of the holding company,
11:23 16   UnionBanCal Corporation, and its wholly owned -- or its
11:23 17   wholly owned subsidiaries.
11:24 18       Q. Okay. And as a person that's here prepared to
11:24 19   testify today regarding UnionBanCal Corporation
11:24 20   committees that are established and their oversight of
11:24 21   its wholly owned subsidiaries --
11:24 22       A. Yes.
11:24 23       Q. -- you stated earlier that the public policy
11:24 24   committee would review policies of subsidiary
11:24 25   organizations.

Page 64

11:24 1        A. Yes.
11:24 2        Q. And I would like to know where those policies
11:24 3    of subsidiary organizations are created. Are they
11:24 4    created within a committee of Union Bank of California?
11:24 5        A. I'm not -- I'm really not certain where
11:24 6    they're created, but the policies of Union Bank of
11:24 7    California would be reviewed by the policy committee of
11:25 8    UnionBanCal Corporation.
11:25 9        Q. And do you know what policies of Union Bank of
11:25 10   California are reviewed by the public policy committee
11:25 11   of UnionBanCal Corporation?
11:25 12       A. Not specifically do I know the specific
11:25 13   policies, as I answered.
11:25 14       Q. Do you know what general policy categories are
11:25 15   considered by the public policy committee of Union Bank
11:25 16   of California, I mean of UnionBanCal Corporation?
11:25 17       A. I'm not as familiar with that -- that
11:25 18   committee of public policy, but it would address things
11:25 19   like shareholder voting rights, rotation of directors of
11:25 20   UnionBanCal Corporation. I'm sorry I'm not more
11:26 21   familiar with that particular committee.
11:26 22       Q. To your knowledge, does UnionBanCal
11:26 23   Corporation have any policies that are inconsistent with
11:26 24   those of Union Bank of California?
11:26 25       A. To my knowledge, no.

Page 65

11:26 1        Q. To your knowledge, does Union Bank of
11:26 2    California have any policies that are inconsistent with
11:26 3    the policies of UnionBanCal Corporation?
11:26 4        A. Union Bank is -- is not a public company as
11:26 5    one shareholder, so its policies would not address those
11:26 6    of what UnionBanCal Corporation would, given their
11:26 7    corporate structure difference.
11:27 8        Q. You're not aware of any policies of Union Bank
11:27 9    of California that are inconsistent with any policies of
11:27 10   UnionBanCal Corporation; is that correct?
11:27 11       A. I just -- I just said that I believe that
11:27 12   there are differences. Because Union Bank is not a
11:27 13   public company, does not have public shareholders, their
11:27 14   policies would be different than UnionBanCal
11:27 15   Corporation, that have public shareholders. So it would
11:27 16   be irrelevant to have rotational and voting policies
11:27 17   consistent amongst the organizations.
11:27 18       Q. Are there any policies of Union Bank of
11:27 19   California that overlap policies of UnionBanCal
11:28 20   Corporation?
11:28 21       A. I -- I would expect that they would be
11:28 22   consistent in -- in governance philosophy, but I'm not
11:28 23   -- I'm not -- I don't specifically know of the
11:28 24   differences that would be between those two
11:28 25   organizations.

17 (Pages 62 to 65)

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson          CONFIDENTIAL
February 7, 2007 FOR ATTORNEYS' EYES ONLY

Page 66

11:28  1       Q.  So to the extent that different policies may
11:28  2    exist between UnionBanCal Corporation and Union Bank of
11:28  3    California, you believe that they coincide to create a
11:28  4    common governing philosophy?  Would that be correct?
11:28  5       A.  I'm not sure I'd go that far, but where they
11:28  6    are consistent -- and applicable topics for both
11:29  7    organizations, they would be consistent.  The corporate
11:29  8    structures are different, the ownership is different, so
11:29  9    they would have different policies in that regard.
11:29  10      Q.  And if a particular topic area is not
11:29  11   applicable to UnionBanCal Corporation --
11:29  12      A.  Uh-huh (affirmative).
11:29  13      Q.  -- do you think it would have a policy
11:29  14   governing an inapplicable topic?
11:29  15      A.  Could you repeat the question?
11:29  16      Q.  If a particular topic area is not applicable
11:29  17   to UnionBanCal Corporation, do you think that
11:29  18   UnionBanCal Corporation would have a policy governing an
11:29  19   inapplicable topic?
11:30  20      A.  No.  UnionBanCal Corporation wouldn't have a
11:30  21   policy for an inapplicable policy for UnionBanCal
11:30  22   Corporation.
11:30  23      Q.  And the same would apply to Union Bank of
11:30  24   California, would that be correct?
11:30  25      A.  UnionBanCal Corporation might have a policy

Page 67

11:30  1    that is applicable to its wholly owned subsidiaries.
11:30  2       Q.  And the subsidiaries would be expected to
11:30  3    abide by that policy set out by UnionBanCal Corporation,
11:30  4    correct?
11:30  5       A.  The subsidiary -- yes.  The subsidiary should
11:30  6    abide by policies adopted by that subsidiary and
11:30  7    incorporate it into the policies of UnionBanCal
11:30  8    Corporation.
11:31  9       Q.  And if Union Bank of California -- I'm sorry.
11:31  10   If UnionBanCal Corporation develops a policy directed to
11:31  11   one of its wholly owned subsidiaries, that wholly owned
11:31  12   subsidiary is going to adopt that policy, will they not?
11:31  13          MR. SWEIGART:  I'm going to object to the
11:31  14   form.  You're getting into an area of speculation here.
11:31  15      A.  That -- that is speculation.  I don't know.
11:31  16      Q.  (BY MR. KING)  As you sit here today, would
11:31  17   you have any reason to believe that if the Union -- if
11:31  18   UnionBanCal Corporation developed a policy directed to a
11:31  19   specific wholly owned subsidiary, that that subsidiary
11:31  20   would not adopt that policy?
11:31  21          MR. SWEIGART:  Object to the form.
11:31  22      A.  The organization of Union Bank of California
11:31  23   is a separate organization that has employees, officers
11:32  24   and directors that recommend, approve, adopt policies to
11:32  25   govern Union Bank of California.

Page 68

11:32  1       Q.  (BY MR. KING)  What employees, officers and
11:32  2    directors of Union Bank of California recommend, approve
11:32  3    and adopt policies to govern Union Bank of California?
11:32  4       A.  I'm not here to -- to answer questions relative to
11:32  5    UnionBanCal Corporation.  I'm not here to speculate on
11:32  6    other things outside of my role in Union Bank of
11:32  7    California.
11:32  8       Q.  Were you speculating when you just told me
11:32  9    that the organization of Union Bank of California is a
11:32  10   separate organization that has employees, officers and
11:32  11   directors that recommend, approve and adopt policies to
11:32  12   govern Union -- Union Bank of California?
11:32  13      A.  As my role as an officer of Union Bank, I was
11:32  14   not speculating.
11:33  15      Q.  Okay.  Well, then, who are those officers,
11:33  16   employees and directors that recommend, approve and
11:33  17   adopt policies to govern Union Bank of California?
11:33  18      A.  There are many officers and employees of Union
11:33  19   Bank of California and there's a lot of policies.  Could
11:33  20   you be more specific?
11:33  21      Q.  I'm just -- I'm just asking a question about
11:33  22   your answer.  And you said that Union Bank of California
11:33  23   has employees, officers and directors that recommend,
11:33  24   approve and adopt policies that govern Union Bank of
11:33  25   California, and I'm just curious -- you said you were

Page 69

11:33  1    not speculating when you gave that answer and I'm just
11:33  2    curious as to who those individuals are.
11:33  3       A.  Officers, directors and employees of Union
11:33  4    Bank of California.  There are 10,000 employees.  I'm
11:33  5    not knowledgeable of all of those areas, but there are
11:33  6    policies of Union Bank and I'm knowledgeable that there
11:34  7    are policies of Union Bank.
11:34  8       Q.  And how do you know that those policies are
11:34  9    adopted by -- at the recommendation of officers,
11:34  10   directors or employees of Union Bank of California?
11:34  11      A.  Because they are disseminated throughout the
11:34  12   organization.
11:34  13      Q.  Who disseminates them?
11:34  14      A.  There's a department that does that.
11:34  15      Q.  What department does that?
11:34  16      A.  I don't know the name of that department, but
11:34  17   it is a -- just a communications department.
11:34  18      Q.  Do you know who's in charge of the
11:34  19   communications department?
11:34  20      A.  No, I do not.
11:34  21      Q.  Given the overlap of directors of the Union
11:34  22   Bank of California and UnionBanCal Corporation, do you
11:35  23   honestly believe, as you sit here, as an officer of
11:35  24   UnionBanCal Corporation, that one of its subsidiary
11:35  25   organizations would not adopt a policy directed to that

18 (Pages 66 to 69)

Gretchen Shore Court Reporting & Litigation Support
(903) 758-2183 * (903) 758-4890 Fax     E-mail: gretchenshore@gretchenshore.com

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson            CONFIDENTIAL
February 7, 2007 FOR ATTORNEYS' EYES ONLY

---

Page 70

11:35  1    subsidiary organization?
11:35  2        MR. SWEIGART:  I'm going to object to the
11:35  3    form of that question.
11:35  4        A.  Union Bank would adopt policies that are
11:35  5    appropriate for Union Bank.  Its officers and employees
11:35  6    would evaluate that and adopt that, those policies that
11:35  7    are appropriate for that organization.
11:35  8        Q.  (BY MR. KING)  But you can't tell me what
11:35  9    officers, employees would evaluate those policies.
11:36 10        MR. SWEIGART:  Object to the form.
11:36 11        A.  Not specifically.
11:36 12        MR. KING:  We're about out of tape time,
11:36 13    so let's go ahead and take a break, and if you guys want
11:36 14    to go ahead and break for lunch, will that be fine?  Is
11:36 15    it 11:30 here?
11:36 16        MR. SWEIGART:  Yeah.  I mean, on my time,
11:36 17    it's already --
11:36 18        MR. KING:  It's supper time for you,
11:36 19    isn't it?
11:36 20        MR. SWEIGART:  Almost, middle-of-the-day
11:36 21    time anyway.
11:36 22        THE VIDEOGRAPHER:  We're going to go off
11:36 23    the record at 11:36.
11:36 24        (Recess taken 11:36 to 12:42)
12:28 25        (Exhibit Number 101 marked.)

---

Page 71

12:42  1        THE VIDEOGRAPHER:  We're back on the
12:42  2    record at 12:42.
12:42  3        Q.  (BY MR. KING)  All right, Mr. Anderson, we're
12:42  4    back here from lunch.  Do you see the Exhibit that's
12:42  5    been marked 101 on your screen there in front of you?
12:42  6        A.  Yes.
12:42  7        Q.  Okay.  Does this -- and you can look through
12:42  8    it if you would like real quick.  Does this appear to be
12:42  9    the proxy statement that you had directed me to look up
12:43 10    earlier for some of the information that we were talking
12:43 11    about before we broke for lunch?
12:43 12        A.  Yeah, it looks like it.
12:43 13        Q.  I'll represent to you that I pulled this off
12:43 14    of the Union Bank of California -- or accessed this
12:43 15    through the www.UBOC.com website and, I believe, under
12:43 16    the investor relations tab, or something like that.
12:43 17        A.  Yeah.  Great.
12:43 18        Q.  Does this look familiar to you?
12:43 19        A.  It does.
12:43 20        Q.  Okay.  Have you seen this document before?
12:43 21        A.  Yes, I have.
12:43 22        Q.  I'm going to take control of the mouse
12:43 23    real quick, if you don't mind --
12:43 24        A.  Not a problem.
12:43 25        Q.  -- and take us to a particular page.

---

Page 72

12:43  1        MR. KING:  Do you guys have it up over
12:43  2    on your screen?
12:43  3        MR. SWEIGART:  Yes, we do.
12:44  4        Q.  (BY MR. KING)  This -- the page numbering on
12:44  5    here is a little bit off.  It's a PDF copy of -- of
12:44  6    what's on the website, so the PDF page is different than
12:44  7    the actual page number on the proxy, if that makes
12:44  8    sense.
12:44  9        A.  Yeah.
12:44 10        Q.  Okay.
12:44 11        A.  Which one are you going to go by?
12:44 12        Q.  Let's see here.  I'm going to go by the actual
12:44 13    proxy page and not the Adobe page.
12:44 14        A.  All right.
12:44 15        Q.  So I'll be going by the page number that's
12:44 16    just a single digit, not the 1 of 41.
12:44 17        A.  Sure.
12:44 18        Q.  When we left, we were talking about the public
12:44 19    policy committee.  Can you see that in the middle of
12:44 20    your screen?
12:44 21        A.  Yes.
12:44 22        Q.  Okay.
12:44 23        MR. SWEIGART:  Can you tell us what page
12:44 24    you're on?
12:44 25        MR. KING:  Page 8 of the proxy.

---

Page 73

12:45  1        Q.  (BY MR. KING)  I'll wait for your counsel to
12:45  2    track it down before I start asking you questions about
12:45  3    it.
12:45  4        MR. SWEIGART:  Okay.  I'm on 8.
12:45  5        MR. KING:  Fantastic.
12:45  6        MR. SWEIGART:  Thank you.
12:45  7        MR. KING:  No problem.  And if I jump
12:45  8    ahead and you guys have any problems finding it, just
12:45  9    let me know and stop me before I get -- before I go into
12:45 10    it.
12:45 11        Q.  (BY MR. KING)  Have you had a chance to read
12:45 12    that paragraph on the public policy committee?
12:45 13        A.  Yes, I did.
12:45 14        Q.  Okay.  And it states in there that the public
12:45 15    policy committee is a joint committee of UnionBanCal and
12:45 16    Union Bank of California, correct?
12:45 17        A.  Uh-huh (affirmative).
12:45 18        Q.  Does that refresh your recollection in any way
12:45 19    as to whether or not Union Bank of California has a
12:45 20    public policy committee at the appointment of its board
12:45 21    of directors?
12:45 22        A.  Yes, it does.
12:45 23        Q.  Okay.  And do you -- would you agree that the
12:45 24    public policy committee is a committee that's appointed
12:46 25    by the board of directors of Union Bank of California?

---

19 (Pages 70 to 73)

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson              CONFIDENTIAL
February 7, 2007 FOR ATTORNEYS' EYES ONLY

| Page 74 |
|---|

```
12:46  1       A.  I'm not sure that that says that.
12:46  2       Q.  Is it your understanding, in your role as an
12:46  3   employee of Union Bank of California, whether or not the
12:46  4   board of directors appoints a public policy committee?
12:46  5       A.  That's just conjecture on my part as to who
12:46  6   would actually appoint it.  It is a joint committee of
12:46  7   the two companies.
12:46  8       Q.  And who are the -- who are the directors that
12:46  9   serve on the public policy committee as of December 31,
12:46 10   2005?
12:46 11       A.  They're listed here, that you're showing me.
12:46 12       Q.  Okay.  Can you name those, please?
12:46 13       A.  Sure.  Mary Metz, Aida Alvarez, J. Fernando
12:47 14   Niebla, Carl Robertson and Dean Yoost.
12:47 15       Q.  Now, other than Mr. Robertson, all of those
12:47 16   are also directors of both UnionBanCal Corporation and
12:47 17   Union Bank of California, correct?
12:47 18       A.  That's correct.
12:47 19       Q.  And Mr. Robertson is only a director of Union
12:47 20   Bank of California, correct?
12:47 21       A.  Yes, he is.
12:47 22       Q.  Okay.  Given that this is a joint committee
12:47 23   between UnionBanCal and Union Bank of California, I'll
12:47 24   go back to a question I posed earlier.  In your position
12:47 25   as both an officer of UnionBanCal Corporation and an
```

| Page 75 |
|---|

```
12:47  1   employee of Union Bank of California, and now
12:47  2   understanding that this is a joint committee of
12:48  3   UnionBanCal and Union Bank of California, do you believe
12:48  4   that a policy developed at the hands of the policy
12:48  5   committee of UnionBanCal Corporation would not be
12:48  6   adopted by Union Bank of California?
12:48  7       MR. SWEIGART:  Object to the form.
12:48  8       A.  I still -- I don't change my answer, and the
12:48  9   reason is, is that there are certain policies that would
12:48 10   only be applicable to UnionBanCal Corporation and
12:48 11   therefore they wouldn't be applicable to Union Bank of
12:48 12   California.  Some would be and that's why it's a joint
12:48 13   committee.
12:48 14       Q.  (BY MR. KING)  To the extent --
12:48 15       A.  For instance --
12:48 16       Q.  Let me -- let me ask a question, and then
12:49 17   I'll -- well, I tell you what, go ahead and -- go ahead
12:49 18   and give me your --
12:49 19       A.  Equal opportunity, equal employment
12:49 20   opportunity, there are no employees of UnionBanCal, it
12:49 21   wouldn't be applicable to UnionBanCal.
12:49 22           Business standards for ethical conduct by
12:49 23   an employee, there are no employees of UnionBanCal
12:49 24   Corporation, it would not be applicable.
12:49 25           The laws governing UnionBanCal
```

| Page 76 |
|---|

```
12:49  1   Corporation are different than the laws that govern, in
12:49  2   some respects, Union Bank of California, so it -- those
12:49  3   public policy -- policies relative to those might be
12:49  4   different given the organizations.
12:50  5       Q.  Let me try to find the next one I wanted to
12:51  6   talk to you about.
12:51  7           MR. KING:  Can I close this?
12:51  8           (Mr. King and Ms. Toles conferring.)
12:51  9       A.  Yeah, I was having the same problem, I
12:51 10   couldn't find the up button.
12:51 11       Q.  (BY MR. KING)  Now, this -- this proxy
12:51 12   statement lists various committees.  Have you had a
12:52 13   chance to see that?  And if you need to scroll through,
12:52 14   feel free.
12:52 15       A.  Yeah, I'm looking at it.  I'll --
12:52 16       Q.  Okay.
12:52 17       A.  I can see it.
12:52 18       Q.  Now, are these committees of UnionBanCal
12:52 19   Corporation that are -- that are, to the best of your
12:52 20   knowledge, discussed within the UnionBanCal Corporation
12:52 21   proxy statement?
12:52 22           MR. SWEIGART:  I'm going to object to the
12:52 23   form.
12:52 24       A.  This is the UnionBanCal Corporation proxy
12:52 25   statement.
```

| Page 77 |
|---|

```
12:52  1       Q.  (BY MR. KING)  Okay.
12:52  2       A.  So it's discussed within it.
12:52  3       Q.  Okay.  Do you see the executive compensation
12:52  4   and benefits committee?
12:52  5       A.  I do.
12:52  6       Q.  Okay.  Is that a --
12:52  7           MR. KING:  I'm sorry.  It's at the --
12:52  8   it's still on page 8.  I believe it's at the top of that
12:52  9   page.
12:52 10           MR. SWEIGART:  Okay.  Got it.
12:52 11       Q.  (BY MR. KING)  Is the executive compensation
12:52 12   and benefits committee, as described here, a committee
12:52 13   of UnionBanCal Corporation?
12:52 14       A.  You know, it does not, that I can see,
12:53 15   identify it as which one.  It is whether it's combined
12:53 16   or separate.  That's one of the reasons why earlier in
12:53 17   our conversation I wasn't -- I wasn't sure.
12:53 18       Q.  So you don't know if this is a committee --
12:53 19   well, does --
12:53 20       A.  It absolutely is a committee of UnionBanCal
12:53 21   Corporation.
12:53 22       Q.  You just don't know whether or not it's also a
12:53 23   committee of Union Bank of California.
12:53 24       A.  I believe it is, although I'm not sure.
12:53 25       Q.  Okay.  Who makes up the executive compensation
```

20  (Pages 74 to 77)

3c3ebca2-e20f-4bec-8e6e-ea8a463df33b

David Anderson            CONFIDENTIAL
February 7, 2007 FOR ATTORNEYS' EYES ONLY

---

Page 78

12:53  1    and benefits committee?
12:53  2        A.  Would you like me to read the directors' names
12:53  3    again.
12:53  4        Q.  Please.
12:53  5        A.  Richard D. Farman, Dale Crandall, Mike
12:53  6    Gillfillan, Fernando Niebla.
12:53  7        Q.  Are these -- are these directors of
12:53  8    UnionBanCal Corporation?
12:54  9        A.  Yes.
12:54 10        Q.  Are they also directors of Union Bank of
12:54 11    California?
12:54 12        A.  Yes.
12:54 13        Q.  Do you see that first sentence where it says
12:54 14    that the executive compensation of benefits committee
12:54 15    oversees Union Bank of California's employee benefits
12:54 16    plan?
12:54 17        A.  Yes.
12:54 18        Q.  Okay.  Do you know how the executive
12:54 19    compensation and benefits committee oversees the Union
12:54 20    Bank of California's employee benefit plan?
12:54 21        A.  I'm not a -- an attending member of this
12:54 22    committee, but -- so I can't speak specifically on that
12:55 23    topic.
12:55 24        Q.  Well, you -- you told me earlier today that
12:55 25    you were here as a representative of UnionBanCal

---

Page 79

12:55  1    Corporation and that you were prepared to talk about
12:55  2    committees only for UnionBanCal Corporation.
12:55  3        A.  Uh-huh (affirmative).
12:55  4        Q.  Are you not prepared to talk about the
12:55  5    executive compensation and benefits committee of
12:55  6    UnionBanCal Corporation?
12:55  7        A.  I am, depending on how specific the questions
12:55  8    are.
12:55  9        Q.  So you have absolutely no idea what role --
12:55 10    let me -- that's probably a horrible question.
12:55 11        A.  I agree.
12:55 12        Q.  What is your understanding of how the
12:55 13    executive compensation and benefits committee oversees
12:55 14    Union Bank of California's employee benefit plan?
12:55 15        A.  Okay.  There are a number of employee benefit
12:55 16    plans that are in place for employees of Union Bank of
12:55 17    California, and those are such things as profit-sharing
12:56 18    plans, medical plans, retiree plans, and it is their
12:56 19    responsibility to approve amendments to those plans.
12:56 20        Q.  Would it be fair to say the executive
12:56 21    compensation and benefits committee has oversight into
12:56 22    the compensation of Union Bank of California employees?
12:56 23        A.  Yes.
12:56 24        Q.  Would it be fair to say that the executive
12:56 25    compensation and benefits committee exercises a degree

---

Page 80

12:56  1    of control over the compensation of employees of Union
12:56  2    Bank of California?
12:56  3            MR. SWEIGART:  Object to the form.
12:57  4        A.  Could you define "control"?  It seems to be
12:57  5    very broad.
12:57  6        Q.  (BY MR. KING)  How would you define "control"?
12:57  7        A.  I -- I suppose I wouldn't define "control."  I
12:57  8    guess I'd rather have you ask me a specific question.
12:57  9        Q.  So you can't define the word "control"?
12:57 10            MR. SWEIGART:  I've got to object to the
12:57 11    form, argumentative.
12:57 12        A.  The -- the -- the committee's function is to
12:57 13    approve recommendations of management, so I guess that's
12:57 14    how I would define control for you.
12:57 15        Q.  (BY MR. KING)  Would it be fair to say that
12:57 16    the executive compensation and benefits committee has
12:57 17    final say as to the compensation of employees of
12:57 18    UnionBanCal Corporation?
12:57 19            MR. SWEIGART:  Object to the form.
12:58 20        A.  There is no employees of UnionBanCal
12:58 21    Corporation.
12:58 22        Q.  (BY MR. KING)  I'm sorry.  Would it -- let me
12:58 23    rephrase that question.
12:58 24            Would it be fair to say that the
12:58 25    executive compensation and benefits committee has final

---

Page 81

12:58  1    say as to the compensation of employees of Union Bank of
12:58  2    California?
12:58  3        A.  Of only certain employees, I think as
12:58  4    specified in here.
12:58  5        Q.  And what employees would those be?
12:58  6        A.  I think it's the senior executives.
12:58  7        Q.  Is it your understanding that the executive
12:58  8    compensation and benefits committee only has final say
12:58  9    as to the compensation of senior executives of Union
12:58 10    Bank of California?
12:58 11        A.  I think that they have the approval function
12:58 12    of -- recommendation of management.
12:59 13        Q.  And once management recommends a certain
12:59 14    compensation package and it's approved by the executive
12:59 15    compensation and benefits committee, does it have to be
12:59 16    approved by anyone -- any other entities or committees?
12:59 17        A.  Not that I'm aware of.
12:59 18        Q.  So the buck stops with the executive
12:59 19    compensation and benefits committee.  Would that be fair
12:59 20    to say?
12:59 21        A.  They would make a report to the board of
12:59 22    directors.
01:00 23        Q.  Does the executive compensation and benefits
01:00 24    committee have any voice in the compensation of
01:00 25    directors of UnionBanCal Corporation or Union Bank of

---

21 (Pages 78 to 81)

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson                CONFIDENTIAL
February 7, 2007FOR ATTORNEYS' EYES ONLY

---

Page 82

01:00  1   California?
01:00  2       A.  In the middle of the paragraph it says the
01:00  3   committee also reviews and recommends directors'
01:00  4   compensation, so I believe the answer is yes.
01:00  5       Q.  Okay.  This thing is giving me fits here.  I
01:01  6   think I got it now.
01:01  7           MR. KING:  Thank you very much.  There we
01:01  8   go.
01:02  9       Q.  (BY MR. KING)  We also talked earlier about a
01:02 10   corporate governance committee.  Do you recall that?
01:02 11       A.  Yeah.  That's on page 4 or 5.  I can't see.
01:02 12   Five.  Oops.
01:02 13       Q.  Hang on.  Let me see if I can find that again.
01:02 14   It's on page 4 -- I believe it's 5 of 41 on the Adobe
01:02 15   numbering.
01:02 16           MR. SWEIGART:  It's --
01:02 17           MR. KING:  I'm at -- I'm at page 5 of 41.
01:03 18   I'm sorry.
01:03 19           THE WITNESS:  Yeah.  There's a subheading
01:03 20   in the middle of the page, The Board Of Directors And
01:03 21   Committees, and the first one is Corporate Governance.
01:03 22           MR. KING:  Sometimes technology is too
01:03 23   smart for us.
01:04 24       Q.  (BY MR. KING)  Have you got a chance to read
01:04 25   that paragraph under Corporate Governance?

Page 83

01:04  1       A.  Yes.
01:04  2       Q.  Does this give you an understanding of what
01:04  3   the role of the corporate governance committee's
01:04  4   function is for UnionBanCal Corporation?
01:04  5       A.  Basic understanding, yes.
01:04  6       Q.  It says, UnionBanCal, if you look at the
01:04  7   second paragraph --
01:04  8       A.  Uh-huh (affirmative).
01:04  9       Q.  -- it says, UnionBanCal has adopted a code of
01:04 10   ethics and conduct entitled the business standards for
01:05 11   ethical conduct --
01:05 12       A.  Uh-huh (affirmative).
01:05 13       Q.  -- which is applicable to all officers and
01:05 14   employees.
01:05 15       A.  Uh-huh (affirmative).
01:05 16       Q.  UnionBanCal has also adopted a code of ethics
01:05 17   for senior financial officers and a code of ethics
01:05 18   applicable to its directors.  These codes are subject to
01:05 19   an annual certification process to review compliance.
01:05 20       A.  Uh-huh (affirmative).
01:05 21       Q.  Now, earlier, when we were talking about
01:05 22   different policies that may be developed by UnionBanCal
01:05 23   Corporation, you indicated that business standards for
01:05 24   ethical conduct by an employee was one such policy that
01:05 25   UnionBanCal Corporation would not develop because there

Page 84

01:05  1   are no employees of UnionBanCal Corporation.
01:05  2       A.  Uh-huh (affirmative).
01:05  3       Q.  Is that correct?
01:05  4       A.  Right.
01:05  5       Q.  Do you -- in light of reading the second
01:05  6   paragraph there, do you still believe that that's an
01:05  7   accurate statement?
01:05  8       A.  Yes, I do.  It says covers officers and
01:05  9   employees.  It is applicable to the officers of
01:06 10   UnionBanCal Corporation.
01:06 11       Q.  But UnionBanCal Corporation's -- the code of
01:06 12   ethics and conduct that it adopted, it didn't --
01:06 13   UnionBanCal Corp. did, in fact, adopt a code of ethics
01:06 14   and conduct, did it not?
01:06 15       A.  Yes, it did.
01:06 16       Q.  Okay.  And right here it says that it is
01:06 17   applicable to all officers and employees, correct?
01:06 18       A.  That's right.
01:06 19       Q.  And earlier you had said that UnionBanCal
01:06 20   Corporation would have no reason to adopt standards for
01:06 21   ethical conduct by an employee, correct?
01:06 22       A.  For an employee, that's correct.
01:06 23       Q.  But here it's stating that UnionBanCal has
01:06 24   adopted a code of ethics and conducted --
01:06 25       A.  For officers.  Stop, officers.

Page 85

01:06  1       Q.  Well, it doesn't stop right here on the
01:06  2   company's proxy statement, though.  It continues and
01:06  3   says employees, does it not?
01:06  4       A.  That's correct.
01:06  5       Q.  Whoever wrote this document could've stopped
01:06  6   at officers, correct?
01:06  7       A.  It's a policy that -- as you can see, it is
01:06  8   for UnionBanCal and is applicable to any employees of
01:07  9   any of the subsidiary corporations, which I also stated
01:07 10   to you earlier.
01:07 11       Q.  Is that what it says in that sentence, that
01:07 12   it's applicable to employees of UnionBanCal
01:07 13   subsidiaries?
01:07 14       A.  UnionBanCal is used in this term as the -- I
01:07 15   believe, in this case, applies to also its subsidiary
01:07 16   employees.
01:07 17       Q.  And how do you have that understanding?
01:07 18       A.  It's just my -- my understanding from reading
01:07 19   this.
01:07 20       Q.  Is there anything in the document that
01:07 21   limits -- that says that UnionBanCal here is referring
01:07 22   to its -- itself and its subsidiaries?
01:07 23       A.  I do not have that in front of me to be able
01:07 24   to read it.
01:07 25       Q.  Well, you have the entire document in front of

22 (Pages 82 to 85)

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson                CONFIDENTIAL
February 7, 2007 FOR ATTORNEYS' EYES ONLY

---

**Page 86**

01:07 1    you, Mr. Anderson.
01:07 2        A. No, the code of ethics is what I'm referring
01:07 3    to.
01:07 4        Q. Okay. But here in its proxy statement -- who
01:07 5    is the proxy statement provided to, Mr. Anderson?
01:07 6        A. Shareholders of UnionBanCal Corporation.
01:07 7        Q. And is it for the benefit of shareholders of
01:08 8    UnionBanCal Corporation?
01:08 9        A. Yes, it is.
01:08 10       Q. Is it for the benefit of the public at large
01:08 11   who may be interested in investing in UnionBanCal
01:08 12   Corporation?
01:08 13       A. Yes.
01:08 14       Q. And is it important that if you're going to
01:08 15   make -- that if UnionBanCal Corporation makes
01:08 16   representations to its shareholders and the public at
01:08 17   large, that those statements be correct and accurate?
01:08 18       A. It is accurate.
01:08 19       Q. Okay. So Union --
01:08 20       A. UnionBanCal.
01:08 21       Q. Excuse me. This document is accurate when it
01:08 22   says, UnionBanCal has adopted a code of ethics and
01:08 23   conduct entitled the business standards for ethical
01:08 24   conduct, which is applicable to all officers and
01:08 25   employees, correct?

**Page 87**

01:08 1        A. Yes.
01:08 2        Q. It does not say and employees of its
01:08 3    subsidiaries there, does it not?
01:08 4        A. UnionBanCal has no employees. If it did, it
01:08 5    would've been applicable to those employees. It does
01:08 6    not.
01:08 7        Q. But it doesn't say here that it doesn't have
01:08 8    employees, correct?
01:09 9        A. It does not and it is not necessary, in my
01:09 10   view.
01:09 11       Q. And it doesn't define employees as being
01:09 12   limited to employees of UnionBanCal Corporation
01:09 13   subsidiaries, does it?
01:09 14       A. No. I don't think it is necessary to.
01:09 15       Q. If you're just the average person on the
01:09 16   street that had no knowledge of UnionBanCal
01:09 17   Corporation --
01:09 18       A. Uh-huh (affirmative).
01:09 19       Q. -- would you -- and you read this sentence,
01:09 20   would you read it to believe that UnionBanCal
01:09 21   Corporation has no employees?
01:09 22           MR. SWEIGART: Object to the form.
01:09 23       A. I'm not sure the reader would understand
01:09 24   whether it had any employees or not.
01:09 25       Q. (BY MR. KING) And, in fact, if -- if

**Page 88**

01:09 1    Mr. Smith, in Marshall, Texas, happened to pick up this
01:09 2    proxy statement and look at it and read this sentence,
01:09 3    he -- it would be -- it would appear that UnionBanCal
01:09 4    Corporation does have employees, would it -- would it
01:09 5    not?
01:09 6            MR. SWEIGART: Object to the form.
01:10 7        A. He might.
01:10 8        Q. (BY MR. KING) Mr. Smith, in Marshall, Texas,
01:10 9    has no reason to believe that employees is only limited
01:10 10   to UnionBanCal subsidiaries if he read that sentence,
01:10 11   correct?
01:10 12           MR. SWEIGART: Object to the form.
01:10 13       A. They might.
01:10 14       Q. (BY MR. KING) They might what? They might
01:10 15   think it was limited to UnionBanCal Corporation?
01:10 16       A. Officers and employees, I would find --
01:10 17   probably feel it was irrelevant to -- it'd give him
01:10 18   comfort to know that it covered any functioning people
01:10 19   within the organization, glad to know that anyone that
01:10 20   serves in this company, in any capacity, would be
01:10 21   covered by a code of ethics.
01:10 22       Q. Including employees of UnionBanCal
01:10 23   Corporation, if they have them.
01:11 24       A. I think that's the important part of what the
01:11 25   reader would want to understand, that anyone that serves

**Page 89**

01:11 1    in any capacity within UnionBanCal would be covered by a
01:11 2    code of ethics.
01:11 3        Q. Including employees.
01:11 4        A. If there were some, yes.
01:11 5            MR. KING: I'm going to go to page 9.
01:11 6            MR. SWEIGART: Is that the Adobe page?
01:11 7            MR. KING: That is the proxy page.
01:11 8            MR. SWEIGART: Proxy page. Okay.
01:11 9            THE WITNESS: In many cases they're
01:12 10   sync'd up, or pretty close, depending what part of the
01:12 11   page you're on.
01:12 12           MR. SWEIGART: Okay. I think I've got
01:12 13   it.
01:12 14           THE WITNESS: I need my glasses.
01:12 15           MR. KING: I hit the wrong button. I
01:12 16   couldn't have told you anything about that page. I'm
01:13 17   afraid I went to the wrong page. I want to go to page
01:13 18   13 of the proxy.
01:13 19       Q. (BY MR. KING) Do you see where it says,
01:13 20   Election of Directors, Mr. Anderson?
01:13 21       A. Yes.
01:13 22       Q. Okay. I'd like to direct you to that first
01:13 23   paragraph.
01:13 24       A. Uh-huh (affirmative).
01:13 25       Q. And we'll talk in a minute about the election

23 (Pages 86 to 89)

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson             CONFIDENTIAL
February 7, 2007 FOR ATTORNEYS' EYES ONLY

---

Page 90

```
01:13  1   of the board of directors. I believe earlier you had
01:13  2   stated that Union -- tell me if I -- if I misquote your
01:14  3   testimony -- that directors of UnionBanCal Corporation
01:14  4   exercise the right to vote on the directors and vote on
01:14  5   directors on behalf of UnionBanCal Corporation for the
01:14  6   board of directors of Union Bank of California. Is that
01:14  7   correct?
01:14  8       A. I think that's what I said.
01:14  9       Q. Okay. You see that last paragraph -- I mean
01:14 10   the last sentence in that first paragraph, under
01:14 11   Election of Directors, beginning, All nominees?
01:14 12       A. Yeah.
01:14 13       Q. Okay. Can you read those last two sentence --
01:14 14   I'm sorry -- next-to-the-last sentence, can you read
01:14 15   those last two sentence, please.
01:14 16       A. The one starting with, All nominees?
01:14 17       Q. Yes, sir.
01:14 18       A. All nominees except for Messrs Mickey and
01:15 19   Kanari are also directors of Union Bank of California.
01:15 20       Q. And can you read that last sentence.
01:15 21       A. If elected as directors of UnionBanCal, all
01:15 22   nominees, except for Mr. Mickey and Kanari, are expected
01:15 23   to be re-elected as directors of Union Bank of
01:15 24   California.
01:15 25       Q. Do you have any understanding as to why all
```

Page 91

```
01:15  1   nominees, except for Messrs Mickey and Kanari, were
01:15  2   expected to be re-elected as directors of Union Bank of
01:15  3   California?
01:15  4       A. No.
01:15  5       Q. Would it be fair to say that all nominees for
01:15  6   the board of directors of UnionBanCal were also up for
01:16  7   election for directors of Union Bank of California
01:16  8   except for Messrs Mickey and Mr. -- and Mr. Kanari?
01:16  9           MR. SWEIGART: Object to the form;
01:16 10   mischaracterizes the document.
01:16 11       Q. (BY MR. KING) Let me -- let me rephrase that.
01:16 12           Would it be fair to say that the
01:16 13   directors that were up for re-election --
01:16 14       A. Which directors?
01:16 15       Q. The -- one minute.
01:16 16       A. Okay.
01:16 17       Q. I'm going to try to make this as clear as I
01:16 18   can.
01:16 19       A. Well, I hope so.
01:16 20       Q. Would it be fair to say that the directors of
01:16 21   UnionBanCal Corporation, that were up for re-election,
01:16 22   were also up for re-election to the board of directors
01:16 23   of Union Bank of California except for Mr. Mickey and
01:16 24   Mr. Kanari?
01:16 25           MR. SWEIGART: Object to the form.
```

Page 92

```
01:16  1       A. I think it says, if elected UnionBanCal
01:17  2   directors, that they would be up for re-election.
01:17  3       Q. (BY MR. KING) Okay. So if they were elected
01:17  4   as directors of UnionBanCal Corporation would those
01:17  5   nominees be voting on themselves as directors for Union
01:17  6   Bank of California?
01:17  7       A. I'm not sure of the legal process of who would
01:17  8   vote. They'd be elected, but I don't know the legal
01:17  9   term as what you just asked me.
01:17 10       Q. They would be elected by the -- the board of
01:17 11   directors for Union Bank of California, would be elected
01:17 12   by the board of directors for UnionBanCal, correct?
01:18 13       A. Right, I believe so.
01:18 14       Q. Okay.
01:18 15       A. I'm just not certain, but I believe so.
01:18 16       Q. And if -- and if those -- if the same
01:18 17   individuals that are up for election for Union -- for
01:18 18   the board of directors of Union Bank of California are
01:18 19   also directors of UnionBanCal, those directors would be
01:18 20   voting on themselves in the process of electing the
01:18 21   directors for Union Bank of California, correct?
01:18 22       A. To the extent that they are the same people,
01:18 23   but the boards are not the same. Mickey and Kanari, as
01:18 24   we can see, are not bank board directors up for
01:18 25   nomination, so the boards are not the same.
```

Page 93

```
01:18  1       Q. There's a slight difference, correct?
01:18  2       A. Well, more than a slight difference. It's
01:19  3   about 20 percent difference.
01:19  4       Q. I believe you had testified earlier that all
01:19  5   of the board of directors -- all the members of the
01:19  6   board of directors for UnionBanCal Corporation are also
01:19  7   on the board of directors for Union Bank of California.
01:19  8   Is that correct?
01:19  9       A. I don't believe I said that.
01:19 10       Q. Okay. How many -- I don't want to go back and
01:19 11   rehash this completely. Do you recall how many members
01:19 12   of the board of directors for UnionBanCal Corporation
01:19 13   also serve on the board of directors for Union Bank of
01:19 14   California?
01:19 15           MR. SWEIGART: Object to the form; asked
01:19 16   and answered.
01:19 17       A. I think as it says all but two.
01:19 18       Q. (BY MR. KING) Okay. And those two are
01:19 19   Mr. Mickey and Mr. Kanari, correct?
01:20 20       A. Yes.
01:20 21       Q. Now, are Mr. Mickey and Mr. Kanari on the
01:20 22   board of directors for UnionBanCal or Union Bank of
01:20 23   California?
01:20 24       A. They're on the board of directors for
01:20 25   UnionBanCal.
```

24 (Pages 90 to 93)

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson              CONFIDENTIAL
February 7, 2007 FOR ATTORNEYS' EYES ONLY

Page 94

01:20  1      Q.  Okay.
01:20  2      A.  They are not on the board of directors of
01:20  3  Union Bank.
01:20  4      Q.  Okay.  Did you testify earlier that all the
01:20  5  members that are on the board of directors for Union
01:20  6  Bank of California are also members of the board of
01:20  7  directors for UnionBanCal?
01:20  8          MR. SWEIGART:  Object to the form.  If
01:20  9  you want to show him his prior testimony --
01:20 10      A.  Yeah, would you like to?  If I did say that
01:20 11  they are the same, then that's incorrect.
01:20 12      Q.  (BY MR. KING)  Okay.
01:20 13      A.  Because there is a director of Union Bank that
01:20 14  is not a director of UnionBanCal.
01:20 15      Q.  Okay.  So --
01:20 16      A.  My recollection was you asked me the number of
01:21 17  people.  It's clear on the form who is and who isn't.  I
01:21 18  might have made a mistake in my math, but it is very
01:21 19  clear on the form.
01:21 20      Q.  I understand.  I understand.  And I'm not
01:21 21  trying to mix you up.  I'm just wanting to make sure we
01:21 22  have a -- we both have the same understanding.
01:21 23      A.  I think that form you showed me before was
01:21 24  very clear.
01:21 25      Q.  Okay.

Page 95

01:21  1      A.  And I think this is very clear.  And I think
01:21  2  those things should stand as my answers.  If I gave an
01:21  3  incorrect -- by my math, I apologize.
01:21  4      Q.  Hey, I understand.  I'm an Aggie and I make
01:21  5  mathematical errors all the time, so --
01:21  6      A.  Okay.  Your apology is accepted.
01:21  7      Q.  I appreciate it.
01:22  8          Do you see the first full paragraph on
01:22  9  page 14 that begins with, The board of directors has
01:22 10  adopted?
01:22 11      A.  Yes.
01:22 12      Q.  It says, The board of directors has adopted a
01:22 13  policy which provides that any director who is employed
01:22 14  full-time by UnionBanCal or Union Bank of California
01:22 15  shall retire from the board at age 65, and any director
01:22 16  who is not employed full-time by UnionBanCal or Union
01:22 17  Bank of California, and it goes on from there.
01:22 18      A.  Uh-huh (affirmative).
01:22 19      Q.  Are there any directors who were employed
01:22 20  full-time by Union Bank of -- UnionBanCal?
01:23 21      A.  There are no directors of UnionBanCal that are
01:23 22  employed full-time by UnionBanCal as UnionBanCal has no
01:23 23  employees.
01:23 24      Q.  Are there any directors who were employed
01:23 25  part-time by UnionBanCal?

Page 96

01:23  1      A.  As I said, there are no employees of
01:23  2  UnionBanCal.  That covers full-time and part-time.
01:23  3      Q.  Has there ever been an employee of
01:23  4  UnionBanCal?
01:23  5      A.  Not that I'm aware of.
01:23  6      Q.  Full-time or part-time.
01:23  7      A.  Full-time or part-time.
01:23  8      Q.  As you sit here today, you're not aware of any
01:23  9  prior -- or any individual being employed full-time or
01:23 10  part-time by UnionBanCal Corporation.
01:23 11      A.  That's correct.
01:23 12      Q.  Is there an intent to hire any employees by
01:23 13  UnionBanCal Corporation?
01:24 14      A.  Not -- not that I'm aware of.
01:24 15      Q.  Why is there a policy that provides that any
01:24 16  director who is employed full-time by UnionBanCal or
01:24 17  Union Bank of California --
01:24 18      A.  Because --
01:24 19          MR. SWEIGART:  Object to the form.
01:24 20          Go ahead.
01:24 21          THE WITNESS:  I'm sorry.
01:24 22      A.  I suppose that there is the possibility that
01:24 23  an employee could be hired by UnionBanCal Corporation.
01:24 24      Q.  (BY MR. KING)  There's nothing to prohibit
01:24 25  that, correct?

Page 97

01:24  1      A.  Not that I'm aware of.
01:24  2          MR. KING:  I'm going to go to page 23 of
01:24  3  the proxy.
01:25  4      Q.  (BY MR. KING)  Mr. Anderson, I'd like for you
01:25  5  to look at the heading Senior Management Bonus Plan in
01:25  6  that paragraph underneath that.
01:25  7      A.  Yes.  (Reviewing document.)
01:25  8      Q.  Have you had a chance to look through that?
01:25  9      A.  Yes.
01:25 10      Q.  Do you see that first sentence where it says,
01:26 11  The senior management bonus plan provides the means
01:26 12  whereby certain senior management employees of
01:26 13  UnionBanCal and Union Bank of California may be given
01:26 14  the opportunity to earn performance-based cash annual
01:26 15  incentives?
01:26 16      A.  Yes.
01:26 17      Q.  If there are no employees of UnionBanCal, why
01:26 18  is there a need for a senior management bonus plan that
01:26 19  provides for employees of UnionBanCal to earn
01:26 20  performance-based cash annual incentives?
01:26 21          MR. SWEIGART:  Object to the form.
01:26 22      A.  So that if there were employees of UnionBanCal
01:26 23  Corporation, it would be a policy in place to cover that
01:26 24  rather than revising policies if an employee was hired.
01:27 25      Q.  (BY MR. KING)  I'd like to go down just a

25 (Pages 94 to 97)

Gretchen Shore Court Reporting & Litigation Support
(903) 758-2183 * (903) 758-4890 Fax     E-mail: gretchenshore@gretchenshore.com

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson               CONFIDENTIAL
February 7, 2007FOR ATTORNEYS' EYES ONLY

---

Page 98

```
01:27  1   little bit to page 24.
01:27  2       A.  Uh-huh (affirmative).
01:27  3       Q.  Under Employment Agreements, I'd like to talk
01:27  4   to you about that first paragraph under Employment
01:27  5   Agreements.
01:27  6       A.  Okay.
01:28  7       Q.  Let me know when you've had an opportunity to
01:28  8   read through that first paragraph.
01:28  9       A.  I have.
01:28 10       Q.  In this paragraph it says, In February of
01:28 11   2004, Union Bank of California entered into an
01:28 12   employment agreement with Mr. Flynn as of April 1, 2004,
01:28 13   effective as of April 1, 2004 in connection with his
01:28 14   appointment effective April 1 of 2004 as vice chairman
01:28 15   and head of Commericial Financial Services Group of
01:28 16   Union Bank of California and UnionBanCal.
01:28 17       A.  Uh-huh (affirmative).
01:28 18       Q.  Did I read that correctly?
01:28 19       A.  Yes.
01:29 20       Q.  Okay.  Later on in the paragraph it goes on to
01:29 21   say that his agreement will be extended automatically at
01:29 22   the end of each year unless UnionBanCal delivers written
01:29 23   notice to Mr. Flynn.  Did I read that correct?
01:29 24       A.  I'm sure you did.  Is that the --
01:29 25       Q.  Is that the correct -- I'm sorry.  I didn't
```

Page 99

```
01:29  1   read it -- I didn't quote it, but is that in the correct
01:29  2   context of the sentence?
01:29  3       A.  Yes.
01:29  4       Q.  Okay.  So UnionBanCal Corporation has the
01:29  5   ability to terminate Mr. Flynn's employment with Union
01:29  6   Bank of California, correct?
01:29  7       A.  I believe it is that he can terminate his
01:29  8   relationship as an officer of UnionBanCal Corporation.
01:30  9       Q.  Well, in the context of this sentence, unless
01:30 10   I'm misreading it, UnionBanCal Corporation has the
01:30 11   opportunity, should it desire, to terminate the
01:30 12   employment of Mr. Flynn as to both his position with
01:30 13   Union Bank of California and UnionBanCal Corporation.
01:30 14   Is that correct?
01:30 15       A.  Well, the first sentence says that it's an
01:30 16   agreement between Union Bank of California.
01:30 17       Q.  Correct.
01:30 18       A.  So that's where the -- I believe the agreement
01:30 19   is the appropriate body.  However, given that Mr. Flynn
01:30 20   is an officer of UnionBanCal Corporation, they can
01:30 21   always terminate him as an officer of UnionBanCal
01:30 22   Corporation.
01:30 23       Q.  Let's look at the sentence on the fourth line.
01:30 24       A.  Uh-huh (affirmative).
01:30 25       Q.  The agreement is for an initial three-year
```

Page 100

```
01:31  1   period and is extended automatically at the end of each
01:31  2   year for an additional one year unless UnionBanCal
01:31  3   delivers written notice to Mr. Flynn --
01:31  4       A.  Uh-huh (affirmative).
01:31  5       Q.  -- at least 60 days prior to the anniversary
01:31  6   of the effective date of the agreement.
01:31  7       A.  Uh-huh (affirmative).
01:31  8       Q.  That agreement will not be extended.
01:31  9       A.  Uh-huh (affirmative).
01:31 10       Q.  Now, here this sentence references the
01:31 11   agreement, which is the agreement entered into between
01:31 12   Mr. Flynn and Union Bank of California, correct?
01:31 13       A.  That's correct.
01:31 14       Q.  And UnionBanCal Corporation has the ability to
01:31 15   terminate that agreement if the proper notice is
01:31 16   provided in accordance with that paragraph, correct?
01:31 17       A.  I -- I can read it like you can and that's
01:31 18   about the amount of details that I can give to you on
01:31 19   this.
01:31 20       Q.  Well, is -- from reading that, is that your
01:31 21   understanding based on your reading of this?
01:31 22       A.  Based upon my reading of it, I would've
01:31 23   thought that UnionBanCal can give him written notice as
01:32 24   an officership of UnionBanCal.
01:32 25       Q.  So the fact that this sentence references the
```

Page 101

```
01:32  1   agreement, that doesn't have any relevance to you in
01:32  2   analyzing UnionBanCal's options?
01:32  3       A.  It certainly has relevance.  I'm just not
01:32  4   certain of the specifics and how they relate.  That's
01:32  5   why I draw back to the first sentence that Union Bank of
01:32  6   California entered into the agreement.  Whether
01:32  7   UnionBanCal Corporation or not has authority under that,
01:32  8   I'm not certain.
01:32  9       Q.  Well, it says that --
01:32 10       A.  It might be a conflict in how it is written.
01:32 11       Q.  Well, it says that UnionBanCal can deliver
01:33 12   notice that the agreement will not be extended, correct?
01:33 13       A.  I can read it just like you can.
01:33 14       Q.  Well, is that what it says, Mr. Anderson?
01:33 15       A.  That's what it says.
01:33 16       Q.  Okay.  And you stated earlier that the
01:33 17   information that's in this proxy statement is complete
01:33 18   and accurate, correct?
01:33 19       A.  Yes, I believe it to be.
01:33 20       Q.  Okay.
01:33 21       A.  I think it's a matter of interpretation.
01:33 22       Q.  How would you interpret the term "the
01:33 23   agreement"?  Is there any other -- does it -- is there
01:33 24   any other agreement other than the agreement between
01:33 25   Union Bank of California and Mr. Flynn that this
```

26 (Pages 98 to 101)

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson                CONFIDENTIAL
February 7, 2007 FOR ATTORNEYS' EYES ONLY

Page 102

01:33 1 sentence could be referencing?
01:33 2    A. No. I think that that's accurate. It is an
01:33 3 agreement between Union Bank of California and
01:33 4 Mr. Flynn, and as I read it, it seems as though
01:34 5 UnionBanCal has the authority to terminate him as an
01:34 6 officer of the holding company. Whether it's
01:34 7 interrelated then to his employment because of that with
01:34 8 Union Bank, I don't know.
01:34 9    Q. Is that really what you think, Mr. Anderson?
01:34 10 You don't tie that agreement -- the agreement back to
01:34 11 the agreement between UnionBanCal -- or Union Bank of
01:34 12 California and Mr. Flynn?
01:34 13    MR. SWEIGART: Object to the form. It's
01:34 14 argumentative.
01:34 15    Q. (BY MR. KING) I'd like you to move down -- or
01:34 16 I've moved down -- I'd like you to look at the paragraph
01:34 17 talking about an agreement -- an employment agreement
01:34 18 with Mr. Matson.
01:34 19    A. Uh-huh (affirmative).
01:34 20    Q. What is Mr. Matson's role? Chief financial
01:34 21 officer? Is that correct?
01:34 22    A. That's what it says.
01:34 23    Q. Okay. And this sentence says, Union Bank of
01:34 24 California entered into an employment agreement with
01:34 25 Mr. Matson effective as of January 1, 1998, in

Page 103

01:34 1 connection with his appointment as executive vice
01:34 2 president and chief financial officer and an amendment
01:35 3 to the employment agreement effective as of May 1, 2005
01:35 4 in connection with his employment as vice chairman and
01:35 5 chief financial officer. Did you see that?
01:35 6    A. Yes.
01:35 7    Q. Okay. It also states here that Mr. Matson's
01:35 8 compensation is subject to annual review and increases
01:35 9 as determined by the executive compensation and benefits
01:35 10 committee of the board of directors; is that correct?
01:35 11    A. Yes.
01:35 12    Q. Okay. And would that be the executive
01:35 13 compensation and benefits committee of the board of
01:35 14 directors of UnionBanCal Corporation?
01:35 15    A. I believe that that is a combined committee of
01:36 16 UnionBanCal Corporation and Union Bank, but I'm not
01:36 17 sure, certain.
01:36 18    Q. Why do you believe it may be a combined
01:36 19 committee between Union Bank of California and
01:36 20 UnionBanCal?
01:36 21    A. My recollection when I was reading it a few
01:36 22 minutes ago.
01:36 23    Q. Okay. I'm going to scroll down to page 29 of
01:36 24 the proxy statement. I'd like for you to look at this
01:37 25 overview section here, Mr. Anderson, of the executive

Page 104

01:37 1 compensation and benefits committee report on executive
01:37 2 compensation.
01:38 3    A. (Reviewing document.) Okay.
01:38 4    Q. Under the overview it says, UnionBanCal
01:38 5 executive compensation and benefits committee, the
01:38 6 compensation committee, reviews and approves executive
01:38 7 officer compensation programs and award levels and
01:38 8 oversees UnionBanCal's employee benefit plans.
01:38 9    If UnionBanCal has no employees, why does
01:39 10 it have an employee benefit plan?
01:39 11    A. In case that it -- the event that it does have
01:39 12 employees, it would then be covered.
01:39 13    Q. And it, in fact, has in place an employee
01:39 14 benefits plan currently; is that correct?
01:39 15    A. It -- for employees of UnionBanCal
01:39 16 Corporation.
01:39 17    Q. Okay. I'm going to move down to the next --
01:39 18 portion of the next page. It's still on 29 of the --
01:39 19    MR. SWEIGART: There's a break on the
01:39 20 Adobe.
01:39 21    MR. KING: Correct. There's a -- at the
01:39 22 top of that next page under, What Is Our Philosophy On
01:39 23 Executive Compensation.
01:39 24    Q. (BY MR. KING) Do you see that, Mr. Anderson?
01:39 25    A. Yes, sir.

Page 105

01:39 1    Q. I'd like for you to look at that first
01:40 2 paragraph there and let me know when you've finished
01:40 3 looking at it.
01:40 4    A. (Reviewing document.) Yes, I have.
01:40 5    Q. It says, It is our philosophy -- our being
01:40 6 UnionBanCal Corporation, I presume. Would that be
01:40 7 correct?
01:40 8    A. I'm sorry. Say again. Our, is that what
01:40 9 you're referring to?
01:40 10    Q. It is our philosophy, do you understand
01:40 11 whether or not "our" there is referring to UnionBanCal
01:40 12 Corporation?
01:40 13    A. Yes.
01:40 14    Q. Okay. It is our philosophy to compensate
01:40 15 executive officers in a matter that promotes the
01:40 16 recruitment, motivation and retention of exceptional
01:40 17 employees that will help UnionBanCal achieve a strategic
01:40 18 business objective and build superior stockholder value.
01:40 19 Did I read that correctly?
01:40 20    A. Yes.
01:40 21    Q. Are officers, executive officers compensated
01:41 22 for promoting -- I mean for recruiting, motivating and
01:41 23 retaining exceptional employees that help UnionBanCal
01:41 24 achieve strategic business objectives?
01:41 25    A. There are no employees of UnionBanCal.

27 (Pages 102 to 105)

Gretchen Shore Court Reporting & Litigation Support
(903) 758-2183 * (903) 758-4890 Fax    E-mail: gretchenshore@gretchenshore.com

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson                CONFIDENTIAL
February 7, 2007FOR ATTORNEYS' EYES ONLY

Page 106

01:41 1    Q. But it's UnionBanCal's philosophy to
01:41 2 compensate it's executive -- it's executive officers in
01:41 3 a manner that promotes those executive officers'
01:41 4 recruitment and motivation and retention of exceptional
01:41 5 employees; is that correct?
01:41 6    A. That's correct.
01:41 7    Q. Mr. Anderson, do you know who is responsible
01:42 8 for hiring employees of Union Bank of California?
01:43 9    A. Union Bank of California.
01:43 10   Q. Is there a human resource department at Union
01:43 11 Bank of California?
01:43 12   A. Yes, there is.
01:43 13   Q. Is there a human resource department or
01:43 14 division at UnionBanCal Corporation?
01:43 15   A. No.
01:43 16   Q. Who does the -- is there a particular
01:43 17 individual that's the vice president of HR that's
01:43 18 ultimately responsible for the HR department at Union
01:43 19 Bank of California?
01:43 20   A. Yes.
01:43 21   Q. Do you know who that person is?
01:43 22   A. Paul Fear. I mentioned that earlier.
01:43 23   Q. Mr. Fear. Who does Mr. Fear report to, do you
01:43 24 know, in his role as -- let me back up. What is
01:43 25 Mr. Fear's job title in regards to his human resource

Page 107

01:43 1 position?
01:43 2    A. I don't know specifically. He's an executive
01:43 3 vice president. I believe director of human resources
01:43 4 is his title, but --
01:43 5    Q. Do you know who he reports to in his current
01:43 6 role with Union Bank of California?
01:43 7    A. He reports to a vice chairman of Union Bank of
01:43 8 California.
01:43 9    Q. Do you know who that is?
01:44 10   A. I -- I do happen to know. Currently it is a
01:44 11 man by the name of Oka, Mr. Oka, O-k-a.
01:44 12   Q. And what is -- you said Mr. Oka is a vice
01:44 13 chairman of Union Bank of California?
01:44 14   A. Yes.
01:44 15   Q. Does Mr. Oka have any positions with
01:44 16 UnionBanCal Corporation?
01:44 17   A. He is an officer of UnionBanCal Corporation.
01:44 18   Q. Do you know what his role as an officer with
01:44 19 UnionBanCal Corporation is?
01:44 20   A. He is an officer of that. Since there are no
01:44 21 employees, he has no role in a -- as a UnionBanCal
01:44 22 Corporation officer in the hiring of employees.
01:44 23   Q. Do you know what Mr. Oka does in his role as
01:44 24 officer of UnionBanCal Corporation?
01:44 25   A. Serves on the board of directors, is also a

Page 108

01:45 1 director of UnionBanCal Corporation. I specifically
01:45 2 don't know what his role specifically is with
01:45 3 UnionBanCal Corporation other than to be a member of the
01:45 4 board of directors.
01:45 5    Q. Do you know who conducts performance reviews
01:45 6 of Union Bank of California employees?
01:45 7    A. Yes, I happen to know.
01:45 8    Q. And who -- who does that?
01:45 9    A. That individual's supervisor.
01:45 10   Q. And do these individual supervisors prepare
01:45 11 some type of report to submit to someone higher up the
01:45 12 chain of command within the Union Bank of California
01:45 13 organization?
01:45 14   A. That is the policy.
01:46 15   Q. And are those -- do you know whether or not
01:46 16 those performance reviews are ultimately submitted to
01:46 17 the compensation and benefits committee at UnionBanCal
01:46 18 Corporation?
01:46 19   A. No, I'm not aware of it, whether it is or not.
01:46 20   Q. Do you receive a paycheck, Mr. Anderson?
01:46 21   A. Yes, I do.
01:46 22   Q. Who do you receive your paycheck from?
01:46 23   A. Union Bank of California.
01:46 24   Q. And is that in compensation for your role as
01:46 25 executive vice president and controller of Union Bank of

Page 109

01:46 1 California?
01:46 2    A. Yes.
01:46 3    Q. Are you compensated for your role as an
01:46 4 officer, an executive vice president and controller for
01:46 5 UnionBanCal Corporation?
01:46 6    A. No, I'm not.
01:46 7    Q. You receive no compensation for your role as
01:47 8 an officer of UnionBanCal Corporation?
01:47 9    A. No, I do not.
01:47 10   Q. Does Union Bank of California -- Union Bank of
01:47 11 California compensate you for your roles and your duties
01:47 12 that you perform as an officer, executive vice president
01:47 13 and controller of UnionBanCal Corporation?
01:47 14   A. I'm sorry, did you just ask that question like
01:47 15 a second ago? Could you repeat it? It sounds like the
01:47 16 same question.
01:47 17   Q. Does Union Bank of California compensate you
01:47 18 for your role in your duties that you perform as an
01:47 19 officer, as an executive vice president and controller
01:47 20 of UnionBanCal Corporation?
01:48 21   A. I'm pausing because it's a difficult question
01:48 22 to answer. I'm an employee of Union Bank of California.
01:48 23 I am paid for my work for Union Bank of California.
01:48 24 There is no direct compensation because of my
01:48 25 officership in UnionBanCal Corporation.

28 (Pages 106 to 109)

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson              CONFIDENTIAL
February 7, 2007 FOR ATTORNEYS' EYES ONLY

Page 110

01:48  1      Q.  If you were to resign as an officer of
01:48  2   UnionBanCal Corporation, do you think you would still
01:48  3   receive the same amount of compensation as your role as
01:48  4   executive vice president and controller of Union Bank of
01:48  5   California?
01:48  6          MR. SWEIGART:  Object to the form; calls
01:48  7   for speculation.
01:48  8      Q.  (BY MR. KING)  You may answer.
01:48  9      A.  I may answer?  I don't know.
01:49 10      Q.  If you resigned as an officer of UnionBanCal
01:49 11   Corporation, would you expect to receive the same amount
01:49 12   of compensation from Union Bank of California for
01:49 13   performing your role as an employee of Union Bank of
01:49 14   California?
01:49 15      A.  I -- really don't know.
01:49 16      Q.  You don't have any idea?
01:49 17      A.  I guess it depends on what the reasons were.
01:49 18   Additional assignment somewhere else in the bank?  I --
01:49 19   I -- it really is -- would be difficult to surmise what
01:49 20   that is, what would happen.
01:49 21      Q.  Do you know who's responsible for determining
01:49 22   your compensation?
01:49 23      A.  Yes, the person I report to.
01:49 24      Q.  And that is Mr. Matson; is that correct?
01:50 25      A.  Yes.

Page 111

01:50  1      Q.  Mr. Matson is the chief financial officer,
01:50  2   correct?
01:50  3      A.  Yes, he is.
01:50  4      Q.  Do you know if your compensation is at all
01:50  5   determined by the executive compensation and benefits
01:50  6   committee of UnionBanCal Corporation?
01:50  7      A.  No, I don't, but I don't believe it is.
01:50  8      Q.  Why do you not believe that it is?
01:50  9      A.  Because it's determined by my -- my boss,
01:50 10   David Matson.
01:50 11      Q.  Do you know if Mr. Matson discusses your --
01:51 12   the performance review that he conducts of you with the
01:51 13   executive compensation and benefits committee of
01:51 14   UnionBanCal Corporation?
01:51 15      A.  I do not know.
01:51 16      Q.  Is it possible that he does?
01:51 17      A.  Speculation.  I don't know.
01:51 18      Q.  Is it possible?
01:51 19      A.  Anything is possible.  Highly unlikely.
01:51 20      Q.  Why do you say it's highly unlikely?
01:51 21      A.  Because that isn't the purpose of a comp and
01:51 22   benefit committee.
01:51 23      Q.  And what is your understanding of what the
01:51 24   purpose of the compensation and benefits committee is?
01:51 25          MR. SWEIGART:  Objection:  Asked and

Page 112

01:51  1   answered repeatedly.  Let's move this along.
01:51  2      Q.  (BY MR. KING)  Are you an executive officer?
01:51  3      A.  No.
01:51  4      Q.  What is the definition -- or who are the
01:52  5   executive officers of UnionBanCal Corporation?
01:52  6      A.  It's listed in the proxy.
01:52  7      Q.  Do you know those offhand?
01:52  8      A.  Flip to the page and I'll read it for you.
01:52  9      Q.  Do you know what page it's on in the proxy?
01:52 10      A.  It's up near the front, I believe.
01:52 11      Q.  So as you sit here today, you don't know who
01:52 12   the -- who the executive officers of UnionBanCal
01:52 13   Corporation are.
01:52 14      A.  I just thought that I'd be accurate by going
01:52 15   to the listing so I didn't miss anybody.
01:52 16      Q.  Okay.  Well, with your understanding, who are
01:52 17   they?
01:52 18      A.  David Matson, Phil Flynn.
01:52 19      Q.  Who is that?
01:52 20      A.  Phil Flynn.  We reviewed his executive
01:52 21   compensation agreement a moment ago.
01:52 22      Q.  Okay.
01:52 23      A.  Oka, Morimura.
01:53 24      Q.  What is Mr. Morimura's title?
01:53 25      A.  Chief executive officer and director.

Page 113

01:53  1      Q.  Okay.
01:53  2      A.  Paul Fear, head of personnel at the bank.
01:53  3   Bill Stolte.
01:53  4      Q.  Bill what?
01:53  5      A.  Stolte, S-t-o-l-t-e.
01:53  6      Q.  What's his title?
01:53  7      A.  Executive vice president and head of IRMG,
01:53  8   which is the internal audit department.  John McGuckin,
01:53  9   secretary.  Just a minute.  Currently, John Ericsson.
01:54 10   Yoost, Worsoe.
01:54 11          THE WITNESS:  Yeah, I know.  Last name is
01:54 12   W-o-r-s-o-e, first name J-o-h-a-n-n-e-s.  He's Dutch.
01:54 13      A.  I think I've got them, but I might have missed
01:54 14   one or two there.
01:54 15      Q.  (BY MR. KING)  What is Mr. Ericsson's title?
01:54 16      A.  He's an executive vice president.
01:54 17      Q.  And Mr. Worsoe?
01:54 18      A.  Executive vice president.
01:55 19      Q.  Who's ultimately responsible for the
01:55 20   day-to-day operations of Union Bank of California?
01:55 21      A.  Union Bank of California.
01:55 22      Q.  Is there any one individual at Union Bank of
01:55 23   California who has ultimate responsibility for its
01:55 24   operations?
01:55 25      A.  Well, CEO and president would have ultimate

29 (Pages 110 to 113)

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson                    CONFIDENTIAL
February 7, 2007FOR ATTORNEYS' EYES ONLY

Page 114

01:55  1   responsibility subject to the board of directors, but --
01:55  2       Q.  And is that Mr. Morimura?
01:55  3       A.  Morimura, yes.
01:55  4       Q.  And Mr. Morimura's also the chief executive
01:55  5   officer of UnionBanCal Corporation, correct?
01:55  6       A.  Yes, he is.
01:55  7       Q.  Is he responsible for the day-to-day
01:55  8   operations of UnionBanCal Corporation?
01:55  9       A.  Yes.
01:55 10       Q.  What are the day-to-day operations of
01:56 11   UnionBanCal Corporation?
01:56 12       A.  As a public company, it issues and retires or
01:56 13   purchases from the open market its outstanding public
01:56 14   stock; pays dividends on stock; it raises debt in the
01:56 15   debt markets; it complies with and operates under all
01:56 16   the laws and regulations that it's governed by; it, if
01:56 17   necessary, provides support to subsidiary companies,
01:57 18   financial support and management support.
01:57 19       Q.  Anything else?
01:57 20       A.  Pretty much covered.  It has no products or
01:57 21   services or employees so that limits the role of this
01:57 22   company.
01:57 23           MR. KING:  Do you guys want to take a
01:57 24   quick five-minute break?
01:57 25           MR. SWEIGART:  Sure.

Page 115

01:57  1           THE VIDEOGRAPHER:  We're off the record
01:57  2   at 1:57.
01:57  3           (Recess taken 1:57 to 2:10)
02:10  4           THE VIDEOGRAPHER:  Back on the record at
02:10  5   2:10.
02:10  6       Q.  (BY MR. KING)  Mr. Anderson, we just came back
02:10  7   from a quick break.  I just want to go back and clean up
02:10  8   a couple of things before I move on.
02:10  9           Earlier, I believe before lunch, if I'm
02:10 10   not mistaken, we had talked about the board of directors
02:10 11   meetings that were held in January of this year --
02:10 12       A.  Uh-huh (affirmative).
02:10 13       Q.  -- by Union Bank of California and UnionBanCal
02:10 14   Corporation.  And I believe you had indicated that you
02:10 15   thought both of those were held beginning the morning of
02:10 16   January 23rd.
02:11 17       A.  That's correct.
02:11 18       Q.  Were those board of directors meetings held
02:11 19   simultaneously with each other?
02:11 20       A.  I don't know about this one specifically, but
02:11 21   usually they -- they can be.  They're separate business
02:11 22   for both boards, but if it applies to all the
02:11 23   organizations, they could be combined.
02:11 24       Q.  To the best of your knowledge, are they
02:11 25   usually combined?

Page 116

02:11  1       A.  I -- I'd say most of the time that they are
02:11  2   combined.
02:11  3       Q.  And during the course of those meetings when
02:11  4   they're combined, is there any way to distinguish when
02:11  5   members of the board of directors are speaking on behalf
02:11  6   of UnionBanCal Corporation or Union Bank of California?
02:11  7       A.  Yes, I believe so.
02:11  8       Q.  And what are -- what are those procedures?
02:11  9       A.  Well, the -- the item before the -- the board
02:11 10   would be addressed to that specific board members, such
02:12 11   as the filing of a proxy.  The approval of the proxy or
02:12 12   the SEC documents are approved by the board of directors
02:12 13   of UnionBanCal Corporation.  So if the business
02:12 14   pertained to that particular company, it would be
02:12 15   addressed to those members.
02:12 16       Q.  Would both boards be in the -- conducting
02:12 17   the --
02:12 18           MR. KING:  Strike that.
02:12 19       Q.  (BY MR. KING)  When the proxy statement, for
02:12 20   example, is up for approval, are members of Union Bank
02:12 21   of California, members of that board of directors, also
02:12 22   in the meeting with the board of directors for
02:12 23   UnionBanCal Corporation?
02:12 24       A.  I believe so, particularly in the case of the
02:12 25   proxy, because some of the board committees are only

Page 117

02:13  1   bank board committees.  But based upon an acceptance of
02:13  2   the document, it would only be asked by the directors of
02:13  3   UnionBanCal Corporation.
02:13  4       Q.  Are you aware of any instances where the board
02:13  5   of directors for UnionBanCal Corporation met separate
02:13  6   and apart from the board of directors of Union Bank of
02:13  7   California at a regularly scheduled meeting?
02:13  8       A.  No, I'm not sure that I would be aware of --
02:13  9   if they met separately or not.
02:13 10       Q.  But as you sit here today, to the best of your
02:13 11   knowledge, you're not aware of any such instance; is
02:13 12   that correct?
02:13 13       A.  I'm -- I'm not aware of either direction,
02:13 14   separate or combined, as to whether they've met
02:14 15   separately.
02:14 16       Q.  But you do know that they have, in fact, met
02:14 17   in a combined fashion before, correct?
02:14 18       A.  Yes, absolutely.
02:14 19       Q.  Okay.  But you -- as you sit here today, you
02:14 20   do not know whether they have not met or whether they
02:14 21   have met separately; is that correct?
02:14 22       A.  That's correct.
02:14 23       Q.  Okay.  When there are common issues to both
02:14 24   boards that are being discussed at a board meeting --
02:14 25       A.  Uh-huh (affirmative).

Gretchen Shore Court Reporting & Litigation Support
(903) 758-2183 * (903) 758-4890 Fax     E-mail: gretchenshore@gretchenshore.com

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson                 CONFIDENTIAL
February 7, 2007 FOR ATTORNEYS' EYES ONLY

---

Page 118

02:14 1    Q. -- is there any way to distinguish when one
02:14 2  individual, who serves on both boards, is speaking on
02:14 3  behalf of UnionBanCal Corporation as opposed to Union
02:14 4  Bank of California?
02:14 5    A. I'm sure if it's regarding UnionBanCal
02:14 6  Corporation it's identified as UnionBanCal Corporation.
02:14 7    Q. And you believe that would be identified as
02:14 8  such on the agenda of the meeting? How -- how do you
02:14 9  think that would be identified?
02:14 10    A. I'm sure by the agenda and minutes.
02:15 11    Q. Have you ever seen the agenda and minutes of
02:15 12  board of directors meetings?
02:15 13    A. I've occasionally seen those.
02:15 14    Q. Have you seen any instances where there were
02:15 15  specific topics that were designated only for
02:15 16  UnionBanCal Corporation as opposed to Union Bank of
02:15 17  California?
02:15 18    A. Approval of the 10-K.
02:15 19    Q. Other than that?
02:15 20    A. No.
02:15 21    Q. The -- in the -- was it an agenda that you saw
02:15 22  that separated out the approval of the 10-K between the
02:15 23  two boards?
02:15 24    A. I believe it was an agenda.
02:15 25    Q. In that agenda that you saw, were both boards

Page 119

02:15 1  attending that same meeting?
02:15 2    A. I don't recall.
02:16 3    Q. Earlier we had also talked about UnionBanCal
02:16 4  Corporation's office at 400 California Street here in
02:16 5  San Francisco. Do you recall that?
02:16 6    A. Yes.
02:16 7    Q. Is that an office building that's owned by
02:16 8  UnionBanCal Corporation?
02:16 9    A. No.
02:16 10    Q. Who owns that building?
02:16 11    A. Union Bank of California.
02:16 12    Q. Okay. Does UnionBanCal Corporation lease any
02:16 13  office space in that building?
02:16 14    A. No.
02:16 15    MR. KING: Cheryl, is this document up
02:16 16  for everybody? It's the same one.
02:16 17    MS. TOLES: No.
02:16 18    MR. KING: Okay. Can y'all both -- y'all
02:16 19  both have the document that we were just looking at
02:17 20  earlier in front of you?
02:17 21    MR. SWEIGART: The proxy statement?
02:17 22    MR. KING: Yes.
02:17 23    MR. SWEIGART: Yes, we still have that
02:17 24  up.
02:17 25    MR. KING: Okay. I'm going to go to

Page 120

02:17 1  page 7, I believe, of the proxy. That's where I hope to
02:17 2  get to. And it's going to be at the top of page 7 of
02:17 3  the proxy.
02:17 4    Q. (BY MR. KING) In that second paragraph down,
02:17 5  I would like for you to read that, Mr. Anderson, and let
02:17 6  me know when you've had a chance to read it.
02:17 7    A. Second paragraph?
02:17 8    Q. Yes, sir, the one that begins, As part of its
02:17 9  nominating responsibilities.
02:17 10    A. (Reviewing document.) Okay.
02:18 11    Q. You see about middle of that second line where
02:18 12  it says, Stockholder nominations must be made in
02:18 13  accordance with section 2.1 of UnionBanCal's bylaws and
02:18 14  must be addressed to UnionBanCal Corporation, office of
02:18 15  the corporate secretary, 400 California Street,
02:18 16  San Francisco, California?
02:18 17    A. Yes.
02:18 18    Q. Did I read that correctly?
02:18 19    A. Yes, you did.
02:18 20    Q. Okay. Does the corporate secretary maintain
02:18 21  an office at 400 California Street?
02:18 22    A. Yes. It is an office at 400 California
02:18 23  Street.
02:18 24    Q. And that was Mr. McGuckin?
02:18 25    A. Yes.

Page 121

02:18 1    Q. -- is that correct?
02:18 2    Now, Mr. McGuckin's office, is that an
02:18 3  office as his role of the corporate secretary for Union
02:18 4  Bank of California or his role as corporate secretary of
02:18 5  UnionBanCal Corporation?
02:18 6    A. Both. He's an officer of both companies.
02:19 7    Q. And the office that he maintains at 400
02:19 8  California Street is on behalf of both UnionBanCal
02:19 9  Corporation and Union Bank of California.
02:19 10    A. Yes.
02:19 11    Q. Are there any other officers, directors,
02:19 12  managers of any kind of Union Bank of California and
02:19 13  UnionBanCal Corporation that hold an office at 400
02:19 14  California Street for both entities?
02:19 15    A. For the corporation, no.
02:19 16    Q. So Mr. McGuckin would be the only individual
02:19 17  that maintains an office on behalf of UnionBanCal
02:19 18  Corporation.
02:19 19    A. Well, this says office of the corporate
02:19 20  secretary. I mean, I'll try and interpret that, office
02:19 21  meaning position, office, a mailing place to be
02:20 22  delivered to. I would not construe that as an office as
02:20 23  this room is an office.
02:20 24    Q. But Mr. McGuckin, you've testified --
02:20 25    A. As an officer of --

31 (Pages 118 to 121)

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson              CONFIDENTIAL
February 7, 2007 FOR ATTORNEYS' EYES ONLY

---

Page 122

```
02:20  1        Q.  -- a few minutes ago --
02:20  2        A.  -- of UnionBanCal Corporation --
02:20  3        Q.  Hang on.  Let me -- let me finish my question,
02:20  4    please.
02:20  5        A.  Uh-huh (affirmative).
02:20  6        Q.  You testified that Mr. McGuckin maintains an
02:20  7    office in his role of corporate secretary for both the
02:20  8    Union Bank of California and his role as corporate
02:20  9    secretary of UnionBanCal Corporation at 400 California
02:20  10   Street, correct?
02:20  11       A.  That's where the mail is delivered.
02:20  12       Q.  Okay.  Does Mr. McGuckin actually have a
02:20  13   physical office --
02:20  14       A.  Yes, he does.
02:20  15       Q.  -- at 400 California Street?
02:20  16       A.  Yes, he does.
02:20  17       Q.  Do you know if -- if that's where he goes to
02:20  18   work every day?
02:20  19       A.  That's where he goes to work usually.
02:20  20       Q.  Okay.  And he goes to -- he reports to work at
02:21  21   400 California Street on behalf of both Union Bank of
02:21  22   California and UnionBanCal Corporation.  Would that be
02:21  23   correct?
02:21  24       A.  Yes, that is correct.
02:21  25       Q.  Are there any other officers or directors or
```

Page 123

```
02:21  1    managers of either -- of both UnionBanCal Corporation
02:21  2    and Union Bank of California that also have a physical
02:21  3    office at 400 California Street?
02:21  4            MR. SWEIGART:  Object to the form.
02:21  5        A.  Yes.
02:21  6        Q.  (BY MR. KING)  Do you know who those are?
02:21  7        A.  I believe I can name those.
02:21  8        Q.  Can you please name those for us.
02:21  9        A.  Could you give me the list of officers we gave
02:21  10   you?
02:21  11       Q.  Mr. Matson?
02:21  12       A.  Yes.
02:21  13       Q.  And when -- when you respond with "yes" or
02:22  14   "no," I'm presuming it's in regards to this last
02:22  15   question I asked.
02:22  16       A.  This last question as to whether officers of
02:22  17   UnionBanCal Corporation and Union Bank have an office at
02:22  18   400 California Street.
02:22  19       Q.  Correct.
02:22  20       A.  I'll clarify that in saying there are no
02:22  21   separate offices of UnionBanCal Corporation.  In other
02:22  22   words, Mr. McGuckin does not walk into one office as an
02:22  23   officer of Union Bank and walk into a different office
02:22  24   as an officer of UnionBanCal Corporation.
02:22  25       Q.  And that would be the -- I presume that answer
```

Page 124

```
02:22  1    will apply to all these others --
02:22  2        A.  To every single one of these.  If you
02:22  3    painfully want us to go through all of those, I'll
02:22  4    answer it the same way.
02:22  5        Q.  Fantastic.  Mr. Matson.
02:22  6        A.  Yes.
02:22  7        Q.  Mr. Flynn.
02:22  8        A.  No.
02:23  9        Q.  Mr. Oka.
02:23  10       A.  Yes.
02:23  11       Q.  Mr. Morimura.
02:23  12       A.  Yes.
02:23  13       Q.  Mr. Fear.
02:23  14       A.  Yes.
02:23  15       Q.  Mr. Stolte.
02:23  16       A.  Yes.
02:23  17       Q.  We've already covered Mr. McGuckin.
02:23  18   Mr. Ericsson.
02:23  19       A.  No.
02:23  20       Q.  Mr. Warsoe.
02:23  21       A.  No.
02:23  22       Q.  And I had a Yoost on here, but I think that
02:23  23   may have been his first name.
02:23  24       A.  Yeah.
02:23  25       Q.  Okay.
```

Page 125

```
02:23  1        A.  Yoost Warsoe.
02:23  2        Q.  Is there anyone -- any other individuals that
02:23  3    you can think of?
02:23  4        A.  Well, I now recall that Jim Yi is also an
02:23  5    executive officer for that list, but he does not have an
02:23  6    office at 400 California Street.
02:23  7        Q.  And what is Mr. Yi's position?
02:23  8        A.  He is executive vice president in charge of
02:23  9    item processing and technology.
02:23  10       Q.  Item processing and technology?
02:23  11       A.  Right.
02:24  12       Q.  Okay.
02:24  13       A.  IT guy.
02:24  14       Q.  Okay.  Thank you.
02:24  15           Anyone else that you can think of other
02:24  16   than those that we have -- that you have indicated?
02:24  17       A.  Yes.
02:24  18       Q.  Who else?
02:24  19       A.  Joanne Bourne.
02:24  20       Q.  And what role does she have?
02:24  21       A.  Executive vice president.  Does not have
02:24  22   offices at 400 California.
02:24  23       Q.  Oh, she does not.
02:24  24       A.  Does not.
02:24  25       Q.  Okay.
```

32 (Pages 122 to 125)

Gretchen Shore Court Reporting & Litigation Support
(903) 758-2183 * (903) 758-4890 Fax    E-mail: gretchenshore@gretchenshore.com

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson              CONFIDENTIAL
February 7, 2007FOR ATTORNEYS' EYES ONLY

Page 126

02:24  1    A. And Linda Betzer, executive vice president,
02:24  2  and does not have an office at 400 California Street.
02:24  3    Q. Are there any other executive officers that we
02:24  4  missed earlier?
02:24  5    A. I'm trying to remember.
02:24  6    Q. Okay.
02:24  7    A. I'm really trying.
02:24  8    Q. That's fine. I understand.
02:24  9    A. Those three came to mind, I added them to the
02:24 10  list.
02:24 11    Q. Well, I appreciate that.
02:24 12    A. Yeah.
02:24 13    Q. You confused me a minute. We went back to
02:24 14  executive officers and then trying to cover the officing
02:24 15  of these individuals at the same time.
02:25 16        Are those all the executive officers you
02:25 17  can remember at this time?
02:25 18    A. Yes.
02:25 19    Q. Are there any other individuals, such as
02:25 20  Mr. McGuckin, that -- his office arrangement that we
02:25 21  talked about at 400 California Street, have we left off
02:25 22  any individuals that have an office at 400 California
02:25 23  Street on behalf of both UnionBanCal Corporation and
02:25 24  Union Bank of California?
02:25 25    A. For executive officers, I believe we've

Page 127

02:25  1  covered them.
02:25  2    Q. Okay. Are there other employees that have --
02:25  3  or other individuals that have an office on behalf of
02:25  4  both Union Bank of California and UnionBanCal
02:25  5  Corporation at 400 California Street?
02:25  6    A. Could you clarify? You say individuals. We
02:25  7  only have employees or officers. Which one would you
02:25  8  like me to address?
02:25  9    Q. Employees.
02:25 10    A. Of?
02:25 11    Q. Let me back up.
02:25 12        Are there individuals or employees of
02:26 13  either UnionBanCal Corporation or Union Bank of
02:26 14  California that have an office at 400 California Street
02:26 15  on behalf of both UnionBanCal Corporation and Union Bank
02:26 16  of California?
02:26 17    A. Okay. You said employees of UnionBanCal
02:26 18  Corporation. There are no employees. You also said
02:26 19  individuals and I'll ignore individuals, it's either
02:26 20  officers or employees, so there are no other -- there
02:26 21  are no employees of UnionBanCal so therefore there
02:26 22  aren't any offices at UnionBanCal for employees.
02:26 23    Q. Are there any other officers?
02:26 24    A. Of?
02:26 25    Q. UnionBanCal Corporation, who may be an officer

Page 128

02:26  1  or employee of Union Bank of California --
02:26  2    A. Yes.
02:26  3    Q. -- who have an office at 400 California Street
02:26  4  on behalf of both UnionBanCal Corporation and Union Bank
02:26  5  of California?
02:26  6    A. Yes.
02:26  7    Q. Okay. How many such individuals?
02:27  8    A. We submitted a list of officers of UnionBanCal
02:27  9  Corporation to you, and I -- I couldn't go through that
02:27 10  list unless you showed me that list. I would be one of
02:27 11  those individuals.
02:27 12    Q. Okay.
02:27 13    A. I am an officer of UnionBanCal and an officer
02:27 14  and employee of Union Bank of California but I'm not an
02:27 15  executive officer.
02:27 16        MR. KING: Did we receive a list of
02:27 17  officers?
02:27 18        MR. SWEIGART: I believe it should've
02:27 19  been produced. I don't have the production with me.
02:27 20        MR. KING: Give me just a second, let me
02:27 21  make sure I haven't missed that.
02:27 22        MR. SWEIGART: Probably would've followed
02:27 23  right on after the directors.
02:27 24        MR. KING: If I did, I apologize.
02:28 25        MR. SWEIGART: It was certainly meant to

Page 129

02:28  1  be produced. Do we have our --
02:28  2        MR. HARRIS: I mean, I can go up to my
02:28  3  office because I definitely have a copy.
02:28  4        MR. SWEIGART: If you can't find it here,
02:28  5  we can see if we can --
02:28  6        MR. KING: Okay. I have a listing of the
02:28  7  board of directors. Let me -- let me just check real
02:28  8  quick through these other documents to make sure that I
02:28  9  haven't missed that. I don't think that was produced,
02:28 10  but let me ...
02:29 11    Q. (BY MR. KING) Tetsuo Shumura, does that name
02:29 12  ring a bell?
02:29 13    A. He's a director of UnionBanCal Corporation.
02:29 14    Q. Steven Glaser, G-l-a-s-e-r?
02:29 15    A. (No response.)
02:29 16    Q. We're going to try to bring this up real
02:29 17  quick.
02:29 18    A. Good. Good. Good. That would help me,
02:29 19  too --
02:29 20    Q. Yes, sir.
02:29 21    A. -- rather than trying to guess.
02:30 22    Q. All right. Can you see that?
02:30 23    A. Yeah.
02:30 24    Q. Okay.
02:30 25    A. Yes.

33 (Pages 126 to 129)

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson            CONFIDENTIAL
February 7, 2007 FOR ATTORNEYS' EYES ONLY

---

Page 130

02:30  1      Q.  Does that help refresh your memory?
02:30  2      A.  Yes.  And, in fact, there you go, Steve
02:30  3   Glaser.  He is the one executive officer -- when I added
02:31  4   those other three, add Steve Glaser.
02:31  5      Q.  Okay.
02:31  6      A.  Thank you for bringing this up.  Now I can see
02:31  7   have I've -- have I given you all, or not.  I think I
02:31  8   have.  Bruce Cabral --
02:31  9           THE COURT REPORTER:  Excuse me?
02:31  10          THE WITNESS:  Bruce Cabral,
02:31  11  C-a-b-r-a-l --
02:31  12     A.  -- is also an EVP.
02:31  13     Q.  (BY MR. KING)  Now, we've already stated --
02:31  14  determined that -- you said Mr. Shimura does not have an
02:31  15  office, like we were just discussing, at both -- or at
02:31  16  400 California Street, correct?
02:31  17     A.  Yes, I did.  I said he does.
02:31  18     Q.  Oh, he does.
02:31  19     A.  Yes.  I just said he was a director.
02:31  20     Q.  I apologize.  Okay.
02:31  21     A.  He is chairman --
02:32  22     Q.  Okay.
02:32  23     A.  -- so listed as senior management as chairman
02:32  24  and, yes, he does have an office at 400 California
02:32  25  Street.

---

Page 131

02:32  1      Q.  Is he also chairman for Union Bank of
02:32  2   California?
02:32  3      A.  Yes.  No.  I'm sorry.  Let me think for a
02:32  4   second.  Boy, do you want to go back to that first --
02:32  5   that first listing to refresh my memory, remember the
02:32  6   listing that had all the bank directors and the holding
02:32  7   company directors?  I'm having a senior moment as to
02:32  8   whether Shimura was also a bank director.  Mickey and
02:32  9   Kanari aren't, but I believe Shimura is.
02:32  10     Q.  I think, if we scroll down, it also has a
02:32  11  listing of directors on the same document.
02:32  12     A.  Oh, okay.  Well, that'll answer it, then.
02:33  13     Q.  There it is.  We'll try to zoom in on that for
02:33  14  you.
02:33  15     A.  Okay.  I guess -- oops, head on down.
02:33  16          MR. SWEIGART:  Scroll on down to the
02:33  17  bank --
02:33  18     A.  Do you want me to do that?  I don't want to
02:33  19  override you over there.
02:33  20     Q.  (BY MR. KING)  I'll let you control it here.
02:33  21     A.  Okay.  It appears not.
02:33  22     Q.  It appears not what?
02:33  23     A.  Yes, that he's not a director of Union Bank of
02:33  24  California.
02:33  25     Q.  When you go down to the next -- keep scrolling

---

Page 132

02:33  1   down --
02:33  2      A.  Oh, did I miss --
02:33  3      Q.  -- bottom right-hand name.
02:34  4      A.  Yes.  And what is this referring to?
02:34  5      Q.  This is a continuation from --
02:34  6      A.  Continuation?  Then he is.
02:34  7      Q.  Okay.
02:34  8      A.  I'm sorry.
02:34  9      Q.  Okay.  That's all -- perfectly all right.
02:34  10     A.  It's a long day, you know.
02:34  11     Q.  I understand.
02:34  12     A.  And, yes, he has an office at 400 California
02:34  13  Street.
02:34  14     Q.  Okay.  I'm going to scroll back up here.
02:34  15     A.  Yeah.
02:34  16     Q.  I believe you said Mr. Flynn does not have an
02:34  17  office at 400.
02:34  18     A.  Right.
02:34  19     Q.  Mr. Oka does?
02:34  20     A.  Yes.
02:34  21     Q.  Ms. Bourne does not?
02:34  22     A.  Does not.
02:34  23     Q.  Mr. Ericsson does not?
02:34  24     A.  Does not.
02:34  25     Q.  Mr. Glaser?

---

Page 133

02:34  1      A.  Does not.
02:34  2      Q.  Mr. Stolte?
02:34  3      A.  Does.
02:34  4      Q.  Mr. Yi?
02:34  5      A.  Does not.
02:34  6      Q.  Mr. Morimura?
02:34  7      A.  Does.
02:34  8      Q.  Mr. Matson?
02:34  9      A.  Does.
02:34  10     Q.  Ms. Betzer?
02:34  11     A.  Does not.
02:34  12     Q.  Mr. Gabral?
02:34  13     A.  Does.
02:34  14     Q.  Mr. Fear?
02:34  15     A.  Does.
02:34  16     Q.  Mr. McGuckin?
02:35  17     A.  Does.
02:35  18     Q.  Mr. Warsoe?
02:35  19     A.  Does not.
02:35  20     Q.  Okay.  Anybody else that maintains an office
02:35  21  that is an officer of UnionBanCal Corporation and either
02:35  22  an officer or director or employee of Union Bank of
02:35  23  California that maintains an office at 400 California
02:35  24  Street?
02:35  25     A.  Yes.

---

34 (Pages 130 to 133)

Gretchen Shore Court Reporting & Litigation Support
(903) 758-2183 * (903) 758-4890 Fax     E-mail: gretchenshore@gretchenshore.com

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson            CONFIDENTIAL
February 7, 2007 FOR ATTORNEYS' EYES ONLY

---

Page 134

02:35 1    Q. Who else?
02:35 2    A. Can you give me that list that I first asked
02:35 3  for a minute ago that I thought that we submitted to
02:35 4  you? There are other officers --
02:35 5    Q. I don't have a -- I don't have the other list
02:35 6  that was submitted.
02:35 7         MR. SWEIGART: Okay. We believe we
02:35 8  produced a list of people who were officers of both
02:35 9  companies.
02:35 10        MR. KING: Okay.
02:35 11        MR. SWEIGART: We didn't give you a list
02:35 12 of all the officers of the bank --
02:35 13        MR. KING: Okay.
02:35 14        MR. SWEIGART: -- but you have a list of
02:35 15 directors and officers of UnionBanCal and a list of the
02:35 16 officers who were for both, who have dual roles.
02:35 17        MR. HARRIS: Yeah. I mean, there's so
02:35 18 many officers of the bank.
02:36 19        MR. SWEIGART: We'll see if we can locate
02:36 20 that with our Bates number.
02:36 21   A. As I said, I'm an example of that.
02:36 22   Q. (BY MR. KING) Okay.
02:36 23   A. I'm not a senior management officer of either
02:36 24 the bank or the holding company, but I am an officer of
02:36 25 UnionBanCal and Union Bank and my name was on that list.

---

Page 135

02:36 1    Q. And you had indicate that there are 18 floors
02:36 2  of approximately 50 people --
02:36 3    A. Yes.
02:36 4    Q. -- at that building.
02:36 5    A. Yes.
02:36 6    Q. Would it be fair to say there are a large
02:36 7  number of individuals that have an office like this,
02:36 8  that we described, or just a handful more?
02:36 9    A. I would say more than a handful. A handful is
02:36 10 five. I'd put it in the range of about ten.
02:36 11   Q. Okay. Well, without belaboring this point any
02:36 12 longer, in addition to those individuals that we've
02:36 13 named already, you believe there may be approximately
02:36 14 ten more individuals who were officers or directors for
02:36 15 UnionBanCal Corporation.
02:36 16   A. Officers only.
02:37 17   Q. Okay. Officers of UnionBanCal Corporation
02:37 18 that also serve as officers or employees of Union Bank
02:37 19 of California that are officed at 400 California Street.
02:37 20   A. Yes.
02:37 21   Q. Okay. When these individuals go to work at
02:37 22 400 California Street, is there any type of system to
02:37 23 distinguish the work that they perform on behalf of
02:37 24 Union Bank of California from the work that they perform
02:37 25 on behalf of UnionBanCal Corporation?

---

Page 136

02:37 1         MR. SWEIGART: I'll object to the form.
02:37 2    A. No, there's not. However, the -- because the
02:37 3  activities of UnionBanCal, there are no products or
02:37 4  services, the role of many of these people in
02:37 5  UnionBanCal Corporation, there isn't any role from a
02:38 6  day-to-day activity.
02:38 7    Q. (BY MR. KING) Did you tell me earlier that
02:38 8  Union Bank of California owns the building at 400
02:38 9  California?
02:38 10   A. Yes, it does.
02:38 11   Q. Does it lease -- is there any type of lease
02:38 12 arrangement between Union Bank of California and
02:38 13 UnionBanCal Corporation?
02:38 14   A. There is no lease.
02:38 15        MR. KING: Can we pull up the proxy
02:38 16 statement?
02:39 17   Q. (BY MR. KING) I'm going to go to page 19 of
02:39 18 the proxy statement. Can you see that, Mr. Anderson?
02:39 19   A. Yes, I can.
02:39 20   Q. Can you tell the judge and jury what this
02:39 21 table on page 19 of the proxy statement represents?
02:39 22   A. The table is entitled Executive Compensation.
02:39 23   Q. Okay.
02:39 24   A. It lists the highest paid officers of
02:40 25 UnionBanCal Corporation, plus those in the heading, as

---

Page 137

02:40 1  required to list the president and chief executive
02:40 2  officer and the former president and chief executive
02:40 3  officer, and then the next four most highly compensated
02:40 4  executive officers.
02:40 5    Q. Is there anyone on this list that does not --
02:40 6  for example, Mr. Morimura is listed as president and
02:40 7  chief executive officer.
02:40 8    A. Yes.
02:40 9    Q. And is that in his capacity of president and
02:40 10 chief executive officer of UnionBanCal Corporation?
02:41 11   A. As -- I just lost it. Sorry.
02:41 12   Q. That's all right.
02:41 13   A. It would be really great to move that top box
02:41 14 up there so that I can go up and down without having to
02:41 15 try to move the bar along the side and flipping seven
02:41 16 pages every time I do that. There you go. That's
02:41 17 great.
02:41 18        MS. TOLES: Wait a minute. Let me get
02:41 19 to it. Let go of your mouse for a minute.
02:41 20        THE WITNESS: Oh, sorry. Fighting you,
02:41 21 huh?
02:41 22        MR. KING: That's all right. Let me --
02:41 23 let me try to control it here.
02:41 24   Q. (BY MR. KING) Did you need to see something
02:41 25 else on this -- the top of this list, Mr. Anderson?

---

35 (Pages 134 to 137)

3c3ebca2-e20f-4bec-8e6e-ea8a463df33b

David Anderson                CONFIDENTIAL
February 7, 2007FOR ATTORNEYS' EYES ONLY

Page 138

```
02:41  1        A.  Yeah.  I was just going to the introductory
02:41  2   paragraph --
02:41  3        Q.  Okay.
02:41  4        A.  -- so I could read it to the judge and jury.
02:42  5        THE WITNESS:  Thank you very much for
02:42  6   doing that.
02:42  7        A.  Yes.  I'm sorry, with all that, did I do what
02:42  8   you asked me to do?
02:42  9        Q.  (BY MR. KING)  Let me go back and see exactly
02:42 10   what I asked you to do before we started trying to sort
02:42 11   through all this.
02:42 12        I believe, for example, Mr. Morimura is
02:42 13   listed as president and chief executive officer.  Is
02:42 14   this listing in his role as president and chief
02:42 15   executive officer of UnionBanCal Corporation or Union
02:42 16   Bank of California?
02:42 17        A.  As stated in the footnote number one down
02:42 18   below, as it concludes, it says, The data set forth in
02:42 19   this table for the above officers includes compensation
02:42 20   awarded to, earned, or paid by -- paid to them from any
02:43 21   source for services rendered to UnionBanCal
02:43 22   Corporation -- UnionBanCal and its subsidiaries.
02:43 23        Q.  Is there any way to flush out the amount of
02:43 24   their salary or other benefits that are tied to their
02:43 25   services rendered on behalf of UnionBanCal as opposed to
```

Page 139

```
02:43  1   any of its subsidiaries?
02:43  2        A.  No, other than the statements that I have made
02:43  3   to you and -- well, no.  There's just no employees of
02:43  4   UnionBanCal Corporation.  There's no -- no compensation
02:43  5   paid.  But it gets clearly indicated that it's for
02:43  6   UnionBanCal and its subsidiaries.  The differentiation
02:43  7   between the companies, no.
02:44  8        Let me correct.
02:44  9        Q.  Feel free.
02:44 10        A.  Mr. Flynn and Mr. Matson have an employment
02:44 11   agreement with Union Bank of California, that we
02:44 12   reviewed earlier.  I think that would indicate to people
02:44 13   that it was paid by Union Bank of California.
02:44 14        Q.  And would it be paid by Union Bank of
02:44 15   California for services rendered to UnionBanCal and
02:44 16   Union Bank of California and other subsidiaries?
02:44 17        A.  It is paid by Union Bank to a Union Bank
02:44 18   employee, whose services include being an officer of
02:44 19   Union Bank of California as well as an officer of Union
02:44 20   Bank of California.
02:44 21        Q.  You mean --
02:45 22        MR. SWEIGART:  I think you misspoke
02:45 23   there.  You said Union Bank of California twice.
02:45 24        A.  Oh, UnionBanCal Corporation.
02:45 25        Q.  (BY MR. KING)  Okay.  Thank you very much.
```

Page 140

```
02:45  1        Other than those two there's -- I mean,
02:45  2   but for those -- with your description of Mr. Flynn and
02:45  3   Mr. Matson, in regards to the other, I believe, six
02:45  4   individuals, is there any way to determine the amount of
02:45  5   salary or compensation paid to them for services
02:45  6   rendered to UnionBanCal as opposed to UnionBanCal
02:45  7   subsidiaries?
02:45  8        A.  I'm not aware of any.
02:45  9        Q.  Right before we took a break, this last break,
02:45 10   you had talked about some of the operations of
02:46 11   UnionBanCal Corporation.
02:46 12        A.  Yes.
02:46 13        Q.  You said one of those operations is to provide
02:46 14   support to subsidiaries including financial and
02:46 15   management support.  Do you recall that?
02:46 16        A.  Yes.
02:46 17        Q.  What type of financial or management support
02:46 18   does UnionBanCal Corporation provide to Union Bank of
02:46 19   California?
02:46 20        A.  Under the Bank Holding Company Act, it's there
02:46 21   to provide support, financial support and managerial
02:46 22   support.  It has not had to.
02:46 23        Q.  Does Union Bank of California have access to
02:46 24   UnionBanCal Corporation's resources?
02:46 25        A.  Does Union Bank of California, is that what
```

Page 141

```
02:46  1   you said?
02:46  2        Q.  Yes.
02:46  3        A.  Have access to the resources of UnionBanCal
02:47  4   Corporation.
02:47  5        Q.  Yes.
02:47  6        MR. SWEIGART:  I object to the form.
02:47  7        A.  Sure, if I understand the question.  There's
02:47  8   a -- there are no employees of UnionBanCal Corporation.
02:47  9        Q.  (BY MR. KING)  Does UnionBanCal Corporation
02:47 10   have any assets?
02:47 11        A.  Yes.
02:47 12        Q.  What assets does it have?
02:47 13        A.  Cash; time deposits; loans; only two wholly
02:47 14   owned subsidiaries; interest receivable; at times,
02:47 15   dividend receivable; and its investment in each one of
02:47 16   its wholly owned subsidiaries.
02:47 17        Q.  Does Union Bank of California have access to
02:47 18   any of these assets that you've just described?
02:48 19        A.  I don't understand the word "access."
02:48 20        Q.  Does Union Bank of California, for example,
02:48 21   have the ability to utilize the cash on hand of
02:48 22   UnionBanCal Corporation for its own benefit?
02:48 23        A.  UnionBanCal Corporation is a separate
02:48 24   corporation.  To the extent it makes a deposit in Union
02:48 25   Bank, as any other company would make a deposit in Union
```

36 (Pages 138 to 141)

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson            CONFIDENTIAL
February 7, 2007 FOR ATTORNEYS' EYES ONLY

---

**Page 142**

02:48  1   Bank, Union Bank has access to those deposits subject to
02:48  2   that liability, no different than any customer of Union
02:49  3   Bank.
02:49  4       Q.  Does UnionBanCal Corporation prepare
02:49  5   consolidated financial statements with itself and its
02:49  6   subsidiaries?
02:49  7       A.  Yes.
02:49  8       Q.  Does it do so with all of its subsidiaries?
02:49  9       A.  Yes.
02:49  10      Q.  Does Union Bank of California -- I'm sorry --
02:49  11  does UnionBanCal Corporation arrange any financing
02:49  12  agreements for Union Bank of California?
02:49  13          MR. SWEIGART:  I'm going to object to the
02:49  14  form.
02:49  15      A.  Union Bank of California is a separate entity
02:49  16  and would arrange its own financing.  As in any
02:50  17  financial transaction, consideration of corporate
02:50  18  structure and ownership is part of it, but they would be
02:50  19  based upon Union Bank of California's operations.
02:50  20      Q.  (BY MR. KING)  Has UnionBanCal Corporation
02:50  21  taken out any loans with other financial entities?
02:50  22      A.  It has -- it issues debt instruments, fully
02:50  23  disclosed in the financial statements, holder -- and I
02:50  24  believe at this time there are two outstanding issues
02:50  25  and, yes, they are held by, in -- in one case, a

---

**Page 143**

02:50  1   financial institution, and others -- it could be a
02:51  2   number of different holders because it's public issued.
02:51  3       Q.  And these are instances where UnionBanCal
02:51  4   Corporation has borrowed money from another entity,
02:51  5   correct?
02:51  6       A.  Yes.
02:51  7       Q.  As collateral for any of those loans, has
02:51  8   UnionBanCal Corporation provided, as collateral, the
02:51  9   assets of any of its subsidiaries?
02:51  10      A.  No.
02:51  11      Q.  In any of those loans, has UnionBanCal
02:51  12  Corporation made any representations as to the business
02:51  13  operations of any of its subsidiaries?
02:51  14      A.  I don't believe so.
02:51  15      Q.  Does Union Bank of California pay dividends to
02:51  16  UnionBanCal Corporation?
02:51  17      A.  Yes.
02:51  18      Q.  How often does it pay dividends to UnionBanCal
02:52  19  Corporation?
02:52  20      A.  Quarterly.
02:52  21      Q.  Is that how UnionBanCal Corporation is funded,
02:52  22  through the dividends it receives from its subsidiaries?
02:52  23      A.  A portion.
02:52  24      Q.  Okay.  What other ways is UnionBanCal
02:52  25  Corporation funded other than dividends it receives from

---

**Page 144**

02:52  1   its subsidiaries?
02:52  2       A.  Public debt, private debt issuances, issuance
02:52  3   of common stock, interest on the investments that they
02:52  4   have.
02:52  5       Q.  Do you know what part -- what percentage of
02:52  6   UnionBanCal Corporation's funding comes from dividends
02:52  7   paid to it by Union Bank of California?
02:53  8       A.  Ask that again.  I'm sorry.  What percentage
02:53  9   of --
02:53  10      Q.  What percentage of UnionBanCal Corporation's
02:53  11  funding is attributable to dividends paid to UnionBanCal
02:53  12  Corporation by Union Bank of California?
02:53  13      A.  If you could clarify funding.  What does
02:53  14  funding mean in your regard?
02:53  15      Q.  Well, whenever I'd asked you earlier what --
02:53  16  how UnionBanCal Corporation was funded, you had
02:53  17  indicated it was funded through dividends that were paid
02:53  18  to it --
02:53  19      A.  Yes.
02:53  20      Q.  -- by UnionBanCal -- I mean Union Bank of
02:53  21  California and also public debt, private debt, issuances
02:53  22  of common stock, interest on investments.
02:53  23          With your understanding in answering that
02:53  24  question of how UnionBanCal Corporation is funded, what
02:54  25  percentage of those funds is attributable to dividends

---

**Page 145**

02:54  1   received from Union Bank of California?
02:54  2       A.  It's different over different time periods as
02:54  3   to whether UnionBanCal issues some public stock or
02:54  4   issues some debt securities themselves, so that
02:54  5   percentage changes year to year based upon -- based upon
02:54  6   the needs of UnionBanCal Corporation.
02:54  7          I'm not trying to -- I'd like to answer
02:54  8   the question, but I'm not --
02:54  9       Q.  In the last fiscal year of 2006 --
02:54  10      A.  Okay.  All right.
02:54  11      Q.  -- do you know how much funding -- what
02:54  12  percentage of UnionBanCal Corporation's funding is
02:55  13  attributable to dividends paid to it by Union Bank of
02:55  14  California?
02:55  15      A.  Probably a substantial portion.
02:55  16      Q.  75 percent?
02:55  17      A.  I'd say -- it'd be -- I don't recall that
02:55  18  UnionBanCal issued a public debt instrument in 2006, so
02:55  19  I think it was a high percentage.
02:55  20      Q.  Would it be higher than 75 percent, you
02:55  21  believe?
02:55  22      A.  It very well could be.
02:55  23      Q.  Would it be higher than 90 percent?
02:55  24      A.  That might be about the right spot.
02:55  25      Q.  Give or take a few percentage points?

---

37 (Pages 142 to 145)

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson          CONFIDENTIAL
February 7, 2007 FOR ATTORNEYS' EYES ONLY

---

Page 146

02:55  1      A.  Could be a lot of money.
02:55  2      Q.  How about in the year 2005?
02:55  3      A.  I think we issued some debt and some stock
02:55  4   that year and did an acquisition so it would've been a
02:55  5   smaller percentage, but still a significant portion of
02:55  6   the -- of the funding of the UnionBanCal Corporation
02:56  7   comes from the dividends of Union Bank of California, as
02:56  8   well as other subsidiaries of UnionBanCal Corporation.
02:56  9      Q.  In 2005, would the percentage of funding
02:56  10  attributable to dividends paid by Union Bank of
02:56  11  California be higher than 75 percent?
02:56  12     A.  It -- it probably was.
02:56  13     Q.  Would it be higher than 85 percent?
02:56  14     A.  I don't recall the specifics unless we pull up
02:56  15  the financial statements.
02:56  16     Q.  But you're --
02:56  17     A.  There is a -- there is -- that information is
02:56  18  publicly disclosed.
02:56  19     Q.  As you sit here today, are you comfortable
02:56  20  saying that it was more than -- around or more than 75
02:56  21  percent?
02:56  22     A.  Yes.
02:56  23     Q.  Would you be comfortable giving a higher
02:56  24  percentage than that as you sit here today?
02:56  25     A.  No.

---

Page 147

02:56  1      Q.  How about for 2004?
02:56  2      A.  I -- subject to any additional issuance of
02:56  3   stock or public financing of the holding company, the
02:57  4   remainder would be in excess of 75 percent.
02:57  5      Q.  Which would be attributed to dividends by
02:57  6   Union Bank.
02:57  7      A.  Dividends from Union Bank and its other wholly
02:57  8   owned subsidiaries.
02:57  9      Q.  Okay.  We've only got a couple of minutes left
02:57  10  on the tape.  I want to try to get in a couple of quick
02:57  11  questions, if I can.
02:57  12          Are you familiar with the Union -- with
02:57  13  the website www.UBOC.com?
02:57  14     A.  Yes.
02:57  15     Q.  Do you know who owns that website?
02:57  16     A.  Frankly, no.
02:57  17     Q.  Okay.  I tell you what, let's go ahead and
02:57  18  take a break.
02:57  19     A.  Okay.
02:57  20     Q.  I don't want to run out of tape here.
02:57  21          THE VIDEOGRAPHER:  We're off the record
02:57  22  at 2:58.
02:58  23          (Recess taken 2:58 to 3:03)
03:03  24          THE VIDEOGRAPHER:  Back on the record at
03:03  25  3:03.

---

Page 148

03:03  1      Q.  (BY MR. KING)  Mr. Anderson, right before we
03:03  2   left off, we had briefly got into a little bit about the
03:03  3   website www.UBOC.com.  Are you familiar with that
03:03  4   website at all?
03:03  5      A.  I am.
03:03  6      Q.  Okay.  Do you know what entity that particular
03:03  7   website is the website for?
03:03  8      A.  No.  I'm not sure I can really answer that.
03:03  9      Q.  On your understanding, the best of your
03:03  10  understanding, is www.UBOC a website for Union Bank of
03:03  11  California?
03:03  12     A.  It has information about Union Bank of
03:03  13  California.
03:03  14     Q.  To the best of your understanding is
03:03  15  www.UBOC.com a website for UnionBanCal Corporation?
03:03  16     A.  I think it has information on UnionBanCal
03:03  17  Corporation.
03:04  18     Q.  Based on your understanding, would it be fair
03:04  19  to say that Union Bank of California and UnionBanCal
03:04  20  Corporation share the website www.UBOC.com?
03:04  21          MR. SWEIGART:  Object to the form.
03:04  22     A.  There's information for both companies on it.
03:04  23     Q.  (BY MR. KING)  Given that there's information
03:04  24  for both companies on that website, would it be fair to
03:04  25  say that UnionBanCal Corporation and Union Bank of

---

Page 149

03:04  1   California share that website?
03:04  2          MR. SWEIGART:  Object to the form still.
03:04  3      A.  It's appropriate to tell anyone inquiring on
03:04  4   UBOC what all of the entities that are appropriate,
03:04  5   so there's information, as you would, on a company and
03:05  6   its wholly owned subsidiaries and a company for what it
03:05  7   -- for it's 100 percent owned or owned by parent.
03:05  8      Q.  (BY MR. KING)  I believe you said earlier you
03:05  9   do not know who operates the website?
03:05  10     A.  No, I do not.
03:05  11     Q.  You don't know if it's Union Bank of
03:05  12  California or UnionBanCal Corporation.
03:05  13     A.  I think I've answered that.
03:05  14     Q.  Would your answer be, no, you don't know?
03:05  15     A.  I do not know.
03:05  16     Q.  Do you believe that the information on the
03:05  17  website www.UBOC.com is accurate?
03:06  18          MR. SWEIGART:  I'm going to object to the
03:06  19  form.
03:06  20     A.  I have no reason to believe that it's not
03:06  21  accurate.
03:06  22     Q.  (BY MR. KING)  Do you have any reason to
03:06  23  believe that Union Bank of California or UnionBanCal
03:06  24  Corporation would put -- or have put, at its direction,
03:06  25  any inaccurate information about the respective entity

---

38 (Pages 146 to 149)

Gretchen Shore Court Reporting & Litigation Support
(903) 758-2183 * (903) 758-4890 Fax      E-mail: gretchenshore@gretchenshore.com

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson             CONFIDENTIAL
February 7, 2007 FOR ATTORNEYS' EYES ONLY

---

**Page 150**

03:06  1  on that website?
03:06  2         MR. SWEIGART: Object to the form.
03:06  3     A. I would not expect it to be inaccurate.
03:06  4         MR. KING: Can you pull up the corporate
03:06  5  profile website?
03:07  6         (Exhibits Number 102-103 marked.)
03:07  7     Q. (BY MR. KING) Do you see that document in
03:07  8  front of you, Mr. Anderson?
03:07  9     A. Yes, I do.
03:07 10     Q. Have you ever seen this page from this website
03:07 11  before?
03:07 12     A. Yes, I have.
03:07 13     Q. And is this, from your understanding -- excuse
03:07 14  me. I apologize. Is this, from your understanding, a
03:07 15  page off the www.UBOC.com website?
03:07 16     A. It looks to be.
03:07 17     Q. And do you understand this to be a corporate
03:07 18  profile page for UnionBanCal Corporation?
03:08 19     A. That's what it says as a corporate profile of
03:08 20  UnionBanCal Corporation.
03:08 21     Q. Okay. I'd like for you to take a minute and
03:08 22  just read through that main text underneath there where
03:08 23  it says Corporate Profile, about four paragraphs, and
03:08 24  let me know when you're finished reading it.
03:08 25     A. (Reviewing document.) Okay.

**Page 151**

03:08  1     Q. Do you see the second paragraph --
03:08  2     A. Yes.
03:08  3     Q. -- where it says, We provide a comprehensive
03:08  4  array of personal and commercial financial products and
03:08  5  services to individuals --
03:08  6     A. Yes.
03:08  7     Q. -- businesses and government agencies and are
03:08  8  differentiated from our competitors by providing
03:08  9  personalized, high-quality and responsive service?
03:08 10     A. Yes, I do.
03:08 11     Q. Do you believe that's inaccurate?
03:08 12     A. No, I do not.
03:08 13     Q. Do you believe that -- so you believe that it
03:08 14  is, in fact, accurate to say that UnionBanCal
03:09 15  Corporation provides a comprehensive array of personal
03:09 16  and commercial financial products and services to
03:09 17  individuals, businesses and government agencies.
03:09 18         MR. SWEIGART: Object to the form;
03:09 19  mischaracterizes the document.
03:09 20         THE WITNESS: I'm supposed to answer?
03:09 21         MR. SWEIGART: Yes.
03:09 22     Q. (BY MR. KING) Yes.
03:09 23     A. Okay. Yes, I think it's accurate. And "we,"
03:09 24  in this context, is referring to UnionBanCal Corporation
03:09 25  as it says what its primary subsidiary is.

**Page 152**

03:09  1     Q. Who do you believe the "we" is referring to?
03:09  2  I'm sorry, I didn't understand your last answer.
03:10  3     A. UnionBanCal Corporation and its subsidiaries.
03:10  4     Q. When you go down to the third paragraph, At
03:10  5  December 31, 2006 we had approximately 10,209 full-time
03:10  6  equivalent employees, 321 full-service domestic
03:10  7  branches.
03:10  8     A. Uh-huh (affirmative).
03:10  9     Q. Additionally, we had two international
03:10 10  facilities. Did I read that correctly?
03:10 11     A. Yes, you did.
03:10 12     Q. Do you also believe that "we" there is
03:10 13  referring to UnionBanCal and its subsidiaries?
03:10 14     A. Yes, I do, because UnionBanCal Corporation has
03:11 15  no employees.
03:11 16     Q. In this particular document, when the term
03:11 17  "we" is used, there's no distinction being drawn between
03:11 18  UnionBanCal Corporation and its subsidiary, is there?
03:11 19         MR. SWEIGART: Object to the form;
03:11 20  mischaracterizes the document.
03:11 21     A. Could you repeat the question?
03:11 22     Q. (BY MR. KING) I will.
03:11 23         In this particular document, when the
03:11 24  term "we" is used, there is no distinction drawn between
03:11 25  UnionBanCal Corporation or its subsidiaries; is that

**Page 153**

03:11  1  correct?
03:11  2     A. In that particular paragraph, it does not.
03:12  3     Q. When you say "in that particular paragraph,"
03:12  4  which one are you referring to?
03:12  5     A. The second paragraph and third paragraph.
03:12  6         MR. KING: Can you pull up the ...
03:12  7         (Exhibit Number 104 marked.)
03:12  8     Q. (BY MR. KING) Mr. Anderson, do you recognize
03:12  9  this document?
03:12 10     A. Yes, I do.
03:12 11         MR. KING: Mr. Sweigart, can y'all see it
03:12 12  on y'all's monitor?
03:12 13         MR. SWEIGART: I've got one page up. I
03:12 14  can't go through the whole thing. It's 1 of 127 pages,
03:12 15  so --
03:12 16     A. I recognize the front cover.
03:12 17     Q. (BY MR. KING) Okay. And what do you -- from
03:12 18  the front cover, what do you recognize this document to
03:12 19  be? And feel free to scroll through --
03:12 20     A. Sure.
03:12 21     Q. -- any amount that you'd like.
03:12 22     A. It is the form 10-K for the fiscal year ended
03:12 23  12-31-2005 for UnionBanCal Corporation.
03:13 24     Q. Okay. I'm going to take control of it real
03:13 25  quick, if you don't mind.

39 (Pages 150 to 153)

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson                CONFIDENTIAL
February 7, 2007   FOR ATTORNEYS' EYES ONLY

---

**Page 154**

03:13 1    A.  It's yours.
03:13 2    Q.  And I'm going to go down to page 53.  And I
03:13 3  believe we have the same problem here with the Adobe
03:13 4  page number and the actual page number.  I'm going to go
03:13 5  to F-53, I believe, unless I change my numbering system
03:13 6  in the wee hours of the morning last night.
03:13 7        MR. SWEIGART:  46, 47, okay, making
03:13 8  progress.  Okay.  I think I've got it.
03:14 9        MR. KING:  I apologize, Gentlemen.  I
03:14 10  thought I had this marked.
03:14 11    A.  It's a big document.
03:14 12    Q.  (BY MR. KING)  It is, with competing page
03:15 13  numbers.
03:15 14        Okay.  I am at the top of page F-53,
03:15 15  which is page 60 of 127.
03:15 16        MR. SWEIGART:  Okay.  Note one, Summary
03:15 17  of Significant Accounting?
03:15 18        MR. KING:  We are on the same page.
03:15 19        MR. SWEIGART:  Okay.
03:15 20        MR. KING:  Glad to hear that.
03:15 21    Q.  (BY MR. KING)  There in the introduction
03:15 22  section, I'd like you to look at this.
03:15 23    A.  (Reviewing document.)  Yes.
03:15 24    Q.  The second sentence says, UnionBanCal
03:15 25  Corporation and its subsidiaries, the company, provide a

**Page 155**

03:15 1  wide range of financial service to consumers, small
03:16 2  businesses, middle market companies and major
03:16 3  corporations, primarily in California, Oregon and
03:16 4  Washington, and also nationally.  Did I read that
03:16 5  correct?
03:16 6    A.  Yes, you did.
03:16 7    Q.  What is the -- what is the purpose of a 10-K
03:16 8  filing?
03:16 9    A.  To satisfy the regulations of the SEC and the
03:16 10  New York Stock Exchange for filing your stock on the --
03:16 11  on the Exchange.
03:16 12    Q.  The SEC and the New York Stock Exchange
03:16 13  require that these document -- that a 10-K be filed in
03:16 14  certain instances?
03:16 15    A.  Yes.
03:16 16    Q.  Okay.  Is this state -- is this document --
03:16 17  would it be fair to say that the document and its
03:16 18  contents are accurate?
03:16 19    A.  Yes.
03:16 20    Q.  And their accuracy is, in fact, sworn to by
03:16 21  the individual that signs off on this document; is that
03:16 22  correct?
03:16 23    A.  Yeah.
03:16 24    Q.  Who signs off on UnionBanCal Corporation's
03:16 25  10-K statement?  Do you know?

**Page 156**

03:17 1    A.  Sure.  It's listed on one of these pages.
03:17 2    Q.  Do you know who it is?
03:17 3    A.  Well, we can go and look.
03:17 4    Q.  Okay.  Well, go and look.  Can you scroll down
03:17 5  and tell me who signed off on this document?
03:17 6    A.  Is it -- are you asking for a representation
03:17 7  from management or the auditors.
03:17 8    Q.  Management of UnionBanCal Corporation.
03:17 9    A.  Okay.  Probably this will -- this will -- this
03:17 10  will cost us some time, but that's all we got for today
03:17 11  so I'm happy to do this for you.
03:17 12    Q.  Well, I appreciate it.
03:17 13    A.  Go to page F-114.  It is signed by Takashi
03:17 14  Morimura, David Matson and David Anderson.
03:17 15    Q.  So you're one of the individuals that signed
03:17 16  off on this document, correct?
03:18 17    A.  I am.
03:18 18    Q.  And by signing off on this document on March
03:18 19  1, 2006, you swore and attest to its accurate; is that
03:18 20  correct?
03:18 21    A.  Yes, I did.
03:18 22    Q.  Did you read through this document before you
03:18 23  signed it?
03:18 24    A.  I did.
03:18 25    Q.  You did?

**Page 157**

03:18 1    A.  Yes, I did.
03:18 2    Q.  Did you read through the entire document
03:18 3  before you signed it?
03:18 4    A.  Yes, I did.
03:18 5    Q.  When you read through this document, did you
03:18 6  find any inaccuracies in it before you signed it?
03:18 7    A.  Not that I recall.
03:18 8    Q.  As you sit here today, do you continue to
03:18 9  swear and attest that everything in this document is
03:18 10  true and correct?
03:18 11    A.  Yes, I do.
03:18 12    Q.  Okay.
03:18 13    A.  You need to go up higher if you want to get
03:19 14  back to where you were.  Little further.  Keep going.
03:19 15  Who's running the show anyway?
03:19 16    Q.  That's a good question sometimes.  I don't
03:19 17  know.  I'm glad you're here to keep me in line.  There
03:19 18  we go.  I think that's it, now, correct?
03:19 19    A.  That's it.
03:19 20    Q.  All right.  Thank you very much for your help.
03:19 21    A.  You're welcome.
03:19 22    Q.  I guess since you signed it you have a pretty
03:19 23  good knowledge of where I need to go, don't you?
03:19 24        Do you believe that it's a correct
03:19 25  statement that UnionBanCal Corporation and its

40 (Pages 154 to 157)

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson               CONFIDENTIAL
February 7, 2007 FOR ATTORNEYS' EYES ONLY

---

Page 158

03:19  1   subsidiaries, the company, provide a wide range of
03:19  2   financial services to consumers, small business, middle
03:19  3   market companies and major corporations, primarily in
03:19  4   California, Oregon and Washington, and also nationally?
03:19  5        A.  I just said that I believe that these are
03:19  6   correct statements.
03:19  7        Q.  And as you sit here, you have no reason to
03:19  8   dispute that fact that UnionBanCal Corporation and its
03:19  9   subsidiaries provide a wide range of those services as
03:19 10   listed?
03:20 11        A.  That's correct.
03:20 12            MR. KING:  Cheryl, how do I minimize this
03:20 13   without closing it down?  Just hit the minimize button?
03:20 14            MS. TOLES:  This right here.
03:20 15            MR. KING:  Can we pull up the annual
03:20 16   report?
03:20 17            (Exhibit Number 105 marked.)
03:21 18        Q.  (BY MR. KING)  Mr. Anderson, do you know
03:21 19   whether or not UnionBanCal Corporation compiles the
03:21 20   annual report for shareholders?
03:21 21        A.  It compiles a Form 10-K --
03:21 22        Q.  Are you --
03:21 23        A.  -- which is the annual report to shareholders.
03:21 24        Q.  Okay.  Is -- is there any other document that
03:21 25   accompanies the 10-K that's provided to shareholders?

---

Page 159

03:21  1        A.  Yes, the proxy.
03:21  2        Q.  Okay.  Can you see this document that's in
03:21  3   front of you right now?
03:21  4        A.  Sure.
03:21  5        Q.  Okay.  Do you recognize -- I'll let you scroll
03:21  6   through it and tell me whether or not you recognize this
03:21  7   document.
03:21  8        A.  (Reviewing document.)  Yes, I do.
03:22  9        Q.  And what is this document?
03:22 10        A.  Its named the annual report to -- let me go to
03:22 11   the front.  UnionBanCal Corporation 2005 Annual Report.
03:22 12        Q.  Do you know who this document is provided to
03:22 13   typically?
03:22 14        A.  It is used as a marketing document, as well as
03:22 15   it is the document that accompanies the proxy statement
03:22 16   to shareholders.
03:23 17        Q.  How is this -- how is this annual report used
03:23 18   as a marketing document?
03:23 19        A.  It is handed out to customers of Union Bank of
03:23 20   California.
03:23 21        Q.  How does one go about obtaining a copy of the
03:23 22   annual report from UnionBanCal Corporation?
03:23 23        A.  Are you asking a -- a -- at any of the
03:23 24   offices, or you can write to the investor relations
03:23 25   department.

---

Page 160

03:23  1        Q.  And in this annual report, what does
03:23  2   UnionBanCal Corporation market?
03:23  3        A.  The products and services of UnionBanCal
03:23  4   Corporation and its wholly owned subsidiaries.
03:24  5        Q.  Could an individual in Marshall, Texas request
03:24  6   a copy of this document --
03:24  7        A.  Yes.
03:24  8        Q.  -- from UnionBanCal Corporation?
03:24  9        A.  Yes.
03:24 10        Q.  Could he obtain a copy of this by mailing the
03:24 11   corporate secretary, for example, in California?
03:24 12        A.  I would certainly think so.
03:24 13        Q.  And if an individual requested a copy -- if an
03:24 14   individual in Marshall, Texas requested a copy of the
03:24 15   annual report, would the annual report be sent to that
03:24 16   individual?
03:24 17        A.  Yes.  I think it says that on the back cover,
03:24 18   how to get a copy.  That is the front cover.
03:24 19        Q.  Would UnionBanCal Corporation mail a copy of
03:25 20   the annual report to an individual in Marshall, Texas if
03:25 21   they requested it?
03:25 22        A.  I think you asked me that.  I think I said
03:25 23   yes.
03:25 24        Q.  Is your answer still yes?
03:25 25        A.  I think it's yes.  Yes, it is yes.

---

Page 161

03:25  1        Q.  Okay.  Thank you.
03:25  2            I would like for you -- is -- let me back
03:25  3   up.
03:25  4            Is this also a document that is an
03:25  5   informational tool to the public?
03:25  6        A.  Yes.
03:25  7        Q.  And is the information that's contained in
03:25  8   this annual report true and accurate?
03:25  9        A.  I believe it to be.
03:25 10        Q.  Do you know who, at UnionBanCal Corporation,
03:25 11   compiled the annual report and puts it together?
03:26 12        A.  There is a section in this annual report that
03:26 13   incorporates and includes the Form 10-K and I'm one of
03:26 14   the preparers and signers of the Form 10-K.
03:26 15        Q.  Excluding the 10-K from this document, do you
03:26 16   know who performs --
03:26 17        A.  That's an integral part of the document.
03:26 18        Q.  Okay.  Well, who -- who compiles this is
03:26 19   particular section of the document that we're looking
03:26 20   at, Mr. Anderson?
03:26 21        A.  The public relations department.
03:26 22        Q.  Would it be the public relations department of
03:26 23   UnionBanCal Corporation?
03:26 24        A.  The -- the public relations department is of
03:26 25   Union Bank and UnionBanCal.

---

41 (Pages 158 to 161)

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson          CONFIDENTIAL
February 7, 2007 FOR ATTORNEYS' EYES ONLY

---

Page 162

```
03:27  1    Q.  So the public relations department is shared
03:27  2  between Union Bank and UnionBanCal Corporation.
03:27  3    A.  Yes.
03:27  4    Q.  When this annual report was being prepared and
03:27  5  compiled by an individual in the public relations
03:27  6  department --
03:27  7    A.  Yes.
03:27  8    Q.  -- were they acting on behalf of Union Bank of
03:27  9  California or UnionBanCal Corporation?
03:27 10    A.  Both, since the document speaks to both
03:27 11  companies.
03:27 12    Q.  Do you know who -- do you know of any
03:27 13  individuals, as you sit here today, that are in the
03:27 14  public relations department?
03:27 15    A.  Yes.
03:27 16    Q.  Do you know where the public relations
03:27 17  department offices are located?
03:27 18    A.  Throughout the state of California.
03:28 19    Q.  Who is the head of the public relations
03:28 20  department?
03:28 21    A.  Steve Johnson.
03:28 22    Q.  And where is Mr. Johnson's office located?
03:28 23    A.  400 California Street.
03:28 24    Q.  Would Mr. Johnson be responsible for putting
03:28 25  this document together?
```

Page 163

```
03:28  1    A.  He would be responsible for putting this
03:28  2  together.
03:28  3    Q.  What is Mr. Johnson's job title?
03:28  4    A.  Senior vice president.  He's an employee of
03:28  5  Union Bank.
03:28  6    Q.  Is he also an officer of UnionBanCal
03:28  7  Corporation?
03:28  8    A.  I wish I had that list right now, but I
03:28  9  believe --
03:28 10    Q.  So do I.
03:28 11    A.  -- I believe so.
03:28 12    Q.  Okay.  Do you know if Mr. Johnson is
03:28 13  compensated for his role as an officer of UnionBanCal
03:28 14  Corporation?
03:28 15    A.  Mr. Johnson is an employee of Union Bank of
03:29 16  California.
03:29 17    Q.  Do you know if Mr. Johnson is compensated in
03:29 18  his role as an officer of UnionBanCal Corporation?
03:29 19    A.  No, I do not.  I know he's not compensated as
03:29 20  an employee of UnionBanCal Corporation.
03:29 21    Q.  I'd like for you to look at this page that
03:29 22  I'm -- that's on your screen right now.
03:29 23      MR. KING:  And, Counsel, I've gone to the
03:29 24  last page, it's 15 of 16, a dark Navy blue page.
03:29 25      MR. SWEIGART:  It starts, UnionBanCal
```

Page 164

```
03:29  1  Corporation is a commercial bank holding company?
03:29  2      MR. KING:  Got it, on the same page
03:29  3  again.
03:29  4      MR. SWEIGART:  Okay.
03:29  5    Q.  (BY MR. KING)  I'd like for you to take a
03:29  6  minute and read through that, Mr. Anderson.  And let me
03:29  7  know when you've finished reading those three
03:29  8  paragraphs.
03:29  9    A.  (Reviewing document.)  Okay.
03:30 10    Q.  Is this document correct when it states, The
03:30 11  company provides a comprehensive array of personal and
03:30 12  commercial financial product and services to
03:30 13  individuals, small businesses, middle market companies,
03:30 14  major corporations, government agencies, and
03:30 15  not-for-profit organizations, and is an acknowledged
03:30 16  leader in trust and investment management services,
03:30 17  private banking, and consumer and business lending, with
03:30 18  expertise in commercial, middle market, corporate and
03:30 19  real estate lending?
03:30 20    A.  Yes, that's accurate that the company and, in
03:31 21  this context, is UnionBanCal Corporation and its
03:31 22  subsidiaries.
03:31 23    Q.  On the first sentence of that paragraph I just
03:31 24  read says, UnionBanCal Corporation is a commercial bank
03:31 25  holding company, incorporated in Delaware.  Did I read
```

Page 165

```
03:31  1  that right?
03:31  2    A.  Yes.
03:31  3    Q.  And it says it's a bank holding company,
03:31  4  correct?
03:31  5    A.  Yes, it is.
03:31  6    Q.  And the next sentence begins with, The company
03:31  7  provides a comprehensive array of personal and
03:31  8  commercial -- commercial financial products.  Did I say
03:31  9  that correctly?
03:31 10    A.  Yes, you did.
03:31 11    Q.  And you said that -- earlier that this
03:31 12  document is provided as a marketing tool to the general
03:31 13  public and shareholders --
03:31 14    A.  Yes.
03:31 15    Q.  -- correct?
03:31 16      If someone was unfamiliar with
03:31 17  UnionBanCal Corporation and its corporate structure in
03:31 18  reading this first paragraph, would they -- would --
03:31 19  would that individual believe that UnionBanCal
03:32 20  Corporation is not providing personal and commercial
03:32 21  financial products and services?
03:32 22      MR. SWEIGART:  Object to the form of the
03:32 23  question.  You expect him to speculate as to what some
03:32 24  other individual somewhere, who only reads a paragraph
03:32 25  might conclude?
```

Gretchen Shore Court Reporting & Litigation Support
(903) 758-2183 * (903) 758-4890 Fax    E-mail: gretchenshore@gretchenshore.com

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson                    CONFIDENTIAL
February 7, 2007 FOR ATTORNEYS' EYES ONLY

---

**Page 166**

03:32  1          MR. KING: Mr. Sweigart --
03:32  2          MR. SWEIGART: That's not -- that's not a
03:32  3   correct question, and you know it.
03:32  4          MR. KING: Mr. Sweigart --
03:32  5          MR. SWEIGART: We've been at this all
03:32  6   day.
03:32  7          MR. KING: Mr. Sweigart --
03:32  8          MR. SWEIGART: Ask a correct question.
03:32  9          MR. KING: If you have an objection, you
03:32 10   can object to form.
03:32 11          MR. SWEIGART: I've objected to the form.
03:32 12   It's a misleading question. You're mischaracterizing
03:32 13   the document and you're asking him to speculate. It's
03:32 14   an improper question.
03:32 15          MR. KING: Mr. Sweigart --
03:32 16          MR. SWEIGART: The form's improper. Ask
03:32 17   a correct question correct.
03:32 18          MR. KING: Mr. Sweigart, under the
03:32 19   Eastern District of Texas your objections are limited to
03:32 20   form.
03:32 21          MR. SWEIGART: I've objected to the form
03:32 22   and I've objected to the form over and over again and
03:32 23   I'm getting pretty dang tired now of you asking improper
03:32 24   questions. Ask a proper question.
03:32 25          MR. KING: And please make proper

---

**Page 167**

03:32  1   objections, Mr. Sweigart, and limit it to form.
03:32  2          MR. SWEIGART: That's what I've been
03:33  3   doing all day with a great deal of patients.
03:33  4          MR. KING: Thanks for your patients. I
03:33  5   appreciate it.
03:33  6      Q.  (BY MR. KING) Is there any reason to believe
03:33  7   that the company, as it -- in your -- based on your
03:33  8   understanding, in your reading of this paragraph, refers
03:33  9   to anything but UnionBanCal Corporation?
03:33 10          MR. SWEIGART: Object to the form.
03:33 11      A.  No document can be taken in context of just
03:33 12   one paragraph. You have to look at the document.
03:33 13      Q.  (BY MR. KING) And in this document,
03:33 14   UnionBanCal Corporation represents that it provides
03:33 15   commercial -- personal and commercial financial products
03:33 16   and services, does it not?
03:33 17          MR. SWEIGART: Object to the form;
03:33 18   mischaracterizes the document.
03:33 19      A.  A thorough reading of the document would
03:34 20   conclude what the role of each of the companies are.
03:34 21      Q.  (BY MR. KING) And what is the role of
03:34 22   UnionBanCal Corporation, in your opinion, from reading
03:34 23   this document?
03:34 24      A.  It's a bank holding company, commercial bank
03:34 25   holding company, incorporated in Delaware.

---

**Page 168**

03:34  1      Q.  Do you believe that UnionBanCal Corporation,
03:34  2   from reading this document, provides a comprehensive
03:34  3   array of personal and commercial financial products and
03:34  4   services?
03:34  5      A.  I won't make you read the rest of the
03:34  6   paragraph, but it is the company. There's a number of
03:34  7   places in various parts of the document that let's you
03:34  8   know what the company is.
03:34  9      Q.  Can you show me those places?
03:34 10      A.  Go to the 10-K. We just read it.
03:34 11          MR. KING: Can we pull up the 10-K,
03:34 12   please?
03:34 13      A.  We were just there a minute ago, footnote
03:35 14   number one, second paragraph -- or second line of that
03:35 15   paragraph.
03:35 16      Q.  (BY MR. KING) Okay. So UnionBanCal
03:35 17   Corporation and its subsidiaries comprises the company,
03:35 18   correct?
03:35 19      A.  Yes.
03:35 20      Q.  Not just UnionBanCal Corporation subsidiaries;
03:35 21   is that correct?
03:35 22      A.  Ask again.
03:35 23      Q.  UnionBanCal Corporation and its subsidiaries
03:35 24   comprises the term, quote, the company, unquote.
03:35 25      A.  In this -- in this context, yes.

---

**Page 169**

03:36  1      Q.  And the company -- quote, the company,
03:36  2   unquote, is not defined solely by UnionBanCal
03:36  3   Corporation subsidiaries, is it?
03:36  4      A.  I'm struggling to -- would you ask the
03:36  5   question again? Is not defined only by the company? Is
03:36  6   that what you said, by the word "the company"?
03:36  7      Q.  No, Mr. Anderson.
03:36  8          The company, quote, the company --
03:36  9      A.  Right.
03:36 10      Q.  -- unquote, is not defined as solely as
03:36 11   UnionBanCal Corporation's subsidiaries; isn't that
03:36 12   correct?
03:36 13      A.  Yes.
03:36 14      Q.  So where the term the company is used
03:36 15   throughout the annual report and the 10-K it refers to
03:36 16   both UnionBanCal Corporation and its subsidiaries. Is
03:37 17   that your testimony?
03:37 18      A.  In this context, yes, it does.
03:37 19      Q.  And the company does not separate UnionBanCal
03:37 20   Corporation from that definition of the company, does
03:37 21   it, Mr. Anderson?
03:37 22          MR. SWEIGART: Object to form.
03:37 23      A.  No, it doesn't. The rules of the Securities &
03:37 24   Exchange Commission requires that a registrant explain
03:37 25   things clearly.

43 (Pages 166 to 169)

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson             CONFIDENTIAL
February 7, 2007 FOR ATTORNEYS' EYES ONLY

---

**Page 170**

03:37  1         MR. KING: Object to nonresponsive.
03:37  2      A.  We think that it has explained it clearly and
03:37  3  the SEC has not objected to that.
03:37  4         MR. KING: Object to nonresponsive.
03:37  5      Q.  (BY MR. KING)  And when the term the company
03:37  6  is used throughout the annual report and the 10-K
03:37  7  filing, it does not specifically exclude UnionBanCal
03:37  8  Corporation from the definition of the company, correct?
03:37  9      A.  Unless specifically stated in various parts of
03:37 10  the documents.
03:38 11      Q.  Are you aware of any instances in the 10-K
03:38 12  document that the term the company excludes UnionBanCal
03:38 13  Corporation?
03:38 14      A.  I'm not aware of that.
03:38 15      Q.  And you're one of the individuals who put
03:38 16  together the Form 10-K, correct?
03:38 17      A.  Yes, I am.
03:38 18      Q.  And signed off to its accuracy, correct?
03:38 19      A.  Yes, I did.
03:38 20         MR. KING: Can we go back to the annual
03:38 21  report?  Thank you.
03:38 22      Q.  (BY MR. KING)  Are you aware of any instance
03:38 23  in this portion of the annual report or in the 10-K
03:38 24  portion of this annual report where it is stated that
03:39 25  UnionBanCal Corporation does not provide personal and

---

**Page 171**

03:39  1  commercial financial products and services to
03:39  2  individuals?
03:39  3         MR. SWEIGART: Object to the form of the
03:39  4  question.  The document speaks for itself.
03:39  5      A.  I don't recall any specifics about -- about
03:39  6  that in the document.
03:39  7      Q.  (BY MR. KING)  Including the 10-K that you
03:39  8  helped prepare?
03:39  9      A.  Right.  I think that -- there is a separate
03:40 10  footnote in the 10-K that is a separate footnote on the
03:40 11  UnionBanCal Corporation itself.  A reader of the
03:40 12  financial statements would understand its scope of
03:40 13  operations from that footnote.
03:40 14      Q.  Can you show me where that footnote is if I
03:40 15  pull up the --
03:40 16      A.  Sure.
03:40 17      Q.  Let me try to pull it up for you.  Let me
03:40 18  control this thing and see if I can get this pulled back
03:40 19  up.
03:40 20         Okay, there you go, Mr. Anderson.
03:41 21      A.  (Reviewing document.)  Note 27 to the
03:41 22  financial statements.  Do you want to take control so
03:41 23  you can look at it?
03:41 24      Q.  Note 27?
03:41 25      A.  Yes.

---

**Page 172**

03:42  1      Q.  And how is it that the average reader would
03:42  2  take from note 27 that UnionBanCal Corporation does not
03:42  3  engage in some of the activities that we have just
03:42  4  discussed?
03:42  5         MR. SWEIGART: Object to the form.
03:42  6      A.  Because a commercial bank makes loans and
03:42  7  takes deposits and there aren't any here.
03:43  8      Q.  (BY MR. KING)  Is there any other note in this
03:43  9  document or any other portion of this document that
03:43 10  would lead the average reader of the financial
03:43 11  statements to understand the scope of UnionBanCal
03:44 12  Corporation's operations?
03:44 13         MR. SWEIGART: Object to the form.
03:44 14      A.  In my estimation, no -- no further explanation
03:44 15  is necessary or required.
03:44 16         THE WITNESS: Is that better?
03:44 17         THE VIDEOGRAPHER: I think so.  Thank
03:44 18  you.
03:44 19      Q.  (BY MR. KING)  Mr. Anderson, what's more clear
03:44 20  to you, a financial statement, such as that in note 27,
03:44 21  or a statement that the company provides a comprehensive
03:44 22  array of personal and commercial financial products and
03:44 23  services to individuals?
03:44 24         MR. SWEIGART: Object to the form.
03:44 25      A.  Those statements were important, can't be

---

**Page 173**

03:44  1  taken individually.
03:45  2      Q.  (BY MR. KING)  Is one of those, in your
03:45  3  opinion, more clear than the other?
03:45  4         MR. SWEIGART: Object to the form.
03:45  5      A.  That's hard to speculate.
03:45  6      Q.  (BY MR. KING)  Is one more clear to you than
03:45  7  the other?
03:45  8         MR. SWEIGART: Object to the form.
03:45  9      A.  I think they're both very clear.
03:45 10      Q.  (BY MR. KING)  Thank you.
03:46 11         Mr. Anderson, do you recall earlier in
03:46 12  the day when we talked about different terms and, for
03:46 13  example, one of the terms was commercial banking and it
03:46 14  was operations and customer service, do you recall that?
03:46 15      A.  Yes.
03:46 16      Q.  And do you recall telling me that each of
03:46 17  those terms that I -- when I asked you if they had a
03:46 18  particular meaning to you, do you recall that line of
03:46 19  discussion?
03:46 20      A.  Yes.
03:46 21      Q.  And do you recall that each of those terms
03:46 22  that you agreed with me were banking activities?
03:46 23      A.  Yes.
03:46 24      Q.  I'd like for you to look -- you can see the
03:46 25  document.  I'm on the 10-K filing right now and I'm on

---

44 (Pages 170 to 173)

Gretchen Shore Court Reporting & Litigation Support
(903) 758-2183 * (903) 758-4890 Fax    E-mail: gretchenshore@gretchenshore.com

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson                CONFIDENTIAL
February 7, 2007 FOR ATTORNEYS' EYES ONLY

### Page 174

```
03:46  1   page 18 of the 10-K filing.  I would like for you to
03:47  2   look down at the paragraph by Mr. Flynn's name.
03:47  3       A.  Yes.
03:47  4       Q.  And on the third sentence by Mr. Flynn's name,
03:47  5   it says, He, Mr. Flynn, served as vice chairman and head
03:47  6   of the commercial financial services group of Union --
03:47  7       A.  I'm sorry, third line or third sentence?  You
03:47  8   said sentence, I believe.
03:47  9       Q.  I'm sorry, third line.  I apologize.
03:47 10       A.  Thank you.
03:47 11       Q.  He, Mr. Flynn, served as vice chairman and
03:47 12   head of the commercial financial services group of
03:47 13   UnionBanCal Corporation and Union Bank of California.
03:47 14   Do you see that?
03:47 15       A.  Yes.
03:47 16       Q.  And earlier you had said that commercial
03:48 17   financial services was a banking activity, correct?
03:48 18       A.  Yes.
03:48 19       Q.  Is it your testimony that UnionBanCal
03:48 20   Corporation does not engage in banking activities?
03:48 21       A.  Yes.
03:48 22       Q.  If UnionBanCal Corporation does not engage in
03:48 23   banking activities, can you explain to the judge and
03:48 24   jury why UnionBanCal Corporation has a commercial
03:48 25   financial services group when you earlier said
```

### Page 175

```
03:48  1   commercial financial services is a banking activity?
03:48  2       MR. SWEIGART:  Object to the form.
03:48  3       A.  I think as I said before, that is his title.
03:48  4   It happens that UnionBanCal Corporation does not have
03:48  5   commercial financial services operations.
03:49  6       Q.  (BY MR. KING)  But UnionBanCal Corporation
03:49  7   apparently has a group that's dedicated to commercial
03:49  8   financial services; is that correct?
03:49  9       A.  In the bank, Union Bank of California.  It is
03:49 10   very clear from looking at the footnotes to the
03:49 11   financial statements that UnionBanCal has no commercial
03:49 12   banking activities.
03:49 13       Q.  Well, I'm looking at this paragraph right now,
03:49 14   Mr. Anderson, and in this paragraph it specifically
03:49 15   says, Mr. Flynn has served as vice chairman and head of
03:49 16   the commercial financial services group of UnionBanCal
03:49 17   Corporation.  Now, does UnionBanCal Corporation have a
03:49 18   commercial financial services group?
03:49 19       A.  No, it does not.
03:49 20       Q.  So this is an inaccurate statement in the
03:49 21   10-K.
03:49 22       MR. SWEIGART:  Object to the form.
03:49 23       A.  It is an accurate statement.
03:50 24       Q.  (BY MR. KING)  Did UnionBanCal Corporation
03:50 25   have a commercial financial services group from April
```

### Page 176

```
03:50  1   2004 to March 2005?
03:50  2       A.  UnionBanCal Corporation itself, separate
03:50  3   entity, does not have a commercial financial services
03:50  4   group.
03:50  5       Q.  Well, then, what was Mr. Flynn the head of if
03:50  6   he was not the head of commercial financial services
03:50  7   group of UnionBanCal Corporation?
03:50  8       A.  He was the head of the -- of both.  It just
03:50  9   happened to not have, in that particular company,
03:50 10   commercial financial services activities.
03:51 11       Q.  Earlier you just testified that UnionBanCal
03:51 12   Corporation does not have a commercial financial
03:51 13   services group, yet you've just now testified, a couple
03:51 14   of sentences later, that Mr. Flynn was the head of both
03:51 15   groups.
03:51 16       MR. SWEIGART:  Object to the form;
03:51 17   mischaracterizes the testimony.
03:51 18       Q.  (BY MR. KING)  So does or does not UnionBanCal
03:51 19   Corporation have a commercial financial services group?
03:51 20       A.  I -- I must have misspoke.  It does not have
03:51 21   commercial financial services.  UnionBanCal does not.
03:51 22       Q.  Does UnionBanCal Corporation --
03:51 23       A.  As a separate entity.
03:51 24       Q.  Let me finish asking my question.
03:51 25       A.  Uh-huh (affirmative).
```

### Page 177

```
03:51  1       Q.  Does UnionBanCal Corporation have a commercial
03:51  2   financial services group as stated in this 10-K?
03:51  3       MR. SWEIGART:  Object to the form;
03:51  4   mischaracterizes the document.
03:52  5       A.  UnionBanCal Corporation has no employees so it
03:52  6   cannot have --
03:52  7       Q.  (BY MR. KING)  That's not my question,
03:52  8   Mr. Anderson.  My question is very specifically, does
03:52  9   UnionBanCal Corporation have a commercial financial
03:52 10   services group?
03:52 11       A.  No.
03:52 12       Q.  So this is an inaccurate statement in this
03:52 13   10-K; is that correct?
03:52 14       A.  I do not believe it is.
03:52 15       MR. SWEIGART:  Object to the form;
03:52 16   mischaracterizes the document and the prior testimony.
03:52 17       Q.  (BY MR. KING)  Well, if -- if UnionBanCal
03:52 18   Corporation -- and I'm sorry if I'm just belaboring this
03:52 19   because it makes absolutely no sense to me.
03:52 20       If UnionBanCal Corporation does not have
03:52 21   a commercial financial services group, how can Mr. Flynn
03:52 22   be the vice chairman and head of the commercial
03:52 23   financial services group of UnionBanCal Corporation?
03:52 24       A.  Because that is his title at UnionBanCal
03:52 25   Corporation, as an officer.
```

45 (Pages 174 to 177)

Gretchen Shore Court Reporting & Litigation Support
(903) 758-2183 * (903) 758-4890 Fax      E-mail: gretchenshore@gretchenshore.com

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson                CONFIDENTIAL
February 7, 2007 FOR ATTORNEYS' EYES ONLY

---

Page 178

```
03:52  1      Q.  He's the head of something that does not
03:52  2   exist.
03:52  3      A.  It happens that it doesn't for that company.
03:53  4   It is a matter of convenience for the company to have
03:53  5   officership titles.
03:53  6      Q.  Is it a matter of convenience for the company
03:53  7   to mis -- to mislead shareholders?
03:53  8         MR. SWEIGART:  Object to the form of the
03:53  9   question, argumentative.  No basis in the record
03:53 10   whatsoever for that comment.
03:53 11      A.  I think it's very clear.
03:53 12      Q.  (BY MR. KING)  We had also talked earlier
03:53 13   about commercial banking.  Do you recall that?
03:53 14      A.  Yes.
03:53 15      Q.  And you had indicated that commercial banking
03:53 16   was also a banking activity, correct?
03:53 17      A.  Yes.
03:53 18      Q.  If you look here in Mr. Flynn's little excerpt
03:53 19   next to his name it says that Mr. Flynn has served as
03:53 20   executive vice president and chief credit officer of
03:54 21   UnionBanCal Corporation and Union Bank of California,
03:54 22   NA, from September 2000 to April 2000, as executive vice
03:54 23   president and head of specialized lending from May 2000
03:54 24   to September 2000, and as executive vice president and
03:54 25   head of the commercial banking group from June 1998 to
```

---

Page 179

```
03:54  1   May 2000.  Did I read that correctly?
03:54  2      A.  Yes, you did.
03:54  3      Q.  Did Mr. Flynn serve as executive vice
03:54  4   president and head of the commercial banking group for
03:54  5   UnionBanCal Corporation from June 1998 to May 2000?
03:54  6      A.  Did you just read what you just read again?
03:54  7      Q.  Well, I asked -- I ask a question.
03:54  8      A.  Yes.
03:54  9      Q.  He did.
03:54 10      A.  He served as executive vice president in his
03:54 11   -- did you, I'm sorry, ask me about and chief credit
03:54 12   officer, or which line are you on?  I'm sorry.
03:54 13      Q.  The fourth and third from the bottom.
03:54 14      A.  This is an accurate statement.
03:54 15      Q.  So Mr. Flynn served as executive vice
03:55 16   president and head of the commercial banking group from
03:55 17   June 1998 to May 2000 for UnionBanCal Corporation,
03:55 18   correct?
03:55 19         MR. SWEIGART:  Object.  It
03:55 20   mischaracterizes the document.  It doesn't say that.
03:55 21      Q.  (BY MR. KING)  Is that incorrect?
03:55 22      A.  I think, as stated in this document, it is
03:55 23   correct.
03:55 24      Q.  What entity did Mr. Flynn serve as executive
03:55 25   vice president and head of the commercial banking group
```

---

Page 180

```
03:55  1   for during that time period?
03:55  2      A.  Mr. Flynn had a title of executive vice
03:55  3   president and head of the commercial banking group in
03:56  4   both UnionBanCal Corporation and Union Bank.
03:56  5      Q.  And earlier you said that commercial banking
03:56  6   is a banking activity, correct?
03:56  7      A.  Yes, I did.
03:56  8      Q.  Is this another position that did not exist
03:56  9   within UnionBanCal but they just gave Mr. Flynn the
03:56 10   title of?
03:56 11         MR. SWEIGART:  Object to the form.
03:56 12      A.  I did not say that the position didn't exist.
03:56 13   The position exists.  That is his title.
03:56 14      Q.  (BY MR. KING)  Was there a commercial banking
03:56 15   group -- is there a commercial banking group within
03:56 16   UnionBanCal Corporation?
03:56 17      A.  No.  There are no activities of commercial
03:56 18   banking group in UnionBanCal Corporation.
03:57 19      Q.  We talked earlier about customer service and
03:57 20   what that entailed in your understanding of Union Bank
03:57 21   of California.  Do you recall that?
03:57 22      A.  Yes.
03:57 23      Q.  And you had said that in those context
03:57 24   customer services were banking activities.  Do you
03:57 25   recall that?
```

---

Page 181

```
03:57  1      A.  Yes.
03:57  2      Q.  I'd like for you to look here by Ms. Betzer's
03:57  3   name.
03:57  4      A.  Yeah.
03:57  5      Q.  Do you see where Ms. Betzer served as a
03:57  6   customer -- as vice -- executive vice president and head
03:57  7   of the operations and customer services group of
03:58  8   UnionBanCal Corporation and Union Bank of California,
03:58  9   N.A. since January 2000?
03:58 10      A.  Yes, I see that.
03:58 11      Q.  Is that an accurate statement?
03:58 12      A.  Yes, it is.
03:58 13      Q.  Is there an operations and customer services
03:58 14   group within UnionBanCal Corporation?
03:58 15      A.  There are no operations and service -- in
03:58 16   customer services activities within UnionBanCal
03:58 17   Corporation.
03:58 18      Q.  So in this instance, Ms. Betzer was given the
03:58 19   title of executive vice president and head of a group
03:58 20   that did not exist within UnionBanCal Corporation.
03:58 21         MR. SWEIGART:  Object to the form of the
03:58 22   question.
03:58 23      A.  Ms. Betzer has a title of executive vice
03:58 24   president head of operations and customer service group
03:59 25   at UnionBanCal Corporation.  There are no operations,
```

46 (Pages 178 to 181)

Gretchen Shore Court Reporting & Litigation Support
(903) 758-2183 * (903) 758-4890 Fax    E-mail: gretchenshore@gretchenshore.com

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson          CONFIDENTIAL
February 7, 2007 FOR ATTORNEYS' EYES ONLY

**Page 182**

03:59  1  customer services at UnionBanCal Corporation and there
03:59  2  are no employees at UnionBanCal Corporation.
03:59  3      Q.  (BY MR. KING)  And that group, operations and
03:59  4  customer services group, does not exist at UnionBanCal
03:59  5  Corporation, according to your testimony here today.
03:59  6      A.  That is that individual's title, as I've said
03:59  7  a number of times.
03:59  8      Q.  That's the individual's title.
03:59  9      A.  Yes.
03:59 10      Q.  But that group does not exist within
03:59 11  UnionBanCal Corporation, correct?
03:59 12      A.  It does not currently exist in UnionBanCal
03:59 13  Corporation.
03:59 14      Q.  Has it ever existed in UnionBanCal
03:59 15  Corporation?
03:59 16      A.  No, it hasn't.
03:59 17      Q.  Do you recall going over the term commercial
03:59 18  deposits?
03:59 19      A.  Yes, I did.
03:59 20      Q.  And you had indicated that commercial deposits
04:00 21  was a banking activity as well, correct?
04:00 22      A.  That's correct.
04:00 23      Q.  I'd like for you to look at Ms. Bourne's
04:00 24  little segment next to her name.
04:00 25      A.  Yes.

**Page 183**

04:00  1      Q.  Let's see if I can pull it up so we can see
04:00  2  the complete paragraph here.  It says, Ms. Bourne has
04:00  3  serve as executive vice president since April of 2000
04:00  4  and is head of the commercial deposits and treasury
04:00  5  management group of UnionBanCal Corporation and Union
04:00  6  Bank of California.  Did I read that correct?
04:00  7      A.  Yes.
04:00  8      Q.  I think we also talked about treasury
04:00  9  management earlier and you said that was also a banking
04:00 10  activity, correct?
04:00 11      A.  Yes, it is.
04:00 12      Q.  Is this an accurate statement, that Ms. Bourne
04:00 13  served as executive vice president since April of 2000
04:00 14  and as head of the commercial deposits and treasury
04:00 15  management group of UnionBanCal Corporation and Union
04:00 16  Bank of California?
04:00 17      A.  Yes, it's accurate.
04:01 18      Q.  Does a commercial deposits and treasury
04:01 19  management group exist within UnionBanCal Corporation?
04:01 20      A.  This is Ms. Bourne's title at UnionBanCal
04:01 21  Corporation.  There are no commercial deposits or
04:01 22  treasury management services provided at UnionBanCal
04:01 23  Corporation.
04:01 24      MR. KING:  Object to nonresponsive.
04:01 25      Q.  (BY MR. KING)  Is there a commercial deposits

**Page 184**

04:01  1  and treasury management group of UnionBanCal
04:01  2  Corporation?  Yes or no?
04:01  3      A.  There is not.
04:01  4      Q.  And Ms. Bourne is listed in the 10-K as being
04:01  5  the head and executive vice president of a group that
04:01  6  does not exist within UnionBanCal Corporation, correct?
04:01  7      MR. SWEIGART:  Object to the form.
04:01  8      A.  I think I've clarified that, that that's that
04:01  9  person's title, and I've answered your question as to
04:01 10  whether there are any activities at the UnionBanCal
04:02 11  Corporation of this type and there aren't any.
04:02 12      Q.  (BY MR. KING)  Okay.  Well, it's clear as mud
04:02 13  to me.  Do you recall talking about real estate lending?
04:02 14      A.  Yes.
04:02 15      Q.  Do you recall saying that real estate lending
04:02 16  was a banking activity?
04:02 17      A.  Yes.
04:02 18      Q.  I'd like for you to look at Mr. Gibral, the
04:02 19  section right next to him.  Does a real estate
04:03 20  lending -- is a real estate lending department within
04:03 21  UnionBanCal Corporation?
04:03 22      A.  No, there's not.
04:03 23      Q.  In Mr. Gibral's position as a senior credit
04:03 24  officer responsible for real estate lending and national
04:03 25  banking, what entity did he hold that position with?

**Page 185**

04:04  1      A.  For sure, Union Bank of California.  And I'm
04:04  2  not sure if it's with UnionBanCal at this date, prior to
04:04  3  this date.
04:04  4      Q.  Do you recall our discussion of community
04:04  5  banking earlier in the day?
04:04  6      A.  Yes.
04:04  7      Q.  Do you recall stating the community banking
04:04  8  was a banking activity?
04:04  9      A.  Yes.
04:04 10      Q.  I'd like for you to look at Mr. Kendrick's
04:04 11  excerpt next to his name.  Is it a correct statement
04:04 12  that Mr. Kendrick has served as executive vice president
04:04 13  and head of the community banking group of UnionBanCal
04:04 14  Corporation and Union Bank of California since December
04:05 15  2000?
04:05 16      A.  Yes, that is correct.
04:05 17      Q.  And is there a community banking group within
04:05 18  UnionBanCal Corporation?
04:05 19      A.  No, there's not.  This is Mr. Kendrick's
04:05 20  title.
04:05 21      Q.  So again, Mr. Kendrick is given the title of
04:05 22  being the vice president and head of a group that does
04:05 23  not exist within UnionBanCal Corporation, correct?
04:05 24      A.  Yes.
04:05 25      Q.  As an officer of UnionBanCal Corporation and

Gretchen Shore Court Reporting & Litigation Support
(903) 758-2183 * (903) 758-4890 Fax     E-mail: gretchenshore@gretchenshore.com

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson            CONFIDENTIAL
February 7, 2007 FOR ATTORNEYS' EYES ONLY

---

**Page 186**

04:05 1 an officer and employee of Union Bank of California, do
04:05 2 you think it is appropriate to make statements such as
04:05 3 this in your 10-K where you state that various
04:06 4 individuals are heads and vice presidents of departments
04:06 5 that do not exist?
04:06 6     MR. SWEIGART: Object to form.
04:06 7     A. I think it's very clear.
04:06 8     Q. (BY MR. KING) You think it's clear from
04:06 9 somebody reading this document, for example, that they
04:06 10 would, in reading, for example, the excerpt by
04:06 11 Mr. Flynn, they would understand that there is not a
04:06 12 commercial financial services group that exists within
04:06 13 UnionBanCal Corporation?
04:06 14     MR. SWEIGART: Object to form.
04:06 15     Q. (BY MR. KING) Do you really believe that?
04:07 16     A. I think that that's -- I think it's
04:07 17 appropriate disclosure.
04:07 18     Q. Do you believe that's fair and accurate as an
04:07 19 officer of UnionBanCal Corporation, an employee and
04:07 20 officer of Union Bank of California?
04:07 21     A. I think the descriptions of the employees'
04:07 22 titles and job history is accurate.
04:08 23     Q. We've already covered this, but you did swear
04:08 24 to the accuracy of this document in this 10-K, correct?
04:08 25     MR. SWEIGART: Asked and answered.

---

**Page 187**

04:08 1     A. Asked and answered.
04:08 2     Q. (BY MR. KING) You can answer the question.
04:08 3     A. I've already -- you've already asked it and
04:08 4 I've already answered it.
04:08 5     Q. Will you already answer it again, please?
04:08 6     A. I'd be glad to, as many time you'd like me to.
04:08 7 It's accurate.
04:08 8     Q. And you swore and attested to that, correct?
04:09 9     A. Yes, I have.
04:08 10     Q. And you took an oath earlier today that you
04:08 11 would tell -- tell the truth today, correct?
04:08 12     A. That's correct.
04:08 13     Q. And you understand you made that oath under
04:08 14 the penalty of perjury; is that correct?
04:08 15     A. Yes, I did.
04:08 16     Q. And looking back, is there anything that you
04:08 17 would change, as a writer or an individual involved in
04:09 18 writing, compiling this 10-K, that you would change?
04:09 19     MR. SWEIGART: Object to the form.
04:09 20     A. Not for this filing.
04:09 21     Q. (BY MR. KING) You anticipate that you may
04:09 22 make those changes in future 10-K filings as an officer
04:09 23 of UnionBanCal Corporation?
04:09 24     MR. SWEIGART: Object to the form.
04:09 25     A. 10-K is a living document and it requires

---

**Page 188**

04:09 1 change as circumstances change, as business changes,
04:09 2 officer changes. Some of these officers aren't even
04:09 3 here any longer with the corporation. So, yes, we will
04:09 4 review the next 10-K, we will make sure it's as accurate
04:09 5 as this document was accurate at the time it was filed.
04:11 6     (Exhibit Number 106 marked.)
04:11 7     Q. (BY MR. KING) I'd like for you to look at
04:11 8 what has been marked as Document 106, Mr. Anderson. I'd
04:11 9 like for you to look through that.
04:11 10     A. Uh-huh (affirmative).
04:11 11     Q. Do you recognize that document?
04:11 12     A. (Reviewing document.) Yes, I do.
04:11 13     Q. Is that your signature on page 2 of this
04:11 14 document?
04:11 15     A. I believe so.
04:11 16     Q. Did you personally sign this document?
04:11 17     A. Yes, I did.
04:11 18     Q. Did you write this document?
04:11 19     A. I helped prepare it.
04:11 20     Q. Did you write it?
04:11 21     A. Can you clarify write it?
04:11 22     Q. Did you draft, make an initial draft of this
04:11 23 document?
04:11 24     A. I assisted in the drafting of the document.
04:11 25     Q. How did you assist in drafting this document?

---

**Page 189**

04:11 1     A. Answering the questions, putting down the
04:11 2 statements.
04:11 3     Q. Did you write down the statements that are --
04:11 4 did you personally type or write down the statements
04:11 5 that are listed in this affidavit?
04:12 6     A. I personally did not type this document.
04:12 7     Q. Do you know who did?
04:12 8     A. Well, the legal department of
04:12 9 UnionBanCal/Union Bank.
04:12 10     Q. Did you provide the substance of this
04:12 11 document?
04:12 12     A. Yes, I did. The answers sound familiar, don't
04:12 13 they?
04:12 14     Q. Strangely enough, they do.
04:12 15     A. Not strangely. It's -- it's accurate.
04:12 16     Q. Is there anything in this document that, as
04:12 17 you sit here today, you would change?
04:12 18     A. No, sir, there's not.
04:12 19     Q. Despite the fact that UnionBanCal Corporation
04:13 20 and Union Bank of California have a shared compensation
04:13 21 and benefits committee, UnionBanCal Corporation has a
04:13 22 senior management bonus plan, UnionBanCal Corporation
04:13 23 has an employee benefits plan, and UnionBanCal
04:13 24 Corporation has a philosophy of recruiting, motivating
04:13 25 and retaining exceptional employees who will help

---

Gretchen Shore Court Reporting & Litigation Support
(903) 758-2183 * (903) 758-4890 Fax    E-mail: gretchenshore@gretchenshore.com

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson                 CONFIDENTIAL
February 7, 2007FOR ATTORNEYS' EYES ONLY

Page 190

04:13 1  UnionBanCal Corporation achieve strategic business
04:13 2  objectives, do you still believe and expect the judge
04:13 3  and jury in this case to believe that UnionBanCal has no
04:13 4  employees?
04:13 5      MR. SWEIGART: Object to the form of the
04:13 6  question; mischaracterizes, in summary form, all of the
04:13 7  testimony we spent a whole day on here.
04:13 8      MR. KING: Mr. Sweigart, once again, I'm
04:13 9  going to ask that you abide by the local rules of the
04:13 10 Eastern District of Texas.
04:13 11     MR. SWEIGART: Object to the form. You
04:13 12 mischaracterize the testimony.
04:13 13     MR. KING: Your objection is limited to
04:13 14 form in the Eastern District, Mr. Sweigart. And I would
04:13 15 appreciate it, and I'm sure Judge Folsom would also
04:14 16 appreciate it, if you would abide by the rules that he
04:14 17 set forth for his court in the Eastern District.
04:14 18     MR. SWEIGART: I object to the form of
04:14 19 the your question, and I gave you the courtesy of
04:14 20 telling you why, and you know it's an improper question.
04:14 21     MR. KING: I'm sure you've read the local
04:14 22 rules of the Eastern District --
04:14 23     MR. SWEIGART: I certainly have.
04:14 24     MR. KING: -- and you know your
04:14 25 objections are improper objections.

Page 191

04:14 1      THE COURT REPORTER: Hold it.
04:14 2      (Unintelligible proceedings due to
04:14 3  multiple speakers.)
04:14 4      MR. SWEIGART: I didn't explain it. I
04:14 5  simply told you, very clearly, why your question was an
04:14 6  improper form.
04:14 7      MR. KING: And that's what makes it an
04:14 8  improper objection, Mr. Sweigart.
04:14 9      Q. (BY MR. KING) I'll ask the question again,
04:14 10 Mr. Anderson.
04:14 11     A. Thank you.
04:14 12     Q. Despite the fact that UnionBanCal Corporation
04:14 13 and Union Bank of California have a shared compensation
04:14 14 and benefits committee, UnionBanCal Corporation has a
04:14 15 senior management bonus plan, UnionBanCal Corporation
04:15 16 has an employee benefits plan, and UnionBanCal
04:15 17 Corporation has a philosophy of recruiting, motivating
04:15 18 and retaining exceptional employees who will help
04:15 19 UnionBanCal Corporation achieve a strategic business
04:15 20 objective, do you still believe and intend to testify to
04:15 21 the judge and jury in this matter that UnionBanCal
04:15 22 Corporation has no employees?
04:15 23     MR. SWEIGART: Object to the form.
04:15 24     A. UnionBanCal Corporation has no employees.
04:15 25     Q. (BY MR. KING) And you stand by that

Page 192

04:15 1  statement, correct?
04:15 2      A. Yes.
04:15 3      Q. Under penalty of perjury.
04:15 4      A. Absolutely.
04:15 5      Q. Despite the fact that UnionBanCal Corporation
04:15 6  and Union Bank of California share multiple directors
04:16 7  and officers, the fact that the board of directors for
04:16 8  both UnionBanCal Corporation and Union Bank of
04:16 9  California often meet in conjunction with one another,
04:16 10 do you still stand by your statement in paragraph 6 that
04:16 11 UnionBanCal is not involved in the day-to-day management
04:16 12 of any of its subsidiaries including Union Bank of
04:16 13 California, N.A.?
04:16 14     MR. SWEIGART: Object to the form.
04:16 15     A. UnionBanCal Corporation is not involved in the
04:16 16 day-to-day management of any of its subsidiaries,
04:16 17 including Union Bank of California.
04:17 18     Q. (BY MR. KING) Despite the fact that
04:17 19 UnionBanCal Corporation has officers who have served as
04:17 20 executive vice presidents and heads of commercial
04:17 21 financial services group of UnionBanCal Corporation,
04:17 22 head of commercial banking group operations and customer
04:17 23 services group of UnionBanCal Corporation, commercial
04:17 24 deposits and treasury management group of UnionBanCal
04:17 25 Corporation, and community banking group of UnionBanCa

Page 193

04:17 1  Corporation, do you stand by your testimony under
04:17 2  penalty of perjury that UnionBanCal Corporation does no
04:17 3  engage in any retail banking operations as listed in
04:17 4  paragraph 5?
04:17 5      A. UnionBanCal Corporation does not participate,
04:17 6  in any way, in commercial banking activities of Union
04:17 7  Bank of California.
04:18 8      Q. Did you meet with your attorneys before this
04:18 9  deposition today?
04:18 10     A. Yes.
04:18 11     Q. How often did you meet with -- when did you
04:18 12 meet with your attorneys in preparation for your
04:18 13 deposition today?
04:19 14     A. Yesterday afternoon and this morning, as we
04:19 15 walked in here.
04:19 16     Q. What time yesterday afternoon did you meet
04:19 17 with your attorneys?
04:19 18     A. I don't recall the exact time. It was in the
04:19 19 afternoon.
04:19 20     Q. Do you recall how long you met with your
04:19 21 attorneys?
04:19 22     A. An hour or so.
04:19 23     Q. How long did you meet with your attorneys this
04:19 24 morning?
04:19 25     A. Five minutes.

49 (Pages 190 to 193)

Gretchen Shore Court Reporting & Litigation Support
(903) 758-2183 * (903) 758-4890 Fax     E-mail: gretchenshore@gretchenshore.com

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson                CONFIDENTIAL
February 7, 2007 FOR ATTORNEYS' EYES ONLY

---

Page 194

04:19  1    Q.  Where did y'all meet at?
04:19  2    A.  Next door.
04:19  3    Q.  Both yesterday and today?
04:19  4    A.  No.
04:19  5    Q.  Where did you meet at yesterday?
04:19  6    A.  The offices of UnionBanCal or Union Bank of
04:19  7    California.
04:19  8    Q.  Are those offices at 400 California
04:19  9    Street?
04:19  10   A.  Yes.
04:19  11   Q.  Did you meet in your office?
04:19  12   A.  It was actually a conference room.
04:19  13   Q.  And when you met in that conference room
04:19  14   yesterday, were you meeting on behalf of UnionBanCal
04:19  15   Corporation or Union Bank of California?
04:19  16   A.  I was meeting on behalf of UnionBanCal
04:20  17   Corporation as signed by these statements.
04:20  18   Q.  Are you paid a -- I believe you had said
04:20  19   earlier you are paid a salary by Union Bank of
04:20  20   California.  Correct?
04:20  21   A.  Yeah, barely enough to get by.
04:20  22   Q.  How much do you receive as compensation from
04:20  23   Union Bank of California?
04:20  24       MR. SWEIGART:  I'm going to object to the
04:20  25   form of that.  What's the relevance of this at all with

Page 195

04:20  1    the limited discovery -- we have a limited discovery
04:20  2    order here with respect to, as you know, jurisdictional
04:20  3    contacts with the state of Texas.  What this man's
04:20  4    compensation has to do with that, I don't understand at
04:20  5    all.
04:20  6       MR. KING:  I think bias is always
04:20  7    relevant to any testimony that's given, and this goes to
04:20  8    show bias.
04:20  9       MR. SWEIGART:  The amount of his
04:20  10   compensation --
04:20  11      MR. KING:  Yes.
04:20  12      MR. SWEIGART:  -- as opposed to the fact
04:21  13   he's compensated?  I would say the fact he's
04:21  14   compensated, you've made your point.  You should move
04:21  15   on.
04:21  16      MR. KING:  Well, I don't believe I have.
04:21  17   Q.  (BY MR. KING)  How much do you receive from --
04:21  18   as compensation from Union Bank?
04:21  19   A.  I'm not one of the executive officers listed
04:21  20   or the top four highest paid officers as required for
04:21  21   disclosure so it's less than that.
04:21  22   Q.  How much would that be?
04:21  23   A.  I don't know if that's relevant to this
04:21  24   discussion as --
04:21  25      MR. SWEIGART:  I think you can take this

Page 196

04:21  1    up with the Court.  I'm going to instruct him not to
04:21  2    answer this as beyond the scope -- the limited authority
04:21  3    granted you to take this deposition.
04:21  4       Q.  (BY MR. KING)  Are you going to take your
04:21  5    counsel's advice and not answer my question?
04:21  6    A.  Yes.
04:21  7    Q.  Okay.  Do you own any type -- or have any type
04:21  8    of stock options in UnionBanCal Corporation?
04:21  9    A.  Yes, I do.
04:21  10   Q.  And do you obtain those stock options in
04:22  11   UnionBanCal Corporation through your employment with
04:22  12   Union Bank of California?
04:22  13   A.  Yes.
04:22  14   Q.  Do you obtain those stock options in your role
04:22  15   as an officer of UnionBanCal Corporation?
04:22  16   A.  I'm an employee of Union Bank of California
04:22  17   and am compensated 100 percent by Union Bank of
04:22  18   California.
04:22  19   Q.  And you don't receive any stock options
04:22  20   through your role as an officer of UnionBanCal
04:22  21   Corporation; is that correct?
04:22  22   A.  I am compensated as an employee of Union Bank
04:22  23   of California for my efforts at Union Bank of
04:22  24   California.
04:22  25   Q.  That's not the question I asked, Mr. Anderson.

Page 197

04:22  1    The question I asked was, do you receive any stock
04:22  2    options through your role as an officer with UnionBanCal
04:22  3    Corporation?  Yes or no.
04:22  4    A.  That is not separated.  That is not defined.
04:23  5    It is my role as an employee of Union Bank of
04:23  6    California.  No specific designation that says, Here's
04:23  7    compensation for a role as an officer of UnionBanCal
04:23  8    Corporation.
04:23  9    Q.  Have you recently exercised any of your stock
04:23  10   options in UnionBanCal Corporation?
04:23  11   A.  Yes, I have.
04:23  12   Q.  And do you recall when you exercised those
04:23  13   stock options?
04:23  14   A.  Yes, last Wednesday.  I'm sure you have
04:23  15   a Form 4.
04:23  16   Q.  January 30th, 2007?
04:23  17   A.  I think that's accurate.  I think that was
04:23  18   Wednesday.
04:23  19   Q.  Okay.
04:23  20   A.  My recollection was accurate.  Thank you for
04:23  21   bringing it up.
04:23  22   Q.  That's all right.
04:23  23       I don't have an electronic copy of this,
04:23  24   and I only have two copies, but I'll hand you a copy and
04:23  25   you can show it to your counsel, if you would like.

50 (Pages 194 to 197)

Gretchen Shore Court Reporting & Litigation Support
(903) 758-2183 * (903) 758-4890 Fax    E-mail: gretchenshore@gretchenshore.com

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson                  CONFIDENTIAL
February 7, 2007 FOR ATTORNEYS' EYES ONLY

---

Page 198

04:23  1       A.  Sure.
04:23  2       Q.  This is an SEC Form 4 that I pulled up from
04:23  3   the SEC.gov website, as indicated from the address
04:23  4   below.  Does this look familiar to you?
04:24  5       A.  Yes, it does.
04:24  6       Q.  Does this look like a Form 4 that you filed
04:24  7   with the United States Securities & Exchange Commission?
04:24  8       A.  That's accurate.
04:24  9       Q.  And on January 30th, 2007, is it correct --
04:24  10  hang onto that for just a moment.
04:24  11      Q.  Okay.
04:24  12      Q.  -- you exercised -- you acquired 6,000 shares
04:24  13  of stock through, it appears, two separate transactions
04:24  14  on January 30th, 2007?
04:24  15      A.  Yes.
04:24  16      Q.  And this is -- this is marked as Exhibit 107,
04:24  17  for the record.
04:24  18          (Exhibit Number 107 marked.)
04:24  19      Q.  (BY MR. KING)  Is it accurate that you
04:24  20  acquired 1,000 shares at the price of 35 dollars and 8.3
04:24  21  cents?
04:24  22      A.  No.
04:24  23      Q.  Okay.  At what price did you acquire the 1,000
04:25  24  shares?
04:25  25      A.  35.083.  I think you said .83 but I'm not

---

Page 199

04:25  1   sure.
04:25  2       Q.  Okay.  I think 35 dollars and 8.3 cents.
04:25  3       A.  Okay.  There you go.
04:25  4       Q.  Is that correct?
04:25  5       A.  That's correct.
04:25  6       Q.  If I misspoke, I apologize.
04:25  7       A.  That's okay.
04:25  8       Q.  And you also acquired 5,000 shares at 34
04:25  9   dollars and 12-and-a-half cents.
04:25  10      A.  Yes.
04:25  11      Q.  And that same day you exercised an option of
04:25  12  selling those shares; is that correct?
04:25  13      A.  Yes, I did.
04:25  14      Q.  You sold all 6,000 of those shares you had
04:25  15  acquired that same day, correct?
04:25  16      A.  Yes, I did.
04:25  17      Q.  And you sold those shares for 63 dollars and
04:25  18  82.24 cents per share, correct?
04:25  19      A.  That's correct.
04:25  20      Q.  Do you currently have any other shares in
04:25  21  UnionBanCal Corporation?
04:25  22      A.  Shares?  Yes.  That's listed on this.
04:25  23      Q.  And how many shares do you currently hold of
04:25  24  UnionBanCal Corporation stock?
04:26  25      A.  This statement says 735.6716 shares by my

---

Page 200

04:26  1   401(k) plan.
04:26  2       Q.  Those are owned -- those 735 and a fraction of
04:26  3   shares are owned through your 401(k); is that correct?
04:26  4       A.  Yes.
04:26  5       Q.  Other than those shares, do you own any other
04:26  6   shares of UnionBanCal Corporation?
04:26  7       A.  Isn't there two pages to this?
04:26  8       Q.  I just have the one page.
04:26  9       A.  Oh, okay.  Yes, I do.
04:26  10      Q.  Do you know approximately how many shares you
04:26  11  have in UnionBanCal Corporation?
04:26  12      A.  I don't have the exact amount.
04:26  13      Q.  Do you have an approximation?
04:26  14      A.  Yeah.  Approximately 2,000 shares.
04:27  15      Q.  As a shareholder, and also as an officer of
04:27  16  UnionBanCal Corporation, you certainly would not want
04:27  17  the price of UnionBanCal Corporation stock to go down, would you?
04:27  18      A.  Of course not.
04:27  19          MR. KING:  I have no further questions.
04:27  20          MR. SWEIGART:  No questions.
04:27  21          THE VIDEOGRAPHER:  We're off the record
04:27  22  at 4:27.
04:27  23          (Proceedings concluded at 4:27)
       24
       25

---

Page 201

1             CHANGES AND CERTIFICATION
2   WITNESS NAME:  DAVID ANDERSON
3   DATE OF PROCEEDING:  FEBRUARY 7, 2007
4   PAGE  LINE   CORRECTION              REASON
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

51 (Pages 198 to 201)

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b

David Anderson              CONFIDENTIAL
February 7, 2007 FOR ATTORNEYS' EYES ONLY

---

Page 202

1      I, DAVID ANDERSON, have read the foregoing
       deposition and hereby affix my signature that same is
2      true and correct, except as noted above.

3                _____
                 DAVID ANDERSON
4

       THE STATE OF TEXAS   )
5      COUNTY OF _____)

6          Before me, _____, on this day
       personally appeared _____, known to me (or
7      proved to be on the oath of _____ or through
       description of identity card or other document) to be
8      the person whose name is subscribed to the foregoing
       instrument and acknowledged to me that he executed the
9      same for the purposes and consideration therein
       expressed.

10
           Given under my hand and seal of office this
11     _____ day of _____, A.D., 2007.

12               _____
                 Notary Public in and for the
13               State of _____
                 County of _____
14     My Commission Expires: _____

15

16

17

18

19

20

21

22

23

24

25

---

Page 203

1              C E R T I F I C A T E

2      STATE OF TEXAS    )

3      COUNTY OF DALLAS  )

4          I, Lisa J. Gretarsson, Certified Shorthand

5      Reporter, duly qualified in and for the state of Texas,

6      do hereby certify that, pursuant to the agreement

7      hereinbefore set forth, there came before me, DAVID

8      ANDERSON, who was by me duly sworn to testify the truth,

9      the whole truth, and nothing but the truth of his

10     knowledge concerning the matters in controversy in this

11     case; and that he was thereupon  carefully examined upon

12     his oath and his examination reduced to typewriting by

13     me or under my supervision; that the deposition is a

14     true record of the testimony given by the witness before

15     me pursuant to the agreement of the parties.

16         That the amount of time used by each party at the

17     deposition is as follows:

18         R. Benjamin King - (5:25)

19         Raymond L. Sweigart - (0:00)

20         That pursuant to information given to the

21     deposition officer at the time said testimony was taken,

22     the following includes counsel for all parties of

23     record:

24

25

---

Page 204

1      FOR THE PLAINTIFF:
2      R. Benjamin King, Esq.
       NIX PATTERSON & ROACH, L.L.P.
3      2900 St. Michael Drive, Suite 500
       Texarkana, Texas  75503
4        Telephone:  903-223-3999
         Facsimile:  902-223-8520
5        E-mail:  benking@nixlawfirm.com
6      FOR THE DEFENDANT, UNIONBANCAL CORP.
       Raymond L. Sweigart, Esq.
7      Brian Harris, Esq.
       PILLSBURY, WINTHROP, SHAW, PITTMAN, LLP
8      1650 Tysons Boulevard
       McLean, Virginia  22102
9        Telephone:  703-770-7900
         Facsimile:  703-770-7901
10       E-mail:  raymond.sweigart@pillsburylaw.com
11

12         I further certify that I am neither attorney nor
13     counsel for nor related to or employed by any of the
14     parties to the action in which this deposition is taken,
15     and further that I am not a relative or employee of any
16     attorney or counsel employed by the parties hereto or
17     financially interested in the action.
18         In witness whereof, I have hereunto set my hand
19     and affixed my seal this _____ day of _____,
20     2007.
21

22               _____
                 LISA J. GRETARSSON, CSR No. 4486
23               Expiration Date:  12-31-08
                 Firm Registration No. 90
24               208 N. Green Street, Ste. 201
                 Longview, TX  75601
25               903/758-2183 (telephone)
                 903/758-4890 (fax)

---

Gretchen Shore Court Reporting & Litigation Support
(903) 758-2183 * (903) 758-4890 Fax     E-mail: gretchenshore@gretchenshore.com

3c3ebca2-e20f-4bec-8e6e-ea8a463df38b