IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

DATATREASURY CORP.,                          :
                                             :
                  Plaintiff,                 :
                                             :
         v.                                  :  Civil Action No. 2-06-CV-72(DF)
                                             :
WELLS FARGO and COMPANY, et al.,             :
                                             :
                  Defendants.                :
                                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x


**MEMORANDUM OF THE CLEARING HOUSE PAYMENTS COMPANY L.L.C.
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
OF NONINFRINGEMENT OF THE '007 PATENT**

Dockets.Justia.com

## TABLE OF CONTENTS

Page

I.Summary Judgment of Noninfringement is Appropriate Under the Ordinary Language of the Claims of the '007 Patent................................................................ 15

II.The Clearing House Does Not Infringe the '007 Patent Either Literally or Under the Doctrine of Equivalents........................................................................ 19

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Altech Controls Corp.* v. *E.I.L. Instruments, Inc.*,
No. CIV. A. H-92-3189, 1997 WL 579179 (S.D. Tex. June 6, 1997)............................15

*Anderson* v. *Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....................................................................................................14

*BAE Sys. Elec. Ltd.* v. *Rockwell Collins, Inc.*,
No. Civ.A. 3:03CV0694-K, 2004 WL 1809811 (N.D. Tex. Aug. 12, 2004).................15

*Calpetco 1981* v. *Marshall Exploration, Inc.*,
989 F.2d 1408 (5th Cir. 1993).................................................................................4, 15

*Connectel, LLC* v. *Cisco Sys., Inc.*,
391 F. Supp. 2d 526 (E.D. Tex. 2006).......................................................................22

*Desper Products, Inc.* v. *Qsound Labs, Inc.*,
157 F.3d 1325 (Fed. Cir. 1998)................................................................................15

*GFI, Inc.* v. *Franklin Corp.*,
142 F. Supp. 2d 780 (N.D. Miss. 1999).....................................................................22

*Halliburton Energy Servs.* v. *MI, LLC*,
456 F. Supp. 2d 811 (E.D. Tex. 2006).......................................................................14

*IMS Tech., Inc.* v. *Haas Automation, Inc.*,
206 F.3d 1422 (Fed. Cir. 2000).................................................................................20

*Intellectual Property Dev., Inc.* v. *UA-Columbia Cablevision of Westchester, Inc.*,
336 F.3d 1308 (Fed. Cir. 2003).................................................................................17

*Intellicall, Inc.* v. *Phonometrics, Inc.*,
952 F.2d 1384 (Fed. Cir. 1992).............................................................................18, 24

*Kemco Sales, Inc.* v. *Control Papers Co.*,
208 F.3d 1352 (Fed. Cir. 2000).................................................................................21

*Kothmann Enters., Inc.* v. *Trinity Indus., Inc.*,
394 F. Supp. 2d 923 (S.D. Tex. 2005)...................................................................14, 21

*Leggett & Platt, Inc.* v. *Hickory Springs Mfg. Co.*,
285 F.3d 1353 (Fed. Cir. 2002).................................................................................20

Page(s)

## CASES

*Lockheed Martin Corp.* v. *Space Sys./Loral, Inc.*,
324 F.3d 1308 (Fed. Cir. 2003)........................................................................21

*Oreck Holdings, LLC* v. *Dyson, Inc.*,
434 F. Supp. 2d 385 (E.D. La. 2006)................................................................14

*Paragon Podiatry Lab., Inc.* v. *KLM Labs., Inc.*,
984 F.2d 1182 (Fed. Cir. 1993).........................................................................14

*Phillips* v. *AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005).........................................................................16

*Rohm & Haas Co.* v. *Brotech Corp.*,
127 F.3d 1089 (Fed. Cir. 1997).........................................................................14

*Sage Products, Inc.* v. *Devon Indus., Inc.*,
126 F.3d 1420 (Fed. Cir. 1997).........................................................................24

*Sam* v. *Keystone Shipping Co.*,
913 F. Supp. 514 (S.D. Tex. 1996)....................................................................25

*STMicroelectronics, Inc.* v. *Sandisk Corp.*,
No. 4:05CV44, 2006 WL 1867934 (E.D. Tex. June 23, 2006).........................14

*Telemac Cellular Corp.* v. *Topp Telecom, Inc.*,
247 F.3d 1316 (Fed. Cir. 2001).........................................................................20

*Thunderhorse* v. *Pierce*,
418 F. Supp. 2d 875 (E.D. Tex. 2006)...............................................................14

*Trinity Indus., Inc.* v. *Road Sys., Inc.*,
235 F. Supp. 2d 542 (E.D. Tex. 2002)...............................................................14

*Watts* v. *XL Sys., Inc.*,
232 F.3d 877 (Fed. Cir. 2000)...........................................................................20

## FEDERAL RULE

Fed. R. Civ. P. 56(b).............................................................................................13

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
DATATREASURY CORP.,                          :
                                             :
                    Plaintiff,               :
                                             :
       v.                                    :  Civil Action No. 2-06-CV-72(DF)
                                             :
WELLS FARGO and COMPANY, et al.,             :
                                             :
                    Defendants.              :
                                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

## <u>MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u><br><u>OF NONINFRINGEMENT OF THE '007 PATENT</u>

Defendant The Clearing House Payments Company L.L.C. ("The Clearing

House" or "TCH") submits this memorandum in support of its motion for summary judgment

dismissing all claims of Plaintiff DataTreasury Corporation ("DT" or "Plaintiff") against TCH in

this action asserting infringement of U.S. Patent No. 5,265,007 ("the '007 Patent").[1]

---

[1]       In its Complaint, Plaintiff incorrectly alleges that Small Value Payments
Company ("SVPCo") also infringes the '007 Patent.  SVPCo does not exist as a separate
legal entity, having merged into TCH as of July 2004, a fact that is also set forth in the
Rule 7.1 Corporate Disclosure Statement submitted in Case No. 04-CV-85, which has
been consolidated with this case.

## PRELIMINARY STATEMENT

The Clearing House moves for summary judgment of noninfringement because it does not operate any system featuring two elements fundamental to the '007 Patent: (1) "real time" monitoring; or (2) a "cycling" or "time control" means. No reasonable trier of fact could find that The Clearing House infringes the '007 Patent. It is appropriate for this Court to grant summary judgment of noninfringement of the '007 Patent so that neither this Court nor the parties are further burdened with litigating infringement claims that lack any cognizable basis in law or fact.

The '007 Patent claims "a central check clearing system" for financial institutions involving a means of physically exchanging checks and "settling" or reconciling the corresponding debits and credits. (*See*, *e.g.*, Carter Decl. Ex. 1, '007 Patent, col. 1, lines 12-18.)[2] The object of the '007 Patent is "to expedite the forward collection of items and the return of items" so that "the speed of availability of funds is increased and costs are reduced." (Carter Decl. Ex. 1, '007 Patent, col. 3, lines 58-60.) The '007 Patent accomplishes its stated goal with two key features: (1) a central processing unit permitting all participating institutions to engage in "continuous monitoring on a real time basis" of the "sending and receipt status" and "status in transit" of all financial instruments being physically exchanged among the institutions; and (2) a "cycling means" that coordinates the timing of "local" settlements among participating and non-participating financial institutions with a subsequent "final" settlement among only the participating institutions. As discussed more fully below, the criticality of the "cycling means" and the "real time" monitoring aspects of the '007 Patent are stressed throughout the '007 Patent

---

[2]     Citations in the form of "Carter Decl." refer to the Declaration of James H. Carter, submitted in support of The Clearing House's motion.

and were emphasized to the United States Patent & Trademark Office ("USPTO") in order to gain allowance of the patent claims.

In this case, DT has asserted in its patent infringement contentions ("PICs") that TCH's operation of a so-called "National Check Exchange" infringes the '007 Patent. (*See* Carter Decl. Ex. 2, DT PICs.) In a related case pending before this Court, *Data Treasury Corp. v. Citigroup, Inc.*, No. 05-CV-294 (the "Citigroup Litigation"), Plaintiff already has offered a construction of the "cycling means" and "real time" elements of the '007 Patent that are at issue here. According to DT's construction of those elements, which TCH will accept solely for purposes of this motion, TCH does not infringe the '007 Patent as a matter of law.

The Clearing House and its predecessors have been engaged in the physical exchange and settlement of checks since 1853, using a process totally at odds with what is recited in the '007 Patent.[3] The physical check clearing services provided by The Clearing House lack the central features of the '007 Patent as construed by DT: The Clearing House operates no system of exchanging and settling checks that includes "real time" monitoring or "cycling" of "local" and later "final" settlements. (*See generally* Milano Aff. ¶¶ 5-12.) TCH's National Check Exchange does not perform any continuous or "real time" monitoring, and the

---

[3]    As explained in the Affirmation of Gerard F. Milano ("Milano Aff.") submitted in support of this motion, there is a national check exchange system called the National Clearing House Association ("NCHA"), organized by Huntington Bancshares Incorporated (the original assignee of the inventors of the '007 Patent), to create a physical check exchange service along the lines of the Federal Express Company's well-known service for transportation of parcels. (Milano Aff. ¶ 17.) In NCHA's system, physical checks are collected each day from various participating banks, which may have previously collected checks locally from non-participating banks. (*Id*.) The checks are then transported, usually by air courier, to a central site, where they are sorted and delivered to various cities for "local" settlement there, followed by a "national" settlement by NCHA among its participants only. (*Id*. ¶¶ 17-18.)

operating rules governing the National Check Exchange do not provide for any type of "cycling" of its settlement with other "local" settlements involving non-TCH banks. Therefore, no reasonable trier of fact could find that TCH infringes the '007 Patent, and summary judgment of noninfringement is appropriate here.

When summary judgment is granted, "the length and complexity of trial on the remaining issues are lessened, all to the advantage of the litigants, the courts, those waiting in line for trial, and the American public in general." *Calpetco 1981* v. *Marshall Exploration, Inc.*, 989 F.2d 1408, 1415 (5th Cir. 1993). The advantage gained in summary disposition of legally meritless claims is particularly great in a case such as this one, in which DT asserted six patents containing 224 claims against dozens of defendants. It is to the advantage of all concerned—this Court, the parties and counsel—to dispose of DT's infringement claims with respect to the '007 Patent on summary judgment.

## **BACKGROUND**

A. The Process of Exchanging and Settling Checks

For more than 150 years, banks in the U.S. have operated a "clearing" process for checks involving exchange of checks and "settlement" or reconciliation of the financial balances for the checks exchanged. (Milano Aff. ¶ 3.) As the '007 Patent states, such clearing systems "are well known in the banking industry." (Carter Decl. Ex. 1, '007 Patent, col. 1, lines 30-31.) Although much of the process of check exchange and settlement is now done electronically, "enormous volumes of paper checks" are still physically exchanged every business day. (Milano Aff. ¶ 3.)

There are several methods for clearing checks, but one simple example involves physical check exchange among banks at a clearinghouse. (*Id*. ¶ 4.) Each bank (a "Sending Bank") sends checks deposited with it to what is usually a relatively nearby site (a "Designated Exchange Location"), with the checks typically sorted into boxes, bags or envelopes for each of the banks on which the checks are drawn and to which they will be delivered (the "Receiving Banks"). (*Id*.) A Receiving Bank may also agree to receive checks drawn on another bank, in which case the Receiving Bank may also be referred to as a "Correspondent Bank." To maintain order in the process of exchanging checks, the exchange is usually made at pre-determined times each day. (*Id*.)

There is then a process referred to as settlement. Settlement involves the reconciliation of financial balances by which the total number of dollars owed by each bank to each other bank is calculated and the net amounts due are paid or "settled" by entries to each bank's account with one of the regional Federal Reserve Banks, or with a Correspondent Bank that has agreed to pay for another bank's checks. (*Id*.) The Clearing House also maintains a computerized version of the "Amount Brought Sheet" that it began using in 1853, on which each Sending Bank enters the total dollar amount of checks delivered to each Receiving Bank for settlement that day. (*Id*. ¶ 12.) TCH's settlement system aggregates the Amount Brought Sheets of each participant into net settlement totals for each participant. (*Id*.)

B. The '007 Patent

The object of the '007 Patent is "to provide means whereby an association composed of participating banks in major cities is formed, and a national clearinghouse maintained." (Carter Decl. Ex. 1, '007 Patent, col. 1, lines 44-47.) During prosecution of the

'007 Patent, the inventors graphically illustrated their proposed "central check clearing system" as follows:



(Carter Decl. Ex. 3, Amendment dated 12/8/92, at 9.)  In the "national clearinghouse" envisioned in the '007 Patent, the participating member banks "agree to receive items drawn on the individual participants and on other members of its local clearinghouse in that city."  (Carter Decl. Ex. 1, '007 Patent, col. 1, lines 50-52 (emphasis added).)  Members of the local clearinghouses do not also have to be members of the national clearinghouse.  (*See* Carter Decl. Ex. 1, '007 Patent, col. 1, lines 52-53.)

The "system" or "mechanism" claimed in the '007 Patent is governed by a "control means" that provides the "significant advantages" of the "system" recited in the '007 Patent.  Specifically, it is the "system control means by which shipment and receipt schedules are fixed and 'real time' reports of shipment and receipt are made to and accessible . . . [which] provides a means of monitoring anticipated settlements as a result of the [real time] information

recorded." (Carter Decl. Ex. 1, '007 Patent, col. 6, lines 61-66.) In addition, "physical transport of financial instruments between and among the members is controlled by a predetermined time schedule, and the national settlement of the individual members of the association is achieved at a time not later than local settlements by members of the national association are completed." (Carter Decl. Ex. 1, '007 Patent, col. 2, lines 55-61.)

After repeated rejections and more than four years after the application was filed, the '007 Patent finally issued on November 23, 1993, with two independent claims. Claim 1 of the '007 Patent recites: "A mechanism for <u>physically exchanging</u> financial instruments among a number of pre-selected financial institutions, each located at a preselected site, and for effecting the regular periodic settlement of the exchanged instruments among the institutions." (Carter Decl. Ex. 1, '007 Patent, col. 7, lines 43-47 (emphasis added).) Claim 1 then goes on to recite several aspects of the claimed "mechanism."

First, the "mechanism" in claim 1 includes:

> (A) means within each of the pre-selected institutions: (1) for sending and receiving the instruments, said means for sending including <u>means for physically transporting the instruments from an institution at one site to each other of the institutions at the other sites</u>, said means for receiving including means for physically accepting the instruments transported from the other institutions; (2) <u>for sending to and receiving from a central processing unit connected to each institution information reporting in real time in correspondence with the occurrence of an event</u> (a) the value of the instruments transported; and (b) <u>the transport status of the instruments with respect to their having been (i) sent and (ii) received</u>; and (3) for receiving from the central processing unit a calculated value (a) on a real time basis and (b) on a regular periodic settlement basis, information regarding the debits and credits owing to or payable by an institution with respect to each other of the institutions with regard to instruments sent and received . . . .

(Carter Decl. Ex. 1, '007 Patent, col. 7, line 48 to col. 8, line 2 (emphasis added).)

Second, claim 1 recites a "central processing unit" connecting the participating ("pre-selected") financial institutions that provides the following functions:

> (1) <u>continuous monitoring on a real time basis</u> . . . [of] (2) . . . (a)(i) the sending and receipt status of the instruments and (ii) the value of the instruments sent and received, as reported by each of the institutions, and (b) <u>the status in transit of the instruments with respect to their having been (i) sent and (ii) received, as reported by each of the institutions, according to the reporting of an institution's sending and receiving of instruments</u>, and 3) . . . sending to each institution the information monitored with respect to instruments sent to an institution and the value of such instruments . . . . ; and
>
> \*       \*       \*
>
> (C) <u>a cycling means interrelated with the central processing unit (a) for controlling the physical transport of the financial instruments among the institutions and (b) for controlling the means for calculating such that a final calculation</u> of the debits and credits owing from or payable to, with respect to each of the institutions with regard to each other of the institutions, comprising the occurrence of the regular periodic settlement among the institutions <u>does not occur until pre-determined local settlements by the institutions that are not among the number of pre-selected financial institutions are completed</u>.

(Carter Decl. Ex. 1, '007 Patent, col. 8, lines 5-45 (emphasis added).)

Claim 4 recites "[a] system for a financial clearinghouse comprised of an association of selected member financial institution participants situated in different localities." (Carter Decl. Ex. 1, '007 Patent, col. 8, lines 61-64.) The "system" of claim 4 includes the following:

> A. <u>means at each of the participants</u> (1) for sending and receiving financial instruments to be cleared and (2) <u>for sending and receiving in real time information reporting the</u> value and <u>transit status of the financial instruments to be cleared, to a programmed central processing unit</u>, and (3) for addressing the central processing unit by which a participant may determine in real time the information received by the processing unit with respect to that participant's relative credit and debit obligations with respect to other institutions arising from the instruments that are reported to be sent and received;

-8-

B. a programmed central processing unit including: means for calculating debits and credits owing from or payable (1) to one member to another member and (2) from or to one member to all other members, based upon the value of instruments reported by a participant as having been sent and received; means for receiving and recording a participant's reports of the value and transit status of the instruments to be cleared as having been sent and received with respect to all participants in the system; and means for monitoring on a real time as reported basis (1) the actual sending from and receipt by a participant of the value of instruments being cleared as reported by the participants, and (2) the sending from and receipt by a participant of the actual instruments being cleared, said means for monitoring being operatively interconnected to the means for calculating whereby debits and credits owing from one member to another may be determined and monitored on a continuous basis in real time as reports of the value and transit status of the instruments to be cleared are reported by the participants and received by the processing unit; and

C. a time control for determining the time of physical transport of financial instruments between and among the participants according to a predetermined time cycle, and for determining the occurrence of a final settlement by the clearinghouse participants at a pre-determined time until after a time that certain pre-determined local settlements in the localities, by the participants in the localities, are completed.

(Carter Decl. Ex. 1, '007 Patent, col. 8, line 65 to col. 10, line 15 (emphasis added).)[4]

In prosecuting their application before the USPTO, the inventors repeatedly stressed the importance of both the "cycling" of settlements and the "real time" monitoring of the transit status of the financial instruments being exchanged in order to overcome the USPTO's rejections of the claims. The inventors argued that the "cycling" and "real time" elements worked in tandem to result in a system that was in contrast to "static clearing and settlement mechanisms." (*See* Carter Decl. Ex. 4, Second Amendment After Final Action, dated 6/29/93, at 7-8 ("[T]he provision of continuous reporting is set forth in a combination that otherwise includes . . . the coordination of net settlement, in real time, as information about the instruments

---

[4]    By focusing on the above-quoted claim limitations in this motion, TCH does not concede infringement with respect to any aspect of the '007 Patent not expressly addressed herein.

and their value are reported as sent and received under the umbrella of a predetermined schedule

or cycle."); *see also id*. at 8 (the "real time" monitoring features purportedly claimed in the '007

Patent provided for "real time" coordination of settlement, so that "institutions do not need to

'wait until the witching hour' (as in conventional settlements) . . . .").)

   The specification of the '007 Patent further emphasized the importance of the

"real time" monitoring element of the '007 Patent in view of the '007 Patent's requirement that

settlement be "cycled" or timed so that "local" settlements occur prior to "final" or "net"

settlement.  The "central control means" that maintains the claimed clearing system "records the

sending and receipt of the aggregate amount of the actual financial instruments transported, as

reported by the participants, . . . and thereafter calculates the net settlements <u>among the</u>

<u>participants</u> and initiates the corresponding debits and credits necessary to effect settlement

among members in the Federal Reserve settlement systems."  (Carter Decl. Ex. 1, '007 Patent,

col. 2, lines 42-50 (emphasis added).)  The ability to obtain "real time" information is said to be

"of considerable importance to a participant's investment department, which requires such

information to insure effective use of cash on hand and cash anticipated to be received, or to

insure that sufficient cash is available to make settlements."  (Carter Decl. Ex. 1, '007 Patent,

col. 7, lines 24-28.)

  C. TCH's Exchange and Settlement Processes for Physical Checks

   The processes of exchange and settlement used by TCH are governed by rules

promulgated by the Federal Reserve Bank and TCH so that exchange and settlement can proceed

in an orderly, agreed upon manner.  (Milano Aff. ¶ 21 & Ex. A.)  However, the Clearing House

does not offer any service that provides "real time" monitoring of the transit status of any

financial instruments or physical checks.  (Milano Aff. ¶ 5.)  The Clearing House also does not

-10-

offer or provide any ability to control or cycle settlement activities so that "local" settlement occurs before "final" settlement.  (*Id*.)

The physical check and electronic clearing services of The Clearing House are operated in the name of its "SVPCO" line of business.[5]  (*Id*. ¶ 1.)  To facilitate check exchange, TCH maintains "Designated Exchange Locations" and operates check exchanges in three large regions of the United States:  Eastern Region, Midwest Region and Western Region.  (*Id*. ¶ 6.) Banks in each Region exchange checks through The Clearing House facilities in that geographic Region, and exchanges within a Region simply involve a Receiving Bank identifying one or more of TCH's Designated Exchange Locations within the Region as a place at which it will receive checks.  (*Id*. ¶ 7.)  Checks for that Receiving Bank are shipped by Sending Banks to the Designated Exchange Location, exchanged there, and then transported to the Receiving Bank's processing center by couriers for the receiving participants.  (*Id*.)  The Clearing House does not monitor the physical movement of checks as they are in transit from bank to bank—whether the checks are in transit from a Sending Bank to a Designated Exchange Location, from a Designated Exchange Location to a Receiving Bank, or from one Designated Exchange Location to another.  (*Id*. ¶ 12.)

TCH also functions as a "Settlement Agent," acting for banks in the settlement process.  (*Id*. ¶ 21.)  Those banks that use TCH as a Settlement Agent in connection with their physical check exchange agree to operate in accordance with TCH's Uniform Rules for Paper Check Exchange (the "Uniform Rules").  (*Id*.)  Rule 3 of the Uniform Rules in particular provides the requirements for physical exchange of checks, including the requirement of a

---

[5]         "SVPCO" is the trade name used for TCH's physical check and electronic clearing services; "SVPCO" does not refer to any legal entity.

deadline by which a Sending Bank must deliver checks to be sent to the appropriate Receiving Banks.  (*Id*. & Ex. A, at 6.)  The Clearing House calculates settlement for each exchange; some settlements are aggregated before transmission to the Federal Reserve for posting to participants' accounts.  (*Id*. ¶ 7.)  In the case of The Clearing House's settlement process, Sending Banks typically include a "cash letter," which is a listing and total of all checks contained within a single shipment, when they send a batch of checks to an Exchange Location.  (*Id*. ¶ 24.)[6]

Under the Uniform Rules, the only checks permitted through the exchanges are checks drawn on other participating members of The Clearing House's SVPCO Check Services. (*Id*. ¶ 20.)  No participant in SVPCO Check Services is <u>required</u> to receive or settle for any checks other than its own unless it chooses to do so.  (*Id*.)  A participant may <u>choose</u> to do so, in which case the first paragraph of the SVPCO – Check Services Participant Agreement (Exhibit A to Appendix C-1 of the Uniform Rules) provides that a Receiving Bank that "elects to receive a check [drawn on another bank] shall have the same responsibility and liability for the check under the Rules (described below) and other applicable law as the bank [on which the check is drawn] if that bank had received such check through SVPCO – Check Services."  (*Id*.)

TCH is prepared to offer inter-regional check exchange and settlement to banks located in different regions, a process that TCH markets as its "National Check Exchange." Thus far, no bank has seen fit to use that service for an exchange of checks.  (*Id*. ¶ 13.)  Current

---

[6]        Participants may also correct errors in exchanges and settlements using the Online Adjustment System operated by The Clearing House, but the Adjustments System cannot be used to track or monitor the delivery status of any checks exchanged.  (*Id*. ¶ 26.) Moreover, the Online Adjustment System does not control the timing of any settlement activities.  (*See id*.)  In fact, settlement for The Clearing House's national Online Adjustment System is scheduled <u>after</u> the National Check Exchange and all regional exchanges each day so that errors can be corrected on the same day they occur.  (*Id*.)

participants in the National Check Exchange do not exchange original physical checks, but one participant exchanges "Substitute Checks" with two other participants, in which the participating Sending Bank makes a digital copy of the original check, transmits it to a distant location, prints a machine processable, MICR encoded Substitute Check at the distant location and sends it by courier to one of the regional exchanges for presentment to the Receiving Bank participant in another Region. (*Id*. ¶ 14.) Even in connection with Substitute Checks, TCH does not provide any "real time" monitoring of their transit status. Furthermore, TCH does not have a "cycling" means for controlling settlement activities so that "local" settlement occurs before "final" settlement.

No reasonable jury could find that the National Check Exchange or any other system operated by TCH infringes the '007 Patent. Therefore, this Court should grant TCH's motion.

## <u>ARGUMENT</u>

Under Rule 56 of the Federal Rules of Civil Procedure, a party defending itself against a claim "may, <u>at any time</u>, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof." FED. R. CIV. P. 56(b) (emphasis added). Summary judgment pursuant to Rule 56 is appropriate in patent cases as in any other type of case where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *See Trinity Indus., Inc.* v. *Road Sys., Inc.*, 235 F. Supp. 2d 542, 543 (E.D. Tex. 2002) (granting summary judgment of noninfringement and noting that "[t]he purpose of summary judgment is to isolate and dispose of factually insufficient claims or defenses"); *see*

*also Desper Products, Inc.* v. *Qsound Labs, Inc.*, 157 F.3d 1325, 1332 (Fed. Cir. 1998); *Rohm & Haas Co.* v. *Brotech Corp.*, 127 F.3d 1089, 1092-93 (Fed. Cir. 1997).

TCH bears the initial burden of demonstrating the absence of a genuine issue of material fact. *STMicroelectronics, Inc.* v. *Sandisk Corp.*, No. 4:05CV44, 2006 WL 1867934, at *1 (E.D. Tex. June 23, 2006). TCH can demonstrate the absence of a genuine issue of material fact for purposes of summary judgment "by merely point[ing] out that the record contains insufficient proof concerning an essential element of the nonmoving party's claim." *Oreck Holdings, LLC* v. *Dyson, Inc.*, 434 F. Supp. 2d 385, 400 (E.D. La. 2006); *see also Thunderhorse* v. *Pierce*, 418 F. Supp. 2d 875, 885 (E.D. Tex. 2006). DT, which bears the ultimate burden of proving infringement, must then point to "specific evidence in the record and articulate the manner in which that evidence supports" its claim of infringement. *Kothmann Enters., Inc.* v. *Trinity Indus., Inc.*, 394 F. Supp. 2d 923, 941 (S.D. Tex. 2005).

Evidence on which DT may rely to defeat summary judgment must be more than a "scintilla of evidence"; there must be sufficient evidence upon which a reasonable jury could find infringement. *STMicroelectronics*, 2006 WL 1867934, at *1 (citing *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242 (1986)). Thus, summary judgment is warranted where, as here, "it is quite clear what the truth is . . . and the law requires judgment in favor of the movant based upon facts not in genuine dispute." *Paragon Podiatry Lab., Inc.* v. *KLM Labs., Inc.*, 984 F.2d 1182, 1185 (Fed. Cir. 1993); *see also Calpetco 1981*, 989 F.2d at 1415 (noting that district courts "must have considerable discretion in determining when enough is enough" and granting summary judgment so that "the length and complexity of trial on the remaining issues [can be] lessened").

-14-

I.SUMMARY JUDGMENT OF NONINFRINGEMENT IS APPROPRIATE UNDER THE ORDINARY LANGUAGE OF THE CLAIMS OF THE '007 PATENT.

The first step in an infringement analysis is claim construction—a matter of law reserved exclusively for this Court. *See Altech Controls Corp.* v. *E.I.L. Instruments, Inc.*, No. CIV. A. H-92-3189, 1997 WL 579179, at *5 (S.D. Tex. June 6, 1997) (citing *Markman* v. *Westview Instruments, Inc.*, 517 U.S. 370 (1996)); *see also BAE Sys. Elec. Ltd.* v. *Rockwell Collins, Inc.*, No. Civ.A. 3:03CV0694-K, 2004 WL 1809811, at *3 (N.D. Tex. Aug. 12, 2004) ("A party is entitled to summary judgment on the issue of noninfringement if it shows, based on the correct claim construction, that no reasonable jury could have found infringement on the undisputed facts or when all reasonable factual inferences are drawn in favor of the patentee."). For purposes of this motion, the Court needs first to construe the meaning of: (1) "real time monitoring" of the transportation status of financial instruments; and (2) a "cycling means" coordinating timing of "local" and "final" settlements.

A.This Court May Rely Upon Plaintiff's Claim Construction in the Citigroup Litigation.

Although the Court has not yet conducted Markman proceedings in this matter,[7] the Court nonetheless may resolve this motion by construing the terms at issue in accordance with the construction previously proffered by Plaintiff.

In the Citigroup Litigation, DT has urged the Court to construe the "real time" element to mean "[t]he actual time during which something takes place." (*See* Carter Decl. Ex. 5, at 42.) DT also argues that the '007 Patent should be construed to require that "local" settlements among members of the national clearinghouse be completed before "final" settlement. (*See* Carter Decl. Ex. 5, at 46.) Solely for purposes of this motion, TCH is willing to

---

[7]        The parties have begun the process of claim construction by exchanging proposed claim terms on February 7, 2007.

accept Plaintiff's construction with respect to the "real time" element and the timing of "local" and "final" settlement that DT advanced in the Citigroup Litigation.

B. The "Real Time" Element Should Be Construed in Accordance With its Ordinary Meaning.

In addition to relying upon DT's construction of the '007 Patent, this Court may construe the claims by relying upon the language of the claims themselves, viewed in the context of the entire patent. *See Phillips* v. *AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005); *see also Halliburton Energy Servs.* v. *MI, LLC*, 456 F. Supp. 2d 811, 814 (E.D. Tex. 2006) (noting that the intrinsic evidence examined by courts to define the scope of a patented invention "includes the claims themselves, the specification, and the prosecution history"). The claim terms at issue here may be construed according to their ordinary and customary meanings. *See Intellectual Property Dev., Inc.* v. *UA-Columbia Cablevision of Westchester, Inc.*, 336 F.3d 1308, 1314 (Fed. Cir. 2003) ("In the absence of an express intent to impart a novel meaning to claim terms, the words are presumed to take on the[ir] ordinary and customary meanings . . . [which may be determined from] the claims themselves, . . . dictionaries and treatises, . . . the written description, the drawings, and the prosecution history.") All of the claims of the '007 Patent recite or incorporate the limitation of "real time" reporting and monitoring of: (1) the "transport status"; and/or (2) "sending and receipt status" of financial instruments. (Carter Decl. Ex. 1, '007 Patent, col. 7, line 57 to col. 8 line 17; col. 8, line 65 to col. 9, line 9.)[8] "Real time"

---

[8]     Each of the independent claims of the '007 Patent applies only to the physical exchange of financial instruments. (Carter Decl. Ex. 1, '007 Patent, col. 7, lines 43-44 and col. 8, lines 65-66 and col. 10, lines 7-8.) TCH's National Check Exchange does not involve physical exchange of financial instruments transported from one institution to another. (Milano Aff. ¶ 14.) Instead, it involves Substitute Checks which are created as a result of an electronic information system rather than a physical movement of anything from the bank initiating the process. (*Id.*) However, this is not a basis for the present

in the '007 Patent can have only its ordinary meaning—*i.e.*, "real time" means as an event is occurring.

   As set forth in claim 1, "real time" reporting requires reporting "<u>in correspondence with the occurrence of an event</u>."  (Carter Decl. Ex. 1, '007 Patent, col. 7, lines 59-60 (emphasis added).)  The specification discloses that the claimed invention should allow for the "status of participant's accounts in the national clearinghouse association [to be] recorded and displayed instantaneously as soon as information is received by the central control means."  (Carter Decl. Ex. 1, '007 Patent, col. 4, lines 4-7.)  During prosecution before the USPTO, the inventors argued that the claimed system included a means of "determin[ing] the status of . . . the relative debit owing and/or credit payable and transit status of items sent and received by an individual institution . . . ."  (Carter Decl. Ex. 3, Amendment dated 12/8/92, at 12.)  In response to the USPTO's rejection of the proposed claims, the inventors then added the "real time" monitoring element, arguing that "real time" monitoring would provide a "continuous and active process" for monitoring the financial instruments "in various stages of transport and/or exchange."  (Carter Decl. Ex. 4, Second Amendment After Final Office Action, dated 6/29/93, at 8.)  Thus, viewing the '007 Patent in its entirety, "real time" should be construed in accordance with its ordinary meaning.  *See*, *e.g.*, *Intellicall, Inc.* v. *Phonometrics, Inc.*, 952 F.2d 1384, 1388 (Fed. Cir. 1992) (refusing to apply the inventors' "secretly held intended meaning" of certain claim limitations that was not disclosed in the patent's specifications).

   The definition of "real time" provided in the '007 Patent is also consistent with various dictionary definitions.  For instance, "real time" is defined as "the actual time during

_____

 motion.

which a process or event occurs, esp. one analyzed by a computer, in contrast to time subsequent

to it when computer processing may be done, a recording replayed, or the like." (Carter Decl.

Ex. 6, Oxford English Dictionary, 2d ed., at 272.) Similarly, "real time" is also defined as "at

once; instantaneously." (Carter Decl. Ex. 7, Random House Webster's Unabridged Dictionary,

2d ed., at 1607.) This Court should construe the "real time" element of the '007 Patent in

accordance with its ordinary meaning.

C. The "Cycling Means" of the '007 Patent Coordinates "Local" Settlements to Occur Before "Final" Settlement.

The "mechanism" and "financial clearinghouse" system recited in the claims of

the '007 Patent must also be limited to a "mechanism" or "system" with a "cycling means"

(Carter Decl. Ex. 1, '007 Patent, col. 8, line 32) or "time control" ('007 Patent, col. 10, line 7)

whereby "local" settlements must occur prior to a "final" settlement, because the '007 Patent

does not provide any other definition of that phrase. As set forth in the claims, "final" settlement

is settlement "by the clearinghouse participants" (Carter Decl. Ex. 1, '007 Patent, col. 10, lines

11-12), whereas "local" settlement is settlement "in the localities by the participants in the

localities" (Carter Decl. Ex. 1, '007 Patent, col. 10, lines 14-15), who do not also have to

participate in the "national" system. (*See also* Carter Decl. Ex. 1, '007 Patent, col. 1, lines 44-

56.)

The "cycling means" or "time control" recited in the '007 Patent must be

construed to control the timing of settlement "for determining the occurrence of a final

settlement by the clearinghouse participants at a pre-determined time until after a time that pre-

determined local settlements in the localities, by the participants in the localities, are completed."

('007 Patent, col. 10, lines 10-15; *see also* col. 3, lines 39-42.)

-18-

The '007 Patent makes a clear distinction between settlement among members of the "centralized" or "national" clearinghouse association and "local" clearinghouse associations. (*See, e.g.*, Carter Decl. Ex. 1, '007 Patent, col. 3, lines 3-5 ("The local clearinghouse rules, means of exchange and procedures are entirely separate from that of the system.").)  This distinction is critical in the '007 Patent because "members of the local clearinghouse need not be members of the national clearinghouse, and items cleared by the national association include items drawn on local clearinghouse members who do not belong to the national association." (Carter Decl. Ex. 1, '007 Patent, col. 1, lines 52-56; *see also* col. 2 line 66 to col. 3 line 3.)

II. THE CLEARING HOUSE DOES NOT INFRINGE THE '007 PATENT EITHER LITERALLY OR UNDER THE DOCTRINE OF EQUIVALENTS.

The second step in this Court's patent infringement analysis is the "application of the properly construed claim to the accused product."  *Telemac Cellular Corp.* v. *Topp Telecom, Inc.*, 247 F.3d 1316, 1324 (Fed. Cir. 2001).  Summary judgment of noninfringement requires the court to "hold that the alleged infringer does not infringe any of the claims at issue either literally or under the doctrine of equivalents."  *Watts* v. *XL Sys., Inc.*, 232 F.3d 877, 884 (Fed. Cir. 2000) (affirming order granting summary judgment of noninfringement by Judge Hines of the Eastern District of Texas).  Although the issue of whether the accused instrumentality contains an element of each claim limitation, or its equivalent, is a question of fact, summary judgment can nonetheless be appropriate where, as here, "the patent owner's proof is deficient in meeting an essential part of the legal standard for infringement, since such failure will render all other facts immaterial."  *Id.*

To state a claim of literal infringement, DT must demonstrate that the accused product or instrumentality "contains every limitation in the asserted claims."  *Leggett & Platt,*

*Inc.* v. *Hickory Springs Mfg. Co.*, 285 F.3d 1353, 1358 (Fed. Cir. 2002) (citation omitted). As set forth in DT's PICs, elements of the independent claims in the '007 Patent are "governed by 35 U.S.C. § 112(6)." (*See* Carter Decl. Ex. 2.) Claim elements governed by § 112, ¶ 6, "often referred to as means-plus-function or step-plus-function limitations, recite a specified function to be performed rather than the structure, material, or acts for performing that function." *IMS Tech., Inc.* v. *Haas Automation, Inc.*, 206 F.3d 1422, 1429-30 (Fed. Cir. 2000). "Literal infringement of a § 112 ¶ 6 claim requires that the relevant structure in the accused device perform the identical function recited in the claim and be identical or equivalent to the corresponding structure in the specification." *Lockheed Martin Corp.* v. *Space Sys./Loral, Inc.*, 324 F.3d 1308, 1320 (Fed. Cir. 2003); *see also Kothmann Enters., Inc.* v. *Trinity Indus., Inc.*, 394 F. Supp. 2d 923, 951 (S.D. Tex. 2005) ("An accused device literally infringes a claim expressed in means-plus-function format if the accused device performs the identical function recited in the claim and is identical or equivalent to the corresponding structure described in the specification.").

Infringement under the doctrine of equivalents requires that the accused product contain each limitation of the claim or its equivalent." *Leggett*, 285 F.3d at 1358-59. The equivalent of a claim element is present in an accused device only if "insubstantial differences distinguish the missing claim element from the corresponding aspects of the accused device." *Id*. With a means-plus-function claim, the doctrine of equivalents analysis requires application of "the traditional function-way-result test, [in which] the accused structure must perform substantially the same function, in substantially the same way, to achieve substantially the same result, as the disclosed structure." *Kemco Sales, Inc.* v. *Control Papers Co.*, 208 F.3d 1352, 1364 (Fed. Cir. 2000); *see also GFI, Inc.* v. *Franklin Corp.*, 142 F. Supp. 2d 780, 783-84 (N.D.

-20-

Miss. 1999) (noting that, for infringement to be found under the "function-way-result test . . . all three prongs (function, way and result) must be substantially identical or there is no infringement").  Under Section 112, paragraph 6, an accused structure is not, as a matter of law, the equivalent of a structure disclosed in the patent—and thus cannot literally infringe—unless it performs the identical function claimed.  *Kemco*, 208 F.3d at 1364.

Here, any claim of infringement of the '007 Patent—either literally or under the doctrine of equivalents—fails as a matter of law.  In contrast to what is claimed in the '007 Patent, The Clearing House does not operate <u>any</u> central exchange system or national check clearing site.  (Milano Aff. ¶ 13.)  Instead, physical check exchanges operated by TCH are entirely local or intra-regional.  (*Id*.)  Furthermore, no TCH system or service contains the "real time" monitoring or "cycling" features at the heart of the '007 Patent.  (*Id*. ¶ 22.)

In its PICs, DT identified only TCH's National Check Exchange as an Accused Instrumentality.  According to the PICs, the "National Check Exchange infrastructure and rules provides [sic] for the physical exchange of financial instruments."  (Carter Decl. Ex. 2.)  Although this Court requires that PICs contain rigorous analysis and detailed explanations of a plaintiff's infringement theories, *see Connectel, LLC* v. *Cisco Sys., Inc.*, 391 F. Supp. 2d 526, 528 (E.D. Tex. 2006), DT's PICs demonstrate DT's misunderstanding of TCH's National Check Exchange rather than infringement.[9]

---

[9]     As a general matter, the PICs do not comply with this Court's Local Patent Rules.  For example, Local Patent Rule 3-1(d) requires DT to disclose in its PICs "[w]hether each element of each asserted claim is claimed to be literally present or present under the doctrine of equivalents in the Accused Instrumentality."  DT did not make such a disclosure in its PICs.  In any event, TCH cannot be found to infringe the '007 Patent under either a theory of literal infringement or infringement under the doctrine of equivalents.

A. There Is No "Real Time" Monitoring in Any TCH System.

No TCH system, including its National Check Exchange, monitors the transit status of physical checks or financial instruments. (Milano Aff. ¶ 22.) The Clearing House does not monitor the physical movement of checks while they are in transit, either from Sending Banks to Designated Exchange Locations, from Exchange Locations to Receiving Banks or from one Exchange Location to another. (*Id*. ¶¶ 21-22.) The Clearing House maintains no computer system that ever records information on the transport status of physical checks for the use of participants themselves. (*Id*. ¶¶ 22, 27.)[10]

The National Check Exchange operated by TCH does not provide for any "real time" monitoring or tracking of physical checks. (Milano Aff. ¶ 22.) In fact, TCH's National Check Exchange has never included the exchange of physical checks because no bank participating in the National Check Exchange has ever chosen to use the National Check Exchange for the exchange of original physical checks. (*Id*. ¶ 13.) Participants in TCH's National Check Exchange instead use "Substitute Checks," created from digital copies of physical checks, which a Sending Bank transmits by courier to one of TCH's regional exchanges for presentment there to a Receiving Bank. (*Id*. ¶ 14.) The Substitute Checks are distributed to Receiving Banks at Designated Exchange Locations and settled pursuant to a separate National Check Exchange settlement. (*Id*.) The National Check Exchange employs no mechanism or means for "real time" monitoring of the transit status of these Substitute Checks or of any other checks.

---

[10]    Contrary to the "rigorous analysis" required by this Court, DT's PICs assert that unidentified "software" in the National Check Exchange communication system provides "real time" reporting. This is *ipse dixit*, not proof that a reasonable trier of fact could rely upon in order to find infringement. Furthermore, DT's conclusory assertion is contradicted by the evidence of the Milano Affirmation. (Milano Aff. ¶ 22.)

B. There Is No "Cycling Means" in Any TCH System.

No system or service provided by The Clearing House involves coordination by TCH of the timing of "local" and "final" settlements. (Milano Aff. ¶ 5.) The '007 Patent requires that "all participants must be members of the national clearinghouse association, and all member banks must agree to accept and process items drawn on themselves and on banks within the local clearinghouse." (Carter Decl. Ex. 1, '007 Patent, col. 2 line 67 to col. 3 line 2.) As a result, the '007 Patent recites two different types of settlement—"final" settlement "by the clearinghouse participants" (Carter Decl. Ex. 1, '007 Patent, col. 10, lines 11-12), and earlier "local" settlement "by the participants in the localities." (Carter Decl. Ex. 1, '007 Patent, col. 10, lines 13-16.)

TCH does not require that any Receiving Bank receive or pay for any other participant's checks. (Milano Aff. ¶ 20.) If a Receiving Bank accepts settlement responsibility for checks drawn on another bank, its responsibility is the same as its responsibility for settling for a check drawn on itself and funding comes from its own accounts. (*Id*.) There is no coordination in any TCH settlement system between TCH's scheduled settlements and any settlement a Receiving Bank makes with another bank or clearinghouse. (*Id*. ¶¶ 5, 13.)

The Uniform Rules governing the National Check Exchange contain nothing about coordinating TCH settlements with participating banks' separate settlements involving non-participating institutions. (*Id*. ¶¶ 20-21.) TCH does not coordinate the timing of such settlements or monitor the physical movement of checks while they are in transit, either from Sending Banks to Designated Exchange Locations, from Exchange Locations to Receiving Banks or from one such Location to another. (*Id*.) Accordingly, there can be no finding of

-23-

infringement, even under the doctrine of equivalents. *See Intellicall,* 952 F.2d at 1389 (holding

that infringement under the doctrine of equivalents cannot be based upon the theory that the

accused instrumentality is "equivalent overall to the claimed invention" because "<u>every</u>

<u>limitation</u> of a claim [must] be met . . . by a substantial equivalent") (emphasis in original); *see*

*also Sage Products, Inc.* v. *Devon Indus., Inc.*, 126 F.3d 1420, 1429 (Fed. Cir. 1997) (dismissing

an infringement claim where "a jury could not find the differences between the claimed and

accused devices insubstantial without ignoring the[] claimed functions in their entirety").

   DT's PICs further demonstrate the appropriateness of summary judgment here.

DT asserts that a TCH computer server "controls" settlement.  In fact, however, TCH operates no

such computer "control" feature.  The TCH settlement service in connection with the National

Check Exchange is not coordinated with any "local" or other settlement.  (*Id*. ¶ 24.)

   In any event, even if there were a TCH computer controlling settlement,

according to DT's PICs, TCH still would not infringe the '007 Patent.  In its PICs, DT asserts

that a TCH computer server "controls the settlement of the instruments among the institutions in

the National Check Exchange such that the settlement of the instruments via the National Check

Exchange is achieved <u>before</u> <u>local</u> <u>settlement</u> by the institutions."  (Carter Decl. Ex. 2 (emphasis

added).)  In other words, DT has asserted in its PICs that settlement is controlled in TCH's

National Check Exchange so that "final" settlement occurs <u>before</u> "local" settlements, which is

the exact opposite of what is claimed in the '007 Patent, which specifically requires timing

"final" settlement to occur <u>after</u> "local" settlements.  Based upon the assertions in DT's own

PICs, TCH does not infringe the '007 Patent.

No amount of discovery will add evidentiary substance to DT's conclusory PICs because, as discussed above, TCH simply does not operate or provide services that encompass the functions recited in the '007 Patent. *See, e.g., Sam* v. *Keystone Shipping Co.*, 913 F. Supp. 514, 518 (S.D. Tex. 1996) (holding that summary judgment was appropriate and discovery unnecessary where affidavit supporting motion for summary judgment established the absence of a fact central to plaintiff's claim). DT's claim of infringement with respect to the '007 Patent is meritless as a matter of law and fact and should be dismissed at this time.

<u>**CONCLUSION**</u>

This Court should grant summary judgment dismissing Plaintiff's infringement claims against The Clearing House with respect to U.S. Patent No. 5,265,007 and grant to The Clearing House such further relief as this Court deems proper.

Dated:  February 21, 2007                    Respectfully submitted,

_____
Preston W. McGee
Flowers Davis, P.L.L.C.
1021 ESE Loop 323, Suite 200
Tyler, Texas 75701
(903) 534-8063

*Of Counsel:*
James H. Carter
James T. Williams
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

-25-

Lawrence F. Scinto
Ronald A. Clayton
FITZPATRICK, CELLA, HARPER & SCINTO
30 Rockefeller Plaza
New York, New York 10112-3801
(212) 218-2254
*Attorneys for Defendant The Clearing House*
*Payments Company L.L.C.*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing instrument was served upon all counsel of record in the above entitled and numbered cause on this the 21st day of February, 2007.

    X        Via ECF



_____
Preston W. McGee