## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| **DATATREASURY CORPORATION** | | |
| **Plaintiff,** | § | |
| | § | |
| | § | **Civil Action No.:2:06-CV-** |
| **v.** | § | **72 (DF)** |
| | § | |
| | § | **JURY TRIAL DEMAND** |
| **WELLS FARGO & COMPANY, ET. AL.,** | § | |
| **Defendants** | § | |

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF CLAIM INVALIDITY BASED ON INDEFINITENESS FOR U.S. PATENT NO. 5,265,007

Dockets.Justia.com

TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................ 1
II.   UNDISPUTED FACTS ............................................................................................. 2
III.  STATEMENT OF GENUINE ISSUES.................................................................... 2
IV.   ARGUMENTS AND AUTHORITIES ..................................................................... 3
      A. Defendants Must Prove the '007 Patent Invalid by Clear and Convincing Evidence .......... 3
      B. Expert Testimony Can and Should Be Considered in Determining Whether the
      Specification's Disclosure of Structure is Sufficient to be Understood by One Skilled in the
      Art ........................................................................................................................................ 4
      C. An Algorithm Need Not be Expressed in Flow Charts or Source Code .............................. 6
      D. The Federal Circuit is More Generous in Finding Structure Linked to Computer-
      Implemented Functions than Defendants Suggest ...................................................................... 9
      E. The '007 Patent is a Financial Services Patent, Not a Software Patent ............................. 12
V.    SUFFICIENT STRUCTURE IS DISCLOSED IN THE SPECIFICATION, FROM THE
POINT OF VIEW OF A PERSON OF ORDINARY SKILL IN THE ART, FOR PERFORMING
THE FUNCTIONS IN THE EIGHT TERMS DISCUSSED BY DEFENDANTS. .................... 14
VI.   DEFENDANTS' ANALYSIS AND EXPERT TESTIMONY CANNOT MEET THE HIGH
BURDEN FOR INVALIDATING A UNITED STATES PATENT. .......................................... 24
VII.  CONCLUSION .............................................................................................................. 26

i

# TABLE OF AUTHORITIES

*Advanceme, Inc. v. Rapidpay, LLC*, No. 6:05cv424, No. 6:06cv082, 2006 U.S. Dist. LEXIS 92444, at *25-26 (E.D. Tex. Dec. 21, 2006).............................................................. 13

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255, 91 L. Ed. 2d 202 (1986) ............................ 3

*Application of Freeman*, 573 F.2d 1237, 1245-46 (C.C.P.A. 1978)............................................... 7

*Atmel Corp. v. Info. Storage Devices, Inc*., 198 F.3d 1374, 1382 (Fed. Cir. 1999)............. 5, 9, 11

*Budde v. Harley-Davidson, Inc*., 250 F.3d 1369, 1376 (Fed. Cir. 2001).................................... 4, 5

*Connell v. Sears Roebuck & Co*., 722 F.2d 1542, 1549 (Fed. Cir. 1983)...................................... 3

*Cross Med. Prods. v. Medtronic Sofamor Danek, Inc*., 424 F.3d 1293, 1302 (Fed. Cir. 2005)..... 3

*Datamize, LLC v. Plumtree Software, Inc*., 417 F.3d 1342, 1348 (Fed. Cir. 2005) .................. 4, 5

*DataTreasury Corporation v. Citigroup, Inc. et al*., Cause No.2:05cv294 (E.D. Tex.).............. 14

*Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001) ............... 4

*Gobeli Research, Ltd. v. Apple Computer, Inc., et al, 384 F. Supp.2d 1016 (E.D. Tex. 2005)*.7, 12

*Harris Corp. v. Ericsson, Inc*., 417 F.3d 1241, 1253 ................................................................... 6

*In re Alappat*, 33 F.3d 1526, 1545 (Fed. Cir. 1994) (en banc) ..................................................... 6

*In re Dossel*, 115 F.3d 942, 946 (Fed. Cir. 1997) ................................................................. 7, 11

*In re Iwahashi*, 888 F.2d 1370, 1374 (Fed. Cir. 1989) ................................................................. 7

*Intel Corp. v. VIA Techs*., 319 F.3d 1357, 1365-1366 (Fed. Cir. 2003) ........................ 4, 7, 10, 26

*Invitrogen Corp. v. Biocrest Mfg., L.P*., 424 F.3d 1374, 1379 (Fed. Cir. 2005) ...................... 3, 4

*Medical Instrumentation and Diagnostics Corporation v. Elekta AB*, 344 F.3d 1205 (Fed. Cir. 2003) ............................................................................................................ 7, 9, 10, 11

*Nat'l Presto Indus., Inc. v. W. Bend Co*., 76 F.3d 1185, 1189 (Fed. Cir. 1996) ........................... 3

*Network Appliance, Inc. v. Bluearc Corp*., No. C 03-5665 MHP, 2005 U.S. Dist. LEXIS 16732, at *17-18 (N. D. Cal. Jan. 5, 2005)................................................................... 13

*Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1340-41 (Fed. Cir. 2003) ............................. 4

*Omegaflex, Inc. v. Parker-Hannifin Corp.,* 2007 U.S. App. LEXIS 14308, *8-9 (Fed. Cir. June 18, 2007) ............................................................................................................... 5

*Personalized Media Communications, LLC v. ITC*, 161 F.3d 696, 705 (Fed. Cir. 1998) ............. 3

*Phillips v. AWH Corp*., 415 F.3d 1303 (Fed. Cir. 2005) (en banc) ............................................... 5

*S3, Inc. v. nVIDIA Corp*., 259 F.3d 1364, 1370-71 (Fed. Cir. 2001)...................................... 7, 10

*Seer Systems, Inc. v. Beatnik, Inc*., No. C 03-04636 JSW, 2006 U.S. Dist. LEXIS 25174, at *9 (N.D. Cal. Mar. 22, 2006).............................................................................................. 7

*Touchcom, Inc.  v. Dresser, Inc*., 427 F. Supp.2d 730, 735 (E.D. Tex. 2005)............................ 12

*WMS Gaming, Inc. v. International Game Technology*, 184 F.3d 1339, 1348 (Fed. Cir. 1999) 6, 7

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

———————————————————

| | |
|---|---|
| **DATATREASURY CORPORATION** | |
| **Plaintiff,** | § |
| | § |
| | §     **Civil Action No.:2:06-CV-** |
| **v.** | §           **72 (DF)** |
| | § |
| | §     **JURY TRIAL DEMAND** |
| **WELLS FARGO & COMPANY, ET. AL.,** | § |
| **Defendants** | § |

———————————————————

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT OF CLAIM INVALIDITY BASED ON INDEFINITENESS FOR
U.S. PATENT NO. 5,265,007[1]**

Defendants ask this Court to invalidate U.S. Patent No. 5,265,007 ("the '007 Patent")[2] in its entirety under 35 U.S.C. § 112, ¶¶ 2 and 6.  This Court should deny Defendants' request because (1) Defendants misinterpret or ignore relevant guiding case law, and (2) Defendants' analysis, including the analysis of their expert Dr. Dewayne E. Perry, is scant and conclusory.

## I.    INTRODUCTION

Defendants argue that independent Claims 1 and 4 of the '007 Patent are invalid for indefiniteness, and thus all claims of the '007 Patent are invalid.  This argument is based on their position that the specification does not disclose sufficient structure for certain computer-implemented means-plus-function terms.  Defendants' motion must fail because (1) Defendants

---

[1] This Motion for Summary Judgment (Dkt. No. 710) was originally filed by Defendant Bank of America; however, it has now been joined by most Defendants in this case and hence will be treated as a joint motion.  Plaintiff notes, however, that Defendants USBAI and TCH have not joined in Defendants' Motion for Summary Judgment.
[2] An unidentified party (or parties) has asked the USPTO to accept re-examination for this patent, along with U.S. Patent Nos. 5,717,868, 5,930,778, 5,583,759, have been thrown into re-examination.  The USPTO has accepted re-examination for at least the '759 Patent, at the time this Response was written.

have misinterpreted or ignored relevant case law, including clear Federal Circuit precedent teaching that whether the specification's disclosure is sufficient must be evaluated through the eyes of a person of ordinary skill in the art, and (2) Defendants' scant analysis, and the boilerplate, conclusory declaration of their expert, Dr. Dewayne E. Perry, cannot meet their burden of proving the '007 Patent invalid by clear and convincing evidence.

## II.    UNDISPUTED FACTS

Plaintiff agrees that there are two independent claims to the '007 Patent, Claims 1 and 4. Plaintiff can also agree that the '007 Patent, a financial services patent, does not include a flowchart, mathematical equations, or source code. However, the "facts" included in Defendants' Motion as "B" and "C" in their "Statement of Undisputed Facts" are not facts at all, but are legal determinations that have yet to be made by this Court. There are several "means-plus-function" terms in the '007 Patent which Plaintiff agrees are subject to § 112, ¶ 6. For some of these terms, Plaintiff has proposed that software is all or part of the structure for performing the noted function. The parties' proposed claim constructions, which will be discussed further below, are not "facts" and are not appropriately included in a Statement of Undisputed Facts.

## III.   STATEMENT OF GENUINE ISSUES

Summary judgment is improper because Defendants have not proven *by clear and convincing evidence* that the '007 Patent is invalid. The determination of whether the '007 Patent is invalid for indefiniteness of certain claim terms hinges on this Court's determination of the proper construction of those claim terms, which is a legal determination. However, to prevail on summary judgment, Defendants must prove by clear and convincing evidence at least that the '007 Patent specification does not disclose adequate structure linked to these functions, such as

would be understood by one of ordinary skill in the art. Defendants' Motion falls far short of establishing this fact by clear and convincing evidence.

## IV. ARGUMENTS AND AUTHORITIES

### A. **Defendants Must Prove the '007 Patent Invalid by Clear and Convincing Evidence**

Summary judgment should only be granted if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). In applying this standard, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255, 91 L. Ed. 2d 202 (1986); *Cross Med. Prods. v. Medtronic Sofamor Danek, Inc*., 424 F.3d 1293, 1302 (Fed. Cir. 2005). A United States patent is presumed valid. 35 U.S.C. § 282. Overcoming the presumption of validity requires a showing of facts proved by clear and convincing evidence. *Invitrogen Corp. v. Biocrest Mfg*., *L.P*., 424 F.3d 1374, 1379 (Fed. Cir. 2005); *Connell v. Sears Roebuck & Co*., 722 F.2d 1542, 1549 (Fed. Cir. 1983). That standard of proof also applies in the summary judgment context. *Invitrogen Corp. v. Biocrest Mfg., L.P*., 424 F.3d 1374, 1379 (Fed. Cir. 2005); *Nat'l Presto Indus., Inc. v. W. Bend Co*., 76 F.3d 1185, 1189 (Fed. Cir. 1996).

A claim is definite if "one skilled in the art would understand the bounds of the claim when read in light of the specification." *Invitrogen Corp. v. Biocrest Mfg., L.P*., 424 F.3d 1374, 1383 (Fed. Cir. 2005); *Personalized Media Communications, LLC v. ITC*, 161 F.3d 696, 705 (Fed. Cir. 1998). Claims are indefinite "if reasonable efforts at claim construction prove futile," that is, if a claim "is insolubly ambiguous, and no narrowing construction can properly be adopted." *Invitrogen Corp. v. Biocrest Mfg., L.P*., 424 F.3d 1374, 1383 (Fed. Cir. 2005); *Exxon*

3

*Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001).  Even if it is a formidable task to understand a claim, and the result not unanimously accepted, as long as the boundaries of a claim may be understood it is "sufficiently clear to avoid invalidity [for] indefiniteness."  *Invitrogen*, 424 F.3d at 1383; *Exxon Research*, 265 F.3d at 1375.

As Defendants note, a determination of the definiteness of patent claims is a question of law that "requires a construction of the claims according to the familiar canons of claim construction."  *Datamize, LLC v. Plumtree Software, Inc*., 417 F.3d 1342, 1348 (Fed. Cir. 2005) (quoting *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1340-41 (Fed. Cir. 2003)).

However, that does not allow Defendants to escape their "clear and convincing evidence" burden.  The Federal Circuit explained the burden now borne by Defendants in a similar case where the Defendant alleged that a patent was indefinite on the ground that the specification did not clearly link any structure to the functions recited in the claim:

> "Whether the specification adequately sets forth structure corresponding to the claimed functions must be considered from the perspective of one skilled in the art.  *Budde v. Harley-Davidson, Inc*., 250 F.3d 1369, 1376 (Fed. Cir. 2001).  Any fact critical to a holding on indefiniteness, moreover, must be proven by the challenger by <u>clear and convincing evidence</u>.  *See id*. at 1376-77.  In this case, VIA needed to prove, by <u>clear and convincing evidence</u>, that the specification lacks adequate disclosure of structure to be understood by one skilled in the art as able to perform the recited functions."

*Intel Corp. v. VIA Techs*., 319 F.3d 1357, 1365-1366 (Fed. Cir. 2003) (emphasis added).

**B.  <u>Expert Testimony Can and Should Be Considered in Determining Whether the Specification's Disclosure of Structure is Sufficient to be Understood by One Skilled in the Art</u>**

Defendants' contentions that "DataTreasury cannot offer any evidence or otherwise supplement the '007 patent with expert testimony" and that "extrinsic evidence is inappropriate here," as well as their insinuation that this Court "is limited to the four corners of the patent

itself" in determining this issue, are flatly wrong under Federal Circuit law. *See* Defendants'

"Motion for Summary Judgment for Claim Invalidity" at p. 12. The Federal Circuit has noted

that "[u]nder our caselaw interpreting section 112 P 6, knowledge of one skilled in the art can be

called upon to flesh out a particular structural reference in the specification for the purpose of

meeting the statutory requirement of definiteness. *Budde v. Harley-Davidson, Inc*., 250 F.3d

1369, 1382 (Fed. Cir. 2001) (holding the specification's reference to "commercially available

vacuum sensors" constituted sufficient structure, as one skilled in the art would have understood

the reference); *Atmel Corp. v. Info. Storage Devices, Inc*., 198 F.3d 1374, 1382 (Fed. Cir. 1999)

(holding that the district court "should have determined whether sufficient structure was

disclosed in the specification based on the understanding of one skilled in the art"); 259 F.3d at

1370 (holding that the specification's reference to a "selector" sufficed as one skilled in the art

would have understood the term).

While Defendants cite to the *Datamize* case for other points of law (see page 3), they

conveniently overlook a key point made by the Federal Circuit in that case: "while we have

emphasized the importance of intrinsic evidence in claim construction, we have also authorized

district courts to rely on extrinsic evidence, such as expert testimony." *Datamize, LLC v.

Plumtree Software, Inc*., 417 F.3d 1342, 1348 (Fed. Cir. 2005) (quoting *Phillips v. AWH Corp*.,

415 F.3d 1303 (Fed. Cir. 2005) (en banc) (internal quotation marks omitted)); see *Omegaflex,

Inc. v. Parker-Hannifin Corp.,* 2007 U.S. App. LEXIS 14308, *8-9 (Fed. Cir. June 18, 2007)

(where non-movant Parker proffered an expert, David Geary, the Court noted that "the district

court erroneously gave no probative weight to this expert evidence . . . Parker's expert evidence

cannot simply be disregarded at summary judgment given that Parker was the non-movant . . .

the court's analysis was too narrow in scope and failed to account for evidence regarding the

knowledge of a skilled artisan. The Geary evidence certainly raises a genuine issue of material

fact as to whether a person of ordinary skill in the art would have had reason to add the PCF's

locating sleeve to the Sweeney fitting.") (non-precedential). While the importance of intrinsic

evidence in claim construction cannot be diminished, testimony by persons skilled in the art that

does not contradict, but rather helps to explain the intrinsic evidence, should not be discounted or

excluded.

## C.  An Algorithm Need Not be Expressed in Flow Charts or Source Code

A microprocessor configured to carry out particular functions can properly serve as

corresponding structure for a means-plus-function claim element.  *In re Alappat*, 33 F.3d 1526,

1545 (Fed. Cir. 1994) (en banc).  Because the instructions change the electrical paths within the

device, they modify the structure of the device and create a new machine.  *Id*.; *WMS Gaming,

Inc. v. International Game Technology*, 184 F.3d 1339, 1348 (Fed. Cir. 1999).  Hence the rule

announced by the Federal Circuit in *WMS Gaming*:  "[i]f the disclosed structure is a computer, or

microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general

purpose computer, but rather the special purpose computer programmed to perform the disclosed

algorithm."  184 F.3d at 1349.  The structure for performing the function is limited to the

algorithm disclosed in the specification.  *Id*. at 1339; *Harris Corp. v. Ericsson, Inc*., 417 F.3d

1241, 1253.  However, this does not mean that the patentee must disclose specific source code

for a processor or computer.  And, the term "algorithm" is not limited to a formula of

mathematical symbols—for example, the steps, formula, or procedures to be performed by the

computer may be expressed textually.  *See, e.g., Medical Instrumentation and Diagnostics

Corporation v. Elekta AB*, 344 F.3d 1205, 1213-14 (Fed. Cir. 2003); *Intel Corp. v. VIA Techs.,

Inc.*, 319 F.3d 1357, 1366 (Fed. Cir. 2003); *S3, Inc. v. nVIDIA Corp*., 259 F.3d 1364, 1370-71

(Fed. Cir. 2001); *WMS Gaming, Inc. v. International Game Technology*, 184 F.3d 1339, 1348

(Fed. Cir. 1999); *In re Dossel*, 115 F.3d 942, 946 (Fed. Cir. 1997); *Application of Freeman*, 573

F.2d 1237, 1245-46 (C.C.P.A. 1978), and cases cited therein.

    An algorithm, broadly defined, is "a step-by-step procedure for solving a problem or

accomplishing some end." *In re Iwahashi,* 888 F.2d 1370, 1374 (Fed. Cir. 1989) (quoting

Webster's New Collegiate Dictionary (1976)). The Federal Circuit has made clear that "every

step-by-step process, be it electronic or chemical or mechanical, involves an algorithm in the

broad sense of the term." *Id.*; *Seer Systems, Inc. v. Beatnik, Inc.*, No. C 03-04636 JSW, 2006

U.S. Dist. LEXIS 25174, at *9 (N.D. Cal. Mar. 22, 2006). There is "no need for a disclosure of

the specific program code" when software is linked to the claimed function and one of ordinary

skill in the art would know the kind of program to use. *Medical Instrumentation, 344 F.3d at

1214*; *see also Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1366 (Fed. Cir. 2003) (holding that

the "core logic" modified to perform a particular program was adequate corresponding structure

for a claimed function although the specification did not disclose the internal circuitry of the core

logic); *see also Seer Systems*, 2006 U.S. Dist. LEXIS at *9-10.

    Defendants cite Judge Ward's opinion in *Gobeli Research, Ltd. v. Apple Computer, Inc.,

et al*., for the proposition that there are only four ways that an algorithm can be disclosed in a

patent's specification. 384 F. Supp.2d 1016, 1022-23 (E.D. Tex. 2005). Nowhere in *Gobeli

Research,* however, did Judge Ward state that there is any limitation in the way that an algorithm

can be expressed in the specification. *See id*.[3]  On the contrary, Judge Ward states that "[t]he

Court has reviewed the Gobeli patent in careful detail in search of an algorithm that performs

---

[3] Defendants' reference to the *Touchcom* case likewise does not establish their point. *Touchcom, Inc.  v. Dresser, Inc.*, 427 F. Supp.2d 730, 735 (E.D. Tex. 2005). No language similar to Defendants' argument appears in that case; in fact, source code was included in the *Touchcom* case, but a key piece of it was missing from the specification. *Id.* at 734-35.

[the functions at issue]…" but that the Court was "constrained to conclude that there is no description in the specification of any algorithm that performs either function." *Id*. at 1023. The only passage in *Gobeli Research* that remotely resembles Defendants' argument is the paragraph immediately following the above quote:

> "Gobeli could have provided figures or flow charts that describe the algorithm. Gobeli also could have attached actual code to the patent that would set out the necessary algorithm. None of these options was exercised by the patentee."

*Id*. at 1023. This expression of exasperation with Gobeli's failure to employ any of several standard means of incorporating an algorithm in a patent is far from a pronunciation of a four-category rule as Defendants suggest. Defendants cannot twist Judge Ward's words in an attempt to override clear Federal Circuit authority that an algorithm can be expressed textually and that courts should be liberal in finding such an algorithm.

Moreover, the Federal Circuit's opinion in *WMS Gaming* provides further guidance as to the specificity of algorithm required. In that case, after the oft-cited passage regarding the fact that the structure of a computer-implemented function is limited by the disclosed algorithm, the Federal Circuit found such an algorithm in the Telnaes patent (U.S. Patent No. 4,448,419):

> "The algorithm that controls the assignment of numbers to stop positions is disclosed in Figure 6 of the Telnaes patent. Figure 6 illustrates an algorithm in which a plurality of single numbers are assigned to stop positions such that: 1) the range of single numbers exceeds the number of stop positions; 2) each single number is assigned to only one stop position; 3) each stop position is assigned at least one single number; and 4) at least one stop position is assigned more than one single number."

*WMS Gaming*, 184 F.3d at 1347-48 (see also *WMS Gaming* at p. 1349 ("the structure disclosed for the "means for assigning" limitation of claim 1 of the Telnaes patent is a microprocessor programmed to perform the algorithm illustrated in Figure 6.")). After

reading Defendants' analysis of the case law, one might expect that Figure 6 must

include source code, a flow chart, or at least a highly detailed description of the inner

workings of the software.  A quick look at Figure 6 from the Telnaes Patent, attached as

Exhibit A, however, reveals that it is nothing more than a relatively simple diagram,

similar to those found in the '007 Patent.

**D.  The Federal Circuit is More Generous in Finding Structure Linked to**
**Computer-Implemented Functions than Defendants Suggest**

To support their view, Defendants cite *Medical Instrumentation and Diagnostics*

*Corporation v. Elekta AB*, 344 F.3d 1205 (Fed. Cir. 2003) (*see* Defendants' Motion at pgs. 4, 6).

In applying the rule from *WMS Gaming*, a court must review the specification to determine

whether one skilled in the art would have understood the disclosure of the patent to encompass a

particular algorithm or software program and would have been able to implement that algorithm

or program.  *MIDCO*, 344 F.3d at 1212 (citing *Atmel Corp. v. Information Storage Devices, Inc.*,

198 F.3d 1374, 1380 (Fed. Cir. 1999).  However, Defendants ignore the fact that the Federal

Circuit in *MIDCO* did not stop there.  Instead, the Federal Circuit noted the unusual nature of the

*MIDCO* case and reaffirmed its prior holdings, stating:  "[i]n past cases, we have been generous

in finding something to be a corresponding structure when the specification contained a generic

reference to structure that would be known to those in the art and that structure was clearly

associated with performance of the claimed function."  *Id*. at 1213-14.

The Federal Circuit in *MIDCO* went on to give several examples wherein there was no

source code or flow chart, yet one of skill in the art would be able to select the appropriate

program from available programs or would know what program to use.  For example, in *Intel*

*Corp. v. VIA Technologies, Inc.*, 319 F.3d 1357, 1366 (Fed. Cir. 2003), the court found that there

was no need for a disclosure of specific circuitry because one skilled in the art would know the kind of program to use.  *See MIDCO*, 344 F.3d at 1214.  Similarly, in *S3, Inc. v. nVIDIA Corp*., 259 F.3d 1364, 1370-71 (Fed. Cir. 2001), the court concluded that a "selector" was adequately disclosed as corresponding structure for the "means…for selectively receiving," although the electronic structure of the sensor and the details of its operation were not described.  The selector was referred to in the disclosure and drawings of the patent and was clearly a type of structure. In addition, the Federal Circuit in *S3, Inc*. held that the district court erred by not giving proper consideration to testimony by the patent's inventor and other expert witnesses that persons of skill in the art would readily recognize that the selector shown in the specification was an electronic device such as a simple multiplexer, whose structure was well known to one of skill in the art.[4]  *Id*. at 1370.  The district court had concluded that this evidence was insufficient to overcome the definiteness challenge because the court found that "'common experience' does not suggest that the function described by the 'selectivity' limitation refers to a 'simple multiplexer.'"  Hence, the district court "declined to give any weight to the evidence of the understanding of persons of skill in the field."  *Id*.  The Federal Circuit concluded that:

> "The uncontradicted evidence was that a selector is of well known electronic structure and performs a common electronic function, and is readily implemented from the description in the specification. There was no contrary evidence. It is not the criterion for compliance with § 112, whether a lay person having no skill whatsoever in this field would know how a selector is constructed. Thus the ruling in invalidity for failure to comply with § 112 is incorrect, and must be reversed."

*Id*. at 1370; *see also MIDCO*, 344 F.3d at 1214 (discussing *S3, Inc*. and re-affirming this precedent).

---

[4] In using the term "well known," Plaintiff does not mean to imply that the claimed invention was well known, merely that the structure (software) for performing certain functions, as described below, were well known to those of skill in the art.

Another example given by the Federal Circuit in *MIDCO* that is relevant here is from the case of *In re Dossel*, 115 F.3d 942, 946 (Fed. Cir. 1997). In that case, the court found that the specification had sufficiently disclosed a computer as corresponding structure for a "means for reconstructing," although the specification did not use the term "computer." The specification had described a structure that received digital data, performed complex mathematical operations, and output the results to a display. The court concluded that one of skill in the art of medical imaging would understand that a computer must be the structure to perform these functions. *Id.* at 946-47; *see MIDCO*, 344 F.3d at 1217.

The Federal Circuit has also approved of language in the PTO's Examination Guidelines stating that disclosure of a structure may be implicit in the written description if it would have been clear to those skilled in the art what structure must perform that function:

> "The written description does not have to explicitly describe the structure (or material or acts) corresponding to a means- (or step-) plus-function limitation to particularly point out and distinctly claim the invention as required by 35 USC 112 P 2. Rather, a disclosure of structure corresponding to a means-plus-function limitation may be implicit in the written description if it would have been clear to those skilled in the art what structure must perform the function recited in the means-plus-function limitation."

Interim Supplemental Examination Guidelines for Determination the Applicability of 35 U.S.C § 112 P 6, 64 Fed. Reg. 41,392, 41,393 (1999) (footnotes omitted). *See Atmel Corporation v. Information Storage Devices, Inc*., 198 F.3d 1374, 1380 (Fed. Cir. 1999) ("These guidelines would thus seem to be consistent with our holding on this point.").

These cases, taken together, show that although the Federal Circuit requires an algorithm or software when the structure is a computer or microprocessor, the Court recognizes that in some cases the patentee need not recite the source code for off-the-shelf software or the details of well-known electronic devices. The critical question is whether, from the point of view of one of

ordinary skill in the art, there was a sufficient disclosure of structure for performing the particular function.

**E.  The '007 Patent is a Financial Services Patent, Not a Software Patent**

The two Eastern District cases cited by Defendants, *Gobeli Research, Ltd. v. Apple Computer, Inc., et al.*, 384 F. Supp.2d 1016 (E.D. Tex. 2005) and *Touchcom, Inc.  v. Dresser, Inc.*, 427 F. Supp.2d 730, 735 (E.D. Tex. 2005), illustrate an important difference between this case and the prior *WMS Gaming* line of cases.  The *Gobeli Research* patent involved "interrupts," which are basically signals to a computer from an external device such as a printer, modem, or fax machine, indicating that the external device needs to communicate with, or requires service by, the computer.  When the CPU receives an interrupt, it stops executing the program in progress and transfers control to another program, the "interrupt handler."  The means for which the Court could find no structure was "means for reallocating processing resources unused by said specific portions to other specific portions as a function of task priority."  The *Gobeli Research* patent was an apparatus patent solely involving computer functions.  This function was a central piece of the invention, and there was no evidence that one of skill in the art would not have known any structure for performing this function.  In *Touchcom*, the source code for an essential function, the "controlling display and input means" (a touch screen under the preferred embodiment) was missing from the patent.  *Id*. at 735.  In this case, the means-plus-function terms for which Defendants claim there is no structure do not "enjoy[] considerable relevance to this case," as the means-plus function terms in the *Gobeli Research* and *Touchcom* cases did.  *Id.*  The '007 Patent is a financial services patent, not a software patent.  It is one thing to fail to disclose a portion of the source code in a new software

patent; it is another thing to opt not to include source code for software known by a person of ordinary skill in a financial services patent.

A case that is particularly instructive to the resolution of this dispute is the recent Eastern District case of *Advanceme, Inc. v. Rapidpay, LLC*, No. 6:05cv424, No. 6:06cv082, 2006 U.S. Dist. LEXIS 92444, at *25-26 (E.D. Tex. Dec. 21, 2006).   Unlike *Gobeli Research* and *Touchcom*, which involved software patents, *Advanceme* involved a financial services patent like the '007 Patent.   In *Advanceme*, as in this case, the Defendants claimed that there was no structure to implement certain functions because a computer and software had to be involved in the structure and Defendants claimed that no algorithm was disclosed.   *Id.* at *22.   Magistrate Judge Love correctly applied the Federal Circuit's case law, however, and found that there was sufficient disclosure to one skilled in the art.   *Id.* at *26.   The specification identified generally available equipment.   *Id.* at *25-26.   The Court noted that this equipment included all the structure, including software to be executed by a processor, for implementing the functions in the "means-plus-function" terms at issue.   The Court stated that "such equipment would be understood by one skilled in the art to include the necessary software algorithms for execution by a processor in conducting the necessary point-of-sale operations…"; hence, although Defendants in that case contended that there was no algorithm disclosed, the Court concluded that "[t]his is a description of sufficient disclosure to one skilled in the art."   *Id.* at *22.

Another instructive case is the Northern District of California's *Network Appliance, Inc. v. Bluearc Corp.*, No. C 03-5665 MHP, 2005 U.S. Dist. LEXIS 16732, at *17-18 (N. D. Cal. Jan. 5, 2005).   In that case, the Court held that particular software was incorporated by reference into the patent and became structure for the "decoding" and "encoding" functions.     Defendant's expert witness had observed, "I do not recall explicit encoding and decoding instruction or

13

description in the specification.  But for one skilled in the art, since they are standard NFS commands, …one would not have difficulty knowing how to…implement encoding and decoding."  The '007 Patent is a financial services patent, not a software patent.  This fact necessarily impacts this Court's analysis of what level of code-level detail, if any, is necessary for one of skill in the art to understand what structure performs the functions at issue, just as it affects the nature of those functions.  The software employed in the '007 Patent is not at the heart of the invention itself.

## V.    SUFFICIENT STRUCTURE IS DISCLOSED IN THE SPECIFICATION, FROM THE POINT OF VIEW OF A PERSON OF ORDINARY SKILL IN THE ART, FOR PERFORMING THE FUNCTIONS IN THE EIGHT TERMS DISCUSSED BY DEFENDANTS.

For each of the eight terms that Defendants discuss, there is sufficient supporting structure for one of ordinary skill in the art, and the claims including those terms are not indefinite.  Plaintiff has offered the sworn affidavits of two individuals of ordinary skill in the art, David James and Terry Geer, in connection with its claim construction briefing in the related case of *DataTreasury Corporation v. Citigroup, Inc. et al.*, Cause No.2:05cv294 (E.D. Tex.).  In these affidavits, attached as Exhibits B and C, Mr. James and Mr. Geer have testified that a person of ordinary skill in the art would understand what structures corresponded to the functions in question.  Because each of the eight terms at issue here is the same or substantially similar to the terms at issue before, Plaintiff will once again rely on the testimony of Mr. James and Mr. Geer to illustrate what a person of ordinary skill in the art would understand when reading the '007 Patent.  For DataTreasury's proposed constructions for the eight terms at issue, and the intrinsic evidence relevant to those terms, Plaintiff points the Court to the chart attached as Exhibit D.

1.  **"Means within each of the pre-selected institutions…for sending to and receiving from a central processing unit connected to each institution information reporting in real time in correspondence with the occurrence of an event (a) the value of the instruments transported; and (b) the transport status of the instruments with respect to their having been (i) sent and (ii) received" [Claim 1]**

The parties have agreed that the function is "sending and receiving…(i) sent and (ii) received."  The corresponding structure is "Electronic communications links, which may include conventional telephone links by modem connections and the like, and software."

The specification provides that "communications to and from the switch may occur through conventional telephone links by modem connections and the like." Col. 6:22-24.  This indicates that within the member institutions, there are structures such as modems and similar communications hardware to send and receive data from the "switch," which is described in the specification as being "an appropriately programmed digital computer having means for receipt and transmission of data . . ." 6:11-13.  Moreover, the prosecution history contains a statement that "each institution may use a CPU in a terminal mode connected to the master CPU . . ."[5]  The terminal mode referenced is enabled via the use of a modem or similar communications hardware.

Terry Geer's testimony corroborates the fact that the sending and receipt of information from the participant banks to the CPU would be accomplished using off-the-shelf software.  "Every participant bank's means for accessing the CPU for send/receive and net position status was simply a PC utilizing software like PC Anywhere associated with the operating system such as the Solaris OS system and database management software such as Oracle associated with the Central Processing Unit."  Affidavit of Terry L. Geer, attached hereto as Exhibit C, at ¶ 5.  In addition, Mr. Geer testified that a person skilled in the art would understand from the '007 Patent that this was the structure for the sending and receiving functions:  "[a] person skilled in the art

---

[5]  '007 Patent, Amendment after Final Office Action, attached hereto as Exhibit E.

would understand that the communication link between the CPU and the member PC provided for the ability to receive and send data regarding cash letters."  Exh. C at ¶ 6.

David James also testified that the receiving function (which would utilize the same structure as the sending function, see above) utilized widely available software, as one of ordinary skill in the art would have known:  "The invention took advantage of existing technology, like the software PC Anywhere, Attach Mate, and others, that allowed personal computers, under controlled conditions, to link to a CPU using existing data communication techniques."  Affidavit of David James, attached hereto as Exhibit B, at ¶ 13.

It is worth noting again here that this is a financial services patent, not a software patent. The fact that the hardware and software required for sending and receiving data between computers was well-known at the time is indicated by the specification's reference to the fact that "[t]he switch may be an appropriately programmed digital computer having means for receipt and transmission of data…"  '007 Patent at Col. 6:11-13.  The fact that the term identified here by Defendants has to do with sending and receiving of data by computers at the participant banks, rather than by the switch, does not change the fact that this was well-known technology at the time that did not need to be drawn out or spelled out in much detail in the '007 Patent's specification in order for a personal of ordinary skill in the art to understand the claims.

2.  **"Means within each of the pre-selected institutions… for receiving from the central processing unit a calculated value (a) on a real time basis and (b) on a regular periodic settlement basis, information regarding the debits and credits owing to or payable by an institution with respect to each other of the institutions with regard to instruments sent and received" [Claim 1]**

The parties agree that the function is "receiving from the central processing unit….with regard to instruments sent and received."  The corresponding structure is "accounting system; related software; electronic communications links."

16

The specification provides that "communications to and from the switch may occur through conventional telephone links by modem connections and the like." '007 Patent, Col. 6:22-24. The telephone links transmit the information recited in the function to modems and similar communications hardware at the member institutions. The member institutions have a CPU which utilizes available software, such as PC Anywhere, Procomm, or Attach Mate, to receive information from the CPU or switch. *See* above; *see* Exh. C (Geer) at ¶¶ 5-6; *see also* Exh. B (James) at ¶¶ 13-16. These were well understood by those of ordinary skill in the art. *See* Exh. C ¶¶ 5-6; Exh. B, ¶¶ 13-16.

The accounting software associated with the "switch" or CPU allows a value to be calculated on a real time basis and on a regular periodic settlement basis that can be accessed by the participating institutions. '007 Patent, at Col. 3:35-39 ("By means of the central accounting system, each member will be able electronically to inquire into the accounting system throughout the day, on a real time basis, to manage and reconcile funds in anticipation of settlement."). Terry Geer also describes the accounting software that was associated with the CPU, as "database management software such as Oracle associated with the Central Processing Unit." Exh. C at ¶ 5. David James also describes this accounting software in his Affidavit: "During this period of time, the accounting instructions, similar to spreadsheet software, associated with the CPU, is calculating in real time, as transactions are entered, the net position of each participant." Exh. B at ¶ 25. As David James notes elsewhere in his affidavit, "It is the same process that has existed for decades. The difference is that under this patent, the calculations are done by the accounting instructions, similar to spreadsheet software, associated with the CPU." Exh. B at ¶ 18. It is clear from Mr. James' and Mr. Geer's affidavits that the calculations themselves were not the essential part of the invention (and indeed, as mathematical formulae, would not have

been patentable).  Instead, these calculations were carried out by basic database management or software similar to spreadsheet software, depending on a financial institution's specific implementation.

3.      "**Means for continuous monitoring on a real-time basis, as reported by each institution by the means for sending information within each institution (a)(i) the sending and receipt status of the instruments and (ii) the value of the instruments sent and received, as reported by each of the institutions, and (b) the status in transit of the instruments with respect to their having been (i) sent and (ii) received, as reported by each of the institutions, according to the reporting of an institution's sending and receiving of instruments." [Claim 1][6]**

The function is "continuously monitoring…reporting of an institution's sending and receiving of instruments."  The corresponding structure is "A conventional programmable computer or central processing unit [1:62-65; Fig. 1 (CPU)], electronic communications links [Fig. 1], which may include conventional telephone links by modem connections and the like [6:22-24], and related software."

The specification discloses a "central control means" or "switch" that may be "an appropriately programmed digital computer having means for receipt and transmission of data." Col. 6:9-14.  The "central control means monitors on a real time basis the actual sending and receipt of, and the dollar amount of items being cleared, as reported by the participants, and records the sending and receipt of the aggregate amount of the actual financial instruments transported, as reported by the participants, . . .  " as required by the function.  Col. 2:39-45.  The "central control means" or computer also monitors the transit status of the instruments.  Col. 6:61-64 ("'real time' reports of shipment and receipt are made to and accessible from the control means"); 7:14-20 ("The control means monitors information about shipment and receipts from

---

[6] It is unclear why Defendants have truncated this term now after demanding the longer version of the term during claim construction (so far).  To avoid introducing confusion, Plaintiff will use the term and proposed construction from the Joint Chart and Plaintiff's Opening Brief.  This comment also applies to Terms 4 and 8, below.

each participant . . . Each participant can address the system to determine, at any point in time, anticipated (shipped and in transit) and received checks and the accompanying "cash letter" . . ."

The participant uses a PC with off-the-shelf software to access information from the CPU. *See* Exh. C (Geer), ¶ 7; see also Exh. B (James), ¶ 17. The monitoring is enabled via "conventional telephone links by modem connections and the like." 6:22-24. As is discussed under Term 1, above, the hardware and software used by the participant banks for accessing the CPU was well-known to those of ordinary skill in the art. In addition, as discussed under Term 2, above, the CPU could also be programmed with conventional database management or spreadsheet-like software that was known to those of ordinary skill in the art. As Terry Geer describes in his Affidavit at ¶ 7, and as the specification explains at Col. 7:14-20 (see above paragraph), the central control means monitors information received from participants, and the participants access this information through conventional PC's connected to the central control means by conventional electronic communications links, such as conventional telephone links. See also Exh. B (James) at ¶ 17. The software and hardware for performing this function was well known to those skilled in the art. Exh. C (Geer) at ¶ 7; Exh. B (James) at ¶ 17.

4.      **"Means for calculating debits and credits, based on the value of the instruments sent and received by the institutions, as monitored on a real time basis from information reported by the institutions, of (a) the amount owing from or payable to each one of the pre-selected institutions with respect to each of the other institutions and (b) an aggregate amount owing from or payable to each one of the pre-selected institutions with respect to all of the other institutions" [Claim 1]**

The function is "calculating debits and credits among the participating members." The corresponding structure is "Software on a conventional programmable computer or central processing unit [1:62-65; Fig. 1 (CPU)]."

The specification discloses "a central accounting means such as a conventional programmable computer or other central processing unit for the computation of the settlements

19

among participating banks." Col. 1:62-65; 2:39-49 ("central control means . . . calculates the net

settlements . . . and initiates the corresponding debits and credits); 6:11-16 ("an appropriately

programmed digital computer . . . to reconcile or calculate debits and credits"). This computer

can run on "software adapted to the system . . ." (6:20-22) or by conventional accounting

instructions (like Lotus) associated with the CPU." Exh. C (Geer) at ¶ 8. These accounting

instructions are similar to spreadsheet software and were well known to those in the industry; the

calculations were the same process that had existed for decades. Exh. B (James) at ¶ 18. In

addition, the key steps to be performed by the software are disclosed within the claim language –

calculating debits and credit is "based on the value of the instruments sent and received by the

institutions." A person skilled in the art would know implicitly the type of software that could

calculate debits and credits as required in the function. *See* Exh. C (Geer), ¶ 8; Exh. B (James),

¶ 18.

5.     "**A cycling means interrelated with the central processing unit (a) for controlling the
physical transport of the financial instruments among the institutions and (b) for
controlling the means for calculating such that a final calculation of the debits and credits
owing from or payable to, with respect to each of the institutions with regard to each other
of the institutions, comprising the occurrence of the regular periodic settlement among the
institutions, does not occur until pre-determined local settlements by the institutions in the
pre-selected sites with institutions that are not among the number of pre-selected financial
institutions, are completed**" **[Claim 1]**

       The function is "cycling interrelated with the central processing unit (a) for controlling

the physical transport of the financial instruments among the institutions and (b) for

controlling the means for calculating such that a final calculation . . . does not occur until predetermined

local settlements . . . are completed." The corresponding structure is "rules and parameters

regarding time scheduling where such rules and schedules are interrelated with the central

processing unit (CPU)."

One of skill in the art would know implicitly that the cycling means is simply the activities that happen on a 24-hour clock as spelled out in the clearinghouse rules and regulations, and interrelated with the central processing unit. Exh. C (Geer), ¶ 9; see also Exh. B (James), ¶¶ 19-25. The affidavits of Terry Geer and David James thoroughly explain what a person of ordinary skill in the art would understand from this patent disclosure. *See* Exh. C (Geer), ¶ 9; see also Exh. B (James), ¶¶ 19-25. As these affidavits give a thorough explanation of what this term and the specification would mean to one of skill in the art, Plaintiff will not repeat that language here. However, it is clear from reading these Affidavits that this term has more to do with the sequence of closely-controlled actions in a clearinghouse arrangement than it does with software. The specification includes a thorough discussion of the scheduling or cycling of the clearinghouse. *See, e.g*., Col. 2:62—3:16; 5:25-45; 5:48-7:23. In addition, the specification notes that "software adapted to the system described herein may be devised" to implement the function. Col. 6:20-22. *See also* 3:10-25; 6:60-64; 10:7-16; 2:55-66; 3:9-16; 3:39-42; 5:35-39; 6:9-23.

6.    **"Means for calculating debits and credits owing from or payable (1) to one member to another member and (2) from or to one member to all other members, based upon the value of instruments reported by a participant as having been sent and received" [Claim 4]**

The function is "calculating debits and credits among the participating members." The corresponding structure is "Software on a conventional programmable computer or central processing unit [1:62-65; Fig. 1 (CPU)]." For the same reasons given under Term 4, above, the specification gives sufficient detail for one of ordinary skill in the art to understand what structure corresponds to the function of "calculating debits and credits among the participating members." See Exh. C (Geer) at ¶ 8; Exh. B (James) at ¶ 18.

7.    **"Means for receiving and recording a participant's reports of the value and transit status of the instruments to be cleared as having been sent and received with respect to all participants in the system" [Claim 4]**

The function is "receiving and recording a participant's reports of the value and transit status of the instruments to be cleared as having been sent and received with respect to all participants in the system."  The corresponding structure is "Software associated with an accounting system running on the central processing unit (CPU)."

The means for receiving and recording a participant's reports would be known to those skilled in the art.  *See* Exh. C, Affidavit of Terry L. Geer, ¶¶ 12-13; *see also* Exh. B, Affidavit of David James, ¶ 29.  The CPU receives the reports from the participants and records those reports through the accounting instructions, similar to spreadsheet software, associated with the CPU.  Exh. B (James), ¶ 29.  In addition, the specification discloses the existence of an accounting system, which is interrelated with the CPU or "switch." 1:62-66 ("the association would provide a conventional programmable computer or other central processing unit"); 2:2-4 ("received electronically by the association's accounting means"); 2:11-12 ("prepared by the central accounting means of the association"); 3:31 ("the association's accounting system"); 3:35-37 ("by means of the central accounting system").  Also, "communications to and from the switch may occur through conventional telephone links by modem connections and the like" are depicted in Figure 1.  The phrase "modem connections and the like" shows that the patent contemplates that a modem or similar communications hardware, and the communication links related thereto, may be used as the medium for receiving a participant's reports.  In addition, the specification discloses that "software adapted to the system" may be "devised by persons of skill in the financial programming computer arts"  6:20-24.  The participants receive and record the

reports by doing an inquiry on their PC and printing a hard copy of certain reports.  *See* Exh. C

(Geer), ¶¶ 12-13; Exh. B (James), ¶ 29.  Connecting to the CPU or "switch," obtaining and

printing these reports could be accomplished with standard off-the-shelf software.  Exh. C (Geer)

at ¶ 13.

8.    **"Means for monitoring on a real time as reported basis (1) the actual sending from
and receipt by a participant of the value of instruments being cleared as reported by the
participants, and (2) the sending from and receipt by a participant of the actual
instruments being cleared, said means for monitoring being operatively interconnected to
the means for calculating whereby debits and credits owing from one member to another
may be determined and monitored on a continuous basis in real time as reports of the value
and transit status of the instruments to be cleared are reported by the participants and
received by the processing unit" [Claim 4]**

The parties agree that the function is "monitoring on a real time as reported basis."  The

corresponding structure is "Software associated with a conventional programmable computer or

central processing unit [1:62-65; Fig. 1 (CPU)] operably interconnected with software associated

with the accounting system on the CPU."

The specification discloses a "central control means" or "switch" that may be "an

appropriately programmed digital computer having means for receipt and transmission of data."

Col. 6:9-14.  The "central control means monitors on a real time basis the actual sending and

receipt of, and the dollar amount of items being cleared, as reported by the participants, and

records the sending and receipt of the aggregate amount of the actual financial instruments

transported, as reported by the participants, . . . " as required by the function. 2:39-45.  The

"central control means" or computer also monitors the transit status of the instruments. 6:61-64

("'real time' reports of shipment and receipt are made to and accessible from the control

means"); 7:14-20 ("The control means monitors information about shipment and receipts from

each participant . . . Each participant can address the system to determine, at any point in time,

anticipated (shipped and in transit) and received checks and the accompanying "cash letter" . . ."

The monitoring is enabled via "conventional telephone links by modem connections and the like." 6:22-24. The programming for the computer may be provided by "software adapted to the system" that is "devised by persons of skill in the financial programming computer arts." 6:20-24.

The participant uses a PC with off-the-shelf software to access information from the CPU. *See* Exh. C (Geer), ¶ 7; see also Exh. B (James), ¶ 17. The monitoring is enabled via "conventional telephone links by modem connections and the like." 6:22-24. As is discussed under Term 1, above, the hardware and software used by the participant banks for accessing the CPU was well-known to those of ordinary skill in the art. In addition, as discussed under Term 2, above, the CPU could also be programmed with conventional database management or spreadsheet-like software that was known to those of ordinary skill in the art. As Terry Geer describes in his Affidavit at ¶ 7, and as the specification explains at Col. 7:14-20 (see above paragraph), the central control means monitors information received from recipients, and the participants access this information through conventional PC's connected to the central control means by conventional electronic communications links, such as conventional telephone links. See also Exh. B (James) at ¶ 17. The software and hardware for performing this function was well known to those skilled in the art. Exh. C (Geer) at ¶ 7,14; Exh. B (James) at ¶ 17, 30-31.

## VI. DEFENDANTS' ANALYSIS AND EXPERT TESTIMONY CANNOT MEET THE HIGH BURDEN FOR INVALIDATING A UNITED STATES PATENT.

As noted previously, Defendants bear a high burden for invalidating a United States Patent—they must demonstrate by clear and convincing evidence that the patent is invalid. After identifying eight terms that they claim lack any corresponding structure, the basis for their

argument that the '007 Patent is invalid for indefiniteness of Claims 1 and 4, Defendants do not give this Court or Plaintiff a detailed analysis of each term. Instead, they rely on conclusory statements that supposedly apply to all eight terms, and which span a mere three pages of their thirteen page motion (middle of page 9 to middle of page 12).

The analysis of Defendants' expert, Dr. Dewayne E. Perry, is similarly defective. While Dr. Perry certainly has an impressive resume, he has absolutely no experience in banking or the financial services industry. See Exhibits D and E to Defendants' Motion. Instead, Dr. Perry is a software engineer and a professor of software engineering. See Exhibit D to Defendants' Motion, ¶ 2; Exhibit E to Defendants' Motion, p. 1-2, Academic Employment, Industrial Employment, Keynote speeches, Professional Activities. While the selection of Dr. Perry as an expert is in keeping with Defendants' attempt to confuse the '007 Patent with a software patent, it is difficult to see how Dr. Perry could know what one of ordinary skill in the financial services arts would understand when reading the '007 Patent specification. Even if Dr. Perry were an appropriately-qualified expert, however, this Court would find his Declaration of little use. For each of the eight terms, after giving the term and the function identified in the Joint Claim Chart, Dr. Perry includes a paragraph of boilerplate, conclusory language—the same paragraph for each term.[7] Not even a comma is changed from one term to the next. The Federal Circuit has found that conclusory expert testimony is insufficient to prove indefiniteness by clear and convincing evidence. *Intel Corp. v. VIA Techs.*, 319 F.3d 1357, 1365-1367 (Fed. Cir. 2003) (holding that the

---

[7] The boilerplate language used by Dr. Perry is as follows: "A programmable computer (with its communication-related hardware and its operating system and standard support software) alone could not perform the recited function. In order to perform the recited function, additional application software would need to be written or obtained from third parties. The '007 Patent does not indicate whether such application software exists or was known, or the algorithm such software would implement. Specifically, the '007 Patent does not provide a flowchart, mathematical equation(s), pseudo-code, source code, or description in its specification that could constitute an algorithm corresponding with this function. Further, the '007 Patent does not identify any known or commercially available application software that could be used to perform the recited function. Thus, the '007 Patent fails to disclose even one algorithm for achieving the recited function."

evidence on record did not show that VIA could prove indefiniteness by clear and convincing evidence where "VIA's expert made a conclusory statement that the '291 patent did not disclose adequate structure for one skilled in the art to determine the scope of the claims.").

Finally, to the extent that Dr. Perry's testimony is considered and found by the Court to contradict the testimony of Messrs. Geer and James as to whether any of the means-plus-function claim terms at issue are indefinite to a person of ordinary skill in the art, the contradictions between their testimony raise genuine issues of fact, which should be resolved by a jury and which preclude granting the Defendants' motion for summary judgment of invalidity.

## VII.  CONCLUSION

Defendants' Motion for Summary Judgment should be denied.  Defendants have misconstrued or ignored the relevant case law illuminating the legal principles at issue.  More importantly, they have not proven the '007 Patent invalid by clear and convincing evidence, but have rather presented this Court with inadequate analysis and one affidavit from an expert whose expertise is not in the relevant field of the '007 Patent and whose analysis is a series of boilerplate, conclusory statements.  Defendants' attempt to make the '007 Patent into a software patent are misguided.  The '007 Patent is a financial services patent, and the descriptions in the specification are sufficient for one of ordinary skill in the art to understand what structure is linked to the eight functions identified by Defendants.  Accordingly, Plaintiff respectfully requests that this Court deny Defendants' Motion for Summary Judgment in all respects and for any other relief to which it is entitled.

Respectfully submitted,

_____

**NICOLE REED**
State Bar No. 24041759
**ROD COOPER**
State Bar No.  90001628
**EDWARD  HOHN**
Attorney-in-charge
State Bar No. 09813240
**EDWARD CHIN**
State Bar No. 50511688
**NIX PATTERSON & ROACH, L.L.P.**
5215 N. O'Connor Blvd., Suite1900
Irving, Texas 75039
972.831.1188; 972.444.0716 fax
nicolereed@nixlawfirm.com
rodcooper@nixlawfirm.com
edhohn@nixlawfirm.com
edchin@nixlawfirm.com


**C.  CARY PATTERSON**
State Bar No. 15587000
**BRADY PADDOCK**
State Bar No. 00791394
**ANTHONY BRUSTER**
State Bar No. 24036280
**R. BENJAMIN KING**
State Bar No. 24048592
**NIX PATTERSON & ROACH L.L.P.**
2900 St. Michael Drive, Suite 500
Texarkana, Texas  75503
903.223.3999; 903.223.8520 fax
ccp@nixlawfirm.com
bpaddock@nixlawfirm.com
akbruster@nixlawfirm.com
benking@nixlawfirm.com


**JOE KENDALL**
State Bar No. 11260700
**KARL RUPP**
State Bar No. 24035243
**PROVOST * UMPHREY, L.L.P.**

27

3232 McKinney Avenue, Suite 700
Dallas, Texas  75204
214.744.3000; 214.744.3015 fax
jkendall@provostumphrey.com
krupp@provostumphrey.com

**ERIC M. ALBRITTON**
State Bar No. 00790215
**ALBRITTON LAW FIRM**
P.O. Box 2649
Longview, Texas  75606
903.757.8449; 903.758.7397 fax
ema@emafirm.com

**T. JOHN WARD, JR.**
State Bar No. 00794818
**LAW OFFICE OF T. JOHN WARD, JR.**
P.O. Box 1231
Longview, Texas  75601
903.757.6400; 903.757.2323 fax
jw@jwfirm.com

***ATTORNEYS FOR PLAINTIFF DATATREASURY
CORPORATION***


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was served electronically upon all the following on the 25th day of June, 2007.


Bank of America - Listserve (BankofAmericaF&R@fr.com)
BB&T ListServe (BB&T_DataTreasury@kilpatrickstockton.com)
Citizens Financial (citizensfinancial@standleyLLP.com)
City National Bank - Listserve (citynationalbank@dmtechlaw.com)
Comerica Bank 007 Listserve (Comerica_DataTreasury@kilpatrickstockton.com)
Compass/First Horizon/TN Bank - Listserve (comfhft@andrewskurth.com)
Cullen/Frost Bank - Listserve (frostbank@dmtechlaw.com)
EDS - Listserve (EDS_DataTreasury@mckoolsmith.com)
UBS – Listserve (ubsamericas@velaw.com)
HSBC North America Holdings, Inc./HSBC Bank USA  Listserve  (hsbccounsel@blhc-law.com)
BancorpSouth Listserve (bxs@hughesluce.com)
Bank of Tokyo Listserve (BankofTokyo_DataTreasury@sidley.com)
BofNY Listserve (BofNYLitTeam@pillsburylaw.com)
The Clearing House/SVPCo Listserve (TCH_DT@sullcrom.com)

Deutsche Bank Listserve (DeutscheBank_DataTreasury@sidley.com)
First Citizens Listserve (firstcitizens@bakerbotts.com)
First Data Listserve (FirstData_DataTreasury@sidley.com)
Key Bank Listserve (KeyCorp_DataTreasury@mckoolsmith.com)
LaSalle Bank Listserve (LaSalleBank_DataTreasury@sidley.com)
National City Bank Listserve (foley-dtc@foley.com)
Remitco Listserve (Remitco_DataTreasury@sidley.com)
Telecheck Listserve (Telecheck_DataTreasury@sidley.com)
Union BofCA Listserve (ubofclitteam@pillsburylaw.com)
Viewpointe Listserve (Viewpointe_dtc@skadden.com)
Zion First National Bank Listserve (foley-dtc@foley.com)
Harris Bancorp. - Listserve (Harris_DataTreasury@mckoolsmith.com)
M&T 007 Listserve (M&T_DataTreasury@kilpatrickstockton.com)
PNC Bank - Listserve (PNC_DataTreasury@mckoolsmith.com)
Suntrust - Listserve (SunTrust_DataTreasury@mckoolsmith.com)
U.S. Bancorp – Listserve (foley-dtc@foley.com)
Wachovia 007 Listserve (Wachovia_DataTreasury@kilpatrickstockton.com)
Wells Fargo - Listserve (*DalWellsFargo_DTC@BakerNet.com)

**NICOLE REED**