# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| DATATREASURY CORP., | § § | |
| Plaintiff, | § § | No. 2:06-CV-72 |
| v. | § § | Judge David Folsom |
| WELLS FARGO & CO., et al. | § § | |
| Defendants. | § § | |

**SUPPLEMENTAL RESPONSIVE CLAIM CONSTRUCTION BRIEF
OF DEFENDANTS KEY AND PNC**

Pursuant to the Court's Order of October 25, 2006, [Dkt. No. 325], as well as P.R. 4-5(b), Defendants KeyBank National Association and KeyCorp (collectively, "Key"), and PNC Bank and The PNC Financial Services Group, Inc. (collectively, "PNC"), respectfully submit this supplemental responsive claim construction brief addressing certain of the disputed claim terms of U.S. Patent Nos. 5,717,868 and 5,265,007 (the "'868 patent," and "'007 patent" respectively). [Exhs. B, D].[1]  Key and PNC also submit, for the Court's convenience, a chart listing a subset of the disputed claim terms by patent and providing side-by-side comparisons of the parties' respective proposed constructions of those terms.  [Exh. A].

---

[1] References to "Exh. __" are to the Exhibits in the accompanying Exhibit Appendix.

# TABLE OF CONTENTS

I. INTRODUCTION ..........................................................................................................1

II. DISCUSSION ................................................................................................................1

    A. THE '868 PATENT—OVERVIEW AND PROPOSED CONSTRUCTIONS ..............................................................................................1

        1. Brief Overview of the '868 Patent ..............................................................1

        2. Proposed Claim Constructions for the '868 Patent .....................................2

            a) "co-mingled records"..………………………………………….2

            b) "translating"………..…………………………………………….4

            c) "predetermined institution"…………………………………….5

            d) "file format"………...…………………………………………….5

    B. THE '007 PATENT—OVERVIEW AND PROPOSED CONSTRUCTIONS ..............................................................................................5

        1. Brief Overview of the '007 Patent ..............................................................5

        2. Proposed Claim Constructions for the '007 Patent .....................................6

            a) "pre-selected financial institutions"…………………………….6

            b) "final calculation . . . does not occur until . . ."..………………8

            c) "real time"………...…………………………………………….9

            d) "status in transit"..……………………………………………..10

III. CONCLUSION.............................................................................................................10

# TABLE OF AUTHORITIES

**Case**

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ............................................. 1, 3, 4, 9, 10

## TABLE OF EXHIBITS

Exhibit A ............................................................. Parties' Claim-Construction Comparison Chart
Exhibit B .............................................................. U.S. Patent No. 5,717,868 (the "'868 patent")
Exhibit C ................................................................... Amendment and Response of June 13, 1997
Exhibit D .............................................................. U.S. Patent No. 5,265,007 (the "'007 patent")
Exhibit E ....................................................................................... Amendment of May 13, 1991
Exhibit F ....................................................................................... Amendment of May 29, 1991
Exhibit G ..................................................................................... Amendment of January 2, 1992
Exhibit H ....................................................................................... Amendment of May 14, 1992
Exhibit I .................................................................................... Amendment of December 8, 1992
Exhibit J ........................................... Amendment After Final Action and Statement of May 5, 1993
Exhibit K ......................... Second Amendment After Final Action and Statement of June 29, 1993
Exhibit L ....................................................................................... Collected Dictionary Definitions

**I.    INTRODUCTION**

With respect to many of the disputed terms drawn from the '868 and '007 patents, Key and PNC agree and join with the claim constructions as proposed and argued in Defendants' joint responsive brief. With respect to a number of terms (and related variants) drawn from these patents, however, Key and PNC propose constructions that differ from those offered by the other Defendants. Pursuant to the Court's Order of October 25, 2006, [Dkt. No. 325], this supplemental responsive brief addresses the merits of Key's and PNC's proposed constructions.

Plaintiff DataTreasury Corporation's ("DTC's") opening brief—which contains virtually no substantive argument supporting DTC's proposed constructions—asks the Court to give the disputed claim terms "their ordinary and customary meaning." [Dkt. No. 705 ("DTC Br.") at 2]. DTC mistakenly suggests, however, that this can be accomplished by reference to nothing more than "<u>the exact words of the claim</u>." [*Id.*]. To the contrary, controlling Federal Circuit caselaw makes clear that the "ordinary and customary meaning" of a claim term must be determined in light of, and by reference to, the patent's intrinsic record. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005). As demonstrated below, the litigation-inspired constructions that DTC offers for the disputed terms conflict with the specification, ignore critical prosecution history, and otherwise fail to capture the ordinary meaning of those terms when read in light of the intrinsic record. Because the constructions proposed by Key and PNC remain "true to the claim language" while properly accounting for the "patent's description of the invention," they "will be, in the end, the correct construction[s]." *Id.* at 1316.

**II.    DISCUSSION**

    **A.    THE '868 PATENT—OVERVIEW AND PROPOSED CONSTRUCTIONS**

        **1.    Brief Overview of the '868 Patent**

The '868 patent provides a centralized system for the exchange of electronic payments between banks. The patent is directed toward two principal objects: 1) enabling exchange of

electronic payments among financial institutions "when the data file formats utilized by the institutions are dissimilar," and 2) expediting such payment exchanges between one institution and "a plurality" of others. [Exh. B at 2:18-26]. To expedite electronic payment exchange among a plurality of banks, the patent provides for a centralized "concentrator" to which each participating bank sends payments designated for multiple recipient banks in one co-mingled data file. [*Id.* at 3:1-9]. The concentrator then does the work of sorting and bundling, by intended recipient, the payments contained in that single file. [*Id.*]. To enable exchange among banks using dissimilar file formats, the patented system next translates the sorted bundles from the format used by the sending bank into different formats "selected by each institution that is to receive the information." [*Id.* at 3:63-64]. Finally, the sorted and translated payment files are stored in "uniquely accessible" memory mailboxes and transmitted, respectively, to each intended bank recipient. [*Id.* at 11:5-13].

### 2.  Proposed Claim Constructions for the '868 Patent

#### a)  "co-mingled records"

| Term(s) | DTC's Construction | Key's and PNC's Construction |
|---|---|---|
| "co-mingled records"[2] | *co-mingled*: "combined financial instrument information intended for one or more of a multiple of receiving institutions or settlement mechanisms."<br>*records*: "portions of files sent and received between financial institutions, which contain various data fields." | Information representing multiple financial instruments intended for multiple recipients mixed together in a single data file. |

The parties' dispute with respect to this set of terms centers on whether a "co-mingled" file can consist of payment information intended for just a single recipient. Common sense says no. The extrinsic evidence says no. [*See* Exh. L at 7]. More importantly, the intrinsic record says no. For at least the following three reasons, the Court should hold that a "co-mingled" file must contain payment information designated for multiple recipients.

---

[2] The same constructions are also offered for the following related terms: "co-mingled financial instrument information" (Claim 24); "co-mingled financial instrument information intended for multiple receiving institutions" (Claim 24); "co-mingled information about financial instruments" (Claim 45); and "co-mingled financial instrument information addressed to multiple receiving institutions" (Claim 61).

First, Key's and PNC's construction finds support in the claim language. Shortly after the term "co-mingled records" first appears in claim 1, for example, the claim requires "a processor for separating said co-mingled records of financial instrument information into separate bundles." [Exh. B at 10:59-60]. If all the records in a file were intended for a single recipient, the entire file would constitute a single bundle—there would be no need "for separating said . . . records."

Second, this common-sense construction finds support in the specification. [*See id.* at 6:60-61 ("co-mingled financial instrument information intended for multiple receiving institutions"); *see also id.* at 8:57-58, 61-63]. The specification "contrast[s]" the invention with "bilateral" systems, [*see id.* at 4:38-43], which would involve exchange of payment information intended for individual recipients. The patented system instead "provides for the exchange of information among multiple institutions" through the concentrator, which delivers payment information "in differing formats to different receiving institutions." [*Id.*].

Third, and perhaps most critically, the file history demonstrates that the patentee disclaimed any other interpretation during prosecution of the '868 patent. *See Phillips*, 415 F.3d at 1317. As the patentee explained to the examiner in the amendment adding the "co-mingled" limitation, the

> amended independent claims 1 and 61 relate to apparatus, a means and processes for receiving <u>a data file that comprises several portions, or bundles</u>, of financial instrument information, one or more of which portions or bundles are intended for one recipient <u>and others of which are intended for other recipients</u>. . . . In this manner, the present invention permits the originating institution to <u>co-mingle financial instrument information intended for multiple recipients in a single data file</u>.

[Exh. C (Amendment of June 13, 1997) at 25-26 (emphasis added)]. Significantly, these statements were made in the context of distinguishing the invention over the prior art: "one would not be motivated by Sansone's teachings to provide a means for receiving <u>a single data file containing co-mingled different portions of information for different recipients</u>." [*Id.* at 27 (emphasis added); *see also id.* at 35]. Therefore, even if the claim term could otherwise have

been construed as DTC proposes, the patentee excluded that possibility during prosecution. *See Phillips*, 415 F.3d at 1317.

### b) "translating"

| Term(s) | DTC's Construction | Key's and PNC's Construction |
|---|---|---|
| "translating the records in each bundle of said financial instrument information records from said first data file format into a data file format selected by the predetermined institution designated to receive the information"[3] | Converting the records in each bundle from the first file format to a second file format determined in advance by the receiving institution. | Converting the data representing each financial instrument in each bundle (portion) from the first file format selected by the sending institution to a second, different file format selected by the receiving institution. |

The necessity for the Court's construction of this term springs from a simple but dispositive question: whether "translation" involves conversion from a first file format to a second, *different* file format. It would doubtless stretch credulity to suggest otherwise; nevertheless, Key and PNC ask the Court to make clear that DTC will not be permitted to assert that the post-translation "second file format" *can be the same* as the pre-translation "first file format."[4] This obvious point is well supported by the intrinsic evidence. [*See* Exh. B at 2:20-22, 8:23-29, 8:58-9:5, Fig. 1; *see also* Exh. C at 35 ("[The invention] accomplishes that which has not previously been done before—the exchange of data files of co-mingled individual transaction records <u>where file format requirements of the sender and multiple recipients are different</u>.") (emphasis added)]. It is also well supported by the extrinsic evidence. [*See* Exh. L at 12, 20, 24].

---

[3] The same constructions are also offered for the following related terms: "translating each portion of said separated financial instrument information in said first data file format into a data file format preselected by the receiving institution associated therewith" (Claim 24); "translating each bundle of said separated financial instrument information into a data file format preselected by the receiving institution corresponding thereto" (Claim 45); "translating each bundle of said separated financial instrument information in said first data file format into a data file format selected by the receiving institution associated therewith" (Claim 61); "translating each portion of said data file in said first file format into a file format selected by the receiving institution" (Claim 80).

[4] As The Clearing House's related summary judgment of noninfringement demonstrates, the system under which Defendants are accused of infringing the '868 patent does not translate files from one format to another— information enters the system in DSTU X9.37 format, and leaves the system in DSTU X9.37 format. [*See* Dkt. No. 715 at 18]. DTC thus cannot mount even a colorable charge of infringement without asserting—however misguidedly—that a first format can be "translated" into a second format that is identical to the first.

### c) "predetermined institution"

| Term | DTC's Construction | Key's and PNC's Construction |
|---|---|---|
| "predetermined institution" | Participant institution that has previously agreed to exchange financial instrument information with another participant institution. | Participant institution that has previously agreed to exchange financial instrument information with other participant institutions by way of the central translator. |

The parties' proposals for this term differ only in that DTC's construction does not specify that the relevant payment exchanges must be by way of the patented system. Participant banks could potentially agree to exchange some electronic payments through the central translator, and to exchange other payments by another method; the construction proposed by Key and PNC simply confirms that the claims at issue cannot reach beyond exchanges using the patented system.

### d) "file format"

| Term | DTC's Construction | Key's and PNC's Construction |
|---|---|---|
| "file format" | The arrangement of data fields within a record, and the arrangement of, and definitions of different types of, records within a data file. | The particular arrangement of information within individual data fields or ranges of data fields within a particular record. |

The specification defines this term, and Key's and PNC's proposal tracks that definition. [Exh. B at 5:37-39]. DTC's construction fails to track the definition, and is further unnecessarily confusing. The Court should thus adopt the construction offered by Key and PNC.

### B. THE '007 PATENT—OVERVIEW AND PROPOSED CONSTRUCTIONS

#### 1. Brief Overview of the '007 Patent

The '007 patent is drawn toward providing a more efficient, nation-wide check-clearing alternative to the Federal Reserve. [Exh. D at 7:32-36]. The system achieves its national scale by pre-selecting its "member" or "participant" banks from diverse geographical regions. [*Id.* at 2:66-3:6, 7:44-45]. These pre-selected participants are, in turn, also members of the local clearinghouses in their respective regions. [*Id.* at 2:66-3:6]. Under the patented system, then, a participant bank in geographical region A will send for clearance to a participant bank in region B both 1) those checks drawn on the participant in region B, and 2) those checks drawn on other,

non-participant banks local to region B. [*Id.* at 1:49-51, Fig. 1]. The participant in region B then presents those checks drawn on the non-participant local banks for settlement through the local clearinghouse on behalf of the region A participant. [*Id.* at 3:1-3]. The patent makes clear that settlement among the participants at the national level cannot occur until *after* settlements with the non-participant banks at the local level. [*Id.* at 4:53-54, 8:35-45].

The efficiencies achieved by this check-clearance system are due, in important part, to the "real time electronic tracking of the cash letters transmitted through the transportation system." [*Id.* at 1:67-2:1]. That is, a centralized computer tracks the flow of physical items through the system by use of frequent and immediate updates at various stages of transport and exchange. [*See id.* at 6:11, 25, 53; Exh. K (Amendment of June 29, 1993) at 9]. Using this centralized computer, participant banks can "address the system to determine, at any point in time, anticipated (shipped and in transit) and received checks and the accompanying 'cash letter' that is included in each shipment." [Exh. D at 7:17-21]. "Real time coordination [thus] occurs such that continuous reporting and monitoring allow for efficient funds management." [Exh. K at 8-9].

### 2. Proposed Claim Constructions for the '007 Patent

#### a) "pre-selected financial institutions"

| Term(s) | DTC's Construction | Key's and PNC's Construction |
|---|---|---|
| "pre-selected financial institutions"<br><br>"pre-selected institutions"<br><br>"participants" | Financial institutions which have previously been selected to be members of or participants in the central check clearing system or a local clearinghouse as to clearing the financial instrument.<br>*"participants"*: Members of the clearinghouse association. | Members of a centralized clearinghouse association that settle financial transactions with each other, each located in a specific and exclusive geographical region. |
| "preselected site" | This language is in the preamble and does not need to be construed.<br>Alternatively: The instrument processing location of a participating institution. | A place within a specific and exclusive geographical region. |

The constructions proposed by DTC for this set of terms contain two critical flaws. First, both the claims and specification make clear that, as used in the '007 patent, the terms "pre-selected . . . institutions" and "participants" refer *always* to members of the centralized check-clearing system, and *never* to members of local clearinghouses who are not also members of the centralized system. [*See* Exh. D at 2:67-68 ("all participants must be members of the national clearinghouse association"); *id.* at 8:42-44 (describing "local settlements by the institutions in the pre-selected sites with institutions that are not among the number of pre-selected financial institutions"); *see also id.* at 3:21-28]. By expressly including members of either the central "<u>or</u>" the local clearinghouses, DTC's constructions ignore the patent's fundamental distinction between membership in these two clearinghouses, and thus would cause the claims at issue to read on exchanges between banks that—by definition—have not been selected to participate in the patented system.

Second, the geographic diversity of the pre-selected participants is a fundamental feature of the '007 patent's centralized check-clearing system. [*See id.* at 7:44-45 ("a number of pre-selected financial institutions, each located at a preselected site")]. As explained above, each region's participant bank processes those checks drawn on itself and on non-participating banks local to its region: this makes sense only if the participants are in different regions. [*See id.* at 1:49-51, 2:66-3:6, 3:1-3, Fig. 1]. If any doubt remained on this point, the patentee removed it during prosecution: "the institutions are geographically diverse places at which checks . . . are processed." [Exh. E (Amendment of May 13, 1991) at 3]. Again: "[i]f language not typical of the banking art were employed, the claim could just as well read 'members of the same group in different places.'" [Exh. G (Amendment of Jan. 2, 1992) at 2-3]. DTC's proposed constructions fail to account for the fact that the pre-selected institutions are located at "geographically diverse places," and should be rejected for that reason.

The constructions offered by Key and PNC, on the other hand, reflect both the need for geographic diversity among the participants as well as the distinction between membership in the

national and local clearinghouses. These constructions thus properly capture the ordinary meaning of the terms as they are used in the '007 patent, and should be adopted.

### b) "final calculation . . . does not occur until . . . ."

| Term(s) | DTC's Construction | Key's and PNC's Construction |
|---|---|---|
| "a final calculation of the debits and credits . . . , comprising the occurrence of the regular periodic settlement among the institutions, does not occur until pre-determined local settlements by the institutions in the pre-selected sites with institutions that are not among the number of pre-selected financial institutions, are completed" | "*Final Calculation*" and "*Occurrence of the regular periodic settlement among the institutions*": No construction necessary.<br>"*Debits and credits*": Credits are the amounts owed by an institution; debits are the amounts payable to an institution.<br>"*Predetermined local settlement by the institutions in the preselected sites with institutions that are not among the number of preselected financial institutions*": A settlement between a user and non-user of the clearinghouse that occurs at a regular interval. | Settlement between the member institutions occurs, if at all, at regular intervals. The settlement between members does not occur, however, until each member settles with the non-members of the clearinghouse in the member's locality. |
| "determining the occurrence of a final settlement by the clearinghouse participants at a pre-determined time until after a time that certain predetermined local settlements in the localities, by the participants in the localities, are completed" | Establishing by participant rules settlement time, that accommodates processing, procedures, and transportation needs of all participants regardless of location and time zone. This final settlement occurs after certain predetermined local settlements. | Initiating a settlement between the member institutions, if at all, at regular intervals. The settlement between members does not occur, however, until each member settles with the non-members of the clearinghouse in the member's locality. |

Key's and PNC's constructions for this set of terms again are preferable to those offered by DTC for two reasons. First, DTC's proposed piecemeal construction of the "final calculation" phrase would be more confusing to the jury than the straightforward, plain-language sentences proposed by Key and PNC. Second, DTC's constructions ignore or obscure the important fact that, under the system described by the '007 patent, final settlement among the national participants does not take place until *after* the participants' respective settlements through the local clearinghouses are complete. [*See* Exh. D at 3:9-16, 3:40-42, 4:7-10, 4:30-31, 4:53-54, 8:35-45, 10:13-16]. At least one reason the local settlements must come first is that "[t]he members' final settlement integrates the members' and the local settlements in which the members participate." [Exh. I (Amendment of Dec. 8, 1992) at 9]. Because Key's and PNC's

constructions are less confusing, and properly make clear that the national settlement occurs after the local settlements are complete, those constructions should be adopted by the Court.

### c) "real time"

| Term(s) | DTC's Construction | Key's and PNC's Construction |
|---|---|---|
| "real time"<br><br>"in real time" | The actual time during which something takes place. | Immediate; immediately. |
| "real time in correspondence with the occurrence of an event" | The actual time during which something takes place. | Immediately when the instruments are sent and received. |

When information is entered or available in "real time" under the '007 patent, it is entered or available "immediately." [*See* Exh. D at 6:10-11 ("information about the . . . transmittal is immediately entered"); *id.* at 6:25-26 ("[i]mmediately upon physical receipt of the checks, the . . . participant enters information"); *id.* at 6:52-53 ("receipt . . . is immediately reported"); *id.* at 4:4-6 ("[t]he status of participant's accounts in the national clearinghouse association is recorded and displayed instantaneously"); *id.* at 3:36-38 ("each member will be able electronically to inquire into the accounting system throughout the day, on a real time basis")]. Key's and PNC's construction thus best captures the ordinary meaning of the term in light of the specification. *See Phillips*, 415 F.3d at 1314. This construction also harmonizes with the '007 patent's prosecution history and with relevant extrinsic evidence. [*See* Exh. K at 8-9; Exh. L at 11 (defining "real time" as "[t]he immediate processing of time-dependent input")].

In contrast, DTC offers a litigation-inspired selection of an arbitrary dictionary definition that is completely unmoored from the specification. This is just the approach to claim construction that the Federal Circuit unequivocally rejected in *Phillips*. *See* 415 F.3d at 1320. And because DTC's construction has no connection with the intrinsic record, it provides no illumination of the term's meaning as used in the '007 patent. The "real time" tracking of items through the system is intended to permit participants to "address the system to determine, at any point in time," the value and current shipment status of the items being exchanged. [Exh. D at 7:17-21; *see also id.* at 4:50-52, 6:60-64]. This can only be accomplished if updates to the

system are entered, *e.g.*, "immediately when the instruments are sent and received." The constructions of Key and PNC should thus be adopted, and DTC's rejected.

### d) "status in transit"

| Term(s) | DTC's Construction | Key's and PNC's Construction |
| --- | --- | --- |
| "the status in transit of the instruments" (Claim 1) | Information about transport of financial instruments sent and received by the pre-selected financial institutions. | Electronic tracking information that can be used to identify the location of the instruments in real time. |
| "transit status of the financial instruments to be cleared" (Claim 4) | Information about the status in transit of the instruments, namely, whether the instrument has been sent and/or whether the instrument has been received. | Electronic tracking information that can be used to identify the location of the instruments in real time. |

Key's and PNC's proposed construction of these terms comports with the specification's description of "real time electronic tracking of cash letters transmitted through the transportation system." [*Id.* at 1:67-2:1]. It also comports with the '007 patent's prosecution history: "[t]he mechanism is a continuous and active process conducted and monitored by a plurality of participants, as the instruments are in various stages of transport and/or exchange, in real time." [Exh. K at 9]. DTC's construction, on the other hand, fails to account for the fact that the tracking information available to participants includes more than simply whether the items to be exchanged have been sent or received. [*See id.*; *see also* Exh. D at 5:64-66 ("the fact of transmittal, information about the transmittal of the checks and the total value transmitted are entered into [the system]"); *id.* at 5:25-27, 6:60-64]. Because Key's and PNC's construction better captures the meaning of these phrases in light of the intrinsic record, their proposal is preferable to the proposals offered by DTC. *See Phillips*, 415 F.3d at 1314.

## III. CONCLUSION

The constructions proposed by Key and PNC follow established principles of claim construction, giving effect to the intrinsic record and conveying meaning consistent with the understanding of those of ordinary skill in the art. Key and PNC thus respectfully request that the Court adopt their proposed constructions as set forth above and in the attached Exhibit A.

DATED: July 9, 2007                     Respectfully submitted,

**McKOOL SMITH, P.C.**

/s/ Sam Baxter_____
Sam Baxter
Texas State Bar No. 01938000
sbaxter@mckoolsmith.com
Theodore Stevenson, III
Texas State Bar No. 19196650
tstevenson@mckoolsmith.com
McKOOL SMITH, P.C.
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Telephone: (214) 978-4000
Telecopy:  (214) 978-4044

Peter J. Ayers
Texas State Bar No. 24009882
payers@mckoolsmith.com
Geoffrey L. Smith
Texas State Bar No. 24041939
gsmith@mckoolsmith.com
McKOOL SMITH, P.C.
300 W. 6th Street, Suite 1700
Austin, Texas 78701
Telephone: (512) 692-8700
Telecopy:  (512) 692-8744

**ATTORNEYS FOR DEFENDANTS KEYBANK NATIONAL ASSOCIATION; KEYCORP; PNC BANK; THE PNC FINANCIAL SERVICES GROUP, INC.**

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a), contemporaneously served upon all counsel who have consented to electronic service, and served by first class mail on other counsel on this the 9th day of July, 2007.

/s/ Sam Baxter_____
Sam Baxter