# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| **DATATREASURY CORPORATION,** | |
| **Plaintiff** | |
| **v.** | **2:06-CV-72 DF** |
| **WELLS FARGO & COMPANY, et al.** | |
| **Defendants** | |

## DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF

In accordance with the Court's Docket Control Order and Patent Rule 4-5(b), Defendants[1]:

| | |
|---|---|
| Bank of America Corporation | Lasalle Bank, National Association |
| Bank of America, National Association | M&T Bank |
| Bank of Tokyo-Mitsubishi UFJ, LTD | M&T Bank Corporation |
| BB&T Corporation | National City Bank |
| Branch Banking and Trust Company | National City Corporation |
| Citizens Financial Group, Inc. | PNC Bank, National Association |
| City National Bank | PNC Financial Services Group, Inc. |
| City National Corporation | Telecheck Services, Inc. |
| Comerica Bank & Trust, National Association | The Bank of New York |
| Comerica Incorporated | The Bank of New York Co, Inc. |
| Deutsche Bank Trust Company Americas | The Clearing House Payments Company, LLC |
| First Citizens Bancshares, Inc. | U.S. Bancorp |
| First Citizens Bank & Trust Company | U.S. Bank, National Association |
| First Data Corporation | UBS Americas, Inc. |
| HSBC Bank USA, National Association | Union Bank of California, National Association |
| HSBC North America Holdings Inc. | UnionBanCal Corporation |
| KeyCorp | Wachovia Bank, National Association |
| KeyBank, National Association | Wachovia Corporation |
| Lasalle Bank Corporation | |

(collectively, "Defendants") hereby submit their responsive claim construction brief regarding disputed

terms from the claims of U.S. Patent Nos. 5,265,007 (the "'007 Patent"); 5,717,868 (the "'868

Patent"); 5,583,759 (the "'759 Patent"); and 5,930,778 (the "'778 Patent") (collectively, the

"Huntington Patents"). Each listed Defendant joins this Response solely with respect to those terms

found in claims asserted against it.

---

[1] First Citizens Bancshares, Inc. joins this Response subject to, and without waiver of, its lack of personal jurisdiction defenses.

## TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................1

II.   DISPUTED TERMS IN THE '007 PATENT ..............................................................2

    A.    "*Pre-Selected Financial Institutions*," "*Pre-Selected Institutions*," and "*Participants*" Are Financial Institutions that Directly Participate in a Central Check Clearing System..................................................................3

        1.    Participants and Pre-Selected Institutions Differ from Indirect-Settling Institutions.....................................................................3

        2.    The Central Check Clearing System Is Distinct from the Federal Reserve System..................................................................6

    B.    "*Real Time*," "*in Real Time*," and "*Real Time in Correspondence with the Occurrence of an Event*" Requires Instantaneousness. ...................6

    C.    "*Settlement*," "*Regular Periodic Settlement*," and "*Final Settlement*" Require a Calculation and Transfer of Amounts Owed and Payable. ..................8

    D.    Settlement Among the Direct Participants Occurs After Regular, Prescheduled Local Settlement Between the Participants and the Non-Participants. .......................................................................................9

    E.    The Preambles of Claims 1 and 4 Are Limiting. ................................10

        1.    The Preambles of Claims 1 and 4 Recite Essential Structure and Provide Antecedent Basis for Limitations in the Bodies of the Claims. ..........................................................................10

        2.    A "*Pre-Selected Site*" Is Limiting and Is a Specific and Exclusive Geographic Region of a Previously Chosen Financial Institution. ...............................................................11

    F.    "*Transit Status of the Financial Instruments to be Cleared*" Provides Information About Whether Instruments Are Physically Sent and Received. ...........................................................................................12

    G.    A "*Central Processing Unit*" Connects All Originating and Receiving Institutions. .......................................................................................13

    H.    "*Means for Receiving Including Means for Physically Accepting the Instruments Transported from Other Institutions*" Has No Corresponding Structure......................................................................13

    I.    The "*Means at an Institution by Which Instruments Are Sorted by the Site Locality [and Sent]…*" Is a Sorter and Air and Ground Transportation...................................................................................14

    J.    The "*Means at Each of the Participants (1) for Sending and Receiving Financial Instruments…(2) for Sending and Receiving in Real Time…, and (3) for Addressing the Central Processing Unit…*" Has No Corresponding Structure for Some of the Recited Functions. ......................14

K.   "*A Time Control for Determining the Time of Physical Transport …*" Is a Means-Plus-Function Limitation with No Corresponding Structure........................................................................15

**III.   DISPUTED TERMS IN THE '868 PATENT** ....................................16

A.   "*Co-mingled Records*" Are Intended for Multiple Institutions. .........................17

B.   "*Translating*" Converts Records from One File Format to a Dissimilar and Incompatible File Format...........................................19

C.   "*File Format*" Is a Unique Arrangement of Electronic Data Fields in a Settlement Record...........................................20

D.   The "*Means for Receiving*" Terms Have No Corresponding Structure. .............20

E.   The "*Means for Storing…*" Is Accessible Only by the Institution Designated to Receive the Information. ................................21

F.   The Preambles of Claims 1, 24, 45, 61, and 80 Are Limiting. ...........................22

G.   "*Processor*" and "*Master Processor*" Are Single, Centralized Devices Through Which All Data Files Are Transmitted. ................................24

H.   "*Predetermined Data Format Parameters*" Is a Pre-Selected Specification Defining the Arrangement of Data Fields Within a Financial Record...........................................26

I.   "*Financial Instruments Being Exchanged …*" Means Physically Exchanged...........................................26

J.   "*Institution*" Is a Bank or Other Financial Institution. ........................................27

K.   "*Financial Instrument Information*" Is Information Derived from a Financial Instrument. ...........................................27

L.   The Claim 2 Means-Plus-Function Terms Have No Corresponding Structure...........................................28

**IV.   DISPUTED TERMS IN THE '759 AND '778 PATENTS** .........................................29

A.   Delivery of Financial Instruments from the First Location to the Payment System (or the "*Second Location*") Is Made Without Intermediate Delivery to the Bank........................................30

1.   There Is No Intermediate Delivery to the Collecting and Clearing Bank En Route to the Second Location. ...................................32

2.   The "*Second Location*" Is the Entry Point into the Payment System and Is Remote from the Collecting and Clearing Bank. .............33

B.   The "*Location*," "*First Location*," or "*Item Capture Facility*" Must Be a Location Geographically Distant from All Facilities of the Collecting and Clearing Bank...........................................33

1.   The Preambles of the '759 and '778 Patents Are Limiting. ...................35

2.   The "*First Location*" Must Be Geographically Distant from All Facilities of the Collecting and Clearing Bank..................................35

C.   Printer Applies Two Distinct Indorsements at the Same Time on the Reverse Side of a Financial Instrument. ..........................................36

1.   Printer Applies the Separate Indorsements at the Same Time.................37

2.   The Indorsements Are Printed on the Reverse Side of a Financial Instrument. ............................................................................38

D.   The CPU Ensures Cooperation Between the Payee and the Collecting and Clearing Bank to Determine Payee's Timing of Transport and Control Payee Deposits of Funds. ........................................................39

1.   The CPU and Communication Link Ensure Cooperation Between the Payee and the Payee's Collecting and Clearing Bank. ............................................................................................39

2.   CPU and Communication Link Determine the Timing in Advance of the Transport of the Sorted Instruments and Associated Cash Letters...............................................................40

3.   The CPU Controls When Funds are Credited to the Payee's Account, Dependent upon Receiving Notification of Settlement. .................................................................................40

E.   "*Coordinating the Delivery of the Instruments and Cash Letters into the Payment System*" Requires Controlling the Timing of Transport of the Instruments and Cash Letters..................................................41

F.   "*Imager for Creating a Second Record…*" Is a Means-Plus-Function Limitation with No Corresponding Structure. ......................................41

G.   The Method Claim Steps Must Be Performed in Order. .....................................42

H.   The "*First Location*" Reports Information to All of (1) the Bank(s) of First Deposit, (2) the Payee, and (3) the Bank of Subsequent Deposit. ..............43

I.   "*Scanner*" Is an Electronic Reader that Reads at Least MICR Data. .................44

J.   "*Settlement of Accounts*" Requires a Transfer of the Amounts Owed. ..............44

K.   The "*Depository Bank*" Is Where an Instrument Would Have Been Delivered, Had It Not Been Processed by the Payee............................................45

V.   **CONCLUSION** .................................................................................................45

## EXHIBITS

A.    Defendants' Disputed Constructions Chart

B.    "Agreed Constructions" Chart

C.    "Indefinite Means-Plus-Function Terms" Chart

## '007 PATENT

D.    Paper No. 17 (Dec. 8, 1992 Amendment)

E.    Paper No. 9 (Jan. 2, 1992 Amendment)

F.    Random House Handbook of Business Terms (1988), definition of "real time"

G.    Paper No. 23 (June 29, 1993 Amendment)

H.    Paper No. 1 (Aug. 7, 1989 Original Application)

I.    Paper No. 12 (May 14, 1992 Amendment)

J.    Paper No. 3 (May 13, 1991 Amendment)

K.    Paper No. 20 (May 6, 1993 Amendment)

L.    P.R. 4-3 Joint Claim Construction Statement

## '868 PATENT

M.    Merriam Webster's Collegiate Dictionary (1993), definition of "co-mingle"

N.    Paper No. 4 (June 13, 1997 Amendment)

O.    The Oxford English Dictionary (1989), definition of "uniquely"

P.    Paper No. 2 (Nov. 20, 1996 Office Action)

Q.    Webster's Encyclopedic Unabridged Dictionary of the English Language, Random House, Inc. (1994), definition of "predetermine"

R.    McGraw-Hill Dictionary of Scientific and Technical Terms (1994), definition of "translate"

S.    Webster's Encyclopedic Unabridged Dictionary of the English Language, Random House, Inc. (1994), definition of "preselect"

<u>EXHIBITS (cont.)</u>

**'759 and '778 PATENTS**

      T.      Paper No. 7 (Parent App. No. 08/156,190, May 5, 1995 Amendment)

      U.      The Dictionary of Banking (Woelfel 1994), definition of "settlement"

## <u>AUTHORITIES</u>

*Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369-70 (Fed. Cir. 2003)…………43

*Andersen Corp. v. Fiber Composites*, 474 F.3d 1361, 1365-68 (Fed. Cir. 2007)…..3, 18

*Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 952 (Fed. Cir. 2006)………………  10, 11, 35

*Catalina Mktg. Int'l v. Coolsavings.com., Inc.*, 289 F.3d 801, 809
      (Fed. Cir. 2002)…………………………………………………………… 24

*Combined Systems, Inc. v. Defense Tech. Corp. of Am.*, 350 F.3d 1207,
      1211-13 (Fed. Cir. 2003)…………………………………………………  43

*Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331,
      1343 (Fed. Cir. 2006)……………………………………………………10

*Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003)……… 35

*Indiana Mills & Mfg. v. Dorel Indus.*, 369 F. Supp. 2d 1010, 1014
      (S.D. Ind. 2005)………………………………………………………… 9

*Lockheed Martin Co. v. Space Sys., Inc.*, 324 F.3d 1308, 1319
      (Fed. Cir. 2003)………………………………………………………… 15

*Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1213-14
      (Fed. Cir. 1998)………………………………………………………… 15, 42

*M.I.T. v. Abacus Software*, 462 F.3d 1344, 1353 (Fed. Cir. 2006)…………………41

*Med Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205,
      1211 (Fed. Cir. 2003)……………………………………………………14

*Nystrom v Trex*, 424 F.3d 1136, 1144 (Fed. Cir. 2005)……………………………4

*On Demand Machine Corp.*, 442 F.3d at 1343……………………………………10

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1322  (Fed. Cir. 2005)……………………..7, 18

*SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1286 (Fed. Cir. 2005)……5

*SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331,
      1350-51 (Fed. Cir. 2005)………………………………………………34

*Storage Tech. Corp. v. Cisco Sys., Inc.*, 329 F.3d 823, 831 (Fed. Cir. 2003)……….10

*Tap Pharm. Prods., Inc. v. Owl Pharms., L.L.C.*,419 F.3d 1346
      (Fed. Cir. 2005)…………………………………………………………7

## I.    INTRODUCTION

The Huntington Patents claim narrow inventions in three different areas of the banking and financial industries:

- **the '007 Patent** relates to a national clearinghouse association in which participating banks in different cities exchange checks drawn on themselves and on other banks that do not participate in the national clearinghouse.  The national clearinghouse electronically monitors the physical transport status of the checks and the amount of the checks in real time using information electronically reported by the participating banks.

- **the '868 Patent** relates to a system in which an originating institution electronically sends a single data file containing multiple financial data files intended for multiple receiving institutions (a co-mingled record) to a central translator, which sorts the data by the designated receiving institution and translates each data file from the sending institution's format into a dissimilar and incompatible format selected by the respective receiving institutions.

- **the '759 and '778 Patents** relate to systems in which check payees process, sort, indorse, and prepare cash letters for their own checks (instead of the payee's depository bank), and submit the checks directly into the check payment system, while transmitting electronic check information to the depository bank in anticipation of settlement or for further processing.

DataTreasury Corporation's ("DTC") proposed constructions overreach to expand the scope of these inventions beyond what the inventor(s) purportedly invented.  Despite DTC's efforts to convince the Court otherwise, the law is clear—patent claims must be read in the context of the patent.  Defendants adhere to this principle, and their constructions are dictated by the language of the respective claims, the patent specifications, and the prosecution histories.

Because of the relatively large number of limitations in the asserted claims, Defendants have identified many terms in the Huntington Patents that might be unfamiliar to the jury, confusing to the jury, or affected by the specification or the prosecution history.[2]  In its Opening Brief, DTC addresses the disputed terms in conclusory fashion, complaining there are too many to give adequate discussion to each.  The actual issues for decision, however, are shared among groups of disputed terms and can be properly discussed and decided together in twelve (12) or fewer groups of terms per patent.

---

[2] DTC and Defendants agree on the constructions of many of these terms, which are respectfully submitted for the Court's approval.  *See* **Ex. B** ("Agreed Constructions").

Further, as set forth in Defendants' motions for summary judgment of invalidity[3], the majority of the asserted claims of the Huntington Patents are invalid as indefinite because they contain means-plus-function limitations that lack any corresponding structure.[4]  If the Court grants those motions, the Court will not have to construe the terms in the invalid claims (all asserted claims of the '007 Patent; claims 1, 2, 3, 24, 27, and 48 of the '868 Patent; claims 1 and 11 of the '759 Patent; and claims 1-6 of the '778 Patent).

The Huntington Patents, if valid, should be construed to cover the actual (purported) inventions, and nothing else.  Accordingly, Defendants respectfully request that the Court adopt Defendants' proposed constructions for the disputed terms attached as **Exhibit A**.[5]

## II.    DISPUTED TERMS IN THE '007 PATENT

The '007 Patent relates to a national clearinghouse association composed of selected participating banks in major cities across the nation.[6]  Each participating bank in the national clearinghouse is also a member of a local clearinghouse serving that bank's respective city or locality.[7]  But not every member of a local clearinghouse participates in the national clearinghouse.  In fact, each local clearinghouse includes members that are not participants in the national clearinghouse.[8]  Each participating bank in the national clearinghouse must agree to accept and process checks drawn on banks within its respective local clearinghouse in addition to checks drawn on itself.[9]  Thus, a participant in one city can send checks to a receiving participant in another city that are drawn on the receiving participant and that are drawn on other banks in the receiving participant's local

---

[3] *See* respective Motions for Summary Judgment for Claim Invalidity Based on Indefiniteness of the '007 Patent [Docket No. 710], the '868 Patent [Docket No. 740], the '759 Patent [Docket No. 737], and the '778 Patent [Docket No. 734].

[4] *See* **Ex. C** chart summarizing the indefinite means-plus-function terms briefed in the motions for summary judgment.  For brevity, those terms are not briefed again in this Response, and Defendants incorporate the Motion and supporting briefs by reference.

[5] For the Court's convenience, DTC's constructions of the disputed terms are presented in **Ex. A** as well as the citations to DTC's opening brief where each term is discussed.

[6] '007 Patent, col. 1:44-49; 2:29-32.

[7] '007 Patent, col. 1:44-49; 2:68-3:3.

[8] '007 Patent, col. 1:49-56; 4:25-28.

[9] '007 Patent, col. 1:49-56; 2:68-3:3.

clearinghouse (*e.g.*, local banks that are not participants in the national clearinghouse).[10]  The receiving participant then sorts the received checks for settlement through its local clearinghouse.[11]  Such local settlement is accomplished before settlement through the national clearinghouse.[12]  Throughout the process, the national clearinghouse monitors, and can report in real time to each participating bank, the physical sending and receipt of checks by the participants and the dollar amounts of the checks that are sent and received.[13]  This real-time reporting allows the participating banks to receive "a real time indication of cash needs anticipated for purposes of ... settlement."[14]

A.    **"Pre-Selected Financial Institutions," "Pre-Selected Institutions," and "Participants" Are Financial Institutions that Directly Participate in a Central Check Clearing System.**

The terms "pre-selected financial institution," "pre-selected institution," and "participants" should be construed to mean "financial institutions that have been previously chosen to be direct participants in a central check clearing system other than the Federal Reserve System."  While DTC recognizes that pre-selected financial institutions are previously chosen, its proposed construction ignores the distinction the '007 Patent makes between "participants" or "pre-selected institutions" and non-participant institutions that merely benefit indirectly from the national settlement or "central check clearing" process.  DTC's construction also fails to maintain the sharp distinction the '007 Patent makes between the claimed central check clearing system and the Federal Reserve.[15]

1.    **Participants and Pre-Selected Institutions Differ from Indirect-Settling Institutions.**

The '007 Patent distinguishes between two types of financial institutions: "participant" and "non-participant" institutions.  "Participant" institutions are those that communicate and settle directly

---

[10] '007 Patent, col. 5:17-45; Fig. 1.

[11] '007 Patent, col. 7:7-10; Fig. 1.

[12] '007 Patent, col. 3:10-13; 4:30-40; 4:52-54.

[13] '007 Patent, col. 2:39-42; 3:35-39; 4:4-7; 7:17-21; 7:28-31.

[14] '007 Patent, col. 7:28-31; *see also* col. 3:47-54 (explaining that the national clearinghouse computes settlement amounts for transmission to the Federal Reserve, which effects the actual exchange of funds).

[15] Where a patent's specification makes clear that a term is limited to a particular meaning, that limitation should be included in a proper construction of the claim.  *See Andersen Corp. v. Fiber Composites,* 474 F.3d 1361, 1365-68 (Fed. Cir. 2007) (limiting the term "composite composition" to the forms of "a solid pellet or a solid linear extrudate" because the "specification repeatedly states that the steps of linear extrusion or pelletization are not merely embodiments, but are essential features of the claimed composite composition").

with the central check clearing system.[16]  "Non-participant" institutions are those that settle only indirectly through the central check clearing system by exchanging and settling with a participant institution via a local clearinghouse.[17]  Defendants' construction for the terms "pre-selected financial institution," "pre-selected institution," and "participant" clarify that these terms refer to direct-clearing participant institutions.  DTC's construction on the other hand seeks to impermissibly broaden these terms to encompass non-participant institutions whose checks may indirectly pass through the central check clearing system but who are members only of a local clearinghouse.[18]

The specification supports Defendants' construction.  It describes the invention as including an association of selected member (participant) financial institutions,[19] and even recites selection criteria for the members (participants).[20]  The specification also consistently distinguishes between (a) "participants" or "members" of the "proposed association" and (b) "non-member local clearinghouse banks."[21]  The claims themselves use "pre-selected financial institution," "pre-selected institution," or "participant" interchangeably to describe the members (participants) in the central check clearing system, while using "institutions that are not among the number of pre-selected financial institutions"[22] and "different financial institutions in the locality which are not participants in the clearinghouse"[23] to refer to the non-participant institutions.

The specification recites an exemplary settlement involving a Los Angeles "participant" and a New York "participant," and describes (1) the institutions that settle with the New York participant through a local clearinghouse as "non-participants," and (2) the checks from those non-participants as

---

[16] *See, e.g.,* '007 Patent, col. 5:26-45; 6:25-51; 2:28-32; 1:44-49.

[17] '007 Patent, col. 1:44-56; 2:68-3:3; 5:26-45; 6:25-51.  The "Objects of the Invention" section of the specification explains that "items cleared by the national association include items drawn on local clearinghouse members who do not belong to the national association." *Id.*, col. 1:44-56.

[18] When a term is consistently given a particular meaning throughout the specification, the same meaning is carried into the claims and patentee cannot seek to expand that meaning during claim construction.  *See Nystrom v Trex*, 424 F.3d 1136, 1144 (Fed. Cir. 2005) (limiting "board" to "piece of elongated construction materials made from wood cut from a log" based on manner in which patentee consistently used "board" throughout the specification).

[19] '007 Patent, col. 2:31-32.

[20] '007 Patent, col. 3:21-26.

[21] '007 Patent, col. 4:25-28, 41-42, 50.

[22] '007 Patent, col. 8:42-45.

[23] '007 Patent, col. 10:26-28.

"non-participants' checks."[24]   Additionally, Figure 1 depicts the relationship between the participants, non-participants, and the central control means.  Each "participant" communicates directly with the central control means.  Institutions that are merely a part of the local clearing association, but not "participants," do not communicate directly with the central check clearing system.  The '007 Patent further distinguishes between the two types of financial institutions (*i.e.*, participant and non-participant) by explaining that all participants in the central check clearing system must agree to follow the by-laws of the association,[25] to use the central settlement system,[26] and to comply with a long list of actions for clearing a financial transaction.[27]   Non-participant financial institutions have no such obligations.

DTC's inclusion of "or a local clearinghouse" in its definition of "pre-selected institutions" and "pre-selected financial institutions" ignores the '007 Patent's distinctions between (a) "members" or "participants" who directly participate in the "national" or central check clearing system and (b) non-members or non-participants who may send to or receive from a "participant" checks that will pass through or have passed through the central check clearing system but who have no direct interaction with the central check clearing system.  Similarly, DTC's extension of "participants" to include all members of either the central clearinghouse association or a local clearinghouse ignores this distinction.  The patentee relied on these distinctions during prosecution.[28]   DTC cannot now seek a construction contrary to this distinction.[29]

---

[24] *See* '007 Patent, col. 4:41-43; 6:5-9, 25-51; *see also* Fig. 1.

[25] '007 Patent, col. 3:63-65; 4:41-43.

[26] '007 Patent, col. 3:5-7.

[27] The actions include reporting to the central control means for the central check clearing system the value and transit status of items to be cleared ('007 Patent, col. 2:37-39), and guaranteeing minimum dollar amounts and transaction volumes ('007 Patent, col. 3:21-23).

[28] *See* **Ex. D**, Paper No. 17 (Dec. 8, 1992 Amendment) at 9 (describing the rolls of non-member and member institutions in check clearing process).

[29] *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1286 (Fed. Cir. 2005) ("When the patentee makes clear and unmistakable prosecution arguments limiting the meaning of a claim term in order to overcome a rejection, the courts limit the relevant claim term to exclude the disclaimed matter.").

The plain language meaning in light of the specification makes clear that "pre-selected financial institution," "pre-selected institution," and "participant" can only mean direct-clearing participants of the central check clearing system. Defendants' construction clarifies this point.

>    **2.    The Central Check Clearing System Is Distinct from the Federal Reserve System.**

The '007 Patent makes clear that the central check clearing system is distinct from the Federal Reserve System. Specifically, as part of a discussion of the purported advantages of the '007 Patent's central check clearing system, the '007 Patent recites that "the Federal Reserve System typically is not as quick, and alternative correspondent systems are subject to higher fees."[30] In addition, the specification provides that "[a] clearing system is maintained by a central control means in which debits and credits owing from one member to another are calculated without regard to Federal Reserve System district settlements...."[31] In the January 2, 1992 Amendment, the applicants advocated that

> Lines 11-15 referring to "without regard to Federal Reserve System district settlements," represent one facet of the improvement of the invention by which prompt cash settlements of check accounts may be achieved by banks – independently of the slower Federal Reserve process. The reference of the independence of the claimed system to the Federal Reserve is clearly understood by one skilled in the art.[32]

Thus, the central check clearing system described in and claimed by the '007 Patent is not and cannot be construed to include the Federal Reserve System.

>    **B.    *"Real Time," "in Real Time,"* and *"Real Time in Correspondence with the Occurrence of an Event"* Requires Instantaneousness.**

"Real time" in the context of computer systems means "instantaneous."[33] This is exactly how the '007 Patent uses the term and how the Court should construe it. DTC's proposed construction (*i.e.*, "the actual time during which something takes place") ignores the term's context, offering instead an

---

[30] '007 Patent, col. 7:32-34.
[31] '007 Patent col. 2:32-37.
[32] *See* **Ex. E**, Paper No. 9 (Jan. 2, 1992 Amendment) at 3; *see also* **Ex. I**, Paper No. 12 (May 14, 1992 Amendment) at 8 ("The Federal Reserve settlement may be characterized as the 'background' environment from which the claimed invention is distinguished.").
[33] *See* **Ex. F**, "Real time," *Random House Handbook of Business Terms* (1988).

ambiguous definition handpicked from an extrinsic source with no explanation for why the particular definition is relevant.[34]

| Term | Defendants' Proposed Construction |
|---|---|
| "real time"  (claim 1)<br><br>"in real time" (claim 1) | Instantaneous, instantaneously. |
| "real time in correspondence with the occurrence of an event" (claim 1) | Instantaneous in correspondence with the occurrence of the physical sending and receiving of the financial instruments. |

The '007 Patent specification makes plain that "real time" means instantaneous – "[t]he status of participant's accounts in the national clearinghouse association is recorded and displayed *instantaneously* as soon as information is received by the central control means."[35]  This is wholly consistent with the ordinary meaning of "real time" in the proper context of computer systems in a business environment.  For example, *The Random House Handbook of Business Terms* defines "real time" processing as "immediate and instantaneous processing of data entered in a computer, such that the operator need not wait until a batch is collected."[36]

The prosecution history also confirms the instantaneous nature of the "real time" claim limitation.  For example, during prosecution, the applicants amended the claims to include the limitation that reporting occurs "in real time."  In distinguishing the prior art, the applicants argued:

> In the invention of the amended claims, the fluidity of a real time mechanism is evident.…  [O]nce data is entered, the information is there for all participants to see.…  The mechanism is a continuous and active process … as the participants' settlement obligations are determined, they are available for continuous monitoring by the participants.[37]

The applicants thus describe the real time processing as a *continuous* and *active* process that presents data *as it is received* from participants for the other participants to see.  By relying upon this amendment and argument to gain allowance from the examiner, the applicants confirmed the intended

---

[34] Claim terms cannot be defined by an ordinary meaning isolated from the proper context.  *Tap Pharm. Prods., Inc. v. Owl Pharms., L.L.C.*, 419 F.3d 1346, 1354 (Fed. Cir. 2005).  Nor can a patentee pick and choose from a variety of accepted definitions without regard to the subject matter and context of the term.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1322  (Fed. Cir. 2005) (en banc) (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).
[35] '007 Patent, col. 4:4-7 (emphasis added).
[36] *See* **Ex. F**, "real time," *Random House Handbook of Business Terms* (1988)**.**
[37] **See Ex. G**, Paper No. 23 (June 29, 1993 Amendment) at 8-9.

meaning of "real time" (*i.e.*, instantaneous) and bound the claim limitation to this meaning.[38]  Thus, Defendants' proposed construction is consistent with the patent's specification, the plain meaning in the relevant field of computer systems in a business setting, and the prosecution history.  By contrast, DTC's proposed construction introduces ambiguity and seeks to impermissibly broaden the term by ignoring its proper context and the basis upon which allowance was obtained.

        **C.**    *"Settlement," "Regular Periodic Settlement," and "Final Settlement"* **Require a Calculation and Transfer of Amounts Owed and Payable.**

Defendants' construction of "settlement," "regular periodic settlement," and "final settlement" (collectively, "settlement") reflects the specification's requirement of an actual transfer of funds.  DTC's construction provides no guidance to the meaning of "settlement" or for determining whether or when an accused system actually performs a "settlement" because it uses the word "settlement" as part of its proposed construction.

| Term | Defendants' Proposed Construction |
|---|---|
| "settlement" (claim 1) | A calculation and transfer of amounts owed and payable between financial institutions. |
| "regular periodic settlement" (claim 1) <br><br> "final settlement" (claim 4) | A final calculation and transfer of amounts owed to and payable between direct participants in the central check clearing system occurring at pre-determined time intervals. |

The specification is the "single best guide to the meaning of a disputed term."[39]  Here, the specification clearly establishes that "settlement" requires an actual transfer of funds.  A mere calculation of transfer amounts does not constitute "settlement" in the '007 Patent because settlement is only completed once the participant's accounts are actually credited or debited: "In the United States banking system, national settlement would be completed by *debit and credit of the participant's accounts....*"[40]  The specification further provides that "[t]he Association will also establish a

---

[38] *See SanDisk,* 415 F.3d at 1286 ("When the patentee makes clear and unmistakable prosecution arguments limiting the meaning of a claim term in order to overcome a rejection, the courts limit the relevant claim term to exclude the disclaimed matter.").

[39] *Phillips*, 415 F.3d at 1315.

[40] '007 Patent, col. 2: 12-16 (emphasis added).

procedure in the event that a participant is *unable to settle*."[41]  If "settlement" merely required a calculation of the amount to be transferred, this portion of the specification would not make sense[42] since there would never be an occasion when a participant would be unable to merely perform a calculation.

### D.   Settlement Among the Direct Participants Occurs After Regular, Prescheduled Local Settlement Between the Participants and the Non-Participants.

The terms "a final calculation of the debits and credits … does not occur until predetermined local settlements …" in claim 1 and "the occurrence of final settlement … until after … certain pre-determined local settlements … are completed" in claim 4 set out the nature, and more importantly, the timing of settlements in the claimed check clearing system.  Surprisingly, DTC's construction ignores altogether the timing aspect of these limitations.  By focusing only on individual components of these phrases, DTC's construction fails to address the primary issue to be clarified—the nature and timing of the participant's "local settlements" with non-participant institutions with respect to the "settlement among the [participant] institutions."

| Term | Defendants' Proposed Construction |
|---|---|
| "a final calculation of the debits and credits . . ., comprising the occurrence of the regular periodic settlement among the institutions, does not occur until pre-determined local settlements by the institutions in the pre-selected sites with institutions that are not among the number of pre-selected financial institutions, are completed" (claim 1)<br><br>"[determining] the occurrence of a final settlement by the clearinghouse participants at a pre-determined time until after a time that certain pre-determined local settlements in the localities, by the participants in the localities, are completed" (claim 4) | Settlement among the direct participants in the central check clearing system occurs after regular, prescheduled settlements in each geographical region between the direct participants in that region and institutions in that region that do not directly participate in the central check clearing system. |

The two types of settlements described in the '007 Patent are those occurring between two participants and those occurring between a participant and a non-participant.  The participant/non-

---

[41] '007 Patent, col. 4:64-65 (emphasis added).
[42] Claim term should not be construed in a manner that would be nonsensical in light of patent disclosure or specification.  *See Indiana Mills & Mfg. v. Dorel Indus.*, 369 F. Supp. 2d 1010, 1014 (S.D. Ind. 2005).

participant settlements occur through local clearinghouses, while the participant/participant settlements occur through the central clearing system. The claim limitations above impart two main requirements for the nature and timing of the settlements. First, local settlements are regular and prescheduled, and they occur within a particular geographical region or locality between a direct participant (on behalf of another direct participant) and a non-participant financial institution. Second, the local settlements occur before the settlements between participant institutions. Both of these requirements follow from the plain meaning of the terms and are supported by the specification's description of the settlement process: "On a daily basis, local clearinghouse settlements will occur *before* settlement by the national clearing association."[43] A proper construction of these claim limitations should reflect the overall timing aspect of these limitations and clarify the regular prescheduled nature of the settlements as required by the ordinary meaning of the claim language and the clear language of the specification quoted above.

### E. The Preambles of Claims 1 and 4 Are Limiting.

A "preamble serves to focus the reader on the invention that is being claimed."[44] The Federal Circuit has stated "whether to treat a preamble as a claim limitation is determined on the facts of each case in light of the claim as a whole and the invention described in the patent."[45] A claim preamble is limiting if it "recites essential structure that is important to the invention or necessary to give meaning to the claim."[46] Additionally, a preamble is treated as a claim limitation if it provides the antecedent basis of limitations in the body of the claim.[47]

### 1. The Preambles of Claims 1 and 4 Recite Essential Structure and Provide Antecedent Basis for Limitations in the Bodies of the Claims.

---

[43] '007 Patent, col. 4:52-54; *see also* col. 5:17-18 ("In any particular locality, the participating member would first effect local settlement."); 3:10-13; 4:30-37.

[44] *On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1343 (Fed. Cir. 2006).

[45] *Storage Tech. Corp. v. Cisco Sys., Inc.*, 329 F.3d 823, 831 (Fed. Cir. 2003).

[46] *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 952 (Fed. Cir. 2006); *see also On Demand Machine Corp.*, 442 F.3d at 1343 (finding a preamble limiting where it provided "the framework of the invention").

[47] *See Bicon*, 441 F.3d at 952-53.

The preambles of claims 1 and 4 introduce essential terms used throughout the claims. For claim 1, the preamble introduces "financial instruments" and "pre-selected financial institutions," and in claim 4, the preamble introduces "financial institution participant." These terms provide the antecedent basis for terms appearing later in the claims.[48] Moreover, the preambles of claims 1 and 4 provide a framework of the invention as it is described in the specification, *i.e.*, pre-selected financial institutions each at various pre-selected sites or localities participate in a financial clearinghouse for physically exchanging financial instruments and effecting the regular periodic settlement of these instruments.

### 2.     A *"Pre-Selected Site"* Is Limiting and Is a Specific and Exclusive Geographic Region of a Previously Chosen Financial Institution.

In claim 1, the term "pre-selected financial institution" is defined in the preamble as located at a "pre-selected site." DTC is clear that "pre-selected financial institution" is a limitation that needs construction, but yet takes the position that "pre-selected site," which modifies "pre-selected financial institution," does not act as a limitation. DTC's position impermissibly renders "pre-selected site" as superfluous and "renders the scope of the patent ambiguous" by causing readers of the patent "to guess about which claim language the drafter deems necessary to his claimed invention and which language is merely superfluous, nonlimiting elaboration."[49] Moreover, the term "pre-selected site" is limiting because it originally appeared in the body of the claim and the applicant used this term to distinguish the prior art.[50]

Thus, "pre-selected site" is a limitation and requires construction. A "pre-selected site" for a pre-selected financial institution is more than a processing location of a financial institution, because the site must be selected based on a specific and exclusive geographic region. The '007 Patent

---

[48] DTC evidently agrees that these terms are limiting, as it has provided a construction for these three terms.

[49] *Bicon*, 441 F.3d at 950-51.

[50] *See* **Ex. H**, Paper No. 1 (Aug. 7, 1989 Original Application) at 22 (showing claim 1, as originally filed, required "an association of selected member financial institutions in *predetermined localities*."); *In re Cruciferous Sprout Litig.*, 301 F.3d at 1347-48 (Fed. Cir. 2002) (stating that preamble was a limitation because arguments made during reexamination "show[ed] a clear reliance by the patentee on the preamble to persuade the Patent Office that the claimed invention [was] not anticipated by the prior art").

specification describes that participant institutions in major cities across the country settle with each other through the central check clearing system and settle with local non-participant institutions in their respective regions through local clearinghouses.[51]  Moreover, the specification also states that the pre-selected sites are in specific geographic regions distinct from the Federal Reserve districts.[52]  And during prosecution the applicant emphasized that the pre-selected sites in geographic regions are different than the Federal Reserve districts.[53]  Accordingly, "pre-selected site" should be construed as "the specific and exclusive geographical region of a financial institution that has been previously chosen to be a direct participant in a central check clearing system other than the Federal Reserve System."

### F.    *"Transit Status of the Financial Instruments to be Cleared"* **Provides Information About Whether Instruments Are <u>Physically</u> Sent and Received.**

The primary difference between DTC's and the Defendants' construction of this term from claim 4 is that DTC's construction does not specifically indicate that this term addresses the <u>physical</u> sending and receiving of the instruments.  The intrinsic evidence confirms that the instruments are physically sent and received.

First, the parties have agreed that the term "financial instrument" is a physical document.[54] Moreover, DTC contends that the structure corresponding to the "means … for sending and receiving financial instruments to be cleared" is "air or ground transportation and a pre-selected institution's ***physical*** facility."[55]  Thus, the financial instruments are physical items and the means used to transport

---

[51] *See, e.g.,*'007 Patent, col. 1:44-49 ("It is an object of this invention to provide means whereby an association composed of participating banks in major cities is formed, and a national-clearinghouse system is maintained . . . .  At least one institutional participant in each city would have access to the local clearinghouse.").

[52] *See* '007 Patent, col. 1:19-22 ("The system and method is independent of conventional central bank district geographic and institutional boundaries, and time zones."); *see also* '007 Patent, col. 2:63-66 ("The clearinghouse is independent of conventional central bank district geographic and institutional boundaries, such as Federal Reserve districts, as well as time zones.").

[53] *See* **Ex. I**, Paper No. 12 (May 14, 1992 Amendment) at 8 ("Claim 1 is clarified to state that the settlements effected among the institutions in the pre-selected sites are made separate from the conventional Federal Reserve settlement in a locality and, thus, reference to the Federal Reserve is deleted as necessary.").

[54] *See* **Ex. B** ("Agreed Constructions") (DTC and the Defendants have agreed that the term "financial instrument" should be construed as "A document in writing by which some financial obligation by one person to pay another is represented, such as a check, paper, cash items, money orders, share orders, drafts, notes, bonds, coupons.").

[55] (emphasis added).

the financial instruments are physical (*i.e.*, air and ground transportation). Therefore, it follows that transit status of the physical financial instruments must be "information about whether the instruments have been <u>physically</u> sent and received."

Second, the intrinsic evidence confirms the Defendants' construction. For example, the specification discloses that when a participant physically sends financial instruments to a destination or physically receives financial instruments from a destination, the physical event of sending or receiving the instruments is electronically transmitted by the participant to the central control means.[56] Accordingly, this limitation should be construed as "information about whether the instruments have been physically sent and received."

### G.    A "*Central Processing Unit*" Connects All Originating and Receiving Institutions.

As shown in Figure 3 of the December 8, 1992 Amendment[57]; the central processing unit[58] acts as a "hub about which clearinghouse operations revolve."[59] The financial institutions are "interrelated" by this central processing unit in order to "monitor[] transit and financial data."[60] Thus, the central processing unit is more than a conventional programmable computer, because it must connect to all institutions for the transmission of data files. Accordingly, a "central processing unit" should be construed as "a single central processing unit, connected to all originating and receiving institutions and through which all data files are transmitted."

### H.    "*Means for Receiving Including Means for Physically Accepting the Instruments Transported from Other Institutions*" Has No Corresponding Structure.

The Defendants and DTC agree that this term is a means-plus-function term governed by 35 U.S.C. § 112(6) and that the function is "physically accepting the instruments transported from other

---

[56] '007 Patent, col. 2:1-7; 2:31-50; 5:61-66.

[57] *See* **Ex. D**, Paper No. 17 (Dec. 8, 1992 Amendment) at 9.

[58] Prior to amendment, the "central processing unit" was recited as a "central control means."

[59] *See* **Ex. J**, Paper No. 3 (May 13, 1991 Amendment) at 2; **Ex. K**, Paper No. 20 (May 6, 1993 Amendment) at 8 ("The CPU is a master CPU connected to each institution. Each institution may use a CPU in terminal mode connected to the master CPU, but it is the single master CPU that controls the mechanism.").

[60] *See* **Ex. I**, Paper No. 12 (May 14, 1992 Amendment) at 9; *see also* Fig. 1 ("receipt and transmission of monitoring data"); **Ex. K**, Paper No. 20 (May 6, 1993 Amendment) at 12 (based on the information reported to and calculated by the master CPU, the institutions can monitor their need for funds, and prepare for these fund needs at the settlement, as checks are sent and data transmitted).

institutions."[61]    When employing means-plus-function form, the patentee must "clearly link or associate structure" with the stated function.[62]    DTC states that the corresponding structure for this term is "a pre-selected institution's physical facility and its relationship with air and ground transportation."    However, the specification makes no mention of an institution's physical facility, nor does the specification link such a physical facility to the function of physically accepting the instruments.[63]    Thus, the '007 Patent does not disclose structure sufficient to perform the recited function and is, therefore, indefinite under § 112(2).

I.    The *"Means at an Institution by Which Instruments Are Sorted by the Site Locality [and Sent]…"* Is a Sorter and Air and Ground Transportation.

The Defendants and DTC agree this term is a means-plus-function term governed by § 112(6) and generally agree that the function is "sorting instruments by site locality of each other of the pre-selected institutions and in which the instruments sorted by site are sent by site sort category to institutions at sites within the site sort categories."[64]    The structure provided by the specification for performing this function is a sorter (for sorting) and air and ground transportation (for sending).[65]

J.    The *"Means at Each of the Participants (1) for Sending and Receiving Financial Instruments…(2) for Sending and Receiving in Real Time…, and (3) for Addressing the Central Processing Unit…"* Has No Corresponding Structure for Some of the Recited Functions.

The Defendants and DTC agree this term is a means-plus-function term governed by § 112(6) and agree it includes three functions.    The parties primarily disagree on both the function and associated structure for the *third* function of this term, which recites "addressing the central processing unit by which a participant may determine in real time the information received by the processing unit with respect to that participant's relative credit and debit obligations with respect to other institutions

---

[61] DTC changed its position on the corresponding function from the Joint Statement to now agree with the Defendants' function.  *Compare* **Ex. L**, P.R. 4-3 Joint Claim Construction Statement at B3-B4, no. 5 with DTC Br. at 5.

[62] *Med Instrumentation & Diagnostics Corp. v. Elekta AB,* 344 F.3d 1205, 1211 (Fed. Cir. 2003).

[63] The portions of the '007 Patent specification cited by DTC in support of its construction make absolutely no mention of a physical facility.  *See* '007 Patent, Fig. 1; col. 1:66-2:1; 4:15-20; 5:61-63.

[64] DTC splits the recited function into two distinct functions: "sorting by site locality of each other of the pre-selected institutions" and "sending the instruments sorted by site category to institutions at sites within the site sort categories." Plaintiff's Opening Brief on Claim Construction, p. 9, May 30, 2007.

[65] *See* '007 Patent, col. 1:65-68; 4:41-49; 7:1-13.

arising from the instruments that are reported to be sent and received." DTC impermissibly truncates the function after "processing unit."[66] DTC states that the corresponding structure for this function is "electronic communication links, which may include conventional telephone links by modem connections and the like." However, the specification does not even link these electronic communication links with DTC's truncated function because it fails to disclose that these electronic communication links can "address[] the central processing unit." In essence, DTC hopes to delete the word "means" from this and other similar claim limitations with the hopes of freeing it (and them) from the requirements that "means plus function" have. This, of course, DTC cannot do. Thus, the '007 Patent does not disclose structure sufficient to perform the recited function and is, therefore, indefinite under § 112(2).

K.    **"A Time Control for Determining the Time of Physical Transport ..." Is a Means-Plus-Function Limitation with No Corresponding Structure.**

This term should be construed as a means-plus-function term under § 112(6) despite not using the term "means." DTC contends that this term should not be construed under § 112(6); however, a limitation should be construed as a means-plus-function-limitation when "[t]he limitation is drafted as a function to be performed rather than definite structure," and the "limitation's language does not provide any structure."[67] Here, the phrase "time control" simply characterizes the function of "determining the time of physical transport of financial instruments ..." without indicating any type of structure for actually doing so. Moreover, DTC has provided no evidence that "time control" indicates known structure to one skilled in the art, nor does the specification provide a special meaning for this term indicating structure. In fact, the term does not appear a single time in the specification. Claim language that characterizes the function to be performed without indicating structure "is precisely what

---

[66] *See Lockheed Martin Co. v. Space Sys., Inc.*, 324 F.3d 1308, 1319 (Fed. Cir. 2003)(holding that the district court erred by improperly broadening the scope of the claimed function by "reading out" limitations contained in the claim language)
[67] *Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1213-14 (Fed. Cir. 1998) (interpreting "lever moving element" and "movable link member" under § 112(6)).

was intended by the statutory phrase in § 112(6) requiring that means-plus-function limitations provide a specified function."[68]

Accordingly, this term should be construed under § 112(6), with the function of "determining the time of physical transport of financial instruments between and among the participants according to a predetermined time cycle, and for determining the occurrence of a final settlement by the clearinghouse participants at a pre-determined time until after a time that certain pre-determined local settlements in the localities, by the participants in the localities, are completed."

Since § 112(6) applies to the "time control" claim term, the next step is to examine the specification to identify the structure corresponding to the claimed function. While the specification generally discloses that the *function* of determining the time of physical transport of financial instruments between and among the participants and of determining the occurrence of a final settlement is performed, the specification never discloses actual *structure* used to make these determinations. DTC presumably agrees that no corresponding structure is disclosed as it has not asserted any in the event the Court agrees this term should be construed under § 112(6).

## III.     DISPUTED TERMS IN THE '868 PATENT

The '868 Patent describes another type of centralized system for exchanging financial instrument information between multiple financial institutions.[69] In contrast to the '007 Patent, however, the primary purpose of the centralized system described in the '868 Patent is to translate financial instrument information between different financial data formats, independently of clearinghouses and other settlement mechanisms.[70] Financial institutions can use a variety of different file formats for electronically exchanging financial instrument information, such as Electronic Check Presentment (ECP) format, Automated Clearinghouse (ACH) format, and Electronic Cash Letter (ECL) format.[71] According to the '868 Patent specification, prior art techniques required that, if the

---

[68] *Id.* at 1215.
[69] '868 Patent, col. 2:18-20; 3:48-53; 4:38-40.
[70] '868 Patent, col. 4:30-36; 4:45-49.
[71] '868 Patent, col. 5:49-54.

format used by a receiving institution is incompatible with the format used by the sending institution, either the sending or receiving institution was required to invest in dedicated software to translate the financial file format used by the sender into the format used by the recipient.[72]   The purported invention described in the '868 Patent provides for a central electronic payment interchange concentrator (EPIC) that translates electronic financial information originating in a variety of industry data file formats from multiple sending institutions into formats selected by the respective receiving institutions.[73]   This centralized translator allows a sending institution to group financial instrument information addressed to multiple receiving institutions into a single file, i.e., "co-mingled"[74] data records.[75]   The translator translates each data record from the format used by the sending institution into the formats selected by the designated receiving institutions and stores the translated data in memory locations that are only accessible by the designated receiving institutions for subsequent retrieval.[76]

### A.    *"Co-mingled Records"* Are Intended for Multiple Institutions.

The specification and prosecution history confirm that "co-mingled records," "co-mingled financial instrument information," "co-mingled financial instrument information intended for multiple receiving institutions," "co-mingled information about financial instruments," and "co-mingled financial instrument information addressed to multiple receiving institutions," in claims 1, 24, 45, and 61 (collectively, "co-mingled records") should be construed to mean "multiple records in a single electronic data file having information from multiple financial instruments intended for *multiple recipients*."[77]   Contrary to the prosecution history, however, DTC's proposed construction for "co-mingled" would allow this term to encompass information intended for "*one or more* of a multiple of

---

[72] '868 Patent, col. 1:53-63.

[73] '868 Patent, col. 4:50-60; 4:38-43.

[74]   As discussed below, "co-mingled records" are multiple records in a single electronic data file having information from multiple financial instruments intended for multiple recipients.

[75] '868 Patent, col. 3:58-61; 6:58-61.

[76] '868 Patent, col. 3:61-4:5; 6:61-7:18.

[77] *See* '868 Patent, col. 3:58-61; 6:58-61; 7:1-3; 8:59-65.   *See also* **Ex. M**, Merriam Webster's Collegiate Dictionary (1993), definition of "co-mingle" is "to blend thoroughly into a harmonious whole."

**DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF** – Page 17

receiving institutions…."[78]   The applicant made explicitly clear during prosecution that "co-mingled records" are multiple records in a single electronic data file having information intended for multiple recipients.

Specifically, during prosecution of the '868 Patent, the applicant argued that the prior art describes sending information to only *one* receiving institution and that, therefore, sending information intended for *multiple* receiving institutions distinguishes the claimed invention.[79]   In distinguishing the prior art cited by the Examiner, the applicant stated:

> [The cited prior art references] do not disclose a capability of receiving a data file containing co-mingled information, some portion of which is intended for one recipient and other portions of which are intended for other recipients that require differing data formats for the file information.   The cited references do not separate the individual transaction records in one data file into different portions according to recipient, nor do they disclose the transmission of less than all of a sent data file to a recipient in a system where the data is translated according to the requirements of the recipient.[80]

The applicant further argued that "EPIC accomplishes that which has not previously been done before – the exchange of data files of co-mingled individual transaction records where file format requirements of the sender and *multiple recipients* are different."[81]   The "co-mingled records" therefore must be limited to instruments and records that are intended for multiple recipients; it cannot encompass information intended for only one recipient.[82]

---

[78] *See* DTC's construction proposing that "co-mingled" mean "combined financial instrument information intended for *one or more* of a multiple of receiving institutions or settlement mechanisms." (emphasis added).

[79] *See* **Ex. N**, Paper No. 4 (June 13, 1997 Amendment) at 25-27, 33 ("The amended independent claims 1 and 61 relate to apparatus, a means and processes for receiving a data file that comprises several portions, or bundles, of financial instrument information, one or more of which portions or bundles are *intended for one recipient and others of which are intended for other recipients*… In this manner, the present invention permits the originating institutions to *co-mingle* financial instrument information intended for *multiple recipients* in a single data file.") (emphasis added).

[80] *See* **Ex. N**, Paper No. 4 (June 13, 1997 Amendment) at 26.

[81] *See* **Ex. N**, Paper No. 4 (June 13, 1997 Amendment) at 35 (emphasis added); *see Andersen Corp.,* 474 F.3d at 1373-74 ("Where an applicant argues that a claim possesses a feature that the prior art does not possess in order to overcome a prior art rejection, the argument may serve to narrow the scope of otherwise broad claim language."), *quoting Seachange Int'l, Inc. v. C-Cor Inc.,* 413 F.3d 1361, 1373 (Fed. Cir. 2005).

[82] "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of the prosecution, making the claim narrower than it would otherwise be." *Phillips,* 415 F.3d at 1317.

**B.** **"*Translating*" Converts Records from One File Format to a Dissimilar and Incompatible File Format.**

The "translating…" terms[83] should be construed to mean "converting the records in each bundle from one financial file format to a dissimilar and incompatible financial file format selected by a receiving institution designated to receive the information." This construction is supported by the intrinsic evidence and the extrinsic evidence.[84] Among other things, the intrinsic evidence makes clear that translation involves a conversion between dissimilar and incompatible financial file formats.[85] As the specification makes clear, the conversion is between "formats [that] are ***incompatible*** with one another." [86] If the formats are not dissimilar and incompatible, then no translation is necessary.[87] For claims 24 and 45, the financial format is "pre-selected" by the receiving institution."[88]

DTC's proposed construction of "converting the records in each bundle from the first file format to a second file format determined in advance by the receiving institution" is incomplete and misleading. It ignores the dissimilarity and incompatibility in file format required by the term "translating" and the intrinsic evidence.

---

[83] *See* the "translating…" terms in **Ex. A**. In the case of those terms centered around the "translation" of financial instrument information, it should be assumed that the definition in each instance comports to the particular details of the respective terms, including those terms that use translating the "records in each bundle" or "each portion of said separated financial instrument information."

[84] *See* '868 Patent, col. 1:7-8; 1:16; 1:61-62; 2:18-22; 5:51-56; **Ex. N**, Paper No. 4 (June 13, 1997 Amendment) at 35 (emphasizing the use of different file formats by the sender and recipient); **Ex. P**, Paper No. 2 (Nov. 20, 1996 Office Action); *see also*, '868 Patent col. 2:59-63; 3:1-15; 4:10-13; 4:33-36; 4:58-60; 6:6-11; 6:45-49; 7:39-66; 8:25-29; 10:11-15; 10:59-67; FIGS. 1 and 2; **Ex. R**, McGraw-Hill Dictionary of Scientific and Technical Terms (1994), definition of "translate" is "to convert computer information from one language to another, or to convert characters from one representation set to another, and by extension, the computer instruction which directs the latter conversion to be carried out.; **Ex. S**, Webster's Encyclopedic Unabridged Dictionary of the English Language, Random House, Inc. (1994), definition of "preselect" is "to select in advance; choose beforehand."; **Ex. Q**, "predetermine", Webster's Encyclopedic Unabridged Dictionary of the English Language, Random House, Inc. (1994), "to settle or decide in advance."

[85] *See* '868 Patent, col. 1:7-8; 2:18-22; 5:51-56; **Ex. N**, Paper No. 4 (June 13, 1997 Amendment) at 24-25 (stating that, according to the invention, "[b]ilateral incompatibility which has presented a barrier to clearing commerce is eliminated.")

[86] *See* '868 Patent, col. 5:54-62 ("Although standardized, these formats are ***incompatible*** with one another. Consequently, an originating institution may have a ***singular capability*** to transfer data in a first file format. However, if a financial institution which is to receive this information does not have processing capabilities ***compatible*** with this form, the originating and receiving institutions ***are incapable of communicating*** with regard to information contained in the data files.") (emphasis added); col. 1: 45-47 ("Several ***distinct*** formats are currently used to process financial instrument transactions, such as payment of checks, electronically.") (emphasis added).

[87] *See* '868 Patent, col. 7:47-8:3 (describing exchanging compatible data file formats without translation).

[88] *Id.*

C.    **"*File Format*" Is a Unique Arrangement of Electronic Data Fields in a Settlement Record.**

"File format" should be construed to mean "a unique arrangement of electronic data fields in a settlement record."  The specification requires that "[e]ach record contains data fields having a ***unique*** address wherein a character or number is stored,"[89] and "[a]lthough standardized, these formats are ***incompatible*** with one another." [90]  Thus, DTC's proposed definition of "the arrangement of data fields within a record, and the arrangement of, and definitions of different types of, records within a data file" fails to indicate that different file formats are "unique" or "incompatible" with one another.

D.    **The "*Means for Receiving*" Terms Have No Corresponding Structure.**

The parties agree that "means for receiving a data file from an originating institution …" and "means for receiving a data file format from the originating institution …" are recited in means-plus-function format and that they must be construed under § 112(6).  The parties also agree on the function[91] for these terms, but Defendants contend that the "corresponding" structure for performing that function is not sufficiently disclosed in the specification.

DTC contends that the "corresponding" structure is "translator 1."  This is simply wrong.  The "translator 1" is disclosed as including a processor that is used in translating data files.  However, the specification provides no disclosure of any structure or software that performs the function of "receiving a data file format from an originating institution."  In order for a processor or "translator" to perform the recited function, software must be present such that the processor or translator can "receiv[e] the data file from an originating institution."  The specification, however, discloses no such

---

[89] *See* '868 Patent, col. 5:33-38 ("The data file received by the translator is arranged in a first format.  Conventionally, data file transmission is based on a file structure and format.  The file structure comprises a plurality of header, detail and trailer records.  Each record contains data fields having a ***unique*** address wherein a character or number is stored.  The file format specifies the ***arrangement of information*** within individual data fields or ranges of data fields within a ***particular*** record.") (emphasis added).

[90] *See* '868 Patent, col. 5:54-62 ("Although standardized, these formats are ***incompatible*** with one another.  Consequently, an originating institution may have a ***singular capability*** to transfer data in a first file format.  However, if a financial institution which is to receive this information does not have processing capabilities ***compatible*** with this form, the originating and receiving institutions ***are incapable of communicating*** with regard to information contained in the data files.") (emphasis added); col. 1: 45-47 ("Several ***distinct*** formats are currently used to process financial instrument transactions, such as payment of checks, electronically.") (emphasis added).

[91] The parties agree the function is "receiving a data file from an originating institution."

software, and DTC does not even suggest that it does. The structure (i.e., software) necessary to carry out the function of the "means for receiving" therefore is absent from the specification, thereby rendering claims 1 and 24 invalid for indefiniteness.

The "translator 1" does not encompass the specific functions of the identical "electronic payment interchange concentrator" of claims 1 and 24, which includes at least five elements. The recited "means for receiving a data file from an originating institution" is one of those five elements in claim 1, and the "means for receiving a data file from the originating institution" is one of the five elements that make up the concentrator of claim 24. The specification, however, fails to describe the structure (or software) within each translator 1 that corresponds to the "means for receiving." Thus, DTC does not establish sufficient corresponding structure by identifying only the "translator 1."

The specification simply fails to describe the necessary structure for "receiving a data file from an [or "from the"] originating institution," thereby rendering claims 1 and 24 invalid.

**E.    The "*Means for Storing…*" Is Accessible Only by the Institution Designated to Receive the Information.**

The "means for storing…" and "means for temporarily storing…" terms should be construed under § 112(6). These terms appear in claims 1, 24 and 45 and each of the functions and corresponding structures are identified in the chart below. Common to each term is the storage of information "uniquely accessible" or "unique" to the institution designated to receive the information. The specification clearly states that the memory should only be accessible by the particular receiving institution.[92]   Thus, the terms that recite the information as being (i) "uniquely accessible to the institution designated to receive the information" [claim 1], (ii)  "uniquely accessible to the receiving institution associated therewith" [claim 24], and (iii) "unique to the receiving institution associated therewith [claims 45, 61] should be construed to mean "memory that is 'allocated exclusively to that particular receiving institution.'"   DTC's proposed construction completely ignores the fact that

---

[92] *See* '868 Patent, col. 7:13-16; *see also*, '868 Patent, col. 3:16-18; 3:33-36; 4:19-21; 4:60-64; 7:6-18; 8:29-32; 9:3-5; and Fig. 2; **Ex. O**, The Oxford English Dictionary (1989), "uniquely" is defined as "1.  exclusively; solely; only."

memory must be ***allocated exclusively*** to the particular receiving institution, as is clearly disclosed in the specification and expressly recited in the claims, themselves.

| Term | Defendants' Proposed Construction |
|---|---|
| "means for storing said bundled financial instrument information in an addressable media where the bundled financial instrument information is uniquely accessible to the institution designated to receive the information" (claim 1) | Function: Storing said bundled financial instrument information in an addressable media where the bundled financial instrument information is accessible only by the institution designated to receive the information.<br><br>Corresponding Structure: A mailbox or other partition within a memory device that is allocated to and uniquely accessible only by a specific receiving institution. |
| "means for storing said separated financial instrument information according to the separate portions thereof in a memory storage device in a manner such that each separate portion is uniquely accessible to the receiving institution associated therewith" (claim 24) | Function: Storing said separated financial instrument information according to the separate portions thereof in a memory storage device in a manner such that each separate portion is accessible only by the receiving institution associated therewith.<br><br>Corresponding Structure: A mailbox or other partition within a memory device that is allocated to and accessible only by a receiving institution. |
| "means for temporarily storing each bundle of said separated financial instrument information in memory unique to the receiving institution associated therewith" (claim 45) | Function: Temporarily storing each bundle of said separated financial instrument information in memory assessable only by the receiving institution associated therewith.<br><br>Corresponding Structure: A mailbox or other partition within a memory device that is allocated to and accessible only by a specific receiving institution. |

Again, DTC's broad construction is, in truth, an attempt to delete the word "means" from this limitation to avoid identifying a corresponding structure as required by the "means plus function" language. Although improper, DTC's attempt is understandable – the '868 Patent fails to disclose any structure sufficient to perform the recited function. Therefore, claims 1, 24, and 25 are indefinite under § 112(2).

### F.    The Preambles of Claims 1, 24, 45, 61, and 80 Are Limiting.

The preambles of each independent claim of the '868 Patent should be construed as limiting, as required by the claim language, specification, and prosecution history.[93]

---

[93] See *infra* Section (II)(E) discussing the legal basis for construing preamble terms as limiting.

First, the language of the preambles provides antecedent basis and introduces terms and concepts used later in the claims. For example, the "data file" and "financial instruments" in the body of claim 1 are first introduced in the claim 1 preamble, and dependent claim 9 refers back to "the multiple receiving institutions" found only in the preamble to claim 1. The other preambles provide similar antecedent basis to terms in those claims.[94] Because terms in the preambles form the antecedent basis for claim terms that follow, the preambles must limit the claims.[95]

Second, the preambles give meaning to the claims by providing essential structure and using modifiers to distinguish between coverage of the different claim sets. The term "electronic payment interchange concentrator" in the claim 1 and 24 preambles, for example, is not merely a descriptive name for the set of limitations in the claim (such as the generic term "apparatus"), but contrasts the "concentrating" aspect of the invention with a non-concentrating "bilateral translation system" found in the prior art.[96] Similarly, the preamble phrases "co-mingled information about financial instruments" (claim 45 preamble), "multiple institutions" (claim 1, 24, 61, and 80 preambles), and "the reception, transmission, translation and storage of data files containing information relating to financial instruments among multiple institutions" (claim 24 and 80 preambles) establish the scope of the invention as disclosed in the specification. In particular, the specification states that it provides a "turn-key system … allowing multilateral exchanges between and among a plurality of institutions having different transmitting and receiving formats,"[97] and that portions of co-mingled financial instrument information be "intended for one or more of a multiple of receiving institutions or

---

[94] For example, in **claim 24**, "said data files," "the originating institution," "multiple receiving institutions" and "financial instrument information" rely on the preamble for antecedent basis; in **claim 45**, the phrase "the co-mingled financial instrument information" relies on the phrase "co-mingled information about financial instruments" in the preamble for antecedent basis; in **claim 61**, "financial instrument" and "co-mingled financial instrument" rely on the preamble for antecedent basis; and in **claim 80**, "financial instrument" relies on the preamble for antecedent basis.

[95] *See Bicon*, 441 F.3d at 952 (noting that "when the limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention") (internal quotations omitted).

[96] '868 Patent, col. 4:37-48. The phrase "concentrator" serves as more than a name for the invention, it *is* the invention. *See* col. 3:45-53; 10:43; 12:35.

[97] '868 Patent, col. 1:14-17.

settlement mechanisms."[98]    Because the preambles recite structure essential to what was actually invented, they must be construed as limiting.[99]

Third, as shown in the prosecution history, amendments by the applicant to the preambles show that the applicant intended the preambles to be limiting.[100]  In response to the examiner rejecting claim 1 on the basis of prior art,[101] the applicant amended claim 1 in part by adding the modifying phrase "electronic transaction" before "data files" and adding the verb "exchanged" to the preamble.[102]  Thus, the prosecution history shows that the applicant intended the preamble to limit claim 1.  The applicant made similar amendments to the other independent claims during prosecution, thereby demonstrating that the applicant considered the other preambles to be limiting.[103]

### G.    *"Processor"* and *"Master Processor"* Are Single, Centralized Devices Through Which All Data Files Are Transmitted.

The term "processor" in claims 1 and 24 of the '868 Patent means "a single central processing unit, connected to all originating and receiving institutions and through which all data files are transmitted."  The term "master processor" in claim 45 of the '868 Patent means "a single central processing unit through which all electronic data files are sent for sorting and translation."[104]  These

---

[98] '868 Patent, col. 3:58-61.

[99] The parties also dispute the construction of claim terms found in the preambles, for example, "financial instruments being exchanged between and among the institutions" in the preambles of claims 1, 61, and 80.

[100] *Catalina Mktg. Int'l v. Coolsavings.com., Inc.*, 289 F.3d 801, 809 (Fed. Cir. 2002) (Where an inventor relies on the preamble during prosecution to distinguish the invention from prior art, the preamble is transformed into a claim limitation "because such reliance indicates use of the preamble to define, in part, the claimed invention.").  The "decision to forgo an appeal and submit an amended claim is taken as a concession that the invention as patented does not reach as far as the original claim."  The "decision to forgo an appeal and submit an amended claim is taken as a concession that the invention as patented does not reach as far as the original claim."

[101] *See* **Ex. P**, Paper No. 2 (Nov. 20, 1996 Office Action) at 2.

[102] *See* **Ex. N**, Paper No. 4 (June 13, 1997 Amendment) at 2.

[103] *See* **Ex. N**, Paper No. 4 (June 13, 1997 Amendment) (In **claim 24**, the applicant added the phrase "each of" before "said files containing identifying information," and changed "a predetermined receiving institution" to "multiple predetermined receiving institutions" ("Amendment" at 7); in **claim 45**, the applicant added the word "co-mingled" to both the preamble and within the body of the claim ("Amendment" at 11) arguing that the claimed invention "accomplishes that which has not previously been done before – the exchange of data files of *co-mingled* individual transaction records where file format requirements of the sender and multiple recipients are different" ("Amendment" at 35); and in **claim 61**, as in claim 45, the applicant added "co-mingled" to the preamble, with the same remarks ("Amendment" at 11, 35)).

[104] After further consideration, Defendants are simplifying their previous construction of "master processor" to omit the phrase "including associated application software programmed to perform a specified function."

constructions are dictated by the title of the invention, the claim language itself, and other forms of intrinsic evidence (including the specification and prosecution history).

Notably, the essence of the '868 Patent is directed to a "concentrator" that centralizes the processing and translation of data files. In fact, the title of the patent describes the invention as an "Electronic Payment Interchange <u>Concentrator</u>" (emphasis added), and claims 1 and 24 likewise recite the invention as being a "concentrator." For the claimed invention to operate as a "concentrator," the processor or master processor must be a single, centralized device that is connected to all the originating and receiving institutions so that all data files are transmitted through that device. Without such an arrangement, the claimed invention would not operate as the title and claims require—as a concentrator.

This construction is supported by the claim language itself. For example, claim 45 expressly recites a "master processor through which an electronic data file is sent from an originating institution." The claim language further requires that the master processor separate co-mingled financial instrument information into different bundles and that it also translate "<u>each</u> bundle." The claim language therefore dictates that "master processor" be construed to mean "a single central processing unit … through which all electronic data files are sent for sorting and translation."

Other forms of intrinsic evidence support the above constructions for "processor" and "master processor." Figure 2 of the drawings, for example, shows the processor 21 as being centralized and connected to all originating and receiving institutions so that the data files transmitted among the institutions are transmitted through the processor.[105] Furthermore, in the Amendment dated June 13, 1997, the applicant argued that the "exchange and translation of financial instrument information *at a centralized point*" distinguishes the claimed invention from prior systems.[106]

---

[105] *See also* '868 Patent, col. 6:6-11; 8:21-28; 10:8-15 ("the system described herein . . . [provides] a common central facility which translates information contained in a first data file format transferred by an originating institution into a second data file format selected by the institution that is to receive the information."

[106] *See* **Ex. N**, Paper No. 4 (June 13, 1997 Amendment) at 33 (emphasis added)*; see also* **Ex. P**, Paper No. 2 (Nov. 20, 1996 Office Action) at 3.

DTC's proposed constructions (i.e., "a central processing unit programmed to perform a specified function" and "a central processing unit") ignore critical aspects of the term "processor" required by the claim language itself, the specification, and even the title of the invention.

### H. *"Predetermined Data Format Parameters"* Is a Pre-Selected Specification Defining the Arrangement of Data Fields Within a Financial Record.

The term "predetermined data format parameters" of claim 2 should be construed to mean a "pre-selected specification defining the arrangement of data fields within a financial record."[107]

The term "predetermined data format parameters" of claim 2 is related to the term "file format" of claim 1, which Defendants propose to construe as "a unique arrangement of electronic data fields in a settlement record."  The word "predetermined" implies "pre-selected" or otherwise decided in advance.[108]  The use of the term "predetermined data format parameters" of claim 2 should be interpreted to mean that the "file format" of claim 1 is checked against some "pre-selected specification", which "defin[es] the arrangement of data fields within a financial record."

DTC has not proposed a definition for the term "predetermined data format parameters." Accordingly, the Court should adopt Defendants' proposed construction.

### I. *"Financial Instruments Being Exchanged …"* Means <u>Physically</u> Exchanged.

The phrase "financial instruments being exchanged between and among the institutions" in claim 1 should be construed to mean "physical transport of financial instruments between and among the institutions."  The specification, including Figures 1 and 2, clearly illustrates that, in at least one described embodiment, the financial instruments are physically transported between and among the institutions.[109]  Claim 1 exemplifies this described embodiment by requiring exchange of the financial

---

[107] '868 Patent, col. 6:32-35 ("The information contained in the data file is authenticated to ensure that the data arrangement corresponds to the parameters associated with the format utilized.").

[108] *See* **Ex. Q**, "predetermine", Webster's Encyclopedic Unabridged Dictionary of the English Language, Random House, Inc. (1994), "to settle or decide in advance."

[109] *See* '868 Patent, col. 6:49-57 ("The paper check is presented to R1 by direct ***physical transport*** or clearinghouse mechanism 8 from O1.") (emphasis added).  *See* Fig. 1, no. 8 and Fig. 2, no. 17, illustrating the physical transport of financial instruments.

instruments themselves in addition to the exchange of information relating to the financial instruments.[110]

DTC's proposed construction[111] fails to account for the requirement that the financial instruments be **physically** exchanged, although DTC correctly acknowledges that "documents," i.e., pieces of paper, may be "exchanged between and among institutions."[112]   Accordingly, the Court should adopt Defendants' proposed construction.

### J.    "*Institution*" Is a Bank or Other Financial Institution.

This term "institution" should be construed to mean a "bank or other financial institution."[113] DTC's proposed construction adds elements to its definition that defy the plain meaning of this term, such as "a business" and "other commercial entity."   Such a definition is clearly outside the scope of the '868 Patent, which is directed to "financial institutions."[114]   To broaden the term "institution" to include any business or other commercial entity would also be inconsistent with the prosecution history's characterization of the "invention."[115]

### K.    "*Financial Instrument Information*" Is Information Derived from a Financial Instrument.

The ordinary meaning of the expression "financial instrument information" dictates that it should be construed to mean "information derived from a financial instrument."[116]   DTC's proposed construction adds elements to its definition that defy the plain meaning of this term, such as "electronic

---

[110] *Compare* claim 1 (requiring "financial instruments being exchanged") with claim 24 (requiring "financial instrument *information* being exchanged").

[111] DTC's proposed construction is "documents in writing by which some financial obligation by one person to pay another is represented, such as a check, paper, cash items, money orders, share orders, drafts, notes, bonds, coupons, and other physical instruments that are exchanged between and among institutions."

[112] Not all the claims expressly require the physical transport of the financial instruments, but claim 1 does by virtue of the phrase "financial instruments being exchanged between and among the institutions."   Other claims might only require the exchange of "information" regarding the financial instruments.

[113] *See, e.g.,* '868 Patent, col. 1:5-7; 2:23-25; 4:50-58; 6:36-37; 7:42-47; 7:57-58; 7:64-65; 10:21-26.

[114] *Id.*

[115] *See* **Ex. N**, Paper No. 4 (June 13, 1997 Amendment) at 24-25 ("[The invention] works with multiple originators and multiple recipients, efficiently sorts and translates files and achieves efficiencies in speed and in the reduction of file handling in transaction processing by *financial institutions*…. As related in the Specification at pages 1 through 8, [the invention] solves a bottleneck in electronic commerce among *financial institutions*….") (emphasis added).

[116] *See, e.g.,*'868 Patent, col. 1:6-10, 1:43-45, 1:49-52; 2:18-20; and abstract; *see also,* '868 Patent col. 2:40-41; 2:52-63; 3:3-5; 3:51-52; 4:51-58; 5:14-21; 6:36-39; 9:50-10:7; 12:24-34.

funds transfers" and "additional system generated information."  These elements only confuse the definition by introducing ambiguous phrases introducing unclaimed concepts.

### L.     The Claim 2 Means-Plus-Function Terms Have No Corresponding Structure.

Claim 2 contains three means-plus-function limitations that invoke § 112(6): (a) "means for … validating the identifying information of the originating institution and said designated receiving institutions"; (b) "means for … authenticating the financial instrument information contained in said first data file format with respect to predetermined data format parameters"; and (c) "means for … determining a data file format acceptable to the designated institution."  DTC agrees with Defendants that these limitations are to be construed under § 112(6).

The recited functions of the respective means-plus-function phrases are: (a) "validating [analyzing] the identifying information of the originating institution and said designated receiving institutions [to insure that the institutions are system participants]"; (b) "authenticating the financial instrument information contained in said first data file format with respect to predetermined data format parameters"; and (c) "determining a data file format acceptable to the designated institution."

The specification, however, fails to disclose structure sufficient to perform any of the three above recited functions.  DTC identifies the corresponding structure for claim elements 2(a) and 2(b) as being the "a central processing unit."[117]  For claim element 2(c), DTC identifies the corresponding structure as: "a central processing unit validation procedure or program routine."[118]  However, the portions of the specification cited by DTC fail to disclose the requisite structure.

For each of the three means-plus-function phrases, software must be present to perform the recited functionality.  A CPU or central processing unit in the abstract is insufficient to perform any of the recited functions, and the specification describes no software for performing the claimed functions,

---

[117] DTC cites '868 Patent, col. 6:6-26.
[118] DTC cites '868 Patent, col. 6:33-35.

let alone the purported "central processing unit validation procedure or program routine."[119]  The cited portion of the '868 Patent specification discloses no software, procedure, or program routine described in the specification, and DTC does not even suggest that it does.  Because DTC cannot point to any specific software in the written description, claim elements 2(a), 2(b), and 2(c) are all invalid under § 112(6).

## IV.  DISPUTED TERMS IN THE '759 AND '778 PATENTS

The '759 Patent and the '778 Patent, which claims priority to the '759 Patent, relate to systems for expediting the deposit of checks and collection of funds on those checks.  Using these systems, large businesses can reduce the amount of physical transport of the checks and eliminate their banks' duplicative data capture and check handling functions.[120]  In the prior art, a payee that receives high-volumes of checks would process the payment checks and then physically transport the checks for deposit in the payee's bank, which would sort the checks for further delivery into the payment system.[121]  The patents describe a system allowing a *payee* to submit checks *directly* into the payment system on behalf of the depository bank.[122]  Checks are first received by the payee at a location remote from the depository bank.[123]  The payee sorts the checks, indorses the checks on behalf of itself and the depository bank, and prepares cash letters (*i.e.*, listings of checks and the check amounts) associated with the sorted checks.[124]  The check information is electronically transmitted to the bank so that the payee's account can be credited for the total amount of the checks.[125]  The payee[126] then physically

---

[119] The portion of the specification DTC relies upon for support merely restates the function: "The information contained in the data file is authenticated to ensure that the data arrangement corresponds to the parameters associated with the format utilized."

[120] '759 Patent, col. 1:51-63; '778 Patent, col. 1:18-25; 5:46-6:2.

[121] '759 Patent, col. 3:41-61; '778 Patent, col. 1: 53-55; 2:4-16.

[122] '759 Patent, 2:21-24; 3:10-13; 5:33-45; '778 Patent, col. 11:59-66; 12:38-43; *see* **Ex. T** (Parent App. No. 08/156,190, May 5, 1995 Amendment) at 11-12 ("Without the benefit of the applicant's specification, it would not 'have been obvious to one having ordinary skill in the art' to … submit[] the doubly indorsed instruments **directly** into a check payment system where they are cleared and paid on behalf of the bank of first deposit…") (emphasis added).

[123] '759 Patent, col. 2:2-4; '778 Patent, col. 4:46-52.

[124] '759 Patent, col. 2:5-15; 3:1-13; 3:58-61; '778 Patent, col. 12:38-51.

[125] '759 Patent, col. 2:16-20; '778 Patent, col. 5:27-31.

[126] In an alternative embodiment, a so-called "correspondent bank," which has an account at a larger bank of second deposit, receives the checks from payees. '759 Patent, col. 4:56-67; Fig. 2. The correspondent bank sends the checks to a "first location" remote from the bank of second deposit, where the checks are sorted, indorsed, and submitted

delivers the checks and cash letters directly to the check payment system.[127]  A central processing unit and a communication link connecting the payee, the depository bank, and the check payment system are used to control the timing and monitor the transit of the checks and to coordinate the funding of the payee's account with settlement in the payment system.[128]

### A. Delivery of Financial Instruments from the First Location to the Payment System (or the "*Second Location*") Is Made Without Intermediate Delivery to the Bank.

Each of the terms related to "delivery" to the payment system requires a construction specifying delivery from the "first location" directly to the payment system with ***no "intermediate delivery"*** to the collecting and clearing bank (or bank of subsequent deposit).[129]  The primary stated objective of the invention, and the key feature used to distinguish the claimed matter from the prior art cited by the Patent Office during prosecution, is the elimination of inefficient duplicative handling of financial instruments by permitting payees to submit instruments ***directly*** into the payment system.[130]  Direct submission is thwarted if the payee makes "intermediate delivery" of the checks to the "collecting and clearing bank" on the way to the payment system.  Likewise, elimination of duplicative handling of instruments by the collecting and clearing bank is thwarted if the location where the checks are received into the payment system (the "second location") is the collecting and clearing bank or is co-located with the collecting and clearing bank.  Accordingly, the "delivery" terms and "second location" should be construed as follows:

---

directly into the payment system.  *Id.*, col. 4:60-5:24; 5:32-40.  The primary common features between the two described embodiments are that checks (1) are received, sorted, and indorsed at a location remote from the depository bank or bank of second deposit and (2) are physically delivered *directly* into the payment system on behalf of the depository bank or bank of second deposit.

[127] '759 Patent, col. 2:21-24; 4:26-32.

[128] '759 Patent, col. 2:24-29; 6:53-64; '778 Patent, col. 5:35-45; 13:66-14:13.

[129] '759 Patent, claims 11 and 14, are designed for correspondent banks to submit financial instruments directly into the payment system.

[130] '759 Patent, col. 5:33-51; '778 Patent, col. 12:59-66; *see* **Ex. T** (Parent App. No. 08/156,190, May 5, 1995 Amendment) at 11-12 ("it would not have been obvious to … submit[] the doubly indorsed instruments directly into a check payment system"); *see also id.* at 17-19 (distinguishing claimed matter over U.S. Pat. No. 5,237,159 to Stephens, et al. and over the "Payment Consolidation Service" (PCS) prior art reference, "PCS does not change, as does the present invention, the way in which checks are delivered into the payment system. … The Applicant respectfully submits that Stephens et al. and PCS do not teach or suggest … the submission of the indorsed checks **directly into the payment system, thereby avoiding additional physical transfer of the indorsed checks to the collecting and clearing bank** for subsequent physical transfer into a payment system.") (emphasis added).

| Term | Defendants' Proposed Construction |
|---|---|
| "delivering the groups of instruments and the one or more cash letters from the first location to a second location" (claim 1 and 11 of the '759 Patent)<br><br>"delivering the assembled groups of instruments and the one or more cash letters associated therewith from the first location to a second location" (claim 5 of the '759 Patent) | Delivering the assembled groups of instruments and the one or more cash letters from the first location to a second location, without intermediate delivery to the payee's collecting and clearing bank. |
| "delivering the groups of instruments and the one or more cash letters" (claim 11 and 14 of the '759 Patent) | Delivering the groups of instruments and the one or more cash letters from the first location into the payment system, without intermediate delivery to the bank of subsequent deposit. |
| "transport means for delivering the groups of instruments and the one or more cash letters from the first location to a second location for receipt into the payment system according to parameters determined by the payee's collecting and clearing bank" is in means-plus-function format subject to § 112(6). (claim 1 of the '759 Patent) | <u>Function</u>: Delivering the groups of instruments and the one or more cash letters from the first location to a second location, without intermediate delivery to the payee's collecting and clearing bank, for receipt into the payment system according to parameters determined by the payee's collecting and clearing bank.<br><br><u>Corresponding Structure</u>: Conventional ground or air delivery that delivers the instruments (as sorted and bundled at the first location) and the cash letters (as prepared at the first location) into the payment system without further sorting or bundling or preparation of cash letters at the second location or any other location. |
| "transport means for delivering the groups of instruments and the one or more cash letters from the first location to a second location for introduction into the payment system according to parameters determined by the bank of subsequent deposit" is in means-plus-function format subject to § 112(6). (claim 11 of the '759 Patent) | <u>Function</u>: Delivering the groups of instruments and the one or more cash letters from the first location to a second location, without intermediate delivery to the bank of subsequent deposit, for introduction into the payment system according to parameters determined by the bank of subsequent deposit.<br><br><u>Corresponding Structure</u>: The structure is conventional ground or air delivery that delivers the instruments (as sorted and bundled at the first location) and the cash letters (as prepared at the first location) into the payment system without further sorting or bundling or preparation of cash letters at the second location or any other location. |
| "transport means for delivering said bundled groups of sorted instruments with associated cash letters from the facility into said payment system" is in means-plus-function format subject to § 112(6). (claim 5 of the '778 Patent) | <u>Function</u>: Delivering said bundled groups of sorted instruments with associated cash letters from the facility into said payment system, without intermediate delivery to the payee's depository bank.<br><br><u>Corresponding Structure</u>: The structure is conventional ground or air delivery that delivers the bundled groups of instruments with associated cash letters into the payment system without further sorting or bundling or preparation of cash letters at the payee's depository bank. |
| "second location" (claims 1, 5, and 11 of the '759 Patent) | A subsequent site geographically distant from the payee and the collecting and clearing bank (claims 1 and 5) or bank of subsequent deposit (claim 11) where financial instruments are submitted into the check payment system. |

## 1.     There Is No Intermediate Delivery to the Collecting and Clearing Bank En Route to the Second Location.

The construction of the "delivery" terms above should reflect there is no "intermediate delivery" to the "collecting and clearing bank."  Among the main objectives of the invention are to: (1) "reduce the amount, complexities and requirements for physical transport of financial instruments," and (2) "eliminate … multiple handling involved in the payee's and the bank of first deposit's handling of the same instrument."[131]   To realize these objectives, the invention teaches that the financial instruments are submitted directly into the payment system and are not handled by the "collecting and clearing bank."[132]  During prosecution, the applicant clearly expressed his interpretation of the claims as requiring no intermediate delivery to the collecting and clearing bank:

> The separate indorsement of financial instruments on behalf of each of the payee and the collecting and clearing bank is not the invention per se.  The overall combination, inter alia, of double indorsement and ***the submission of checks directly into the check payment system thereby eliminating physical transportation of the checks to the collecting and clearing bank*** and coordination ***defined by the claims*** would not be apparent to a person of ordinary skill in the art….[133]

The specifications consistently show that financial instruments are transported from the payee's site directly into the payment system, bypassing the "collecting and clearing bank."  For example, in Fig. 1 of the '759 and '778 Patents, the dashed line from the payee to the "collecting and clearing bank" in Fig. 1 labeled "Possible," actually serves to differentiate between the "intermediate delivery" practiced in the prior art and the "direct delivery" claimed by the invention:

> The utility, or check payee 1, however, ***in lieu of actually transporting the physical checks to the depository bank 2*** to make the deposit, as illustrated in Fig. 1 by the solid line with the word "Possible" contiguous thereto, transports the doubly indorsed checks,

---

[131] '759 Patent, col. 1:56-62; '778 Patent, col. 5:53-64.

[132] '778 Patent, col. 11:59-66 ("The paper checks follow **directly** from the payee, on behalf of the depository bank, **directly** into the payment system, also in an expedited manner according to the present invention, since separate sorting and indorsing by the payee and the depository bank are combined into a single sorting and indorsing function 18 at the payee's item capture facility. **The separate transport of paper checks to depository bank 10 is unnecessary.**") (emphasis added); '759 Patent, col. 5:33-36 ("From the sorter site, the cash letter is **delivered directly** into the check payment system.  Although the bank 10 is the collecting and clearing bank for the checks of Bank #1, Institution #2, etc., **the physical checks are not handled by bank 10**.") (emphasis added).

[133] **Ex. T** (Parent App. No. 08/156,190, May 5, 1995 Amendment) at 12-13 (emphasis added) (arguing patentability of claims corresponding to claims 1 and 5 of the '759 Patent); *see also id.* at 17 (distinguishing claims corresponding to claims 11 and 14 because the cited prior art fails to "suggest eliminating the step of transporting the checks to the collecting and clearing bank.").

and accompanying cash letters, for submission *directly into the check payment system*. The *direct* submission of the doubly indorsed checks into the check payment system is depicted by the lines connecting payee 1 and check payment system 3 bearing the legend "Category Sorted Checks and Cash Letters."[134]

Thus, the specifications clearly show the inventor never intended for the invention to encompass intermediate delivery of checks to the collecting and clearing bank.

> ### 2.    The "*Second Location*" Is the Entry Point into the Payment System and Is Remote from the Collecting and Clearing Bank.

The "second location"[135] in the '759 Patent claims is the entry point into the payment system and cannot be co-located with the "collecting and clearing bank." DTC's construction agrees the "second location" is remote from the first location, but does not place the second location away from the payee's "collecting and clearing bank." The '759 Patent specification teaches the payee's "collecting and clearing bank" and the "payment system" are at different locations,[136] and the applicant's arguments during prosecution make clear that the "second location" where checks are delivered for receipt into the payment system is separate from the payee's "collecting and clearing bank."[137] Defendants propose a construction to clarify that there is geographical distance between the "second location" and both the payee and the "collecting and clearing bank" in claims 1 and 5 of the '759 Patent.[138]

> ### B.    The "*Location*," "*First Location*," or "*Item Capture Facility*" Must Be a Location Geographically Distant from <u>All</u> Facilities of the Collecting and Clearing Bank.

The various claim phrases containing the terms "location," "first location," and "item capture facility" (collectively, the "first location") should be construed as a location geographically distant from *all facilities* of the payee's collecting and clearing bank.[139] While DTC agrees that the "first location" must be "separate" from the payee's collecting and clearing bank, DTC's proposed

---

[134] '759 Patent, col. 4:25-34 (emphasis added).
[135] The term "second location" appears in the '759 Patent, but is not referenced in the '778 Patent.
[136] '759 Patent, col. 4:26-32; 5:33-34; 5:63-6:3; Figs. 1 and 2.
[137] See **Ex. T** (Parent App. No. 08/156,190, May 5, 1995 Amendment) at 12-13, 17 (distinguishing invention because the cited prior art fails to "suggest eliminating the step of transporting the checks to the collecting and clearing bank.").
[138] Similarly, Defendants propose a construction clarifying that there is geographical distance between the "second location" and the "bank of subsequent deposit" in the alternative embodiment of claim 11 of the '759 Patent.
[139] In both the '759 and '778 Patents, the terms "location," "first location," and "item capture facility" refer to the same location where the financial instruments are received and processed prior to sending them into the payment system.

constructions (1) fail to define what constitutes the payee's collecting and clearing bank and (2) attempt to read the term "remote" out of the claim. The plain meaning of "remote from the collecting and clearing bank," however, requires a meaningful geographical distance from all bank facilities.

One bank facility is not "remote from the bank" simply because it is at a separate location from another bank facility. Furthermore, a location that is co-located with, or adjacent to, a bank facility is also not "remote from the bank." Both the plain language of a "location remote from the payee's collecting and clearing bank"[140] and the stated objective of the invention—that the payee process the checks and send them directly to the payment system so that the checks can bypass the collecting and clearing bank[141]—require that the location be geographically distant from all facilities of the bank. As further explained below, to avoid jury confusion as to what comprises the "location," "first location," or "item capture facility," Defendants propose the following constructions:

| Term | Defendants' Proposed Construction |
|---|---|
| "said first location determined by the payee remote from the payee's collecting and clearing bank" (claim 1 of the '759 Patent)<br><br>"first location remote from the payee's collecting and clearing bank" (claim 5 of the '759 Patent) | A physical site, which is geographically distant from, and not at any of the facilities of, the bank that performs deposit, collecting, or clearing for the payee. |
| "at a location", "at the location", "said location" (claim 1 of the '778 Patent) | At a facility geographically distant from all facilities of the payee's bank. All instances of "location" refer to the location identified in the preamble, namely, a location geographically distant from all the facilities at the payee's bank. |
| "financial instruments drawn on different institutions that are received by a payee at a first location" (claim 1 of the '759 Patent) | Financial instruments that are drawn on different financial institutions and that are received by a payee at a payee controlled location geographically distant from, and not at any of the facilities of, the collecting and clearing bank. |
| "financial instruments drawn on different institutions that are received by different payees" (claim 11 of the '759 Patent) | Financial instruments that are drawn on different financial institutions and that are received by multiple payees at a location geographically distant from, and not any of the facilities of, the collecting and clearing bank. |
| "received . . . by a payee at a location convenient to a payee's item capture facility and remote from the payee's depository bank" (claim 1 of the '778 Patent) | Physically received at the facility where the payee performs its own processing of checks and other cash items geographically distant from all facilities of the payee's bank. |

---

[140] See *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1350-51 (Fed. Cir. 2005) ("[C]laims with unambiguous plain language should be interpreted in a manner consistent with that plain language.").
[141] '759 Patent, col. 1:51-63; 4:3-9; 4:26-35; '778 Patent, col. 4:49-62; 12:38-43; 13:50-55.

| "payee's item capture facility" (claim 1 of the '778 Patent)<br><br>"an item capture facility at a first location convenient to the payee for receiving said check and payment associated with the check" (claim 11 of the '778 Patent) | Payee's facility where payee performs its own processing of financial instruments; for example, a site where a retail organization payee performs remittance processing functions. Site where remittance processing or deposit processing functions of the payee occur. |
| --- | --- |

### 1.     The Preambles of the '759 and '778 Patents Are Limiting.

The terms "location," "first location," and/or "item capture facility" all derive their antecedent bases from preamble phrases in claims 1 and 5 of the '759 and '778 Patents. Dependence on a preamble phrase for antecedent basis is a well recognized reason to limit claim scope because it indicates a reliance on both the preamble and claim body to define the claimed invention.[142] Here, the preambles in claims 1 and 5 of the '759 and '778 Patents all specify that the "location," "first location," and "item capture facility" are (a) locations where the financial instruments are received, and (b) locations "remote" from the collecting and clearing bank. The bodies of claims then rely upon these definitions of "location," "first location," and "item capture facility" for antecedent basis by referring, for example, to "the location," the first location," or "the item capture facility."

Further, the "first location" terms[143] should be construed as limiting because they recite essential structure giving meaning to the claims. Terms that "recite essential structure that is important to the invention or necessary to give meaning to the claim" are limiting even when they appear in the preamble.[144] Without the preamble limiting the "location," "first location," and "item capture facility," the claims fail to embody the inventions: "expedited deposit, settlement, and submission into the payment system for collection of funds represented by tangible financial instruments that are *received by a payee at a location remote from the payee's collecting and clearing bank*…."[145]

### 2.     The "*First Location*" Must Be Geographically Distant from All Facilities of the Collecting and Clearing Bank.

---

[142] *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003).

[143] With the exception of claim 11 of the '778 Patent, all the terms in the above chart appear in the Preamble.

[144] *Bicon,* 441 F.3d at 952-53; *see infra* Section (II)(E) (discussing the legal basis for construing preamble terms as limiting).

[145] *See* '759 Patent (abstract) (emphasis added); *see also* '778 Patent (abstract).

The claims require the "first location" to be geographically distant and separate from *all* facilities of the collecting and clearing bank. In claims 1 and 5 of both patents, the claim language explicitly requires the "first location" to be a site "remote from the payee's collecting and clearing bank [or payee's depository bank]." In claims 11 and 14 of the '759 Patent, checks are received for "submission into a check payment system on behalf of a bank of subsequent deposit." Submission of checks on behalf of the bank of subsequent deposit necessitates that the checks are submitted from a "first location" that is remote from the bank of subsequent deposit. Similarly, claim 11 of the '778 Patent requires "electronically transmitting said bank information … from said capture facility to the depository bank." Thus, the plain meaning requires that the capture facility be remote from the depository bank.

Throughout the patents, the "first location" is consistently described as "a site *distant* from the location of the depository bank."[146] Moreover, in contrasting "the present system" from the prior art, the patent specifications state that checks are processed "at a site distant from the location of the depository bank."[147] Further, the '778 Patent specification expressly states that sending financial instruments to the collecting and clearing bank's internal facilities, such as in "typical lockbox services" known in the prior art, does not "recognize the efficiency goals of the invention."[148] To avoid jury confusion, the construction should clarify in the terms above that the "location," "first location," and "item capture facility" are not any part or facility of the collecting and clearing bank.

### C.  Printer Applies Two Distinct Indorsements at the Same Time on the Reverse Side of a Financial Instrument.

The printer must apply two separate indorsements together on the reverse side of a financial instrument. The parties essentially agree that "separate indorsements" means two distinct indorsements – one on behalf of the payee, and one on behalf of the collecting and clearing bank. But

---

[146] '759 Patent, col. 4:3-8; '778 Patent, col. 12:38-43; *see also* '759 Patent, col. 4:40-44 ("The conventional step of delivering the physical items to the bank of first deposit is eliminated; the two indorsements of the check are applied at the same time, instead of twice at the *different locations* of the payee and the bank of first deposit.") (emphasis added);
[147] '759 Patent, col. 4:3-9; '778 Patent, col. 12:38-43.
[148] '778 Patent, col. 3:55-67.

the constructions require two clarifications addressing the manner in which the printer applies the indorsements to the financial instruments: (1) the printer applies the two indorsements together or at the same time, and (2) the printer applies the indorsements to the reverse side of the financial instruments. Accordingly, Defendants propose the following constructions:

| Term | Defendants' Proposed Construction |
|---|---|
| "for applying to the instruments . . . a separate indorsement on behalf of each of the payee and the collecting and clearing bank with respect to each instrument received" (claim 1 of the '759 Patent)<br><br>"applying to the instruments ... separate indorsements on behalf of each of the payee and the collecting and clearing bank with respect to each instrument received" (claim 5 of the '759 Patent)<br><br>"applying to each of said instruments a separate indorsement on behalf of each of said payee and said depository bank" (claim 5 of the '778 Patent) | The printer operates to print two distinct indorsements at the same time on the reverse side of a financial instrument, one on behalf of the payee and the other on behalf of the collecting and clearing bank. |
| "a separate indorsement" (claim 1 of the '759 Patent)<br><br>"separate indorsements" (claim 5 of the '759 Patent; claim 5 of the '778 Patent) | Two distinct indorsements, each printed at the same time on the reverse side of a financial instrument. |
| "separate indorsement on behalf of each of said payee and said depository bank" (claim 5 of the '778 Patent) | Two distinct indorsements, each printed at the same time on the reverse side of a financial instrument, one on behalf of the payee and the other on behalf of the payee's depository bank. |

### 1.   Printer Applies the Separate Indorsements at the Same Time.

The printer must apply two separate indorsements *at the same time*—i.e., both indorsements are applied together at the first location—to submit financial instruments directly into the payment system. To accomplish direct submission, the payee must first apply an endorsement on behalf of its collecting and clearing bank together with its own endorsement. The claim language requires that the payee apply both of these indorsements at the "first location."[149] As a result, "[t]he conventional step of delivering the physical items to the bank of first deposit is eliminated; and the two indorsements of

---

[149] *See* '759 Patent, claim 1 (a printer at the first location applies both indorsements); '759 Patent, claim 5 (both indorsements are applied at the first location); '778 Patent, claim 5 (both indorsements are applied at the item capture facility); '759 Patent, col. 4:3-9, 5:46-6:3; '778 Patent, col. 12:38-43.

the check are applied *at the same time*, instead of twice at the different locations. . . ."[150]  After the payee applies the two indorsements in this manner, the specifications refer to the instrument as "doubly indorsed."[151]

Consistent with the plain meaning of these claim terms, the specifications, in discussing the application of double indorsements, always show that the indorsements are applied together.[152]  In the prosecution history the applicant distinguished the claimed invention arguing that the invention eliminated "a *second* sort and indorsement."[153]  To ensure the jury understands the manner of indorsement application in the invention, the construction should include that the two distinct indorsements are applied at the same time.

### 2.    The Indorsements Are Printed on the Reverse Side of a Financial Instrument.

The specifications describe that indorsements are conventionally applied to the "reverse side" of a financial instrument[154], and no other manner of application is disclosed in the specifications.  For completeness and to distinguish from the identification of the payee conventionally applied to the front of the check (i.e., in the "pay to the order of" line), the construction should include that indorsements are applied to the "reverse side" of financial instruments.

---

[150] '759 Patent, col. 4:40-44; '778 Patent, col. 12:64-13:1.

[151] '759 Patent, col. 4:26-35 ; '778 Patent, col. 11:59-12:8.

[152] *See, e.g.*, '759 Patent, col. 2:9-12 ("Indorsements on behalf of the payee and the collecting and clearing bank with respect to each instrument received are applied to each instrument by a printer."); '759 Patent, col. 6:36-40 ("Indorsements of the instruments on behalf of the payee and the depository bank with respect to each check received are applied by a printer or stamping mechanism before, during or after the sort process."); '778 Patent, col. 11:59-64 ("The paper checks follow directly from the payee … into the payment system … according to the present invention, since separate sorting and indorsing by the payee and the depository bank are combined into a single sorting and indorsing function at the payee's item capture facility.").

[153] *see* **Ex. T** (Parent App. No. 08/156,190, May 5, 1995 Amendment) at 11 ("In the claimed invention, *a second sort and indorsement* along with the associated physical transport of the checks *is eliminated*, and this is not an insignificant elimination.").

[154] *See* '759 Patent, col. 3:1-7 and '778 Patent, col. 11:38-44 ("An institutional indorsement is conventionally applied as a stamp that prints payment instructions and the identity of the indorser on the **reverse side** of a check.").

**D.    The CPU Ensures Cooperation Between the Payee and the Collecting and Clearing Bank to Determine Payee's Timing of Transport and Control Payee Deposits of Funds.**

The central processing unit ("CPU") or control unit (collectively, the "CPU") limitations should be construed for purposes of clarification[155] as requiring the CPU to: (1) ensure cooperation between the payee and payee's collecting and clearing bank; (2) determine the timing in advance of the transport of the sorted instruments and associated cash letters; and (3) control when funds are credited to the payee's account, dependent upon receiving notification of settlement.   Accordingly, Defendants propose the following constructions:

| Term | Defendants' Proposed Construction |
|---|---|
| "a central processing unit and communication link providing a coordination between the payee and the payee's collecting and clearing bank which predetermines the timing and monitors the transport of the sorted instruments and the cash letters associated therewith and coordinates the recordation of the deposit of the funds represented by the instruments with the collecting and clearing bank in a sequence coordinated with the timing of a settlement of accounts in the check payment system." (claim 1 of the '759 Patent) | A central processing unit and communication link that:<br><br>(1) ensure cooperation in a common action or effort between the payee and the payee's collecting and clearing bank;<br><br>(2) determine the timing in advance of the transport and monitor the transport of the sorted instruments and the associated cash letters; and<br><br>(3) control when funds are credited to the payee's account at the collecting and clearing bank, dependent upon the timing of  receiving notification that an instrument was settled through the payment system. |
| "a control unit interconnecting the banks and predetermining the timing and monitoring the transport of the sorted instruments" (claim 11 of the '759 Patent) | A computer allowing electronic processing and communication between the banks and directing in advance the timing of the transport of the sorted instruments and monitoring the transport of the sorted instruments. |
| "sequence coordinated with the timing of a settlement of the collecting and clearing bank's account" (claim 5 of the '759 Patent) | Controlling when funds are credited to the payee's account at the collecting and clearing bank, dependent upon the timing of receiving notification that an instrument was settled through the payment system. |
| "coordinate the recordation of the deposit of the funds represented by the instruments in the account with the collecting and clearing bank in a sequence coordinated with the timing of settlement in the check payment system" (claim 11 of the '759 Patent) | The control unit controls when funds are credited to the payee's account at the collecting and clearing bank, dependent upon the timing of receiving notification that an instrument was settled through the payment system. |

**1.    The CPU and Communication Link Ensure Cooperation Between the Payee and the Payee's Collecting and Clearing Bank.**

---

[155] For example, DTC asserts that the primary CPU limitation is "too long and cumbersome to construe." (DTC Brief at 24). The fact that the phrase is long and cumbersome, however, is precisely why a clarifying construction is necessary.

The CPU and communication link are responsible for "providing a coordination between the payee and the payee's collecting and clearing bank," the plain meaning of which requires that the CPU and communication link ensure cooperation in a common action or effort between the payee and the collecting and clearing bank.[156]  DTC does not provide a construction for this limitation.

### 2.     CPU and Communication Link Determine the Timing in Advance of the Transport of the Sorted Instruments and Associated Cash Letters

The CPU and communication link determine the timing of transport in advance.  The claim language refers to this as "predetermining the timing of transport."[157]  Although the '759 specification teaches submitting financial instruments into the payment system quickly, it also requires "that the timing of steps in the present system be synchronized and coordinated" between the payee, the bank, and the payment system prior to sending the instruments.[158]  By employing the CPU and communication link, "the timing of the physical transport of the instruments for submission into the check payment system is controlled…." in advance of transport.[159]  The specification is consistent with the dictionary definition of "predetermine," which is to "to settle or decide in advance."[160]  DTC's construction attempts to read the claim language "predetermining the timing and monitoring the transport of the sorted instruments" out of the claim.[161]

### 3.     The CPU Controls When Funds are Credited to the Payee's Account, Dependent upon Receiving Notification of Settlement.

The CPU controls the crediting of the payee's account so that "[w]hen the bank receives confirmation that it has received credit for the cash letter through the check payment system, it makes the funds available to the payee."[162]  Although the concept of controlling deposits in the payee's account after receiving settlement notification is relatively straightforward, claim language requiring

---

[156] A specific example of cooperation, the CPU and communication link enable the payee to report cash letter information to the bank and permits the bank to anticipate a deposit in the payee's account corresponding to the cash letters. '759 Patent, col. 6:45-64.

[157] '759 Patent, claims 1 and 11.

[158] '759 Patent, col. 4:45-52.

[159] *See, e.g.,* '759 Patent, col. 6:45-64.

[160] *See* **Ex. Q**, Webster's Encyclopedic Unabridged Dictionary of the English Language, Random House, Inc. (1994), definition of "predetermine."

[161] DTC Brief at 27.

[162] '759 Patent, col. 6:49-52.

that the CPU "coordinate the recordation of the deposit … in a sequence coordinated with the timing of a settlement" is muddled and requires a construction clarifying this limitation for the jury.  While DTC's construction is nearly correct, Defendants' construction provides a more straightforward clarification of what the CPU is doing ("controlling when funds are credited to the payee's account") and when the CPU is doing it ("upon the timing of receiving notification that an instrument has settled").

E.    ***"Coordinating the Delivery of the Instruments and Cash Letters into the Payment System"* Requires Controlling the Timing of <u>Transport</u> of the <u>Instruments and Cash Letters.</u>**

The term "coordinating the delivery of the instruments and cash letters into the payment system" should be construed to require controlling the timing of transport of the instruments and cash letters.  One issue with DTC's construction—"controlling the process of the introduction of instruments into the payment system"—is that it defines "delivery of instruments" with a more abstract phrase, "introduction of instruments."  The construction should clarify that delivery is the "transport of the instruments" in accordance with the plain meaning of the claim and as described in the '778 specification.[163]  Another problem with DTC's proposed construction is that it inexplicably reads delivery of "cash letters" out of the term.  Accordingly, Defendants propose the construction: "controlling the timing of transport of the instruments and cash letters into the payment system" to correct the ambiguities and omissions of DTC's proposed construction.

F.    ***"Imager for Creating a Second Record…"* Is a Means-Plus-Function Limitation with No Corresponding Structure.**

"Imager for creating a second record translatable into a visually perceptible image of each of said financial instruments" is in means-plus-function format subject to § 112(6).[164]  DTC contends it is

---

[163] '778 Patent, col. 13:56-14:5 ("The timing of communications and the scheduling and confirmation of check processing activities are coordinated by a central processing unit and communication link between/among the parties involved in the check payment process.  In this manner **the timing of the physical transport of the instruments for submission into the check payment system is controlled**….") (emphasis added).

[164] As discussed previously, a limitation lacking the term "means" is presumed not subject to § 112(6), but may overcome the presumption if the claim term fails to recite sufficiently definite structure or recites function without reciting sufficient structure for performing that function. *M.I.T. v. Abacus Software*, 462 F.3d 1344, 1353 (Fed. Cir. 2006).

not a means-plus-function term, but a limitation should be subject to § 112(6) when i) "[t]he limitation is drafted as a function to be performed rather than definite structure", and ii) the "limitation's language does not provide any structure."[165]   Here, the term "imager" is drafted functionally, as the word "imager" is immediately followed by subsequent functional language "for creating a second record translatable into a visually perceptible image…."   "Such language is precisely what was intended by the statutory phrase in section 112(6) requiring that means-plus-function limitations provide a specified function."[166]   Furthermore, DTC has not cited a single extrinsic dictionary definition or expert testimony evidencing the term "imager" would have provided a known structure to one skilled in the art.  In fact, the term "imager" does not appear a single time in the '778 specification. Accordingly, this term should be construed under § 112(6) with the function of "creating a second record translatable into a visually perceptible image of each of said financial instruments."

Because § 112(6) applies to the "imager" claim term, the next step is to examine the specification to identify the structure corresponding to the claimed function.  While the specification generally discloses the ***function*** of creating images, and discloses the resulting optical and electronic images themselves, the specification never discloses actual ***structure*** used to create the images.[167] DTC presumably agrees that no corresponding structure is disclosed as it has not asserted any in the event the Court agrees this term should be construed under § 112(6).

### G.    The Method Claim Steps Must Be Performed in Order.

The explicit language of claims 5 and 14 of the '759 Patent require that certain claimed steps be performed in the following order:  (1) receiving financial instruments; (2) sorting and indorsing the financial instruments[168]; (3) assembling the financial instruments into discrete bundles with respect to the predetermined sort categories; (4) preparing cash letters associated with each assembled group of

---

[165] *Mas-Hamilton,* 156 F.3d at 1213-14 (interpreting "lever moving element" and "movable link member" under § 112(6)).
[166] *Id.* at 1215 (internal quotations omitted).
[167] The specification describes the imaging step as a **"functional block"** in the figures, and no technical structure is ever depicted.
[168] Unlike other claims steps, the claims do not require a particular order for the "sorting" and "indorsing" steps, and thus "sorting" and "indorsing" may be performed in interchangeable order.

instruments; and (5) reporting the information in the cash letter. The Federal Circuit has a two-part test for determining if claim language implicitly requires an order: (1) as a matter of logic or grammar, does the claim language require the steps be performed in order; and (2) does the specification directly or implicitly require an order.[169] The language of claims 5 and 14 of the '759 Patent logically and grammatically imply a required order:

1.  **"Receiving financial instruments"** – The financial instruments must be received by the payee at the "first location" before any of the later sorting, indorsing, processing, and transmission steps can occur.

2.  **"Sorting and indorsing financial instruments"** – The claims explicitly require that indorsing and, in claim 14, sorting occur "at said first location" where the instruments are received. Thus, the financial instruments must be received prior to sorting and indorsing the instruments.

3.  **"Assembling the financial instruments into bundles"** – The claims explicitly recite that the "*sorted* instruments" are assembled into discrete groups or bundles. Thus, the instruments must be sorted prior to assembling the instruments into discrete groups.

4.  **"Preparing cash letters associated with each assembled group of instruments"** – The claims explicitly recite that cash letters are prepared for "each *assembled* group of instruments." Thus, the instruments must be assembled into groups before preparing associated cash letters.

5.  **"Reporting the information in the cash letters"** – The claims explicitly recite "reporting to the [bank] information contained in the cash letters." Thus, the cash letters must be prepared before information can be reported to the bank.

The step order derived from the claim language is also entirely consistent with the language of the '759 specification.[170]

### H. The "*First Location*" Reports Information to <u>All</u> of (1) the Bank(s) of First Deposit, (2) the Payee, and (3) the Bank of Subsequent Deposit.

The term "reporting to the respective banks and payee information in the cash letters" requires that the information be transmitted to the respective banks *and* the payee. The '759 specification identifies "respective banks" as meaning the bank of first deposit and the bank of subsequent

---

[169] *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369-70 (Fed. Cir. 2003); *Combined Systems, Inc. v. Defense Tech. Corp. of Am.*, 350 F.3d 1207, 1211-13 (Fed. Cir. 2003) (holding that the district court properly construed the step of "forming folds" to be performed before the step of "inserting said formed folds" into an opening).

[170] *See* '759 Patent, col. 4:3-26.

deposit.[171]  Yet, DTC only construes the term as, "transmitting information in or about the cash letters to the banks and/or to the payee."  There are two problems with DTC's construction.  First, it does not construe what "respective banks" means.  Second, it improperly puts an "and/or" in the construction where the plain language uses "and."  To clarify the meaning of the term and make it consistent with the plain meaning of the claim language, the term should be construed as "reporting to the respective banks and payee, information in the cash letters."

## I.     *"Scanner"* Is an Electronic Reader that Reads at Least MICR Data.

After further consideration, Defendants agree with DTC that a "scanner" means "an electronic reader that reads at least MICR data."  Because DTC's construction requires a reading of MICR data, it is implied that the scanner is reading the data from a physical document.[172]

## J.     *"Settlement of Accounts"* Requires a <u>Transfer</u> of the Amounts Owed.

As discussed above in connection with the term "settlement" in the '007 Patent,[173] "settlement" of accounts in the payment system must include a *transfer* or crediting of the amounts owed.  This transfer of funds or "issue of a credit" occurs "when a settlement of the accounts represented by the checks is received through the check payment system."[174]  This construction is consistent with the understanding of "settlement" in the banking industry, which includes "payment of the debit balance by the debtor to the creditor."[175]  DTC's construction of "settlement of accounts" is incomplete because it merely requires a "calculation of aggregate amounts owing and payable" without requiring a ***transfer***

---

[171] The "respective banks" are both the "bank(s) of first deposit" and "bank of subsequent deposit" – a reference back to the beginning of the claim limitation: "…a communication link between the first location and the one or more banks of first deposit and the payee, and the bank of subsequent deposit for reporting to the respective banks and payee information in the cash letters…."  Fig. 2 of the '759 Patent shows this communication link between the "first location" 17 and both the respective "bank of second deposit" 10 and the "bank of first deposit(s) ('correspondent Bank Nos. 1 and 2')."

[172] Defendants have previously construed "scanner" to mean "a magnetic reader that collects MICR data printed in magnetic ink on a physical document."

[173] *See infra* Section (II)(C).

[174] '759 Patent, col. 6:59-64.

[175] *See* **Ex. U**, The Dictionary of Banking (Woelfel 1994), defining "settlement" to mean "in general, the striking of balance between two or more parties having mutual dealings with one another and **payment of the debit balance by the debtor to the creditor**; the striking of balances among members of a clearinghouse association."  (emphasis added);  DTC's definition, Dictionary of Banking Terms (Barron's 1990), defining "settlement" to mean "the accounting process recording the respective debit and credit positions of the two parties **involved in a transfer of funds**."  (emphasis added); *see also*, '007 Patent, col. 2:12-16.

of the amounts calculated.  Accordingly, "settlement of accounts" should be construed to mean "a calculation and transfer of total amounts owed and payable from each financial institutions account."

### K.    The "*Depository Bank*" Is Where an Instrument Would Have Been Delivered, Had It Not Been Processed by the Payee.

The "payee's depository bank" and the "depository bank" is where the payee would have delivered the financial instruments for deposit, had the payee not processed the instruments.  Because the payee processes the instruments at its own item capture facility and delivers them directly to the payment system, "[t]he separate transport of paper checks to [the] *depository bank* is unnecessary."[176] DTC attempts to address this consideration in its construction: "the bank of first deposit where payee has an account, and *where the physical instruments would otherwise be delivered*."  The problem with DTC's construction is that the clause "where the physical instruments would otherwise be delivered" alone is grammatically vague and incomplete because it lacks a contrary clause associated with the word "otherwise."  The following revision to DTC's construction remedies this deficiency: "The bank of first deposit where payee has an account, and where the physical instruments would otherwise be delivered, *had it not been processed at the payee's location*."  Defendants are agreeable to DTC's construction with this clarification.[177]

## V.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court adopt Defendants' proposed constructions for the disputed terms.

---

[176] '778 Patent, col. 11:65-66.
[177] Alternatively, Defendants have proposed: "The bank where the financial instrument would have been delivered for deposit, had it not been processed at the payee's location."

Dated:  July 9, 2007                                  Respectfully submitted,


By: /s/ Thomas M. Melsheimer
Thomas M. Melsheimer
Texas Bar No. 13922550
FISH & RICHARDSON P.C.
1717 Main Street
Suite 5000
Dallas, TX  75201
214-747-5070 (Telephone)
214-747-2091 (Telecopy)

Robert E. Hillman
FISH & RICHARDSON P.C.
225 Franklin Street
Boston, MA  02110-2804
617-542-5070 (Telephone)
617-542-8906 (Telecopy)

Robert M. Parker
Robert Christopher Bunt
PARKER & BUNT, P.C.
100 E. Ferguson, Suite 1114
Tyler, Texas 75702
903-531-3535 (Telephone)
903-533-9687 (Telecopy)

Michael E. Jones
Texas Bar No. 10929400
E. Glenn Thames, Jr.
Texas Bar No. 00785097
POTTER MINTON
500 Plaza Tower
110 North College, Suite 500
Tyler, TX  75702

**ATTORNEYS FOR DEFENDANTS
BANK OF AMERICA CORPORATION,
BANK OF AMERICA, NATIONAL
ASSOCIATION**

By: /s/ Thomas M. Melsheimer by permission
on behalf of the following counsel:

Danielle Williams
KILPATRICK STOCKTON LLP
1001 West Fourth Street
Winston-Salem, NC  27101

Bill Boice
Audra Dial
KILPATRICK STOCKTON LLP
1100 Peachtree Street, Suite 2800
Atlanta, Georgia  30309-4530

**DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF** – Page 46

Kenneth Godlewski
Stephen Baskin
KILPATRICK STOCKTON LLP
607 14th Street, NW, Suite 900
Washington, DC  20005-2018

**ATTORNEYS FOR DEFENDANTS
BB&T CORPORATION, BRANCH
BANKING & TRUST CO., COMERICA
BANK & TRUST, N.A., COMERICA, INC.,
M&T BANK, M&T CORPORATION,
WACHOVIA CORPORATION,
WACHOVIA BANK, N.A.**

Raymond Sweigart
William P. Atkins
Scott Pivnick
PILLSBURY WINTHROP SHAW PITTMAN
LLP
1650 Tysons Blvd.
McLean, VA  22102-4859

**ATTORNEYS FOR DEFENDANTS
BANK OF NEW YORK CO., INC., THE
BANK OF NEW YORK, UNION BANK OF
CALIFORNIA, N.A., UNIONBANCAL
CORPORATION**

David L. Ward, Jr.
Donalt J.Eglinton
WARD AND SMITH, P.A.
1001 College Court
New Bern, NC  28562

Larry Carlson
David Taylor
BAKER BOTTS L.L.P.
2001 Ross Avenue
Dallas, TX 75201-2980

**ATTORNEYS FOR DEFENDANTS
FIRST CITIZENS BANCSHARES, INC.,
FIRST CITIZENS BANK & TRUST CO.**

Preston W. McGee
FLOWERS DAVIS, P.L.L.C.
1021 ESE Loop 323, Suite 200
Tyler, Texas 75701
(903) 534-8063

James H. Carter
James T. Williams
Jane Jaang
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2493

Lawrence F. Scinto
Ronald A. Clayton
Robert H. Fischer
Stephen E. Belisle
FITZPATRICK, CELLA, HARPER &
SCINTO
30 Rockefeller Plaza
New York, New York  10112-3801
(212) 218-2254

**ATTORNEYS FOR DEFENDANTS
THE CLEARINGHOUSE PAYMENTS
CO., L.L.C. F/K/A SMALL VALUE
PAYMENTS CO., L.L.C.**

Glen Boudreaux
Tim Leonard
Edward J. Nicholas
BOUDREAUX LEONARD HAMMOND
CURCIO
2 Houston Center
909 Fannin Street, Suite 2350
Houston, TX  77010

**ATTORNEYS FOR DEFENDANTS
HSBC NORTH AMERICA HOLDINGS,
INC., HSBC BANK USA, N.A.**

Irah Donner
WILMER, CUTLER, PICKERING, HALE &
DORR
399 Park Ave.
New York, NY  10022

**ATTORNEY FOR DEFENDANTS
HSBC NORTH AMERICA HOLDINGS,
INC., HSBC BANK USA, N.A.**

Sam Baxter
Lead Attorney
Texas Bar No. 01938000
sbaxter@mckoolsmith.com
McKOOL SMITH, P.C.
505 East Travis Street, Suite 105
Marshall, Texas  75670
903-927-2111 (Telephone)
903-927-2622 (Telecopy)

Theodore Stevenson, III
Texas Bar No. 19196650
tstevenson@mckoolsmith.com
L. David Anderson
Texas Bar No. 00796126
danderson@mckoolsmith.com
McKOOL SMITH P.C.
300 Crescent Court, Suite 1500
Dallas, TX  75201

214-978-4000 (Telephone)
214-978-4044 (Telecopy)

Peter J. Ayers
Texas Bar No. 24009882
payers@mckoolsmith.com
Geoffrey L. Smith
Texas Bar No. 24041939
gsmith@mckoolsmith.com
McKOOL SMITH P.C.
300 W. 6th Street, Suite 1700
Austin, Texas 78701
512-692-8700 (Telephone)
512-692-8744 (Telecopy)

**ATTORNEYS FOR DEFENDANTS PNC
FINANCIAL SERVICES GROUP, INC.,
PNC BANK NATIONAL ASSOCIATION,
KEYCORP, AND KEYBANK NA**

Edward G. Poplawski (Pro Hac Vice)
EPoplaws@Sidley.com
Jeffrey A. Finn (Pro Hac Vice)
JFinn@Sidley.com
Carissa A. Tener (Pro Hac Vice)
CTener@Sidley.com
SIDLEY AUSTIN L.L.P.
555 West Fifth Street, Suite 4000
Los Angeles, California 90013
213-896-6000 (Telephone)
213-896-6600 (Telecopy)

Lance Lee
WLanceLee@aol.com
Texas Bar No. 240004762
YOUNG, PICKETT & LEE, L.L.P.
4122 Texas Blvd.
P.O. Box 1897
Texarkana, Texas 75504
903-794-1303 (Telephone)
903-792-5098 (Telecopy)

**COUNSEL FOR FIRST DATA
CORPORATION, TELECHECK
SERVICES, INC.;REMITCO, LLC,
DEUTSCHE BANK TRUST COMPANY
AMERICAS, BANK OF TOKYO-
MITSUBISHI UFJ, LTD.**

Edward G. Poplawski (Pro Hac Vice)
EPoplaws@Sidley.com
Jeffrey A. Finn (Pro Hac Vice)
JFinn@Sidley.com
Carissa A. Tener (Pro Hac Vice)
CTener@Sidley.com
SIDLEY AUSTIN L.L.P.
555 West Fifth Street, Suite 4000

Los Angeles, California 90013
213-896-6000 (Telephone)
213-896-6000 (Telecopy)

Sidney Calvin Capshaw, III
State Bar No. 03783900
Andrew W. Spangler
State Bar No. 20401960
Elizabeth L. DeRieux
State Bar No. 05770585
Brown McCarroll
1127 Judson Road, Suite 220
Longview, TX  75601
P.O. Box 3999
Longview, TX  75606-3999
903-236-9800
Fax: 903-236-8787
ccapshaw@mailbmc.com
aspangler@mailbmc.com
ederieux@mailbmc.com

**COUNSEL FOR LASALLE BANK
CORPORATION AND LASALLE BANK
NA**

William L. LaFuze
Texas Bar No. 11792500
wlafuze@velaw.com
D. Ferguson McNiel
Texas Bar No. 13830300
fmcniel@velaw.com
VINSON & ELKINS LLP
2300 First City Tower
1001 Fannin St.
Houston, TX  77002
713-758-2595 (Telephone)
713-615-5017 (Telecopy)

Scott W. Breedlove
Texas Bar No. 00790361
sbreedlove@velaw.dom
VINSON & ELKINS LLP
3700 Trammell Crow Center
2001 Ross Ave.
Dallas, TX  75201-2975
214-220-7700 (Telephone)
214-220-7716 (Telecopy)

Harry Lee Gillam, Jr.
Texas Bar No. 07921800
gil@gillamsmithlaw.com
Melissa Richards Smith
Texas Bar No. 24001351
melissa@gillamsmithlaw.com
GILLAM & SMITH LLP
110 South Bolivar, Suite 204
Marshall, TX  75670

903-934-8450 (Telephone)
903-934-9257 (Telecopy)

**ATTORNEYS FOR
UBS AMERICAS, INC.**

Edward G. Poplawski (Pro Hac Vice)
EPoplaws@Sidley.com
Jeffrey A. Finn (Pro Hac Vice)
JFinn@Sidley.com
Carissa A. Tener (Pro Hac Vice)
CTener@Sidley.com
SIDLEY AUSTIN L.L.P.
555 West Fifth Street, Suite 4000
Los Angeles, California 90013
213-896-6000 (Telephone)
213-896-6600 (Telecopy)

Kurt M. Sauer
DAFFER MCDANIEL
The Chase Building
700 Lavaca, Suite 720
Austin, TX  78701-3119

Sidney Calvin Capshaw, III
State Bar No. 03783900
Andrew W. Spangler
State Bar No. 20401960
Elizabeth L. DeRieux
State Bar No. 05770585
Brown McCarroll
1127 Judson Road, Suite 220
Longview, TX  75601
P.O. Box 3999
Longview, TX  75606-3999
903-236-9800
Fax: 903-236-8787
ccapshaw@mailbmc.com
aspangler@mailbmc.com
ederieux@mailbmc.com

**ATTORNEYS FOR
CITY NATIONAL BANK
CITY NATIONAL CORP.**

Melvin R. Wilcox, III
mrw@smeadlaw.com
SMEAD, ANDERSON & DUNN LLP
2110 Horseshoe Lane
P.O. Box 3343
Longview, TX  75606
903-232-1892 (Telephone)
903-232-1881 (Telecopy)

Of Counsel:
John J. Feldhaus
jfeldhaus@foley.com

Anthony H. Son
ason@foley.com
George C. Beck
gbeck@foley.com
FOLEY & LARDNER LLP
3000 K Street, N.W.
Washington, DC  20007
202-672-5300 (Telephone)

**ATTORNEYS FOR
U.S. BANCORP, U.S. BANK, NATIONAL
ASSOCIATION, NATIONAL CITY
CORPORATION AND NATIONAL CITY
BANK**

Jeffrey Standley
jstandley@standleyllp.com
STANDLEY LAW GROUP LLP
495 Metro Place South, Suite 210
Dublin, OH  43017
614-792-5555 (Telephone)
614-792-5536 (Telecopy)

Claude Welch
cwelch@consolidated.net
115 W. Shepherd Ave.
Lufkin, TX  75904-3808
936-639-3311 (Telephone)
936-639-3049 (Telecopy)

**ATTORNEYS FOR
CITIZENS FINANCIAL GROUP, INC.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on July 9, 2007 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Local Rule CV-5(a)(3).

*/s/ Tim K. Brown*
Tim K. Brown

90226977.doc