# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | |
|---|---|
| **DATATREASURY CORPORATION**<br>**Plaintiff,** § | |
| § | |
| § | **Civil Action No.:2:06-CV-** |
| **v.** § | **72 (DF)** |
| § | |
| § | **JURY TRIAL DEMAND** |
| **WELLS FARGO & COMPANY, ET. AL.,** § | |
| **Defendants** § | |

## PLAINTIFF'S CLAIM CONSTRUCTION REPLY BRIEF

Dockets.Justia.com

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION…………………………………………………………… **1**

II. LAW AND AUTHORITIES………………………………………. **2**

III. DISPUTED TERMS OF THE '007 PATENT……………………………… **2**

    A. "Pre-Selected Financial Institutions," "Pre-Selected Institutions," and "Participants" Are Financial Institutions that are Members of or Participants in a Central Check Clearing System………………..... **2**

    B. "Real Time," "in Real Time," and "Real Time in Correspondence with the     Occurrence of an Event" Does Not Require Instantaneousness or Immediacy…………………………………….. **5**

    C. "Settlement," "Regular Periodic Settlement," and "Final Settlement" Do Not Require Actual Transfer of the Amounts Owed and Payable…………………………………………………………… **6**

    D. Settlement Among the Direct Participants Occurs After Pre-determined Local Settlements Between the Participants and the Non-Participants……………………………………………………… **7**

    E. A "Pre-Selected Site" is the Instrument Processing Location of a Participating Institution. ……………………………………………….. **7**

    F. "Transit Status of the Financial Instruments to be Cleared" Provides Information About Whether the Instruments Have Been Physically Sent and Received ……………………………………………….. **8**

    G. A "Central Processing Unit" Does Not Have to Connect All Originating and Receiving Institutions ……………………………….. **9**

    H. "Means for Receiving Including Means for Physically Accepting the Instruments Transported from Other Institutions" Has A Corresponding Structure……………………………………………….. **10**

i

I. The "Means at an Institution by Which Instruments Are Sorted by the Site Locality [and Sent]…" ……………………………………… 10

J. The "Means at Each of the Participants (1) for Sending and Receiving Financial Instruments…(2) for Sending and Receiving in Real Time…, and (3) for Addressing the Central Processing Unit…" Has Corresponding Structure for All of the Recited Functions ………….. 11

K. "A Time Control for Determining the Time of Physical Transport …" Is Not a Means-Plus-Function Limitation …………………….... 11

IV. DISPUTED TERMS IN THE '868 PATENT ……………………………… 12

A. "Co-mingled records" …………………………………………… 12

B. "Translating" ………………………………………………….. 13

C. "File Format" ………………………………………………….. 15

D. The "Means for Receiving a Data File…" …………………….. 15

E. The "Means for Storing" and "Means for Temporarily Storing…" Terms …………………………………………………………… 16

F. The Preambles of Claims 1, 24, 45, 61, and 80 ………………….. 16

G. "Processor" and "Master Processor"………………………….. 17

H. "Predetermined Data Format Parameters"……………………. 18

I. "Financial Instruments Being Exchanged…" Does NOT Require Physical Exchange …………………………………………….. 18

J. "Institution" …………………………………………………….. 19

K. "Financial Instrument Information" ………………………….. 20

L. The three Means-Plus-Function Terms in Claim 2 …………….. 20

M. Key/PNC's "Predetermined Institution" …………………….. 21

ii

**V.   DISPUTED TERMS IN THE '759 and '778 PATENTS ...................**                    **22**

   **A.   Delivery of Financial Instruments from the First Location to the Payment System ...................................................................**                    **22**

   **B.  "Location," "First Location," "Item Capture Facility" ...................**                    **24**

   **C. Printer Applies Two Indorsements ................................................**                    **26**

   **D. The "central processing unit and communication link . . . settlement of accounts  in the check payment system" [Claim 1, '759 Patent] .........**                    **27**

   **E. "Coordinating the Delivery of the Instruments and Cash Letters into the Payment System" [Claim 5, '778 Patent] ...............................**                    **28**

   **F.  "Imager for Creating a Second Record . . . " [Claim 1, '778 Patent] Is a Device That Creates an Electronic Representation of an Object ......**                    **28**

   **G. The Method Claim Steps in Claims 5 and 14 of the '759 Patent Do Not Need to Be Performed in Order .................................................**                    **29**

   **H. "Reporting to the respective banks and payee information in the cash letters" [Claim 11, '759 Patent] ................................................**                    **29**

   **I. "Scanner" [Claim 1, '778 Patent] Is an Electronic Reader that Reads at Least MICR Data ...................................................................**                    **29**

   **J. "Settlement of Accounts" [Claim 1, '759 Patent] ............................**                    **29**

   **K. The "Payee's Depository Bank" and "Depository Bank" [Claims 1 and 11, '778 Patent] ...................................................................**                    **30**

**VI.       CONCLUSION..................................................................**                    **30**

# TABLE OF AUTHORITIES

*Acumed LLC v. Stryker Corp.*, 483 F.3d 800, at *11 (Fed. Cir. Apr. 12, 2007)........................... 19

*Catalina Mktg. Int'l Inc. v. Coolsavings.com Inc.,* 289 F.3d 801 (Fed. Cir. 2002)……………...17

*Comark Communications, Inc. v Harris Corp.*, 156 F.3d 1182, 1187 (Fed Cir. 1998)…………..…9

*DataTreasury Corp. v. Citigroup Inc., et al* ……………………………………………………*3,5,*14

*DeGeorge v. Bernie*r, 768 F.2d 1318 (Fed. Cir. 1985)……………………………………………...17

*Innova/Purewater, Inc. v. Safari Water Filtration Systems, Inc.,* 381 F.3d 1111, 1117 (Fed. Cir. 2004) (citations omitted)........................................................................................................ 19

*Mass. Inst. of Tech. and Elecs. for Imaging, Inc. v. Abacus Software*, 462 F.3d 1344, 1352 (Fed. Cir. 2006) ................................................................................................................................ 2

*Orion IP, LLC v. Staples, Inc.,* 406 F.Supp.2d 717, 738 (E.D. Tex. 2005) .................................... 2

*Phillips v. AWH Corp*., 415 F.3d 1303, 1312-13, 1323 (Fed. Cir. 2005) (en banc), *cert. denied*, 126 S. Ct. 1332 (2006) ............................................................................................................ 21

## I.     INTRODUCTION

Defendants have grouped certain disputed terms together in their brief while bypassing all discussion of other disputed terms.  For all terms not discussed in Defendants' Response Brief or Key/PNC's Supplemental Brief, DataTreasury assumes that the Defendants agree with DataTreasury's proposed construction, including those terms that Defendants failed to brief, but attempt to bring in through the back door via their multiple motion for summary judgment briefs.[1]  If this Court does consider the Defendants' summary judgment briefing for purposes of claim construction, DataTreasury requests that the Court also consider DataTreasury's summary judgment briefing by reference in response.

Furthermore, Defendants purposely confound the claim construction process by combining terms for the '759 and '778 Patents, attempting to import limitations from one claim into other claims and into another patent altogether, inviting error in the claim construction process and forcing the Court to spend needless resources untangling the web that Defendants have weaved.  DataTreasury respectfully submits that its own claim constructions and the parties' agreed constructions[2] clarify the terms in the patents without inviting such egregious error.

In addition, Defendants' self-serving descriptions of each of the patents should be discarded outright because they are clearly driven by Defendants' non-infringement theories, and are riddled with false statements and factual inaccuracies.

DataTreasury notes that each of the four Patents involved in this claim construction proceeding have been accepted for ex parte re-examination by the USPTO.  Given that the outcome of the re-examination remains uncertain, the parties' claim construction positions might need to be

---

[1] By failing to brief certain disputed claim terms, but incorporating by reference their arguments as to those claims terms from their multiple motions for summary judgment, the Defendants are inappropriately ignoring the Local Rules' page limits for briefs.  DataTreasury requests that the Court either not consider the Defendants' summary judgment briefs for purposes of claim construction or alternatively, deny the Defendants the opportunity to file a sureply brief given that they have already far exceeded the allowable pages for briefing.

[2] Attached hereto as Exhibits A through E.

modified depending on the outcome of the re-examination, when the re-examination results are disclosed. DataTreasury requests that the Court permit the parties to submit supplemental briefing after the re-examination results are known.

Finally, in support of DataTreasury's proposed claim constructions for the disputed claim terms of the '759 and '778 Patents, including those terms that the Defendants failed to brief, DataTreasury attaches and incorporates by reference the Affidavit of Terry Geer,[3] who is the inventor of the '759 Patent and the '778 Patent and a co-inventor of the '007 Patent, and the Affidavit of David James,[4] the inventor of the ''868 Patent.

## II.    LAW AND AUTHORITIES

Plaintiff will not repeat the law and authorities included in its Opening Brief, but reiterate the following few key points. First, "although every word used in a claim has a meaning, not every word requires a construction."[5] This is particularly applicable where Defendants have identified numerous terms only to cobble them together in an attempt to introduce error into these proceedings. Second, where a claim does not require a limitation, that limitation should not be read from the specification or prosecution history into the claims.[6] This is also particularly applicable here, where Defendants have made a series of non-infringement arguments with no support in the patents themselves, and have relied on quotations drawn out of context from the prosecution history.

## III.    DISPUTED TERMS OF THE '007 PATENT

### A.    "Pre-Selected Financial Institutions," "Pre-Selected Institutions," and "Participants" Are Financial Institutions that are Members of or Participants in a Central Check Clearing System

In compromise and to minimize disputed issues, DataTreasury modifies its proposed construction of these terms to **"Financial institutions which have previously been selected to be**

---

[3] Attached hereto as Exhibit F.
[4] Attached hereto as Exhibit G.
[5] *Orion IP, LLC v. Staples, Inc.,* 406 F.Supp.2d 717, 738 (E.D. Tex. 2005).
[6] *Mass. Inst. of Tech. and Elecs. for Imaging, Inc. v. Abacus Software*, 462 F.3d 1344, 1352 (Fed. Cir. 2006).

**members of or participants in a central check clearing system that is not the Federal Reserve System."[7]** DataTreasury's modified construction resolves any conflict among the parties as to whether "or a local clearing house" should be part of the construction and whether the central check clearing system is distinct from the Federal Reserve System.[8]

A remaining dispute is whether the "pre-selected financial institutions," "pre-selected institutions" and "participants" (collectively, "pre-selected institutions") must be "each located in a specific and exclusive geographic region" as required by the Key/PNC Defendants in their proposed construction. This proposed construction should be rejected for several reasons. The meaning of "geographic region" is unknown. Is it a city block, a city's geographic limits, a state's geographic limits, a Federal Reserve district, or something narrower or broader than any of these? The Key/PNC Defendants do not explain what comprises a "geographic region."

The '007 Patent does not require that each of the pre-selected institutions be in a "specific and exclusive geographic region." Under the Key/PNC Defendants' proposed construction, no single member of the central check clearing system can exist within the same geographic region as another member because each is in its own "exclusive geographic region." This unrealistic and unsupported requirement of segregating each of the financial institutions into an exclusive geographic region directly contradicts the specification. The Object of the Invention section of the specification states, "It is an object of this invention to provide means whereby an association composed of participating banks in major cities is formed, and a national clearinghouse system is maintained. *At least one*

---

[7]  DataTreasury's previous construction for "pre-selected financial institutions" and "pre-selected institutions" was "Financial institutions which have previously been selected to be members of or participants in the central check clearing system or a local clearing house as to clearing the financial instrument." DataTreasury's previous construction for "participant" was "members of the clearinghouse association."

[8]  The modified construction is also consistent with certain agreed constructions between DataTreasury and the Citibank Defendants. DataTreasury and the Citibank Defendants agreed that "institutions that are not among the number of preselected financial institutions" means "non-members of the clearinghouse"; that "all participants in the system" means "all the members of the clearinghouse association"; that "clearinghouse" means "institution for effecting the settlement of accounts between member financial institutions"; and that "different financial institutions in the locality which are not participants in the clearinghouse" means "non-member banks of the clearinghouse in the locality." *See* Exh. G to DataTreasury's Opening Claim Construction Brief in *DataTreasury v. Citibank* case, at pp. 5-8.

*institutional participant* in each city would have access to the local clearinghouse."[9] (emphasis

added). If each "geographic region" were a major city, the reference to "*at least one* institutional

participant in each city" shows that the '007 Patent contemplates that each geographic region would

have one or more pre-selected institutions within it.

      The Key/PNC Defendants' proposed construction should also be rejected because it would

also require that no single pre-selected institution can exist across multiple geographic regions. It is

common knowledge that many financial institutions have operations that span multiple cities, states,

Federal Reserve districts, and time zones. Construing the '007 Patent to suggest that it contemplated

the U.S. banking system as one in which each pre-selected financial institution existed in only a

single "exclusive geographic region" and could not exist in any other "geographic region" is

completely unrealistic and is not supported by the specification or the file history.

      The preamble of Claim 1 only states that the pre-selected institutions are "each located at a

preselected site."[10] Having each pre-selected institution be located at a preselected site does not

mean that a pre-selected institution can exist at only one pre-selected site. Also, a "preselected site"

is not the same as a "geographic region." Two pre-selected institutions can be located across the

street from one another, each located at their own pre-selected site, but both be in the same

"geographic region."

      Furthermore, the preamble to Claim 4 only states that the participants are "situated in different

localities." A "locality" is not the same thing as an "exclusive geographic region." The '007 Patent

does not even mention the word "region" or "exclusive." Indeed, the patent even states that "the

system and method is *independent of* conventional central bank district *geographic* and institutional

---

[9]   '007 Patent, at Col. 1:44-49.
[10]   '007 Patent, at Col. 7:45.

*boundaries,* and time zones."[11] (emphasis added). And a portion of the file history that the Key/PNC Defendants cite in their brief actually suggests that while the institutions' check processing facilities (of which there could be many and exist in numerous cities and regions) could be at geographically disperse places, each institution (e.g., bank) need not be wholly confined to a single "exclusive geographic region" (e.g., Bank of America operating only in Texas and in no other states).[12]

Restricting an entire pre-selected institution to an "exclusive geographic region" is a fiction created by the Key/PNC Defendants with no direct support from the intrinsic evidence. The Key/PNC Defendants' proposed construction is too limiting with respect to requiring each pre-selected institution be confined to its own "specific and exclusive geographic region" and should be rejected.

**B.    "Real Time," "in Real Time," and "Real Time in Correspondence with the Occurrence of an Event" Does Not Require Instantaneousness or Immediacy**

DataTreasury and the Citibank Defendants agree that "real time" means "the actual time during which something takes place."[13] In this case, the Key/PNC Defendants dispute this construction and propose "immediate; immediately" as a definition while the remaining defendants have their own twist and propose "instantaneous, instantaneously." Neither of these defendants' constructions is correct because the '007 Patent, while permitting something that takes place in "real time" to occur instantaneously or immediately in certain contexts, *does not require* a "real time" event to always take place instantaneously or immediately as these defendants would require.

DataTreasury's proposed construction is more appropriate because it does not limit "real-time" to only events that occur instantaneously or immediately, but rather recognizes, as the '007 Patent recognizes, that "real-time" events can have some measure of time lag or delay and that "real-

---

[11]    '007 Patent, at Preamble; Col. 1:19-22.
[12]    Key/PNC Defendants' Brief, at 7 (at Exh. G, quoting Amendment of Jan. 2, 1992, "the institutions are geographically diverse places *at which checks . . . are processed.*") (emphasis added).
[13]    *See* Exh. G to DataTreasury's Opening Claim Construction Brief in *DataTreasury v. Citibank* case, at p. 7.

time" events are not always instantaneous or immediate.  The '007 Patent contemplated physical

delivery of cash letters via air and ground transportation (e.g., planes, trains, and automobiles).[14]  It

also contemplated that "*real time* electronic tracking of cash letters transmitted through the

transportation system is permitted."[15] (emphasis added).

The '007 Patent contemplates that an inherent time lag may be part of a "real time" event.

For example, the "real time electronic tracking of cash letters" contemplated that "advice of the

sending of cash letters would be received electronically by the association's central accounting means

from the participating institutions sending such cash letters, and confirmations of receipt would also

be electronically transmitted by participants receiving such cash letters."[16]  In other words, there

would be electronic notice given that the cash letters were sent and received.  There is no

instantaneousness or immediateness aspect to the tracking that requires the notifications occur at the

precise instantaneous moment that the cash letters were sent or received.  A time lag from the

moment that the air or ground courier picks up the cash letters to when a bank clerk enters the fact of

the pickup is entered for transmittal is reasonable and expected.

The Defendants' demand for instantaneousness or immediacy for all "real time" events is

unreasonable, impractical, and inconsistent with the '007 Patent.  DataTreasury's proposed

construction does not preclude a "real time" event from occurring instantly or immediately, but does

allow for certain "real time" events that include reasonably expected time delays or lag.

## C.    "Settlement," "Regular Periodic Settlement," and "Final Settlement" Do Not Require Actual Transfer of the Amounts Owed and Payable

"Settlement" in the context of what occurs within the '007 Patent's central check clearing

system does not require an actual transfer of funds.  The specification makes clear that the central

---

[14]  '007 Patent, at Col. 1: 66-2:1.
[15]  *Id.*
[16]  '007 Patent, at Col. 2:1-7; 5:61-6:16, 6:60-66.

check clearing system or national clearing house association "does not itself effect settlement among the members; member settlements occurs through the Federal Reserve System based on computations made by the control means which are transmitted to one of the Federal Reserve banks." *See* '007 Patent, at Col. 3:46-51; 4:30-37 ("[T]he National Clearing Association will *calculate* the respective debit and credit balances of Bank A and Bank B (not only to each other but to all other participating banks) and transmit the same information to the Federal Reserve for the national banking system settlement.").

**D.      Settlement Among the Direct Participants Occurs After Pre-determined Local Settlements Between the Participants and the Non-Participants**

With respect to the phrases "a final calculation . . . does not occur until . . . are completed" (claim 1) and "[determining] the occurrence of a final settlement . . . are completed" (claim 4), the Defendants and the Key/PNC Defendants allege that DataTreasury's constructions ignore the timing aspect of these limitations. This is not true.

DataTreasury's position regarding the timing aspect is that settlement among the direct participants in the central check clearing system occurs, if at all, after pre-determined local settlements [or "after certain predetermined local settlements" as to Claim 4), if any, have occurred between the direct participants and non-participants at the pre-selected sites (Claim 1) or localities (Claim 4). This is consistent with the Defendants' and Key/PNC Defendants' positions as to the timing of the settlements. DataTreasury still stands by its proposed constructions for these phrases, but this clarification should resolve any perceived conflict that the defendants might have had about the timing aspect. Conflicts remain, however, as to whether the "pre-determined local settlements" are "prescheduled" as the Defendants contend or "at regular intervals" as DataTreasury contends.

**E.      A "Pre-Selected Site" is the Instrument Processing Location of a Participating Institution.**

DataTreasury disagrees with the Defendants' construction of "pre-selected site." DataTreasury's construction is that a "pre-selected site" is "the instrument processing location of a participating institution." The key difference from the Defendants' construction is that the defendants insist on defining the term in terms of a "specific and exclusive geographical region." DataTreasury's construction is appropriate because it recognizes the reality that a participating institution may have numerous geographically disperse instrument processing locations, only some of which have been selected by the participating financial institution to be a participating member of the central check clearing system. A "preselected site" should be defined in terms of whether a particular facility is selected to be involved in the central check clearing system.

Defining a "preselected site" in term of a "specific and exclusive geographic region" as the Defendants have done is wrong because it limits each participating institution to a single geographic region when the reality is that a participating institution may have numerous instrument processing locations, each of which is located in different cities, areas, regions, and Federal Reserve districts. The '007 Patent does not preclude a participating institution from having multiple preselected sites, each of which could be part of the central check clearing system, each of which could be located in different cities, or some of which could be located in the same city, state, region, or district. The Defendants' construction, however, would preclude any of these possibilities without support from the patent for imposing such restrictions, and should be rejected.

**F.      "Transit Status of the Financial Instruments to be Cleared" Provides Information About Whether the Instruments Have Been Physically Sent and Received**

In compromise and to minimize disputed issues, DataTreasury does not oppose the Defendants' proposed construction of "transit status of the financial instruments to be cleared" (Claim 4) as meaning "**information about whether the instruments have been physically sent and received.**" The Key/PNC Defendants' proposed construction, however, is far more limiting in that it

requires "transit status . . ." to mean "electronic tracking information that can be used to identify the location of the instruments in real time." The Key/PNC Defendants have provided no support for the requirement that information about the transit status include information about the *location* of the instruments in real time. The claim language and specification relates "transit status" to only the sending and receipt of the instruments, not their precise locations.[17] The same is true as to "the status in transit of the instruments" (Claim 1), which the Key/PNC Defendants also erroneously insist must show the location of the instruments in real time.[18]

## G.    A "Central Processing Unit" Does Not Have to Connect All Originating and Receiving Institutions

DataTreasury's construction – "a conventional programmable computer" is directly supported by the specification: "a conventional programmable computer or other central processing unit for the computation of the settlements."[19] The Defendants' are wrong in their insistence that a "central processing unit" must connect all originating and receiving institutions and that all data files must run through it. The Defendants do not explain what the originating and receiving institutions are to which they refer. In Claim 1, the central processing unit is "connected to each of the pre-selected institutions."[20] Claim 4 is different in that the central processing unit is not described as requiring to be connected to any specific or type of financial institution. The distinction between Claim 1 and 4 shows that the '007 Patent does not always require the central processing unit to connect to all originating and receiving institutions. See *Comark Communications, Inc. v. Harris Corp*., 156 F.3d 1182, 1187 (Fed Cir. 1998) ("While we recognize that the doctrine of claim differentiation is not a hard and fast rule of construction, it does create a presumption that each claim in a patent has a

---

[17]   '007 Patent, Col. 2:37-41  ("the participants report the value and transit status of the items to be cleared . . . the central control means monitors on a real time basis *the actual sending and receipt of* . . . items to be cleared") ; Col. 9:18-20 ("transit status of the instruments to be cleared as *having been sent and received*") (emphasis added).
[18]   '007 Patent, at Col. 8:13-15 ("the status in transit of the instruments *with respect to their having been (i) sent and (ii) received*") (emphasis added).
[19]   '007 Patent, at Col. 1:63-65.
[20]   '007 Patent, at Col. 8:3-4.

different scope").   The Defendants also fail to provide support from the specification for their

insistence that *all* data files must flow through the central processing unit.

**H.    "Means for Receiving Including Means for Physically Accepting the Instruments Transported from Other Institutions" Has A Corresponding Structure**

The '007 Patent does disclose a corresponding structure for this phrase – it is the participating

banks' physical facilities, which is implicit given that the essence of the patent is about the physical

exchange of checks between participating banks.  It is undisputed that "physical delivery of items

[instruments] would be accomplished through air and ground transportation."[21]  Logic and common

sense tells us that if there is physical delivery of physical items between banks, there must necessarily

be physical facilities at the sending and receiving end.  It is also undisputed that the '007 Patent

provides that it is the participating member banks that receive the instruments sent via physical

transport by other member banks.[22]  Again, this establishes that the banks receive the physically

transported items. The solid line arrows in Figure 1 clearly illustrate the "physical transfer" between

"Participating Bank A Outgoing" (physical facility that sends) and "Participating Bank B Receives

Letter" (physical facility that receives).[23]  If the solid lines indicate physical transport, the sending

and receiving ends must represent physical facilities, which would be readily understandable by a

person of ordinary skill in the art.[24]

**I.    The "Means at an Institution by Which Instruments Are Sorted by the Site Locality [and Sent]…"**

---

[21] '007 Patent, at Col. 1:66-2:1.

[22]  '007 Patent, at Col. 1:49-51 ("Participating member banks would each agree to receive items drown on the individual participant and on other members . . ."); 2:6 ("by participants receiving such cash letters"); 2:55-56 ("physical transport of financial instruments between and among the members"); 6:25-26 ("Immediately upon physical receipt of the checks, the New York participant . . .").

[23] '007 Patent, at Fig. 1; 4:15-22.

[24]  Also consider '007 Patent, at Col. 4:41-48, which states "In the preferred embodiment, sorting of checks between member and non-member local clearinghouse banks is done by the receiving bank. This permits the sending bank to assemble checks for sending without sorting, except for a first sort by member locality, and permits the receiving bank thereafter to sort its local checks when its sort machines would otherwise not be in peak use." This section further establishes that physical checks are physically transported between the banks' physical facilities and then the receiving bank uses sort machines to sort the physical checks.

The parties appear to agree that the structure that performs the sorting function is a sorter or sort machine.  As to the sending function, DataTreasury's construction is that the corresponding structure is "a pre-selected institution's physical facility (i.e., bank, member bank, receiving bank, Participating Bank B), and its relationship with air or ground transportation. [Fig. 1 (solid directional lines); 1:66-2:1; 4:15-22]."  The Defendants' construction does not include the pre-selected institution's physical facility, which DataTreasury believes is necessary in conjunction with air or ground transportation to perform the sending function.

**J.**     **The "Means at Each of the Participants (1) for Sending and Receiving Financial Instruments…(2) for Sending and Receiving in Real Time…, and (3) for Addressing the Central Processing Unit…" Has Corresponding Structure for All of the Recited Functions**

In compromise and to minimize disputed issues, DataTreasury does not oppose the Defendants' description of the third function.[25]  The parties still disagree as to the corresponding structure for this third function, which DataTreasury proposes is: "Electronic communications links [Fig. 1], which may include conventional telephone links by modem connections and the like ['007 Patent, at Col. 6:22-24]."  The specification provides that "communications to and from the switch may occur through conventional telephone links by modem connections and the like."[26]  Via these structures, "each participant can address the system to determine, at any point in time, anticipated (shipped and in transit) and received checks and the accompanying 'cash letter' that is included in each shipment.[27]  A person of ordinary skill in the art would know that the corresponding structure for the third function are the electronic communication links.

**K.**     **"A Time Control for Determining the Time of Physical Transport …" Is Not a Means-Plus-Function Limitation**

---

[25]   The parties now agree that the third function is "for addressing the central processing unit by which a participant may determine in real time the information received by the processing unit with respect to that participant's relative credit and debit obligations with respect to other institutions arising from the instruments that are reported to be sent and received."
[26] Col. 6:22-24.
[27] Col. 7:17-21. *See* Ex. F, Affidavit of Terry Geer, ¶ 10; *see also* Ex. G, Affidavit of David James, ¶ 28(3).

This phrase should be construed as "Predetermined time schedule." Although this term does not contain the word "means," the Defendants nevertheless erroneously insist that this phrase is a means-plus-function term under 35 U.S.C. § 112, ¶ 6. The specification discloses that a "time control" is a predetermined time schedule.[28]

## IV.  DISPUTED TERMS IN THE '868 PATENT

### A.  "Co-mingled records"

Defendants argue that "co-mingled" must mean "intended for multiple receiving institutions." However, there is no support for Defendants' theory, either in the patent claims or specification, or even in their own dictionary definition.[29]  What is mixed together in "co-mingled records"?  This question is answered in the claims and specification of the '868 Patent:  the records may contain information from a number of different financial instruments, and may be destined for one or more receiving institutions.  Claim 1 of the '868 Patent describes "said data file containing co-mingled records of a plurality of separate financial instruments…"[30]  Defendants' construction directly contradicts the language of Claim 1, which states that "the data file is to be received by **one or more than one** predetermined institution."[31]  Although limitations from the specification should not be read into the claims, the specification of the '868 Patent sheds light on the meaning of the term "co-mingled":  "The data file may contain co-mingled financial instrument information, portions of which are intended for **one or more** of a multiple of receiving institutions or settlement mechanisms."[32]  The only other appearance of "co-mingled" in the specification is: "**In a multiple institution**

---

[28]  '007 Patent, at Col. 2:55-58 ("In the system of the invention, physical transport of financial instruments between and among the members is controlled by a predetermined time schedule . . ."); 3:13-16 ("Strict adherence to a time schedule prescribed by the association for providing debit and credit advice and the physical exchange of items is required."); 5:37-39 ("each participant would usually send out in accordance with a fixed and predetermined processing time schedule").
[29]  Defendants' cited definition is "to blend thoroughly into a harmonious whole."  *See* FN 77 of Defendants' Brief.
[30]  See the '868 Patent at Col. 10:52-53.
[31]  Claim 1, at Col. 10:56-58 (emphasis added).
[32]  See the '868 Patent at Col. 3:58-61 (emphasis added).

**application**, a single data file…**may contain** co-mingled financial instrument information intended for multiple receiving institutions."[33] Defendants conveniently omit the opening clause of this sentence, which explains that multiple receiving institutions are involved **in some examples** or applications, but not in others. Defendants' argument directly contradicts the specification, which includes an example wherein there is a single originating institution and a single receiving institution.[34] This important difference can also be seen in the claim language—Claim 24, for example, specifies that the co-mingled financial information is "intended for multiple receiving institutions," while Claim 1 omits that phrase.[35] This is an obvious example of Defendants attempting to introduce clear error into the claim construction process by jumbling claims together in an attempt to mislead this Court into reading limitations from one claim into another.

The prosecution history selected by Defendants likewise cannot save their theory. The portions quoted by Defendants, taken out of context, are ambiguous at best. It is unclear whether the quoted comments are directed to specific examples or applications, or are more global in nature. Furthermore, the cited portion states that the claims have been amended. The language was approved as amended, and that final claim language itself is the best indicator of the meaning of the claim terms. Prosecution history, while relevant, should not be weighed as strongly as the specification or the claim language, as the patent itself is the final result of the communication between the patentee and the USPTO. While the ability to send records with information destined for multiple institutions is one of the advantages of the system, nothing in the claims or the specification requires that in every case, such records or information must be intended for multiple recipients.

The Key/PNC Defendants make the same argument as the other Defendants, which throws the need for supplemental briefing on this point into doubt. Moreover, there is no merit in their argument

---

[33] See the '868 Patent at Col. 6:58-61 (emphasis added).
[34] See the '868 Patent at Col. 6:36-41.
[35] In addition, the fact that Claim 24 uses the separate phrase "intended for multiple receiving institutions" shows that it is a separate limitation, not part of the definition of "co-mingled" or "co-mingled financial instrument information."

that the fact that Claim 1 refers to separating the co-mingled records into bundles requires multiple recipients. As discussed above, the information from different financial instruments or different types of financial instruments (i.e., checks, share drafts, payable-through drafts, travelers checks, money orders, etc.) could be separated according to type. In addition, the records could ultimately be destined for multiple institutions, but could first be cleared through one institution that is a participant in the system.

## B. "Translating"

Defendants argue that any term containing the word "translating" (in five different claims of the '868 Patent, again attempting to confuse the issues as much as possible) necessarily includes the limitation that the two file formats must be "dissimilar and incompatible." There is simply no support for this in the claim language or the specification of the '868 Patent, nor in the file history portions cited by Defendants. The claim language states quite plainly that the translation is into "a data file format selected by the predetermined institution."[36] Defendant Citibank has admitted as much; they agreed with Plaintiff that translating involves "receiving a first file format and converting the first file format to a second file format."[37] While it is true that the standardized formats discussed in the specification are incompatible with each other, and that the need to translate between such file types is an important advantage of the invention, it is not true that each file passed through the system must involve "dissimilar and incompatible" formats. Logically, in a file destined to multiple receiving institutions, there is a probability that at least one of the receiving institutions might use the same format as the originating institution. In addition, Defendants have once again confounded the issues by grouping terms from different claims—their construction involves "converting the records in each bundle," but Claim 24 involves "translating each portion of said separated financial

---

[36] Or "preselected by the receiving institution," Claims 24, 45; "selected by the receiving institution," Claims 61, 80.
[37] See the Joint Claim Construction Chart, Exhibit B, p. 13, in *DataTreasury Corp. v. Citigroup Inc., et al.*, which has been consolidated with this case for purposes of claim construction.

instrument information"—the terms "records" and "bundle" do not appear anywhere in the claim language.[38]  Claims 45 and 61 do not involve the term "records."  Defendants seek not only to import their non-infringement theories into the claims, but also to import limitations from one claim into another—this attempt should be denied.

## C.     "File Format"

Defendants again attempt to confuse and muddle the issues, urging a construction of "file format" that states that file formats must be "unique."  They also attempt to sneak in a completely undefined and unexplained limitation—that the records must be "***settlement*** records"—which are just one type of record in the system.[39]  In addition, Defendants' construction does not explain that file format involves the arrangement of data fields within a record and also the arrangement and types of records within a file.[40]

## D.     The "Means for Receiving a Data File…"

Defendants contend that there is no structure disclosed to perform this function.  Defendants contend that the specification does not include the software that receives the data files from an originating institution.  Receiving data files was not a new or novel concept at the time that the '868 Patent was written.  On the contrary, as David James testifies in his Affidavit,[41] there were several commercially available packages or systems available to serve this purpose for a central processing unit or processor.  The use of this commercially-available software is implied in the specification, which refers to the processor within Translator 1[42] receiving the data files from the originating

---

[38] See Defendants' Brief at p. 19; see Exh. B.
[39] Defendants admit that records are not limited to "settlement records" in their discussion of the related term in Section H (see discussion below).
[40] The Key/PNC Defendants have a different construction that is similar to Plaintiff's.  Plaintiff does not object to this construction.
[41] Attached hereto as Exhibit G, ¶ 7.
[42] See the '868 Patent, Fig. 1—item 1; Fig. 2—block 10.

institutions.[43]  For example, the product SuperTRACS, or Sun Microsystems or Oracle database management systems, could be used to receive the data files.  A person of ordinary skill in the art would know to use commercially available packages or systems such as these to receive the data files.[44]

**E.      The "Means for Storing" and "Means for Temporarily Storing…" Terms**

The structure for the "means for storing" in Claims 1 and 24 should be construed as "archival storage 25 or memory M23, M24…MN."  The structure for the "means for temporarily storing" in Claim 45 should be construed as "memory/mailboxes M23, M24…MN."  Defendant Citibank substantially agreed with Plaintiff that this construction is correct.[45]  These Defendants, however, seek to import their non-infringement theories by adding additional limitations that are not supported. To the extent that the claims include the phrases "uniquely accessible to" or "unique to," those are appropriate for the claims in which they appear.  However, Defendants have absolutely no support for substituting the phrase "accessible only by" for the phrases "uniquely accessible to" or "unique to."[46] The fact that their functions otherwise track the claim language makes it apparent that they have a non-infringement driven motive behind this substitution, which finds no support in the intrinsic evidence.  As drafted, the claim language would not exclude a situation where one institution grants permission for another to access the information, but Defendants' construction would exclude such a situation.  It is unclear what other situations Defendants are attempting to exclude, but their construction is clearly based on non-infringement theories and should be rejected.

**F.      The Preambles of Claims 1, 24, 45, 61, and 80**

---

[43] See, e.g., the '868 Patent at Col. 3:48-57; 4:50-58; 6:6-10; 5:28-33; 8:21-24.
[44] *See* Exh. F, ¶ 7.
[45] Defendant Citibank disagreed  that "archival storage 25" could also be means for storing in Claim 1, but agreed as to the memory/mailboxes M23, M24…MN.  Claim 24 was not asserted against Defendant Citibank.
[46] See Defendants' Brief, chart on page 22.

Defendants devote a page and a half to supporting the idea that several terms from five different claim preambles are limiting. Their scant analysis and quotes picked out of context from the specification and file history cannot support such a broad statement. First, the fact that a term appears in the preamble does not mean that it provides an antecedent basis. As to defendants' arguments that the terms in the preamble provide essential structure, they do not even address each term so it is impossible to respond. Furthermore, their logic is entirely circular: they claim that the preambles support their various non-infringement theories, and therefore they recite essential structure. As noted above and below, these non-infringement driven theories about the nature of the claims are incorrect. Therefore these arguments are both logically flawed and factually incorrect, and must fail. Moreover, the case law cited by Defendants does not support their position that any preamble that is modified during patent prosecution is therefore limiting. Defendants have failed to show how any limitations in the body of any of the claims of the '868 Patent rely upon or derive antecedent basis from the preamble, or how the preambles of any of the claims breathe life and meaning into the claims. Therefore, these preambles should not be held to be limiting.[47]

## G.    "Processor" and "Master Processor"

Defendants' construction of the terms "processor" and "master processor" should likewise be rejected as they introduce multiple unsupported limitations. Defendants' main argument is that these terms should be limited by the term "concentrator." Defendants state that "concentrator" appears in Claims 1 and 24, but it only appears in the preamble of those claims—and Defendants have not explained why it should be limiting.[48] More importantly, there is no logical argument, and certainly no intrinsic evidence, to support Defendants' theory that "[f]or the claimed invention to operate as a 'concentrator,' the processor or master processor must be a single, centralized device that is

---

[47] See, e.g., *Catalina Mktg. Int'l Inc. v. Coolsavings.com Inc.*, 289 F.3d 801 (Fed. Cir. 2002); *DeGeorge v. Bernier*, 768 F.2d 1318 (Fed. Cir. 1985).
[48] See, e.g., *Catalina Mktg. Int'l Inc. v. Coolsavings.com Inc.*, 289 F.3d 801 (Fed. Cir. 2002); *DeGeorge v. Bernier*, 768 F.2d 1318 (Fed. Cir. 1985).

connected to all the originating and receiving institutions so that all data files are transmitted through that device."[49]  Again, Defendants cherry pick from different claims and the file history, but even a cursory review of the evidence cited shows it is far insufficient to support such broad, sweeping, and unsupported limitations.  Defendants attempt to take advantage of the complex nature of connections and processing capabilities of computers, hoping for a construction that would be technologically not feasible or impractical.  Such a construction is simply not supported by the intrinsic evidence of the '868 Patent, and should be rejected.

## H.    "Predetermined Data Format Parameters"

First, Defendants falsely state that Plaintiff has not provided a construction for this term, when one plainly appears in the Joint Claim Construction Chart.[50]  Here, unlike with the term "file format," Defendants admit that the definition should not be limited to "*settlement* records" alone.  Plaintiff's construction of this term explains that the predetermined standards are associated with the data file formats regarding the arrangement of data within data fields, where the arrangement conforms to the particular parameters associated with a specific file transfer protocol.  Defendants' construction does not explain this and should be rejected.[51]

## I.    "Financial Instruments Being Exchanged…" Does NOT Require Physical Exchange

First, Defendants state, falsely, that Plaintiff has offered a construction for the term "financial instruments being exchanged…," which only appears in the preamble of the claims and does not require a construction, as discussed previously.  Plaintiff has offered no such construction.[52]  In another blatant attempt to introduce error into these proceedings, Defendants have discussed a term that only appears in the preamble without ever mentioning that fact, and without supporting their

---

[49] See Defendants' Brief at p. 25.
[50] See Exhibit C to Joint Claim Construction and Prehearing Statement in Compliance with Patent Rule 4-3, at page C10.
[51] See the '868 Patent at Col. 6:29-35; 5:33-48.

[52] Plaintiff's construction discussed on page 27 of Defendants' Brief (footnote 111) is for "financial instruments," which appears in the body of the claim rather than the preamble.

view that this term from the preamble should be construed.[53]  Second, while arguing that financial

instruments must always be physically exchanged in the '868 Patent, Defendants nevertheless admit

that "in at least one described embodiment, the financial instruments are physically transported..."[54]

This is exactly what Defendants have done—found one embodiment in the specification where

physical transport occurs and impermissibly imported this limitation into the claims.  Federal Circuit

case law is clear that it is improper to use details from the preferred embodiments that appear in the

written description of the patent in order to limit the language of the claims that might otherwise have

a broader scope, even when a patent only describes one preferred embodiment.[55]  Not only is the

quote taken out of its context ("In the simplified example of Figure 1…,")[56] the only reason physical

exchange occurs in that example is because it is an ECP example, which at the time required that the

physical item be sent afterwards.  Defendants' definitions contain an unsupportable limitation and

should be rejected.

## J.      "Institution"

There is simply no support for Defendants' view that "institution" must mean a "bank or other

financial institution."  Although Defendants have cited each instance of the term "financial institution"

in the '868 Patent,[57] the only reference they cite to a "bank" appears in Col. 7:42-65, in which an

exchange between banks is described "by way of example."[58]  First, Defendants' construction "bank

or other financial institution" is purposely misleading in that it limits the term "institution" in the

mind of a juror, to a bank or something similar to a bank.  Second, the fact that the term "financial

institution" is used in the specification, while simply "institution" is used in the claims, is evidence

---

[53] See Plaintiff's Opening Brief at p. 13 (discussing why this term does not need to be construed).
[54] Defendants' Brief at page 26, FN 109.
[55] *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, at *11 (Fed. Cir. Apr. 12, 2007); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13, 1323 (Fed. Cir. 2005) (en banc), *cert. denied*, 126 S. Ct. 1332 (2006); *Innova/Purewater, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004) (citations omitted).
[56] This paragraph spans from Col. 6:36-57, and encompasses Defendants' quote at Col. 6:49-57.
[57] See Defendants' Brief, footnote 113.
[58] Col. 7:42-44.

that the claims were not intended to be limited in that manner.  This amounts to nothing more than an impermissible attempt to read limitations from the specification into the claims.

## K.      "Financial Instrument Information"

Defendants' construction of "financial instrument information" directly contradicts the claim language in the '868 Patent.  In Claim 1, for example, the term "financial instrument information" is used to describe the information in the data file from the receiving institution, but it is also used to describe the information transmitted to the receiving institution, after it has been processed (separated into bundles, translated, etc.).  Hence the "financial instrument information" may originally refer to information derived from a financial instrument, but is not limited as Defendants suggest.  On the other hand, Plaintiff's construction is consistent with the claim language and is directly supported by the specification:  "electronic information… representing financial instruments and electronic funds transfers, and additional system generated information…"[59]  The specification explicitly includes electronic funds transfers as well as physical instruments.[60]

## L.      The three Means-Plus-Function Terms in Claim 2

Defendants argue that there is no structure for three means-plus-function terms in claim 2.  The first is "means for…validating the identifying information of the originating institution and said designated receiving institution."  As David James has described in his affidavit, there were certain file procedures that were used for security purposes.[61]  These are referred to in the patent specification at Col. 6:11-26 ("Security procedures are utilized to limit only authorized originating and receiving institutions…[p]rocedures are also used to authenticate information contained in the first data file format with respect to predetermined data format parameters.  This includes validating that the data file submitted by the originating institution is in a format which the system

---

[59] The '868 Patent at 4:50-64.
[60] See id. and the '868 Patent at Col. 5:14-21.  Defendant Citibank also recognized this fact.  *See* Exhibit B to the Joint Claim Chart in that case, at p. 12.
[61] Exh. G, ¶ 12.

recognizes…").  The originating institution could be identified by information such as the routing and transit number in the header record of the file.  This and similar information allowed validation of the file.  Mr. James testified that with this information, a computer could determine the validity of the file, its proposed contents, and the intended receivers.[62]  These computer-implemented security procedures described in Mr. James' affidavit were typical in the industry and known to individuals familiar with the art.[63]  Alternatively, if this Court determines that an algorithm is required as part of the structure for the described function, then the algorithm appears in the specification at Col. 5:63— 6:26.

The second term is "means for… authenticating the financial instrument information contained in said first data file format with respect to predetermined data format parameters."  As noted above, this was part of the security and file procedures that were used to ensure that the correct file was transferred and that it was in the correct format.[64]  As was well-understood in the industry, a computer could use this information to validate the file.  Alternatively, if an algorithm is required as part of the structure of the described function, one appears in the specification at Col. 5:23—6:26.

The third term is "means for…determining a data file format acceptable to the designated institution."  As described above and in David James' affidavit, there were certain standard file procedures and protocols that were used to validate the file format as well as the sender and receiver. These procedures were well-known to those in the industry.  Alternatively, if an algorithm is required as part of the structure for the function of determining a data format acceptable to the designated institution, such an algorithm appears in the specification at Col. 6:27-35 and at Col. 6:3-26.

**M.      Key/PNC's "Predetermined Institution"**

---

[62] Exh. G, ¶ 12.
[63] Exh. G, ¶ 12.
[64] See Exh. G at ¶ 12.

Defendants Key and PNC argue that the term "predetermined institution" must include the phrase "by way of the central translator." Defendants' Supplemental Brief at p. 5. However, Defendants give no support whatsoever for the additional limitations. If the intent was to limit the exchange to "exchanges using the patented system," the construction should have been drafted to say just that. The Joint Defense Group has not offered a construction for this phrase, but Defendant Citibank agreed with Plaintiff's construction. Key and PNC's construction includes undefined and unsupported limitations and should be rejected.

## V.     DISPUTED TERMS IN THE '759 and '778 PATENTS[65]

### A.     Delivery of Financial Instruments from the First Location to the Payment System

This section of Defendants' Brief is particularly troublesome as it combines six different terms from five different claims of two different patents. Defendants' constructions for these various terms have several different problems, although they share the deficiency that they are all obviously, and impermissibly, driven by Defendants' non-infringement theories and they all attempt to read words and limitations into claims that do not belong.

First, Defendants have introduced the words "without intermediate delivery to the payee's collecting and clearing bank" or "to the bank of subsequent deposit" into phrases where they do not appear and do not belong.[66] The '759 Patent describes with sufficient clarity the delivery of the groups of instruments and the cash letters without adding these phrases into the claim language. Defendants' conjecture about what the main benefits of the patent are and what they must therefore require is not evidence and is of no value. Moreover, the benefit of reducing multiple handling can still be realized even if the payee, after sorting and indorsing the financial instruments, utilizes the

---

[65] Plaintiff objects to Defendants' lumping together of these two patents for purposes of claim construction. This tactic has only further complicated already cumbersome proceedings and threatens to inject major error into the claim construction by confusing different claims, specification, and file histories. However, for the Court's convenience and to avoid complicating things even further, Plaintiff will address Defendants' points in the order in which they were presented.
[66] See the first two terms on page 31 of Defendants' Brief.

transportation facilities of their collecting and clearing bank. The central flaw in Defendants'
argument, however, is that it is completely contrary to not only the claim language, but the
specification of the '759 Patent. The '759 Patent clearly gives two examples—Example 1, which
Defendants rely upon for support, in which "in lieu of actually transporting the physical checks to the
depository bank…transports the doubly endorsed checks and accompanying cash letters, for
submission directly into the check payment system." However, there is a completely ***different***
Example 2, in which "a collecting and clearing bank 10 is a provider of check processing services to
other correspondent banks or financial institutions." Defendants completely ignore this distinction,
and their argument is nothing more than an attempt to read a limitation from one of two preferred
embodiments of the specification into the claim language—which, as discussed previously, is clearly
prohibited under Federal Circuit law.

     The file history discussed by Defendants is ambiguous at best and cannot trump the actual
claim language as supported by the specification. Moreover, Defendants have butchered the citations
(which are from the file history of an earlier application by Geer which was subsequently abandoned)
beyond the point of recognition.[67] This illustrates the unreliability of quotes (even if they are not
butchered) cherry-picked out of a file history and presented out of context. There is not enough space
or time to discuss the entire conversations had between the applicant and the examiner; however, we
do know the result of those discussions—the final claim language allowed in the patents.

     Second, Defendants have introduced the words "without further sorting or bundling or
preparation of cash letters at the second location or any other location" or "at the payee's depository

---

[67]  In footnote 130, Defendants quote the response as saying "it would not have been obvious to…submit[] the doubly
indorsed instruments directly into a check payment system." The real quote is "it would not have been obvious to one
having ordinary skill in the art to automate the check payment system by providing, at a first location, a system which
indorses financial instruments separately on behalf of each of the payee and the collecting and clearing bank; coordinating
the transmission of cash letters and information about cash letters with and to the collecting and clearing bank; submitting
the doubly indorsed instruments directly into a check payment system where they are cleared and paid on behalf of the bank
of first deposit; and recording the deposit upon the clearing of the checks." That is just the complete sentence; there is much
more in the discussion of the point.

bank" into phrases where they do not appear and do not belong. As discussed above, there is an entire second example in the '759 Patent specification that Defendants ignore—the correspondent bank example. In that example, efficiencies are realized, yet there may be further sorting and bundling. Defendants impermissibly attempt to read an entire application out of the '759 Patent by reading limitations from one preferred embodiment into the claims.

Third, Defendants' construction of "second location" in claims 1, 5, and 11[68] of the '759 Patent is flawed for two reasons. The first is the addition of the phrase "geographically distant," which does not appear anywhere in the '759 Patent and is not supported by the intrinsic evidence. There is absolutely no discussion of where the "second location" is in Claims 1 or 5 (or where the "bank of subsequent deposit" is for Claim 11 of the '759 Patent), nor in any of the intrinsic evidence relied on by defendants. Plaintiff agrees that the second location is remote or separate from the first location. Arguing that that it must be "geographically distant" is over-reaching and introduces an undefined and ambiguous limitation. The second flaw is that Defendants state that it must be separate from *both* the payee and the collecting and clearing bank. This limitation is not supported by the intrinsic record and Defendants have not cited any supporting evidence. Defendants' construction of this term should be rejected.

## B.    "Location," "First Location," "Item Capture Facility"

This is another blatant example of Defendants attempting to confuse the issues by combining claims and patents in the hope of introducing error—by introducing limitations that do not belong in the claims. Both the '759 Patent and the '778 Patent have two different preferred embodiments, and Federal Circuit law is clear that limitations should not be read from one preferred embodiment into the claims. Focusing on the claim language itself, none of the element have any description of where

---

[68] Defendants did not submit "second location" in Claim 11 as a term for Claim Construction, and did not provide the construction above. Defendants should not be allowed to add new terms in their Responsive Briefing. See Joint Claim Construction and Prehearing Statement in Compliance with Patent Rule 4-3, Exhibit D. Defendants "proposed construction" in footnote 138 should be rejected for the same reason.

the "first location" "location" or "item capture facility" is located. The only such descriptions

appears in the preambles of the claims. ["Said first location determined by the payee remote from the

payee's collecting and clearing bank" (preamble of '759, Claim 1); "first location remote from the

payee's collecting and clearing bank" (preamble of '759, Claim 5); "a location convenient to a

payee's item capture facility and remote from the payee's depository bank" (preamble of '778,

Claim 1).] This type of language is conspicuously absent from even the preamble of Claims 11 of

the '759 Patent and Claim 11 of the '778 Patent, demonstrating Defendants' attempts to read

limitations from one claim into another. Moreover, as noted above, Defendants have not

demonstrated that these preambles are limiting. In their discussion here, they again only point to the

fact that these terms exist in the preamble, but do not explain why the claims depend on them for

preamble basis. The terms also appear in the bodies of the claims and do not require the preambles

for antecedent basis. Defendants also fail to explain why these terms "recite essential structure"

giving meaning to the claims. As noted above, each of the terms also appears in the body of the

claims, which speak for themselves without reference to the preamble.

Furthermore, there is no support in the intrinsic or extrinsic evidence for Defendants' view

that "remote" necessarily means "geographically distant." As discussed previously, Defendants'

citations to portions of the specification describing the location as being "distant" from the depository

bank (See Defendants' Brief, footnote 146) are contained within one of the two examples of the

preferred embodiments of the '759 and '778 Patents; case law clearly prohibits reading such a

limitation into the claims.[69] Defendants do not even attempt to make a rational argument, instead

stating that this is the "plain meaning" of "remote." As discussed previously, "geographically

distant" is far more limiting than "remote," so this construction is over-reaching and unsupported;

---

[69] Defendants' referral to Col. 3:55-67's discussion of "lockbox services" misses the point. The specification states that "typical lock box services" (as of the time of the '778 Patent) do not reap the benefits of the patented invention because they still require "physical transportation of both between lock box location, payee and depository bank" and their processing is "still conducted conventionally, slowly, and repetitively."

furthermore, there is no definition or limit to the term introduced by Defendants (is across town "geographically distant" or does it have to be across the country?) and therefore introducing this term into the construction adds ambiguity and confusion rather than clarity.

In addition to the phrase "geographically distant," there are other unsupported limitations in the constructions listed by Defendants on page 34 of their Brief.  First, Defendants add "any of the facilities of" or "all the facilities of" the collecting and clearing bank, or payee's bank.  There is no support whatsoever in the intrinsic or extrinsic evidence for this limitation, and Defendants cite none. The fact that an item capture facility happens to be owned by payee's collecting and clearing bank does not prevent it from being used for the purposes of the patent.  Defendants do not explain this position and certainly do not cite any relevant support for it.  It is clearly, and impermissibly, an unsupported limitation driven by Defendants' non-infringement theories.  The same is true for the phrase "physically received" in Defendants' construction of "received…by a payee…" in the preamble of Claim 1 of the '778 Patent (which, again, Defendants have not demonstrated needs to be construed, as it only appears in the preamble, and as the phrase stands alone without further construction).  Not only have Defendants skimmed over this limitation and not provided any support for it (there is none), but it is clear that this limitation is in direct conflict with the '778 Patent.  As discussed above, the '759 and '778 Patents explicitly include explicitly include electronic funds transfers in their definitions of "financial instruments."

## C.    Printer Applies Two Indorsements

Again, Defendants seek to introduce limitations that are simply not supported by the intrinsic evidence of either the '759 Patent or the '778 Patent.  Claims 1 and 5 of the '759 Patent and Claim 5 of the '778 Patent do appear to require that the two indorsements are applied **in the same location**. However, that does not mean that they are applied **at the same time**.  The only support cited by Defendants for this limitation comes from the specifications of the two patents, and should not be

read into the claims because they only appear in one of two preferred embodiments.  It is clear from this citation that what is meant by "at the same time" is "while at the same location."  The two portions cited by Defendants state that the indorsements are applied "at the same time, ***instead of twice at the different locations***."[70]  Likewise, the fact that the indorsements are applied by the same printer, stamping mechanism, or sorter does not necessarily mean they are done "at the same time" (again, depending on what is meant by "at the same time.").  Defendants' limitation is not supported by the intrinsic evidence and introduces further ambiguity.

Furthermore, there is no intrinsic or extrinsic evidence for Defendants' claim that the indorsements must be on the reverse side of a financial instrument.  The only evidence cited by Defendants to support this position is again from a discussion of the preferred embodiment in the specification, which does not limit the breadth of the term.  Moreover, this portion of the specification merely states that "an institutional indorsement is *conventionally applied* as a stamp . . . on the reverse side of a check."  This does not support Defendants' view that the indorsements ***must*** be on the reverse side of a financial instrument.

In addition, Defendants again attempt to introduce limitations by lumping claims together.  Defendants' construction of "applying to…instruments…separate indorsements…" for Claim 5 of the '759 Patent and Claim 5 of the '778 Patent includes the limitation that the "the printer operates to print" the indorsements.  However, it is clear from the claim language that while Claim 1 of the '759 Patent requires that "a printer" apply the indorsements, there is no such limitation in Claim 5 of the '759 Patent or Claim 5 of the '778 Patent.

**D.    The "central processing unit and communication link . . .  settlement of accounts in the check payment system" [Claim 1, '759 Patent]**

---

[70] See the '759 Patent, Col. 4:40-44; the'778 Patent, Col. 12:64—13:1.

In compromise and to minimize disputed issues, DataTreasury does not oppose the Defendants' proposed construction[71] of the term: "central processing unit and communication link . . . settlement of accounts in the check payment system." As to the other three terms in the chart on p. 39 of the Defendants' brief, there remain conflicts between the parties' proposed constructions and therefore, DataTreasury stands on its current proposed constructions.

**E.     "Coordinating the Delivery of the Instruments and Cash Letters into the Payment System" [Claim 5, '778 Patent]**

In compromise and to minimize disputed issues, DataTreasury does not oppose the Defendants' proposed construction.[72]

**F.     "Imager for Creating a Second Record . . . " [Claim 1, '778 Patent] Is a Device That Creates an Electronic Representation of an Object**

This phrase should be construed as "a device that creates an electronic representation of an object." This phrase is not in means-plus-function format. Although this term does not contain the word "means," the Defendants nevertheless erroneously insist that this phrase is a means-plus-function term. The specification supports DataTreasury's construction as it shows that the imager is a scanner or camera-type device because from this device, "an image of the physical check is created" and the resulting image "may be an optical or electronic gray-scale or color image of the check." *See* '778 Patent, at Col. 8:10-27. An imager is a well-known structure in the banking industry, and it is sufficiently described in the '778 Patent for one of ordinary skill in the art. In his affidavit, Terry Geer states that "at around the time of writing the '778 Patent, it was well understood that hardware such as the sorters above with software from vendors such as IPS, IIPS, Unisys, and

---

[71] Defendants' construction is: "A central processing unit and communication link that: (1) ensure cooperation in a common action or effort between the payee and the payee's collecting and clearing bank; (2) determine the timing in advance of the transport of the sorted instruments and the associated cash letters; and (3) controls when funds are credited to the payee's account at the collecting and clearing bank, dependent upon receiving notification of settlement that an instrument was settled through the payment system."

[72] Defendants' construction is: "Controlling the timing of transport of the instruments and cash letters into the payment system."

NCR were used as imagers."[73]  The sorters he is referring to are conventional reader-sorters, a well-known machine in the industry.  In addition, Mr. Geer states that "[a] person of ordinary skill in the art would understand the item capture 4 in Figure 1 and the associated components to be the "imager."[74]

**G.     The Method Claim Steps in Claims 5 and 14 of the '759 Patent Do Not Need to Be Performed in Order**

On the one hand, the Defendants argue that the claim steps in Claims 5 and 14 of the '759 Patent must be performed in sequence, yet on the other hand in footnote 168 of Defendants' Brief (p. 42), they concede, as they must, that the sorting and indorsement claim steps do not require a particular order.  This concession proves that the method claim steps are not *required* to be performed in a particular order.

**H.     "Reporting to the respective banks and payee information in the cash letters" [Claim 11, '759 Patent]**

The Defendants have modified their construction to: "reporting to the respective banks and payee, information in the cash letters."  *See* Defendants' Brief, at p. 44.  In light of this modification, DataTreasury does not object to the Defendants' modified construction.

**I.     "Scanner" [Claim 1, '778 Patent] Is an Electronic Reader that Reads at Least MICR Data**

The Defendants agree with DataTreasury's construction that a "scanner" means "an electronic reader that reads at least MICR data."

**J.     "Settlement of Accounts" [Claim 1, '759 Patent]**

In the '759 Patent, the term "settlement" should  be construed as "a calculation of aggregate amounts owing and payable in each account."  The specification defines what "settlement" means:

---

[73] Exh. F at ¶ 16.
[74] Exh. F at ¶ 16.

**Plaintiff DataTreasury's Reply Brief on Claim Construction**          Page **29** of **33**

"Such a settlement involves the physical transport and exchange of the checks, and *a calculation of aggregate amounts owing and payable by participants* in either a bi-lateral or multi-lateral settlement at a predetermined time.  After settlement, the check payor's bank would physically have custody of the check and would conventionally process the check for its customer's account." '759 Patent, at Col. 3:63-4:2 (emphasis added).   There is no reference in the specification to any actual transfer of funds as Defendants' construction requires.

**K.     The "Payee's Depository Bank" and "Depository Bank" [Claims 1 and 11, '778  Patent]**

In compromise, DataTreasury accepts the Defendants' suggestion that DataTreasury's construction be modified as follows: "the bank of first deposit where payee has an account, and where the physical instruments would otherwise be delivered, had it not been processed at the payee's location."  This is the parties' agreed construction.

**VI.     CONCLUSION**

DataTreasury's claim constructions are consistent with the intrinsic evidence and is supported by the relevant extrinsic evidence.  DataTreasury requests that this Court adopt its claim constructions for each of the disputed claim terms.

Respectfully submitted,

_____
ROD COOPER
State Bar No.  90001628
EDWARD  HOHN
Attorney-in-charge
State Bar No. 09813240
EDWARD CHIN
State Bar No. 50511688

**Plaintiff DataTreasury's Reply Brief on Claim Construction**                    Page **30** of **33**

NICOLE REED
State Bar No. 24041759
NIX PATTERSON & ROACH, L.L.P.
5215 N. O'Connor Blvd., Suite1900
Irving, Texas 75039
972.831.1188; 972.444.0716 fax
nicolereed@nixlawfirm.com
rodcooper@nixlawfirm.com
edhohn@nixlawfirm.com
edchin@nixlawfirm.com

C.  CARY PATTERSON
State Bar No. 15587000
BRADY PADDOCK
State Bar No. 00791394
ANTHONY BRUSTER
State Bar No. 24036280
R. BENJAMIN KING
State Bar No. 24048592
NIX PATTERSON & ROACH L.L.P.
2900 St. Michael Drive, Suite 500
Texarkana, Texas  75503
903.223.3999; 903.223.8520 fax
ccp@nixlawfirm.com
bpaddock@nixlawfirm.com
akbruster@nixlawfirm.com
benking@nixlawfirm.com

JOE KENDALL
State Bar No. 11260700
KARL RUPP
State Bar No. 24035243
PROVOST * UMPHREY, L.L.P.
3232 McKinney Avenue, Suite 700
Dallas, Texas  75204
214.744.3000; 214.744.3015 fax
jkendall@provostumphrey.com
krupp@provostumphrey.com

ERIC M.  ALBRITTON
State Bar No. 00790215
ALBRITTON LAW FIRM
P.O. Box 2649
Longview, Texas  75606
903.757.8449; 903.758.7397 fax
ema@emafirm.com

**T. JOHN WARD, JR.**
State Bar No. 00794818
**LAW OFFICE OF T. JOHN WARD, JR.**
P.O. Box 1231
Longview, Texas 75601
903.757.6400; 903.757.2323 fax
jw@jwfirm.com

***ATTORNEYS FOR PLAINTIFF DATATREASURY
CORPORATION***

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that a true and correct copy of the foregoing document was served electronically upon all the following on the 23rd day of August, 2007.

Bank of America - Listserve (BankofAmericaF&R@fr.com)
BB&T ListServe (BB&T_DataTreasury@kilpatrickstockton.com)
Citizens Financial (citizensfinancial@standleyLLP.com)
City National Bank - Listserve (citynationalbank@dmtechlaw.com)
Comerica Bank 007 Listserve (Comerica_DataTreasury@kilpatrickstockton.com)
Compass/First Horizon/TN Bank - Listserve (comfhft@andrewskurth.com)
Cullen/Frost Bank - Listserve (frostbank@dmtechlaw.com)
EDS - Listserve (EDS_DataTreasury@mckoolsmith.com)
UBS – Listserve (ubsamericas@velaw.com)
HSBC North America Holdings, Inc./HSBC Bank USA  Listserve  (hsbccounsel@blhc-law.com)
BancorpSouth Listserve (bxs@hughesluce.com)
Bank of Tokyo Listserve (BankofTokyo_DataTreasury@sidley.com)
BofNY Listserve (BofNYLitTeam@pillsburylaw.com)
The Clearing House/SVPCo Listserve (TCH_DT@sullcrom.com)
Deutsche Bank Listserve (DeutscheBank_DataTreasury@sidley.com)
First Citizens Listserve (firstcitizens@bakerbotts.com)
First Data Listserve (FirstData_DataTreasury@sidley.com)
Key Bank Listserve (KeyCorp_DataTreasury@mckoolsmith.com)
LaSalle Bank Listserve (LaSalleBank_DataTreasury@sidley.com)
National City Bank Listserve (foley-dtc@foley.com)
Remitco Listserve (Remitco_DataTreasury@sidley.com)
Telecheck Listserve (Telecheck_DataTreasury@sidley.com)
Union BofCA Listserve (ubofclitteam@pillsburylaw.com)
Viewpointe Listserve (Viewpointe_dtc@skadden.com)
Zion First National Bank Listserve (foley-dtc@foley.com)
Harris Bancorp. - Listserve (Harris_DataTreasury@mckoolsmith.com)
M&T 007 Listserve (M&T_DataTreasury@kilpatrickstockton.com)
PNC Bank - Listserve (PNC_DataTreasury@mckoolsmith.com)
Suntrust - Listserve (SunTrust_DataTreasury@mckoolsmith.com)
U.S. Bancorp – Listserve (foley-dtc@foley.com)
Wachovia 007 Listserve (Wachovia_DataTreasury@kilpatrickstockton.com)
Wells Fargo - Listserve (*DalWellsFargo_DTC@BakerNet.com)

**ROD COOPER**