# EXHIBIT "G"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| DATATREASURY CORPORATION | § <br> § |
| Plaintiff | § <br> § |
| v. | § Civil Action No.: 2:05-CV-294 <br> § |
| CITIGROUP INC., CITIBANK, <br> NATIONAL ASSOCIATION, | § <br> § <br> § <br> § |
| Defendants | § |

### AFFIDAVIT OF DAVID JAMES

| | |
|---|---|
| STATE OF ARIZONA | § <br> § |
| COUNTY OF MARICOPA | § |

1. My name is David James. I am over twenty-one (21) years of age, of sound mind and competent to make this Affidavit. I have personal knowledge of the matters stated herein, which are true and correct.

2. I have worked in the banking and financial services industry for more than forty years. I have experience in programming and systems, bank operations, item processing, and most aspects of back office payment processing. Attached is my resume further showing the breadth and depth of my experience.

3. I am the inventor of U.S. Patent No. 5,717,868 ("the '868 Patent"). By my education, training, and experience, I am qualified to provide testimony on the understanding of persons of ordinary skill in the art relative to U.S. Patent Nos. 5,265,007 ("the '007 Patent), 5,930,778 ("the '778 Patent), 5,583,759 ("the '759 Patent), and of course the '868 Patent, at the time of their filing and invention date. I have carefully read and analyzed each of these four patents.

4. A person skilled in the art in this field would have a minimum of two to four years of direct experience in one or more of the following areas of banking: bank operations, float management and basic accounting, check processing operations, clearinghouse operations, banking payment rules and Federal Reserve practices, and programming and systems support for these types of banking applications. I have more than the qualifications to give an opinion as a person of ordinary skill in the art in these four

Affidavit of David James                                                                                           Page - 1 -

patents, and in my many years in the industry I have worked with several persons meeting this skill set. Thus, I have a strong appreciation of what a person of ordinary skill in the art would understand when reading these patents.

**'759 Patent—"Means at the first location for preparing one or more cash letters"**

5. At or around the time this patent was written, it was common practice for larger companies like utilities and credit card companies to operate their own billing and accounts receivable systems. Many of these types of companies invested in check reader-sorter type hardware and software from companies like Unisys, NCR, IBM and others for an in-house remittance solution. A person of ordinary skill in the art would know that the sorters in the '759 Patent specification and claims are reader-sorters such as these with types of software available to create cash letters and single deposit records, that comes with the hardware or can be purchased from a variety of vendors such as those provided and further including Banctec, REI-Recognition Equipment Inc., Bell & Howell and Scan Optics and others. The remittance process software provided by these hardware and/or software firms allowed the reader-sorter equipment to create a cash letter and either a single deposit of all checks at one bank or multiple deposits at multiple banks.

6. With the process outlined in this patent, companies would follow the sort pattern specifications provided by the collecting bank. They would also provide two endorsements on the items, one for their company as Payee and one for the collecting bank as bank of first deposit. The company could deliver, on behalf of the collecting bank, most of the checks directly to the local banks that had larger volumes of checks or dollars represented by the checks. The remaining checks would be delivered directly to the closest Federal Reserve processing site or another correspondent bank, as a cash-letter(s) from the collecting bank (i.e., bank of first deposit).

**'868 Patent—"Means for receiving a data file from an originating institution"**

7. At or around the time this patent was written, there existed several commercially available packages to manage the transmission of multiple files into and out of a data facility. These would have been the software run by the processor associated with translator 1 in Fig. 1 of the '868 Patent. One such product was Super TRACS. This system acted as a traffic cop to detect files being sent to the facility and also to go to specific locations in a computer storage device and determine the presence of a file, and based on predetermined parameters established in Super TRACS when that file was to be transmitted and where it was to be transmitted to. There was a similar system produced by Arkansas Systems in Little Rock, AR that provided similar management of file transmissions in and out of a data center, where the processor was an IBM AS400. This system ran off an anticipated daily transmission schedule and could notify the systems operator if an expected file had not been received or if an expected file to be sent was not yet available to be sent. Any similar type of off the shelf file transmission management system could be used to manage this function, or a similar home grown version could be programmed by a person skilled in the art. Sun Microsystems and Oracle database

Affidavit of David James　　　　　　　　　　　　　　　　　　　　　　　　　　　Page - 2 -

management systems further provided similar capabilities for managing file transmission and handling.

### '868 Patent—"Program means for separating and bundling and for translating said records"

8. Check reader-sorters began to appear in the late 1950's early 1960's, as MICR characters began to be printed on checks. This led the way to marked improvements in the way check processing was automated and used by banks to handle the increasing volume of checks being written in the U.S. Check reader-sorters had, in general, between 13 and 48 pockets that were used to separate checks into cash-letters and to further automate the sorting of the on-us checks into account number sequence for storing the checks until they were returned to the drawee in a monthly statement. The software was readily available from multiple vendors such as NCR, Banctec, IBM (CPCS) (SuperMICR running on IBM but made by a separate vendor) and Unisys (IPS) and others, and anyone overseeing bank check processing operations should be familiar with the process and these vendors software.

9. At or around the time this patent was written, program routines for determining the routing and transit number of a check and matching the routing and transit number to a "pocket list" that contained multiple routing and transit numbers existed. The "pocket list" then determined which pocket on the check sorter the item would be directed to. Use of these program routines to separate the items into groups or bundles according to predetermined groupings from sort pocket lists were common place in banks. These groups or bundles became, in some instances, the cash-letters that were presented into the Payment System.

10. At or around the time this patent was written, IBM and others began to deliver, software capabilities to reformat files and records based upon data dictionary parameters. Each record type had a unique structure and sequencing of the information; this software was used to translate the records to a different format. Some of these solutions used data dictionary logic and others used different data mapping logic. The process was commonplace, and there were several ways to accomplish the reformatting.

### '868 Patent—"Security mechanism"

11. Banking regulatory agencies had already begun to monitor security procedures for on-line banking systems and several vendors had begun to market security mechanisms around the time this patent was written. One such vendor's product, Secure ID, was in use and was an example of what was envisioned in 868 as a security mechanism. With Secure ID, each participant is given a token/fob that generates a new 6 digit numeric code every 60 seconds. A serial number on the token/fob synchronizes with software running in the processor. When a participant accesses the processor they are asked to enter a preset 4 digit code known only to them and the processor and the current 6 digit code displayed on the token/fob. This information is transferred to the processor and matched

against the algorithm in the computer associated with the token/fob. If there is a match, the participant is allowed to transact with the processor. If no match, access is denied.

**'868 Patent—"Security procedures"**

12. Most on-line systems in use at or around the time the '868 patent was written met banking regulators' requirements for security by using a combination of authentication mechanisms (see above) and procedures that were routines contained in the logic of the computer. In the case of file procedures, it was common practice to have unique characters in the header, or first record of a data file. "1HRD" in the first 4 positions of the record might identify the first header record. There could be other predefined information such as the routing and transit number of the sending bank, today's date, an indication of the number of files already received from this sender this day, and similar information to allow validation of the file. There could be multiple header records so predefined. Each unique header record would contain addition information that helped the computer determine the validity of the file, the proposed contents of the file and the intended receiver(s), and the total value of the items or a control count to help establish more information about the contents of the file. Header records would typically be followed by detailed transaction records. The last record of a file would typically be a trailer record. It might be identified by having "1EOF" or similar designation in the first 4 positions of the last record. It might also contain balancing information to help the computer establish that all records the sender intended to send had been successfully received and processed. These routines were standard routines known and used across the data processing industry. These are the typical "security procedures" referred to in the '868 that are known to individuals that are familiar with the art.

**'007 Patent—"Means within each of the pre-selected receiving institutions...for receiving from the central processing unit a calculated value (a) on a real time basis and (b) on a regular periodic settlement basis, information regarding the debits and credits owing to or payable by an institution with respect to each other of the institutions with regard to instruments sent and received"**

13. The '007 invention, among other things, automated the collecting and reporting of information from participants in a net settlement clearing arrangement. All participants, being enrolled in the exchange, were provided with the software, the token/fob for the security mechanism, and were trained on the process and procedures of the clearinghouse. The invention took advantage of existing technology, like the software PC Anywhere, Attach Mate, and others, that allowed personal computers, under controlled conditions, to link to a CPU using existing data communication techniques. Each participant, upon being authenticated by the CPU, was able to access several functions provided by the invention. One function was the ability to enter information about cash-letters the participant had sent to other participants. (It should be noted that this invention allowed for net settlement to happen across multiple Federal Reserve Districts. Prior to this the Federal Reserve had only allowed net settlement arrangements within each of the 12 Federal Reserve Districts.) A participant (Participant X) could access a data screen that contained information about other banks Participant X had pre-

selected to send cash-letters to. Participant X was able to enter the amounts of the cash-letters on the screen.

14. Other participants were performing similar data entry for cash-letters they were sending to Participant X. Participant X could also access a data screen that contained information about what these other banks were sending to Participant X.

15. On yet another data screen, Participant X could see the net dollar difference between all of the items Participant X had sent to other participants and the dollar value of the items Participant X was scheduled to receive from the other participants. (Since this was the first national net settlement arrangement, many of the cash-letters were shipped via air courier and took 6 to 12 hours to arrive). Yet another data screen allowed each participant to see, in real time, their anticipated net settlement position based on information that had been entered, by them and others, so far during this settlement cycle.

16. As explained above, information entered by participants or calculated by the CPU is always current as per the last participant's entry and is available to all participants on a real time basis.

**'007—Means for continuous monitoring on real time basis, as reported by each institution by the means for sending information within each institution (a)(i) the sending and receipt status of the instruments and (ii) the value of the instruments sent and received, as reported by each of the institutions, and (b) the status in transit of the instruments with respect to their having been (i) sent and (ii) received, as reported by each of the institutions, according to the reporting of an institution's sending and receiving of instruments**

17. As described above, each participant can access information over their connection to the CPU any information that impacts the net settlement calculations. This information is accessed over their link to the CPU by their personal computers with personal computer software, such as PC Anywhere or Attach Mate.

**'007—Means for calculating debits and credits…as monitored on a real time basis from information reported by the institutions.**

18. In a net settlement arrangement as described in the patent, most people familiar with operating a settlement organization and all participating banks know that a participant's net position is determined by comparing the total value of items the participant sent and the receiving institution received, compared to the total value of items the participant received from the other participants. It is the same process that has existed for decades. The difference is that under this patent, the calculations are done by the accounting instructions, similar to spreadsheet software, associated with the CPU.

**'007—A Cycling means interrelated with the central processing unit (a) for controlling the physical transport of the financial instruments among the institutions and (b) for controlling the means for calculating**

19. A full cycle of a settlement process includes all activities that must occur between one settlement day and the next. It may be easier to picture a 24 hour clock. Once around the clock completes one cycle of the settlement process.

20. In a national net settlement arrangement the participants must establish an agreed upon settlement time. This time must take into consideration the different time zones and the time it will take to transport items between the furthest away participants, like between an east coast bank and a west coast bank.

21. Since most transit work is ready to ship between 8 pm and midnight, the participants might begin to input information about the value of the cash-letters they were sending to other participants as the work was being sent (8 pm to midnight). Assuming that transportation could be arranged so that all work sent by any participant could be received by any other participant by 8 am to 10 am. If adequate transportation does not exist, then a participant may not be able to reach all other participants in a timely manner and that participant would restrict themselves to only sending to participants where deliveries could be made in a timely manner under the agreed upon rules of the clearinghouse.

22. Participants could confirm on-line that they had received their cash-letters by an agreed-upon time, say, 11am. Senders could see if any of their work had not been delivered to the banks they sent to and could contact their couriers to determine the cause of the delay and hopefully get the work delivered and acknowledged by the receiver. Every settlement cycle has a time, after which no additional input of information is allowed (i.e., this might be 12:30 pm in the above example). In that case, at exactly 12:30 each participant would know their net position and could determine if they were in a net debit position. The cycle rules might allow up until 1:30 pm for all net debit position participants to prepare to cover their debit position with sufficient funds. Assuming all net debit positions were funded by net debit position participants, then the settlement would occur at the regular scheduled time of, for this example, 2 pm. Procedures are in place with clearinghouses to cover any contingency where a participant may not be able to cover their net debit position. Within a few minutes after the settlement occurs the system is reopened for inputting of the next settlement day's information.

23. The internal clock of the CPU can automatically determine what phase of the daily cycle the process is in. These rules and instructions of the clearinghouse, which control the daily cycling, are programmed into the CPU in a way understood by persons skilled in the art.

24. (a) In this explanation you can see that the physical transport of the items is controlled by the rules and regulations of the clearinghouse and are the responsibility of the sender and the receiver. The sender must be sure that the courier schedule allows for timely delivery before contracting for the service and must daily input information about the value of each cash-letter sent. The receiver has the responsibility to confirm receipt of the cash-letter the next day after it is received.

Affidavit of David James                                                                 Page - 6 -

25. (b) The CPU is available during specific times of the day, specified by the clearinghouse rules, for receiving information from the participants about cash-letters sent and received up to the net settlement input deadline. During this period of time, the accounting instructions, similar to spreadsheet software, associated with the CPU, is calculating in real time, as transactions are entered, the net position of each participant.

**'007—Means at each participant for (1) sending and receiving financial instruments to be cleared, (2) sending and receiving in real time, information reporting value and transit status of the financial instruments to be cleared to a programmable CPU, (3) Addressing CPU by which a participant may determine in real time, the information received by the CPU with respect to that participants real time debit and credit obligation with respect to other institutions arriving from instructions that are reported to be sent and received.**

26. (1) As discussed earlier in this document, senders are responsible for sending their cash letters to the receiving participants. This could be some form of air or ground transport. Most banks have a designated area in their check processing facility where incoming cash-letters are delivered and where out going cash-letters are placed for pickup by couriers.

27. (2) As discussed earlier in this document, a sending participant is responsible for inputting information into the CPU about the value of each cash-letter they are sending to other participants. A receiving participant is responsible for inputing information to the CPU that cash-letters that other participants had sent to them have been received by them. The inputting of information to, and receiving of information from, the CPU, occurs over the electronic communication links.

28. (3) As discussed earlier in this document, any participant can be on-line to the CPU and receive real time updates of any information input into the CPU by any participant. The inputting of information to, and receiving of information from, the CPU, occurs over the electronic communication links.

**'007—Means for receiving and recording a participant's reports of the value and transit status of the instruments to be cleared as having been sent and received with respect to all participants in the system.**

29. As discussed earlier in this document, each participant can access data screens from the CPU. The accounting instructions, similar to spreadsheet software, associated with the CPU, discussed earlier would have received and recorded the participant entries at the CPU. At the participant location, these data screens could be printed on a printer that could be attached to the personal computer the participant was using to access the CPU.

**'007—Means for monitoring on a real time as reported basis**

30. At or around the time the '007 patent was written there were several commercially available software programs that allowed a personal computer to access another

computer. Examples of such programs were PC Anywhere and Attach Mate. These programs were available at any office supply store that sold personal computer software.

31. Once installed on the participant's personal computer and once the personal computer had access to a communication link, it was possible for the participant to communicate with the CPU as described above and for the participant to monitor events as they happened and were recorded at the CPU (real time).

*[signature]*
DAVID JAMES

SUBSCRIBED AND SWORN TO BEFORE ME this 9 day of April, 2007.

*[signature]*
NOTARY PUBLIC, STATE OF ARIZONA

My Commission Expires: 10-22-08

OFFICIAL SEAL
ILENE BERG
Notary Public - State of Arizona
MARICOPA COUNTY
My comm. expires Oct. 22, 2008

Affidavit of David James                                Page - 8 -

# Exhibit 1

Case 2:06-cv-00072-DF-CMC   Document 776   Filed 08/23/2007   Page 10 of 14

# David L. James
7326 State Route 19, Unit 5002, Mount Gilead, Ohio 43338

## Experience

**JPMChase**       April 14, 2003   to March 31, 2007
*Vice President, Senior Product Sales Specialist* – Global Treasury Services

>   Managed book of business consisting of financial institutions, mid corporate customers and public funds companies and prospects in the western U.S. Called on senior operations and treasury contacts in these companies. Goal was to retain current clients and add new clients. Interfaced with senior bankers, product management, and sales management at Chase. Supported treasury products to help clients collect payments from lockbox, check clearing, both paper and image, including remote image capture. Also supported the Chase nationwide vault services. My position was eliminated effective March 31, 2007.

**Thomson Financial Publishing**, Skokie, IL        February 2002 to April 2003
*Director of Sales* Financial Global Operations Network  February 2002-April 2003

>   Led product and sales teams for the growth of network based applications for financial institutions. Created new network based services. Division was phased out in 2003 as Thomson sought to sell off business units.

*Director of Business Development and Vice Chairman* Financial Global Operations Network                May 1999 – February 2002

>   Managed product and business acquisition activities. Provided thought leadership for the creation of new products and services.

**Carreker Corporation** Dallas TX         February 1998 to May 1999
*Director of Sales* PSN

>   Provided sales leadership for an innovative fraud/risk management service used by many of the nations largest banks. Called on most of the top 100 banks. Business line was sold to New York Clearinghouse in 1999.

**Huntington National Bank** Columbus, Ohio      July 1994 to February 1998
*Vice President/Managing Director* – Financial Institutions Group  4/97 – 2/98

>   Led the start up of this new division focused on product sales through private labeling of products and correspondent services. Hired and developed staff. Created marketing materials and sold new relationships. Built million dollar prospect pipeline. Co-inventor on two  payment

systems patent applications dealing with electronification of check information. Participated in planning and design of alternate payment methodologies for Internet and merchant network products.

*Vice President and Managing Director* – The Check Exchange System (CHEXS)
7/94 – 4/97

Bottom line management responsibility for this partnership business operating the National Clearing House Association. Grew volume from less than 1 million items/day in 1994 to more than 4 million items/day in 1997. Took business from unprofitable operation to multi million profits/year. Oversaw creation of four significant new business products:

Fourth District Clearinghouse – Clears and settles 3.5 million items/day

National Returns Clearinghouse – A private sector, imaged based, alternative to return item processing through the Federal Reserve. Created business plan, selected software and hardware, facilities staff and negotiated all contracts leading to the launch of this business.

Adju$tNet – A personal computer based adjustments processing and settlement system. Created business plan, product design, and managed development contract to create product leading to business start up.

Invented and patented a process for the creation of a payment translation, mapping, store and forward concentration service dealing with electronic transactions in various formats, U S Patent # 5,717,868.

**Corporate Credit Union Network** – Ohio and Michigan        1990 – 1994
*Vice President of Operations*

Business manager responsible for payment systems product management, service delivery, MIS, and related operations: item processing, wire transfer, ATM network, ACH, and related customer support. Led efforts to expand product development, cross sell products, and enhance the profitability of the business. Served over 1000 credit unions through these "Banker Banks". Designed and implemented new software application transition plans for item processing and file transmissions. Increased item processing fee income through new clearing and cash letter product offerings. Negotiated and implemented industry relationships.

**David L. James and Associates, Inc.** Columbus Ohio         1987 to 1994
*President*

> Created a "manufactures sales representative" company focused on representing small software vendors. Marketed product and services to financial institutions in the Midwest. Provided consultative solutions through turnkey implementation. Scope of services ranged from personal computer products to complete item and account processing solutions installed for financial institutions.

**First National Bank Of Chicago**                           1984-1987
*President* – Comtrac– Columbus, OH  1985-1987

> Hired as a turn around manager of this wholly owned business focused on transportation EDI processing, freight bill auditing and payment for Fortune 500 companies. I took over responsibility for the company when it was experiencing severe financial losses and was loosing market share. In less than 18 months we had built a new management team, restored profitability, and re-engineered the auditing and payment processes to increase efficiencies and accuracy. During the turn around process I merged this payments business with a mainframe software business and realigned staffing across both operations. Business was profitably sold in 1987

*President* – First Chicago Data Corp  Chicago, IL  1984-1985

> I was recruited by First Chicago to salvage a poor performing data services operation. This business provided check clearing and core processing services to mid sized banks. The business was loosing $4 million a year on $11 million in sales. Through site consolidation, staff realignment, sales and customer service improvements, we were able to restore profitability and profitably dispose of the business.

**Automated Data Processing** Clifton NJ                     1982 –1984
*Vice President, Regional Manager* – Banking Services Division

> Organized and staffed a new sales effort to successfully introduce service products in a five state Midwest area. Stabilized ongoing revenue while reducing expenses by over $1 million per year. Introduced a personal computer strategy to augment the traditional main frame banking product.

**Citicorp Information Services** – Stamford CT              1980 – 1982
*Vice President*

> Worked under a three year management contract when P G Data Center was sold to Citicorp. During 1980 and 1981 involved in acquisitions,

divestitures and product development. During 1982 served as National Sales Manager for Technology Products with a sales force of 90 representatives.

**P G Data Center, Inc.**, Garrettsville, OH                                    1967-1980
*President*

Successfully directed the start up and growth of a bank service corporation owned by three banks in Ohio. Grew business to $3 million in annual revenue from 50 financial institutions. Directed the construction of a 27,000 square foot data center. Operated four remote capture facilities in addition to the main data center.

Prior to 1967, I worked as a programmer with Suburban Trust Company in Hyattsville MD. I also worked in systems development at National City Bank in Cleveland, OH.

## Education

University of Maryland
Electrical Engineering

California American University
Graduate studies in Leadership and Management

Numerous programs in business, technology, management, and sales

## Military

Air National Guard - Served 13 years active and reserve. 1960-1972
Data Systems Specialist (E7) with Secret Security Clearance