# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | |
|---|---|
| **DATATREASURY CORPORATION,** | **2:06-CV-72 DF** |
| **Plaintiff** | |
| **v.** | |
| **WELLS FARGO & COMPANY, et al.,** | |
| **Defendants** | |
| **DATATREASURY CORPORATION,** | **2:05-CV-292 DF** |
| **Plaintiff** | |
| **v.** | |
| **BANK OF AMERICA CORPORATION, et al.,** | |
| **Defendants** | |
| **DATATREASURY CORPORATION,** | **2:05-CV-293 DF** |
| **Plaintiff** | |
| **v.** | |
| **WACHOVIA CORPORATION, et al.,** | |
| **Defendants** | |
| **DATATREASURY CORPORATION,** | **2:05-CV-291 DF** |
| **Plaintiff** | |
| **v.** | |
| **WELLS FARGO & COMPANY, et al.,** | |
| **Defendants** | |

## DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF

## TABLE OF CONTENTS

Page

I. INTRODUCTION ........................................................................................................1

II. ARGUMENT .............................................................................................................4

    A. DTC is Bound by its Disclaimers Presented during the Reexamination Proceedings which Expressly Exclude Spoke and Hub Architectures and Other Prior Art Architectures from the Scope of "Tiered," and Thus, Render "Tiered" Indefinite under 35 U.S.C. §112 ¶2 .......................................................................4

        1. DTC's proposed construction of "tiered" is both wholly ambiguous and inconsistent with arguments made in reexamination ....................................5

        2. "Tiered" excludes spoke and hub architectures ...........................................6

        3. "Tiered" excludes all architectures depicted and/or described in the Minoli textbook..............................................................................................6

        4. "Tiered" excludes all architectures described in the Geer patent ...............7

        5. "Tiered" excludes additional architectures encompassed in the prior art....8

    B. "Subsystem" means "An organization of computer components that comprises a functional unit that is part of a larger system.  'Subsystem' does not include 'any computer components in the payee's location' (or in both 'the payee's location and in the bank')."  In the alternative, Defendants ask the Court to find all of the claims containing the term "subsystem" to be indefinite.........................................9

    C. "Encrypt" should be construed to specifically exclude network-layer type encryption .................................................................................................................12

        1. The claims themselves require that specific data elements or files are encrypted prior to transmission.................................................................12

        2. Data-level encryption is a necessary aspect of the invention and the only encryption described, according to both the specification and inventor Claudio Ballard ........................................................................................13

        3. DTC is attempting to enlarge the scope of the claims beyond what was described in the specification....................................................................15

## <u>TABLE OF CONTENTS CONT'D.</u>

D.  The Relationship Between "Encrypting Subsystem Identification Information and the Transaction Data" and "Transmitting the Transaction Data and the Subsystem Identification Information Within and Between the Remote Location(s) and the Central Location" in the Claims Requires Encryption of Data to Take Place at the Data Level Within the Remote Location Before Being Transmitted From the Remote to the Central Location ............................................................................16

E.  "Data Access Subsystem providing encrypted subsystem identification information and encrypted paper transaction data to the data processing subsystem" means "1) subsystem identification information and paper transaction data are encrypted and then sent/transmitted by the data access subsystem, and 2) the encrypted subsystem identification information and encrypted paper transaction data are received by the data processing subsystem." ........................18

F.  "Data Access Subsystems for capturing and sending paper transaction data and subsystem identification information" means "a subsystem located at the location of image capture that provides for the input of transaction data and subsystem identification information into the overall system and provides the transaction data and subsystem identification information to other parts of the overall system." ...............................................................................................................19

G.  "Within and Between," meaning both within and between, should be given the same meaning throughout the patents ................................................................21

H.  "Local Area Network" Requires Network Devices to be Located in the Same Physical Facility in Addition to Being Connected to the Network ........................23

I.  "Wide Area Network" is capable of sending data between geographically distant locations .........................................................................................................23

J.  "Remote" as applied to a subsystem or location "refers to a physically separate location or subsystem, not near or immediate, and distant from the central location or subsystem and from any intermediate or collecting location or subsystem." ...24

K.  "Intermediate," as applied to a subsystem or location, "refers to a subsystem or location connected in between a remote and central subsystem(s) or location(s), which is physically separate from, not near or immediate to, and distant from the remote and central subsystem(s) or location(s)." ...................................................27

L.  "Central subsystem" is "a subsystem that is different from the remote subsystems where the function of capturing an image of the paper transaction data is performed." .......................................................................................................29

## TABLE OF CONTENTS CONT'D.

M.      "Collecting and Sending the Electronic or Paper Transaction Data at Intermediate Locations" renders claim 36 indefinite ...................................................................30

N.      "Image" Requires an "Electronic Representation" of an Object to Have a "Pictorial likeness" to the Object ..........................................................................31

O.      "Capturing an Image of Documents and Receipts and Extracting Data Therefrom" Requires Capturing the Documents and Receipts at a Remote Subsystem, Creating an Image of the Captured Documents and Receipts, and Extracting Data from the Created Image .........................................................................................32

P.      "Transaction Data" in the Asserted Claims Means "Paper Transaction Data" .....33

Q.      "Documents and Receipts" Requires Additional Clarification Consistent with the Intrinsic Evidence ...................................................................................................34

        1.      "Documents and Receipts" must include receipts .....................................34

        2.      "Documents" and "Receipts" must be paper ..............................................35

        3.      "Receipt" means a paper acknowledgement of a transaction given by one who receives payment or other property to one who pays money or delivers property.  The receipt evidences a transaction in which the provider of the document was involved.....................................................35

R.      "Paper Transaction Data" Requires Inclusion of the Information Set Forth in Claims 1 and 26 of the '137 Patent.......................................................................37

S.      "Payer Bank's Draft" is a Limitation on the Claim ..............................................38

T.      "Processing, Sending, Verifying, and Storing Paper Transaction Data and the Subsystem Identification Information" Requires Both the Paper Transaction Data and Subsystem Identification Information to be Processed, Sent, Verified and Stored ....................................................................................................................40

U.      "Subsystem Identification Information" refers to "information that identifies computer components of the remote data subsystem or a subsystem that is a part of the remote data access subsystem, but does not refer to the name or location of an organization such as a bank.............................................................................40

## **TABLE OF CONTENTS CONT'D.**

V.    Defendant HSBC Bank USA, N.A. ("HSBC Bank") and HSBC North American Holdings, Inc. ("HNAH") separately and individually assert "subsystem identification information" should be construed as:  "information that identifies the specific machine from which images were transmitted, but does not refer to the name or location of an organization such as a bank ........................................42

      1.    Defendants HSBC Bank and HNAH's Argument in Support of Their Proposed Construction ................................................................................42

          a.    Interview at the PTO ......................................................................42

          b.    DataTreasury's Arguments to the PTO..........................................43

          c.    DataTreasury's Expert's Submission to the PTO ..........................43

W.    Means Plus Function Terms 112(6) ......................................................................45

III.    ARGUMENTS PREVIOUSLY PRESENTED TO THIS COURT IN EARLIER DTC CASES ......................................................................................................................49

IV.    CONCLUSION..........................................................................................................50

# TABLE OF AUTHORITIES

**Cases**

Acumed LLC v. Stryker Corp., 483 F.3d 800 (Fed. Cir. 2007) ....................................................16

Altiris, Inc. v. Symantec Corp., 318 F.3d 1363 (Fed. Cir. 2003) ................................................17

Andersen Corp. v. Fiber Composites, LLC, 474 F.3d 1361 (Fed. Cir. 2007) ..............................26

Arthur A. Collins, Inc. v. N. Telecom Ltd., 216 F.3d 1042 (Fed. Cir. 2000) ..............................36

Astrazeneca AB, Aktiebolaget Hassle, KBI-E, Inc. v. Mutual Pharmaceutical Co., Inc.,
        384 F.3d 1333 (Fed. Cir. 2004) .......................................................................................13

Bicon, Inc. v. Straumann Co., 441 F.3d 945 (Fed. Cir. 2006) ........................................34, 37, 39

Biovail Corp. Int'l v. Andrx Pharmaceuticals, Inc., 239 F.3d 1297 (Fed. Cir. 2001) ...................1

Combined Sys., Inc. v. Def. Tech. Corp. of Am., 350 F.3d 1207 (Fed. Cir. 2003) .....................17

Computer Docking Station Corp. v. Dell, Inc., 519 F.3d 1366 (Fed. Cir. 2008) ...................25, 26

CVI/Beta Ventures, Inc. v. Tura LP, 112 F.3d 1146 (Fed. Cir. 1997) .............................................1

DataTreasury Corp. v. Bank of America Corp. et al., No. 2:05cv292 (E.D. Tex. 2005) .............46

DataTreasury Corp. v. First Data Corp., No. 5:03CV39 (E.D. Tex. 2003) ...........................32, 46

DataTreasury Corp. v. Ingenico et al., 5:02-CV-95 (E.D. Tex. 2004) .............................18, 46, 49

DataTreasury Corp. v. J.P. Morgan Chase & Co., et al., No. 5:02cv124 (E.D. Tex. 2002).........46

DataTreasury Corp. v. Magtek, Inc., 2:03-CV-459 (E.D. Tex. 2003) ....................................46, 49

DataTreasury Corp. v. Small Value Payments Co., 2-04-CV-85 (E.D. Tex. 2004) .....................49

DataTreasury Corp. v. Viewpointe Archive Services, L.L.C., 2:05-CV-290 (E.D. Tex. 2005)....49

DataTreasury Corp. v. Wells Fargo et al., 2-05-CV-72 (E.D. Tex. 2006).......................................1

Exxon Research & Engr. Co. v. United States, 265 F.3d 1371 (Fed. Cir. 2001) ....................5, 12

Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd., 535 U.S. 722 (2002) ...........20, 37

Good Sportsman Mktg. LLC v. Testa Assocs., 440 F. Supp. 2d 570 (E.D. Tex. 2006) ...............22

Halliburton Energy Services, Inc. v. M-I LLC, 514 F.3d 1244 (Fed. Cir. 2008) ...................30, 31

Honeywell Int'l, Inc. v. Int'l Trade Commn., 341 F.3d 1332 (Fed. Cir. 2003) ...............................5

Kumar v. Ovonic Battery Co., Inc., 351 F.3d 1364 (Fed. Cir. 2003) .....................................27, 36

L.G.Elecs., Inc. v. Bizcom Elecs., Inc., 453 F.3d 1364 (Fed. Cir. 2006) .....................................26

Litton Systems, Inc. v. Honeywell, Inc., 145 F.3d 1472 (Fed. Cir. 1998) .......................................3

Loral Fairchild Corp. v. Sony Corp., 181 F.3d 1313 (Fed. Cir. 1999) .........................................17

Mantech Envtl. Corp. v. Hudson Envtl. Servs., Inc., 152 F.3d 1368 (Fed. Cir. 1998) ................17

Mas-Hamilton Group v. LaGard, Inc., 156 F.3d 1206 (Fed. Cir. 1998) ..........................45, 46, 48

Microprocessor Enhancement Corp. v. Texas Instruments Inc., 520 F.3d 1367 (Fed. Cir. 2008)
................................................................................................................................................29

M.I.T. v. Abacus Software, 462 F.3d 1344 (Fed. Cir. 2006) ........................................................45

North American Container, Inc. v. Plastipak Packaging, Inc., 415 F.3d 1335 (Fed. Cir. 2005) ....6

Novartis Pharm. Corp. v. Eon Labs Mfg., 363 F.3d 1306 (Fed. Cir. 2004) ...................................4

O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., 521 F.3d 1351 (Fed. Cir. 2008)...........2, 17,
................................................................................................................................20, 25, 37

O.I. Corp. v. Tekmar Co., 115 F.3d 1576 (Fed. Cir. 1997) .........................................................48

Old Town Canoe Co. v. Confluence Holdings Corp., 448 F.3d 1309 (Fed. Cir. 2006) ...............16

Omega Engr., Inc. v. Raytek Corp., 334 F.3d 1314 (Fed. Cir. 2003) .............................................4

Ormco Corp. v. Align Tech., Inc., 498 F.3d 1307 (Fed. Cir. 2007) ...............................................4

Phillips v. AWH Corp., 415 F.3d 1303 (Fed. Cir. 2005)................................................2, 20, 25, 29

## TABLE OF AUTHORITIES CONT'D.

<u>Pioneer Corp. v. Samsung SDI Co., Ltd.</u>, No. 2:06-cv-384 (DF), 2007 WL 5688764 (E.D. Tex. Dec. 27, 2007)..................................................................................................................30

<u>Renishaw PLC v. Marposs Societa' per Azioni</u>, 158 F.3d 1243 (Fed. Cir. 1998) ........................16

<u>Rexnord Corp. v. Laitram Corp.</u>, 274 F.3d 1336 (Fed. Cir. 2001) ...............................................29

<u>Seachange Int'l, Inc. v. C-COR Inc.</u>, 413 F.3d 1361 (Fed. Cir. 2005) ..........................................6

<u>Seal-Flex, Inc. v. Athletic Track and Court Construction,</u> 172 F.3d 836 (Fed. Cir. 1999) ..........48

<u>Spectrum Int'l, Inc. v. Sterlite Corp.</u>, 164 F.3d 1372 (Fed. Cir. 1998) .............................10, 21, 41

<u>Springs Window Fashions LP v. Novo Industries, L.P.</u>, 323 F.3d 989 (Fed. Cir. 2003) ...............3

<u>Superguide Corp. v. Directv Enter., Inc.</u>, 358 F.3d 870, 886 (Fed. Cir. 2004) ............................34

<u>Terlep v. Brinkmann Corp.</u>, 418 F.3d 1379 (Fed. Cir. 2005) .........................................................6

<u>Union Oil Co. of Cal. v. Atlantic Richfield Co.</u>, 208 F.3d 989 (Fed. Cir. 2000) .........................20

<u>U.S. Surgical Corp. v. Ethicon, Inc.</u>, 103 F.3d 1554 (Fed. Cir. 1997) ...........................................1

<u>Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.</u>, 442 F.3d 1322 (Fed. Cir. 2006).....22, 35

### EXHIBITS

A.      January 30, 2007 DTC Response to Non-Final Office Action ('988 Reexamination Proceeding 90/007,829)

B.      January 31, 2007 Statement of Substance of Interview at 8-9 ('988 Reexamination Proceeding 90/007,829)

C.      U.S. Patent No. 5,930,778

D.      U.S. Patent No. 5,910,988

E.      U.S. Patent No. 6,032,137

F.      Deposition of Claudio Ballard, September 20, 2006 – pages 38-43

G.      Report & Recommendation of the United States Magistrate Judge in DataTreasury Corp. v. Ingenico et al., No. 5:02cv95, at 18 (E.D. Tex. Nov. 2, 2004) ("Report and Recommendation")

H.      Nov. 7, 2008 Declaration of John E. Hiles (Exhibit K to Plaintiff's Opening Brief on Claim Construction)

I.      January 30, 2006 Declaration of John E. Hiles (submitted as an appendix to DTC's January 28, 2007 Response to Non-Final Office Action ('988 Reexamination Proceeding 90/007,829))

J.      February 16, 1999 Petition to Make Special ('137 Prosecution History)

K.      U.S. Patent No. 5,187,750

L.      U.S. Patent No. 5,506,691

M.      Report and Recommendation on First Data Corp.'s Motion for Summary Judgment of Non-Infringement, Data Treasury Corp. v. First Data Corp., No. 5:03CV39 (E.D. Tex. August 29, 2006)

N.      October 23, 1998 Petition to Make Special ('988 Prosecution History)

O.      U.S. Patent No. 5,373,550

P.      U.S. Patent No. 5,175,682

Q.      U.S. Patent No. 5,321,238

R.      January 30, 2007 DTC Response to Non-Final Office Action  ('137 Reexamination Proceeding 90/007,830)

**<u>EXHIBITS CONT'D.</u>**

S.      January 18, 2007 Ex Parte Reexamination Interview Summary ('137 Reexamination Proceeding 90/007,830)

T.      January 31, 2007 Statement of Substance of Interview ('137 Reexamination Proceeding 90/007,830)

Pursuant to the Court's Docket Control Order, Defendant Group 1[1] (collectively, "Defendants") respectfully submit their Joint Claim Construction Brief for construction of terms in U.S. Patent Nos. 5,910,988 C1 (the "'988 Patent") and 6,032,137 C1 (the "'137 Patent") (collectively, "the Patents").

## I.    INTRODUCTION

"Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims."[2]   Plaintiff DataTreasury Corporation ("DTC"), however, seeks to avoid this fundamental purpose of claim construction by advocating constructions that neither clarify nor explain the scope of the intended inventions, and in many cases, introduce ambiguity as to the scope and meaning of claim terms.   Furthermore, DTC asks this Court to ignore controlling claim construction principles that require interpreting terms in view of the prosecution history by insisting on previous constructions of terms now rendered obsolete and incomplete by arguments raised during recent reexamination proceedings for the Patents.[3]

Despite the fact that <u>some</u> of the claim terms at issue have been construed in related litigation, the Court still has the responsibility of construing the disputed claims

---

[1]   The configurations of the Defendant Group 1 joining this brief are defined in the Joint Claim Construction and Prehearing Statement In Compliance with Patent Rule 4-3, Doc. No. 1093, <u>DataTreasury Corp. v. Wells Fargo et al.</u>, 2-06-CV-72, at 3-5.

[2]   <u>U.S. Surgical Corp. v. Ethicon, Inc.</u>, 103 F.3d 1554, 1568 (Fed. Cir. 1997).

[3]   <u>Biovail Corp. Int'l v. Andrx Pharmaceuticals, Inc.</u>, 239 F.3d 1297, 1301 (Fed. Cir. 2001) ("Claim language, however, must be read consistently with the totality of the patent's applicable prosecution history.").   <u>See also</u>, <u>CVI/Beta Ventures, Inc. v. Tura LP</u>, 112 F.3d 1146, 1158 (Fed. Cir. 1997) ("[T]hrough statements made during prosecution or reexamination an applicant for a patent or a patent owner, as the case may be, may commit to a particular meaning for a patent term, which meaning is then binding in litigation.").

**DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF**                    1

properly placed before it.[4]  This case is just like any other in which a patent is asserted in a second litigation.  In each such litigation, "[w]hen the parties raise an actual dispute regarding the proper scope of [the] claims, the court, not the jury, must resolve that dispute."[5]  The fact that some of these terms have already been construed in litigation involving different defendants forecloses neither the possibility of further clarification of these constructions nor construction of additional terms not at issue before those prior courts.  In this case, as in O2 Micro, often "the 'ordinary' meaning of [the disputed terms] does not resolve the parties dispute, and claim construction requires the court to determine what claim scope is appropriate in the context of the patents-in-suit."[6]

The unique procedural position of the instant case further confirms the necessity of the Court taking a fresh look at prior constructions.  In this case, the Patents have emerged from reexamination by the U.S. Patent and Trademark Office ("PTO").  During reexamination, DTC made numerous statements, now part of the intrinsic record, that cast serious doubt on prior interpretations of these claims.  These statements, elaborated on below, shed light on the scope and meaning of various claim terms in dispute. Defendants merely seek constructions consistent with the intrinsic record, which includes the recent reexamination proceedings.

As recognized by the Phillips court, "determining the ordinary and customary meaning of the claim [often] requires examination of terms that have a particular meaning in a field of art."[7]  Phillips then explains that, "[b]ecause the meaning of a claim

---

[4] See, e.g., O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., 521 F.3d 1351, 1360-61 (Fed. Cir. 2008) (holding that even when a previously issued claim construction order exists, the court must still resolve the disputed claim terms in the present case).
[5] O2 Micro Int'l Ltd., 521 F.3d at 1360.
[6] Id. at 1361
[7] Phillips v. AWH Corp., 415 F.3d 1303, 1314 (Fed. Cir. 2005)

**DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF**                                    2

term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically . . . the court looks to [sources available to the public] that show what a person of skill in the art would have understood disputed claim language to mean[, including] 'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence.'"[8]

The Court thus relies on the claims, specifications, and complete prosecution history to construe claims precisely because the public must rely on those very documents to understand the scope of the patent.  As the Federal Circuit stated, "[t]he prosecution history constitutes a public record of the patentee's representations concerning the scope and the meaning of the claims, and competitors are entitled to rely on those representations when ascertaining the degree of lawful conduct . . . ."[9]  In explaining the very purpose of the notice provided by the intrinsic record, the Court stated that "[p]ublic notice of the scope of the right to exclude, as provided by the patent claims, specification and prosecution history, is a critical function of the entire scheme of patent law. The notice function is critical because it provides competitors with the necessary information upon which they can rely to shape their behavior in the marketplace."[10]  The quid-pro-quo is that "[t]he public notice function of a patent and its prosecution history requires that a patentee <u>be held to what he declares during the prosecution of his patent.</u>  A patentee may not state during prosecution that the claims do not cover a particular device and then change position and later sue a party who makes that same device for infringement."[11]  Despite this, DTC asks this Court to ignore both

---

[8] <u>Id.</u> (internal citation omitted).
[9] <u>Springs Window Fashions LP v. Novo Industries, L.P.</u>, 323 F.3d 989, 995 (Fed. Cir. 2003).
[10] <u>Litton Systems, Inc. v. Honeywell, Inc.</u>, 145 F.3d 1472, 1474 (Fed. Cir. 1998).
[11] <u>Springs Window Fashions LP v. Novo Industries, L.P.</u>, 323 F.3d at 995 (emphasis added).

the patent specification's own guidance as to the meaning of terms as well as the representations made to the PTO to obtain allowance of the claims. DTC should not be permitted to avoid the effects of its own representations; allowing DTC to do so would thwart the public notice function and undercut the public's ability to rely on the specification and prosecution history.

In short, Defendants simply ask this Court to construe all disputed claim terms as required under <u>Phillips</u>, based on "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence."

## II.     ARGUMENT

### A.     DTC is Bound by its Disclaimers Presented during the Reexamination Proceedings which Expressly Exclude Spoke and Hub Architectures and Other Prior Art Architectures from the Scope of "Tiered," and Thus, Render "Tiered" Indefinite under 35 U.S.C. §112 ¶2.

The term "tiered" appears in claim 42 ("<u>tiered</u> architecture") and claim 46 ("<u>tiered</u> manner") of the '988 Patent. During reexamination proceedings, DTC relied upon this claim limitation to distinguish prior art. In doing so, DTC made express and binding statements as what this term does not include – unmistakably distinguishing various architectures and data flows. The Court must give effect to DTC's unequivocal disclaimers.[12] Defendants simply seek a result that holds DTC accountable for its numerous disavowals of claim scope made during reexamination.[13]

In this case, this Court should find that DTC's disclaimers have rendered "tiered" indefinite. In the course of describing numerous architectures from the cited prior art that

---

[12] <u>See</u> <u>Novartis Pharm. Corp. v. Eon Labs Mfg.</u>, 363 F.3d 1306, 1311 (Fed. Cir. 2004) (quoting <u>Omega Engr., Inc. v. Raytek Corp.</u>, 334 F.3d 1314, 1324 (Fed. Cir. 2003)) ("Where the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender.").

[13] <u>See</u> <u>Ormco Corp. v. Align Tech., Inc.</u>, 498 F.3d 1307, 1314-16 (Fed. Cir. 2007) (holding that patentee's statements made to distinguish prior art during prosecution limited the scope of terms).

**DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF**                                      4

were not "tiered" in nature, DTC rendered it impossible to determine what might actually constitute a "tiered" system as claimed.  In particular, DTC's clear disclaimers rely upon semantics to describe what is not "tiered" but make it impossible to define what "tiered" actually is, and thus, the term "tiered" is now insolubly ambiguous and indefinite.  The Court should therefore hold the term "tiered," and any claims including it, indefinite under 35 U.S.C. §112 ¶2.[14]

Alternatively, the Court should adopt a construction that excludes the numerous disclaimed architectures and data flows from the scope of the term "tiered."

### 1.     DTC's proposed construction of "tiered" is both wholly ambiguous and inconsistent with arguments made in reexamination.

DTC's proposed construction of "tiered" as "the way in which functional layers of computers are organized" fails to provide any guidance as to what types of architectures satisfy the "tiered" limitations.  Indeed, DTC's proposed construction introduces the amorphous concept of "functional layers" without specifying how one might identify boundaries of functional layers and without defining any restrictions on how such layers are organized.  Thus, DTC's own proposed construction demonstrates that the term "tiered" is indefinite.

The numerous arguments made by DTC to gain allowance over the prior art, some of which are set forth below, do not support or comport with DTC's proposed construction and also render it impossible to determine what exactly "tiered" means.  Thus, the term is indefinite.

---

[14] See Honeywell Int'l, Inc. v. Int'l Trade Commn., 341 F.3d 1332, 1338-40 (Fed. Cir. 2003) ("If the court determines that a claim is not 'amenable to construction,' then the claim is invalid as indefinite under 35 U.S.C. §112 ¶2.") (citing Exxon Research & Engr. Co. v. United States, 265 F.3d 1371, 1375 (Fed. Cir. 2001).

### 2.      "Tiered" excludes spoke and hub architectures.

In response to the PTO's rejection of claims 42 and 46 over the prior art, including U.S. Pat. No. 5,373,550 to Campbell, DTC unambiguously argued that "tiered" could not be met by a "Spoke and Hub" arrangement.  For example, DTC stated during reexamination that:

- "Campbell et al. discloses a 'spoke and hub' structure in contrast to the tiered architecture and manner of claims 42-50 of the '988 Patent."[15]

- "[T]he Spoke and Hub communications structure of Campbell is categorically different than the tiered communications structure required in claims 42 and 46."[16]

- [In describing Campbell:] "Everything flows into the hub and gets routed outbound to some designated address: from 14 to hub (the location of the check image processing node 12) out to 16, where 14 and 16 may be the different addresses found in the check clearance flow."[17] "Thus the communications network (topology) is that of a SPOKE AND HUB."[18]

DTC's disclaimer of spoke and hub architectures is clear and unambiguous.  The Federal Circuit has repeatedly upheld the incorporation of disclaimers of similar clarity when construing claim terms.[19]  Thus, spoke and hub architectures must be excluded from the scope of "tiered."

### 3.      "Tiered" excludes all architectures depicted and/or described in the Minoli textbook.

To further distinguish claims 42 and 46 from the prior art, DTC unequivocally disclaimed the numerous architectures and data flows disclosed in the Minoli textbook.

---

[15] January 30, 2007 DTC Response to Non-Final Office Action at 62 ('988 Reexamination Proceeding 90/007,829) (Ex. A).

[16] January 30, 2007 DTC Response to Non-Final Office Action at 66 ('988 Reexamination Proceeding 90/007,829) (Ex. A) (emphasis added).

[17] January 30, 2007 DTC Response to Non-Final Office Action at 64 ('988 Reexamination Proceeding 90/007,829) (Ex. A).

[18] Id. (emphasis added).

[19] See North American Container, Inc. v. Plastipak Packaging, Inc., 415 F.3d 1335, 1344-46 (Fed. Cir. 2005); Terlep v. Brinkmann Corp., 418 F.3d 1379, 1383-84 (Fed. Cir. 2005); Seachange Int'l, Inc. v. C-COR Inc., 413 F.3d 1361, 1370-74 (Fed. Cir. 2005).

DTC stated during reexamination that "[n]one of the figures and descriptions in Minoli relate to the tiering of data flow between subsystems as in the present patent (U.S. Patent 5,910,988)."[20] During the interview with the Examiner, DTC maintained that "Minoli is silent as to any type of tiered architecture."[21] The Minoli textbook, however, expressly describes a tiered architecture with reference to Figure 8.1: "The APPN network is based on a two-tiered architecture as shown in Fig. 8.1."[22] DTC's absolute disavowal of Minoli's teachings forecloses a positive construction of "tiered" and renders its scope indefinite.

### 4.    "Tiered" excludes all architectures described in the Geer patent.

Moreover, to further distinguish claims 42 and 46, DTC explicitly disclaimed the architectures and data flows in U.S. Pat. No. 5,930,778 ("Geer"). The Geer patent describes, among other things, an arrangement where check images are captured at a first location (a payee location), sent to another location (the payee's depository bank), and sent from there to a third location (the payment system). DTC explicitly stated that this architecture is not tiered:

> The Office action alleges that the "remote subsystem" is the payee 2, the "intermediate subsystem" is the depository bank 10 and the "central subsystem" is the payment system 12. However, there is no tiered or layered nature to the different systems in Geer…Geer has no "intermediate" or "central" subsystems that function in the manner as claimed. There is certainly no "tiered" relationship between the various institutions of Geer in a manner as presently claimed.[23]

---

[20] January 30, 2007 DTC Response to Non-Final Office Action at 74 ('988 Reexamination Proceeding 90/007,829) (Ex. A) (emphasis added).

[21] January 31, 2007 Statement of Substance of Interview at 13 ('988 Reexamination Proceeding 90/007,829) (Ex. B) (emphasis added).

[22] Daniel Minoli, Imaging in Corporate Environments: Technology and Communication 252-53 (McGraw-Hill 1994)

[23] January 30, 2007 DTC Response to Non-Final Office Action at 79 ('988 Reexamination Proceeding 90/007,829) (Ex. A).

At a minimum, DTC's argument in the reexamination makes clear that "tiered" excludes architectures in which images are sent from an image capture location to a bank processing site and/or to an electronic clearinghouse.  The basis for the argument that there are no tiered arrangements in Geer is entirely ambiguous and renders it impossible to determine what "tiered" means.  Thus, the term is indefinite.

> ### 5.   "Tiered" excludes additional architectures encompassed in the prior art.

In addition, DTC further argued during reexamination that additional aspects of the Campbell and Geer references were distinguishable based on their failure to describe a "tiered" architecture or data flow.  In doing so, DTC differentiated the numerous different architectures and data flows disclosed in these references from the claimed "tiered" architectures and manners.  Some of DTC's disclaimers include:

- **"Tiered" excludes architectures in which data is sent from one entity or bank through a node in a communication or routing network to another entity or bank.  "**There is nothing in Campbell et al. that is even remotely related to patentee's claimed 'tiered architecture'. . . .  If anything, the node 12 of Campbell et al. is a system that collects and sends images from and to a plurality of remote locations."[24]

- **"Tiered" excludes architectures in which images flow from one bank or entity to another bank or entity.**  "There is no 'tiered architecture' in Campbell et al."[25]  "The whole purpose of Campbell et al. is the simple transfer of a check image from one institution to another institution in the course of carrying out a check clearance procedure."[26]

- **"Tiered" excludes an architecture in which communications use common carrier networks, public switched telephone networks, or other similar networks, such as that provided by AT&T.**  "The differences of the tiered communication network of claims 42 and 46 over Campbell et al.'s spoke and hub further include, *inter alia*, the claim 42 and 46 tiered structure which is

---

[24] January 30, 2007 DTC Response to Non-Final Office Action at 62 ('988 Reexamination Proceeding 90/007,829) (Ex. A).
[25] January 30, 2007 DTC Response to Non-Final Office Action at 61 ('988 Reexamination Proceeding 90/007,829) (Ex. A).
[26] January 31, 2007 Statement of Substance of Interview at 7 ('988 Reexamination Proceeding 90/007,829) (Ex. B).

appropriate for computer connectivity as described in the specification, while Campbell et al. is not based on computers but is based on utilizing the existing communication network and its corresponding nodes as provided by AT&T at the time."[27]

- **"Tiered" excludes architectures in which an intermediate location is part of a bank or bank facility.** "[M]erely because the data in Geer is sent to bank 10 for internal processing does not render it an 'intermediate' location within a framework of a 'tiered' data transmitting system as claimed."[28]

- **"Tiered" excludes architectures in which a central location is part of a payment system.** "[M]erely because the data in Geer is sent to the payment system 12 does not render it a 'central' location within a framework of a 'tiered' data transmitting system as claimed."[29]

The PTO relied on these and other far-reaching and unequivocal disclaimers of claim scope to allow the rejected claims over the cited prior art, thereby eviscerating the meaning of "tiered" to such an extent that the scope of the term is now indefinite.  At a minimum, DTC's disclaimers expressly limit the scope of "tiered."

> **B.     "Subsystem" means "An organization of computer components that comprises a functional unit that is part of a larger system. 'Subsystem' does not include 'any computer components in the payee's location' (or in both 'the payee's location and in the bank')." In the alternative, Defendants ask the Court to find all of the claims containing the term "subsystem" to be indefinite.**

During reexamination, DTC distinguished its claims from cited prior art to sustain the patentability of claims, relinquishing claimed subject matter and disavowing claim scope related to what can comprise a "subsystem."[30]  Defendants' proposed construction

---

[27] January 30, 2007 DTC Response to Non-Final Office Action at 66 ('988 Reexamination Proceeding 90/007,829) (Ex. A).

[28] Id.

[29] January 30, 2007 DTC Response to Non-Final Office Action at 79-80 ('988 Reexamination Proceeding 90/007,829) (Ex. A).

[30] January 30, 2007 DTC Response to Non-Final Office Action at 78-80 ('988 Reexamination Proceeding 90/007,829) (Ex. A).

refines the Court's previous construction to prevent DTC from improperly recapturing claim scope disavowed during reexamination.[31]

For example, DTC attempted to distinguish the Geer '778 patent to overcome a rejection.  DTC made the following argument about what a "subsystem" as claimed can and cannot comprise:  "The Geer payee's location, or more accurately any computer components in the payee's location are not subsystems of the bank as recited in the present claims.  Similarly, the payee's location and the banks, or more accurately any computer components in the payee's location and in the bank, are not subsystems of the check payment system."[32]

The Geer '778 patent describes computer equipment at the "payee's location," including: "electronic scanning means,"[33] a computer,[34] hardware for performing "sorting of the paper checks,"[35] and "[a] communication link . . . between the payee's location and the depository bank."[36]  The Geer '778 patent also describes the following components as part of the computer equipment at the payee's "bank": "a processing unit"[37] and a "communication link."[38]  Each of these components are "computer components in the payee's location" or in the payee's "bank."  Thus the only reasonable interpretation of DTC's arguments distinguishing Geer '778 on the basis of what can and cannot be a

---

[31] Spectrum Int'l, Inc. v. Sterlite Corp., 164 F.3d 1372, 1379 (Fed. Cir. 1998) (citation omitted) ("[A] patentee, after relinquishing subject matter to distinguish a prior art reference asserted by the PTO during prosecution, 'cannot during subsequent litigation escape reliance [by the defendant] upon this unambiguous surrender of subject matter.' . . . This principle applies with equal force to arguments made by a patentee to sustain the patentability of claims during reexamination.").
[32] January 30, 2007 DTC Response to Non-Final Office Action at 78 ('988 Reexamination Proceeding 90/007,829) (Ex. A).
[33] Geer '778 Patent at col. 4, ll. 54-55. (Ex. C).
[34] Id. at Figs. 1, 2.
[35] Id. at col. 5, l. 13.
[36] Id. at col. 5, ll. 25-27.
[37] Id. at col. 5, ll. 35-45; col. 10, ll. 19-20.
[38] Id. at col. 5, ll. 35-45.

"subsystem" as claimed is that DTC disavowed the scope of "subsystem" to exclude "any computer components in the payee's location" and "any computer components located in the payee's location and in the bank."

The Patents describe "customers," including "merchants, consumers, and bankers,"[39] and describe a process of "captur[ing] the check . . . at the payee's remote location."[40]  The Geer '778 patent, using similar language, describes a process of capturing checks "at the remote customer/payee's location"[41] wherein "the paper financial instruments are typically imaged … at the payee's location remote from the payee's depository bank, substantially contemporaneous with the capture of the financial or other information on the instrument."[42]  Thus, by distinguishing the Geer '778 patent, DTC disclaimed any computer systems at "customer/payee" locations, including the locations of "merchants, consumers, and bankers."

Further, when DTC asserted that "any computer components in the payee's location and in the bank[] are not subsystems of the check payment system,"[43] DTC disclaimed all computer equipment in a bank used, alone or in conjunction with other computer equipment at a payee's location, to capture and exchange information with other portions of the "check payment system"—including other banks, clearing houses, or the Federal Reserve.

In the alternative, Defendants ask the Court to find that DTC's arguments to the PTO render the claims containing the term "subsystem" indefinite.  A claim is indefinite if it fails to "particularly point[] out and distinctly claim[] the subject matter which the

---

[39] '988 Patent at col. 5, ll. 28-29.  (Ex. D).
[40] '137 Patent at col. 22, ll. 8-13 (emphasis added); Fig. 10.  (Ex. E).
[41]  Geer '778 Patent at col. 13, ll. 15-17.  (Ex. C).
[42] Id. at col. 4, l. 67 – col. 5, l. 6.
[43] Id.

applicant regards as his invention."[44]  During reexamination, DTC disclaimed at least a substantial portion of the scope of the claims containing the term "subsystem."  This disclaimer renders it impossible to determine the remaining scope of the claims containing the term "subsystem."  Thus, the claims containing the term "subsystem" are "insolubly ambiguous, and no narrowing construction can properly be adopted."[45]

Defendants ask the Court to construe "subsystem" as follows: "An organization of computer components that comprises a functional unit that is part of a larger system.  'Subsystem' does not include 'any computer components in the payee's location' (or in both 'the payee's location and in the bank')."   In the alternative, Defendants ask the Court to find all of the claims containing the term "subsystem" to be indefinite.

    **C.**    **"Encrypt" should be construed to specifically exclude network-level type encryption.**

As used in the Patents, it is clear that the term "encrypt" refers to data-level encryption, and not network-level encryption.[46]   Data-level encryption involves encrypting specific data to produce an encrypted data file, which can be stored and transmitted from place to place without un-encrypting (i.e., decrypting) the data.  Network-level encryption involves <u>automatically</u> encrypting everything that is transmitted over a particular network connection by virtue of the particular transmission protocol.  In network-level encryption, data is only encrypted as it is being transmitted from a sending device, and the data is automatically un-encrypted when it reaches the receiving device.

    **1.**    <u>**The claims themselves require that specific data elements or files are encrypted prior to transmission.**</u>

---

[44] 35 U.S.C. § 112 ¶2.
[45] <u>Exxon Research and Eng'g Co. v. U.S.</u>, 265 F.3d 1371, 1375 (Fed. Cir. 2001).
[46] <u>See</u> <u>e.g.</u>, '988 Patent Col. 8:3-31  (Ex. D).

**DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF**    12

The Patent claims refer to encrypting particular data items before sending those data items.  For example, claim 1 of the '988 patent recites "encrypted subsystem identification information and encrypted paper transaction data."  In this phrase, the data itself is necessarily encrypted as a separate operation from transmitting the encrypted data.  Indeed, the Court previously construed the larger phrase "with the data access subsystem providing encrypted subsystem identification information and encrypted paper transaction data to the data processing subsystem" to mean "that the data access subsystem encrypts subsystem identification information and encrypts paper transaction data and provides the encrypted information and encrypted data for transmission to the data processing subsystem."  Thus, the data is referred to as "encrypted" before it is sent from the data access subsystem to the data processing subsystem.  The Patents do not refer to any network-level or transmission-type encryption protocols, and only refer to data-level encryption.

## 2.    Data-level encryption is a *necessary aspect* of the invention and the *only encryption described*, according to both the specification and inventor Claudio Ballard.

The specification also teaches that encryption means data-level encryption.[47]  In distinguishing the current invention from prior art, the Patents point out that unlike the current invention, none of the previous verification systems performed data encryption.  Specifically, the '988 Patent recites that "[n]one of these verification systems offer general support for transaction initiation, remote paper and electronic data acquisition,

---

[47] Astrazeneca AB, Aktiebolaget Hassle, KBI-E, Inc. v. Mutual Pharmaceutical Co., Inc., 384 F.3d 1333, 1340-41 (Fed. Cir. 2004) (holding that, "while it is of course improper to limit the claims to the particular preferred embodiments described in the specification, the patentee's choice of preferred embodiments can shed light on the intended scope of the claims" and thus finding that a claim term was limited to the way in which it was used in preferred embodiments disclosed in the specification).

data encryption, data communication, data archival, data mining, manipulation and analytic services."[48]

When describing the encryption that takes place, the specification delineates a data-level encryption process by which the DAT controller takes a bitmap image and forms an "encrypted compressed bitmap image" or ECBI.  The '988 patent states:

> If a CBI [Compressed Bitmap Image] is created, the DAT controller 210 executes an encryption algorithm which is well known to an artisan of ordinary skill in the field to encrypt the CBI in step 318.  Encryption protects against unauthorized access during the subsequent transmission of the data which will be discussed below.  In step 320, the DAT controller 210 determines whether the encryption operation executed successfully. If the encryption is successful, it produces an Encrypted Compressed Bitmap Image (ECBI).  If the encryption is unsuccessful, the DAT controller 210 notifies the operator of the trouble and prompts the operator for repair in step 370.[49]

After adding additional information in a tag to create a "tagged encrypted compressed bitmap image" or TECBI, the TECBI is stored in a separate digital storage to await transmission by a separate modem.[50]  This data-level encryption process is the only type of encryption described in the Patents.

Furthermore, Mr. Claudio Ballard, the inventor, admits that data encryption is the only encryption disclosed in the Patents because data encryption was a necessary aspect of the invention itself.   Mr. Ballard testified at his deposition as follows:

> Q.    But this notion of providing a final layer of encryption before you sent the information out, you didn't actually describe it in your patent? …
> A.    Yes. . . . Yeah, I didn't think it was necessary."
> . . .
> Q.    If you were going to have that final layer of encryption, why did you bother encrypting the bitmap image separately, before you got to that final stage of encryption? . . .

---

[48] '988 Patent Col. 3:11-15  (emphasis added) (Ex. D).
[49] Id. at Col. 8:3-13.
[50] Id. at Col. 7:31-50.

Q.      A.      It was my feeling that that added an extra layer of security in the event that anyone internal to the origination data center, or facility, or whatever, who might have had access to the data before it went to the central repository, we didn't -- I did not want to have the possibility that someone could either view the information or alter it in some way before it got to its final destination.

Q.      So this was to give yourself security within the -- within the capture site?

A.      Correct, and any intermediate locations where the data would -- would arrive before it got to the final destination, if -- if there were such requirements.

Q.      But this final layer of encryption that you had in mind was at the exit from the capture site, wasn't it?

A.      That was, yes.[51]

By his own testimony, Mr. Ballard confirms his intention that encrypting the data itself served to protect the data <u>within the capture site</u>, regardless of undisclosed transmission protocols that might inherently encrypt the transmission <u>from the capture site to another location</u>.

### 3.     <u>DTC is attempting to enlarge the scope of the claims beyond what was described in the specification.</u>

Regardless of the plain language of the claims, the specification, and Mr. Ballard's testimony, DTC believes that network-level encryption satisfies the "encrypt" element. In its opening brief, DTC argues for a construction that would include network level protocols.[52] DTC is attempting to enlarge the scope of the claims beyond what was described in the specification, the claims, and what the inventor himself confirms he intended. The Federal Circuit has made it clear that this is not the proper course for claim construction, and that "the construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the

---

[51] Deposition of Claudio Ballard, September 20, 2006 at 39:25-42:21  (Ex. F).
[52] Plaintiff DataTreasury Corporation's Opening Brief on Claim Construction at 33  ("Plaintiff's Opening Brief on Claim Construction").

correct construction."[53]   Further, the patent scope "should be coextensive with what the inventor invented as evidenced by what is disclosed in the patent specification," and the claims should not "enlarge what is patented beyond what the inventor has described as the invention."[54]   The patentee is not entitled to "claim construction divorced from the context of the written description and prosecution history."[55]   The term "encrypt" should be construed to encompass only data-level encryption.

> **D.    The Relationship Between "Encrypting Subsystem Identification Information and the Transaction Data" and "Transmitting the Transaction Data and the Subsystem Identification Information Within and Between the Remote Location(s) and the Central Location" in the Claims Requires Encryption of Data to Take Place <u>at the Data Level Within the Remote Location</u> Before Being Transmitted From the Remote to the Central Location.**

A proper construction of these phrases recognizes that "the transaction data and subsystem identification information <u>is encrypted</u> and the encrypted transaction data and subsystem identification information is <u>then</u> <u>transmitted</u> within and between the remote location and the central location."[56]   DTC disagrees, insisting instead that there is no order to these claim elements, or alternatively, that encryption occurs only before

---

[53] <u>Renishaw PLC v. Marposs Societa' per Azioni</u>, 158 F.3d 1243, 1250 (Fed.Cir. 1998).

[54] <u>Acumed LLC v. Stryker Corp.</u>, 483 F.3d 800, 815 (Fed. Cir. 2007).

[55] <u>Old Town Canoe Co. v. Confluence Holdings Corp.</u>, 448 F.3d 1309, 1318 (Fed.Cir. 2006).

[56] See Exhibit B to Joint Claim Construction and Prehearing Statement in Compliance with Patent Rule 4-3 at 30 (Doc. No. 1093).

transmission from the remote to central locations.[57],[58]   This order of the claim steps, however, is dictated by logic, grammar, and the Patents' specifications.[59]

Specifically, DTC would have this Court hold that the term encryption *only* encompasses network-level encryption (<u>automatic</u> encryption upon transmission over a particular network using a transmission protocol such as SSL).[60]   Such encryption, however, would only provide protection to the transmission of data upon *leaving* the remote location and being sent to the central location, and would not provide any protection to the sensitive data that exists in the remote or central location at any time <u>before it is sent</u>.   In his deposition testimony, Mr. Ballard expressed his intention that the subsystem identification information and transaction data be encrypted specifically at the <u>data-level</u> within the subsystems themselves, <u>before</u> transmission, in effort to provide data integrity protection.[61]   This was the encryption to which he was referring in the Patents, and omitting that possibility from the construction—as DTC would have the Court do—would circumvent that purpose and intention.

---

[57] See Plaintiff's Opening Brief on Claim Construction at 47.

[58] In addition, in its arguments here and in many other terms in this brief, DTC suggests that since Defendants are asserting constructions that the Court has previously rejected, this should somehow impact the Court's determination and/or even circumvent the need for any new determination at all.  However, the Federal Circuit has held that even when a previous construction order exists, the Court still must resolve the disputed terms in the current case.  See, e.g., O2 Micro Int'l Ltd., 521 F.3d at 1360-61 (even when a previously issued claim construction order exists, the court must still resolve the disputed claim terms in the present case).

[59] A claim may necessitate performance of functions or steps in a particular order if, for example, logic, grammar, the specification, or the prosecution history suggest a particular order.  Altiris, Inc. v. Symantec Corp., 318 F.3d 1363, 1369-70 (Fed. Cir. 2003).  See also Combined Sys., Inc. v. Def. Tech. Corp. of Am., 350 F.3d 1207, 1211-12 (Fed. Cir. 2003) (grammar required order); Loral Fairchild Corp. v. Sony Corp., 181 F.3d 1313, 1322 (Fed. Cir. 1999) (language of claims, specification, and prosecution history required order); Mantech Envtl. Corp. v. Hudson Envtl. Servs., Inc., 152 F.3d 1368, 1376 (Fed. Cir. 1998) (plain meaning of claims required order).

[60] In support of its position, DTC wrongly suggests that FIG. 3A of the '988 patent shows transmission of data *within* the DAT prior to encryption – to the contrary – no steps in the flow chart expressly indicate transmitting within the DAT prior to encryption.  Furthermore, the description in the specification enumerates the steps of the flow chart and does not suggest transmission before encryption either.  See '988 Patent, Col. 7:52-8:8  (Ex. D).

[61] Deposition of Claudio Ballard, September 20, 2006 at 41:25- 43:8.  (Ex. F). See Section II.C.2, supra.

**E.**   **"Data Access Subsystem providing encrypted subsystem identification information and encrypted paper transaction data to the data processing subsystem" means "1) subsystem identification information and paper transaction data are encrypted and then sent/transmitted by the data access subsystem, and 2) the encrypted subsystem identification information and encrypted paper transaction data are received by the data processing subsystem."**

There are three differences between DTC's and Defendants' constructions.  DTC has apparently agreed with Defendants as to the first one, and DTC's positions as to the other two are contrary to the claim language.

First, Defendants' proposed construction makes it clear that the data access subsystem encrypts the information and data <u>before</u> transmitting the information and data, while DTC's construction does not.  The Court previously indicated that encryption must occur before the encrypted data is transmitted.[62]  Basic grammar, logic, and Federal Circuit case law militate in favor of such a construction.  DTC apparently now agrees, as it did not contest this portion of Defendants' proposed construction in its opening brief. Indeed, in a declaration submitted by DTC with its brief, Professor Hiles stated that "[a]s a person of ordinary skill in the art, it is my understanding that for a subsystem to encrypt and send data, the data must be encrypted before being sent outside the subsystem."[63]

Second, Defendants' construction makes clear that the data access subsystem transmits the information and data.  DTC disagrees.  DTC apparently interprets the Court's previous statement that "the encrypted information and data is provided by the data access subsystem and transmitted to the data processing subsystem <u>via the communication network</u>" as eliminating any requirement that the data access subsystem

---

[62] Report and Recommendation of the United States Magistrate Judge in <u>DataTreasury Corp. v. Ingenico et al.</u>, No. 5:02cv95, at 59 (E.D. Tex. Nov. 2, 2004) ("Report and Recommendation") (Ex. G) ("Within the context of the claim clause as a whole, the encrypted information and data is provided by the data access subsystem and transmitted to the data processing subsystem via the communication network.").

[63] Nov. 7, 2008 Declaration of John E. Hiles at 12 (Exhibit K to Plaintiff's Opening Brief on Claim Construction ) (Ex. H).

transmit encrypted data.[64]  This interpretation is plainly incorrect, though, as the claim phrase requires that the "data access subsystem provid[es] encrypted . . . information and encrypted . . . data."  The mere fact that data is transmitted via a communication network does not preclude the data access subsystem from transmitting the data.  Moreover, DTC incorrectly asserts that the Court rejected a previous defendant's argument that the data access subsystem must transmit data.[65]

The third difference is found in DTC's attempt to argue that the data access subsystem can <u>provide</u> encrypted data to the data processing subsystem <u>without the data processing subsystem receiving the encrypted data</u>.[66]  Again, the claim phrase itself contradicts DTC's construction as the claim phrase explicitly requires that the "data access subsystem provid[es] . . . encrypted . . . data <u>to the data processing subsystem</u>."[67]

The Court should hold this phrase means "1) subsystem identification information and paper transaction data are encrypted and then sent/transmitted by the data access subsystem, and 2) the encrypted subsystem identification information and encrypted paper transaction data are received by the data processing subsystem."

**F.** **"Data Access Subsystems for capturing and sending paper transaction data and subsystem identification information" means "a subsystem located at the location of image capture that provides for the input of transaction data and subsystem identification information into the overall system and provides the transaction data and subsystem identification information to other parts of the overall system."**

---

[64] <u>Id.</u> (quoting Report and Recommendation at 59).
[65] Plaintiff's Opening Brief on Claim Construction at 20.
[66] <u>Id.</u>
[67] '988 Patent at Col. 22, ll. 40-43.  (Ex. D).

The intrinsic evidence, this Court's previous reasoning, and four years of intervening recent Federal Circuit case law[68] support the Defendants' proposed clarification to the Court's original construction of this term to make it clear the claimed "data access subsystems for capturing and sending" must be located at the location of image capture.  DTC disagrees.  Accordingly, the Court's previous construction of this term "does not resolve the parties' dispute, and claim construction requires the court to determine what claim scope is appropriate in the context of the patents-in-suit."[69]

The claim language itself mandates that the "data access subsystem" is located at the location of image capture.  Claim 1 specifies that the remote data access subsystem is "for capturing" and includes "an imaging subsystem for capturing the documents and receipts."  Thus, the claim language requires that the data access subsystem perform the capturing via its imaging subsystem.  In other words, the data access subsystem must be at the location of image capture in order to meet the requirements of the claim language.

Likewise, the specification describes no location for the "data access subsystem for capturing and sending" other than the location of image capture.[70]  Fittingly, the Supreme Court and the Federal Circuit hold that claims cannot go beyond the invention described in the specification.[71]

Also, DTC made statements to the PTO during reexamination proceedings confining the data access subsystem to the location of image capture.  DTC must be

---

[68] E.g., O2 Micro Int'l Ltd., 521 F.3d at 1351; Phillips, 415 F.3d at 1303.

[69] O2 Micro Int'l Ltd., 521 F.3d at 1361.

[70] '988 patent at Figs. 2-3a; col. 3, ll. 31-38; col. 5, ll. 26-col. 9, ll. 8; col. 9, ll. 33-col. 10, ll. 67; and col. 20, ll. 2-8.

[71] See, e.g., Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd., 535 U.S. 722, 736 (2002) ("What is claimed by the patent application must be the same as what is disclosed in the specification; otherwise the patent should not issue."); Union Oil Co. of Cal. v. Atlantic Richfield Co., 208 F.3d 989, 997 (Fed. Cir. 2000) ("Thus, § 112 ¶1 ensures that, as of the filing date, the inventor conveyed with reasonable clarity to those of skill in the art that he was in possession of the subject matter of the claims.").

bound by its statements.[72]   During reexamination, DTC submitted a declaration by

Professor Hiles in an attempt to overcome prior art (the "FSTC Application").[73]

Professor Hiles argued that the FSTC Application failed to disclose a "remote data access

subsystem" because the FSTC Application described a data access controller in a

different location than the image capture hardware.[74]  He stated that this would "rule out

the [imaging subsystem and the data access controller in the FSTC Application] from

being considered a Remote Data Access Subsystem."[75]  Thus, DTC stated to the PTO that

an imaging subsystem and a data access controller must be in the same location to satisfy

the "remote data access subsystem" limitation, as claimed.

Defendants ask the Court to resolve the dispute regarding this claim term by

clarifying its earlier construction as follows:  "a subsystem located at the location of

image capture that provides for the input of transaction data and subsystem identification

information into the overall system and provides the transaction data and subsystem

identification information to other parts of the overall system."

### G.     "Within and Between," meaning both within and between, should be given the same meaning throughout the patents.

The parties do not disagree on the definition of "within" or the definition of

"between."  Defendants agree with the Court's original construction that the phrase

---

[72] Statements made during reexamination carry the same weight as statements made during the original prosecution of the application.  See Spectrum Int'l, Inc. v. Sterlite Corp., 164 F.3d 1372, 1379 (Fed. Cir. 1998) ("Therefore, a patentee, after relinquishing subject matter to distinguish a prior art reference asserted by the PTO during prosecution, 'cannot during subsequent litigation escape reliance [by the defendant] upon this unambiguous surrender of subject matter.' . . . This principle applies with equal force to arguments made by a patentee to sustain the patentability of claims during reexamination.") (citation omitted).

[73] January 30, 2006 Declaration of John E. Hiles (submitted as an appendix to DTC's January 30, 2007 Response to Non-Final Office Action ('988 Reexamination Proceeding 90/007,829)) (Ex. I).

[74] January 30, 2006 Declaration of John E. Hiles at 41 (submitted as an appendix to DTC's January 30, 2007 Response to Non-Final Office Action ('988 Reexamination Proceeding 90/007,829)) (Ex. I) ("In FSTC, the external Image Capture equipment contains its own controller, while the ILS is responsible for controlling sending information to the rest of the FSTC Application System.").

[75] Id. (emphasis added).

"within and between" requires both actions to occur, i.e., that "within and between" two

subsystems means both within the two subsystems and between the two subsystems.[76]

DTC agrees with this construction for method claims, but seeks a different construction

for the system claims.[77]   DTC's position contradicts the claim language and Federal

Circuit case law.[78]

      First, DTC's asserted construction violates the plain rules of grammar. The use of

the conjunctive term "and" – instead of the disjunctive "or" – in the phrase itself plainly

and grammatically requires both actions to occur.  Second, a claim phrase must be given

the same meaning throughout the claims unless there is a clear, unambiguous change to

its meaning reflected in the intrinsic evidence.[79]   While DTC argues for a different

construction of "within and between" in system claims as compared to other types of

claims, DTC has identified no clear evidence of a change in the meaning of "within and

between" from claim to claim.

      For these reasons, the Court should hold that "within" means that data is

transmitted within a given subsystem or location, (i.e., between the various components

comprising the subsystem or location), "between" means that data is transmitted from

one subsystem or location to another subsystem or location, and "within and between"

requires that both actions occur.

---

[76] Report and Recommendation at 35-36.  (Ex. G).

[77] See Exhibit B to Joint Claim Construction and Prehearing Statement in Compliance with Patent Rule 4-3 at 19 ("Both actions need not occur in system claims.") (Doc. No. 1093).

[78] See, e.g., Wilson Sporting Goods Co. v. Hillerich & Bradsby Co., 442 F.3d 1322, 1328 (Fed. Cir. 2006) ("the same terms appearing in different claims in the same patent ... should have the same meaning unless it is clear from the specification and prosecution history that the terms have different meanings at different portions of the claims"); Good Sportsman Mktg. LLC v. Testa Assocs., 440 F. Supp. 2d 570, 581 (E.D. Tex. 2006) ("Generally, a term should be given the same meaning throughout the patent.").

[79] Id.

H.     "Local Area Network" Requires Network Devices to be Located in the Same Physical Facility in Addition to Being Connected to the Network.

Defendants propose a construction of Local Area Network ("LAN") that is a connection between computers and/or devices to facilitate the transmission of data between them, and that requires the devices connected to the network to be located at the same "facility."  This construction is consistent with the intrinsic evidence,[80] and reflects the ordinary meaning of the term as of the filing date of the '988 patent as evidenced by numerous dictionary definitions.[81]  The meaning of LAN is clear - in addition to simply connecting devices and/or terminals over a network (as the term "communication network" dictates),[82] the descriptive words "Local Area" express the close <u>physical</u> proximity of the devices connected to the network.

Conversely, DTC's proposed construction fails to provide any clarity, providing only that the connected devices are "not remote" from each other.  By ignoring the intrinsic and extrinsic evidence associated with this term, DTC has fashioned an ambiguous construction that holds no basis in the specification or claims.

I.      "Wide Area Network" is capable of sending data between geographically distant locations.

Defendants propose construing Wide Area Network ("WAN") as "a connection that is capable of sending data between geographically distant locations."  This construction is consistent with the intrinsic evidence, which makes clear that a WAN is

---

[80] '988 Patent, Col. 12, ll. 10-33; Col. 15, ll. 52-67.  (Ex. D).

[81]   Specifically, the definitions include (in relevant part) phrases such as: "a data communication system that lies within a limited spatial area…usually restricted to relatively small areas such as rooms, buildings, ships, and aircraft…"  or "a network that connects several computers that are located nearby in the same room or building […]."   (See Exhibit C to Joint Claim Construction and Prehearing Statement in Compliance with Patent Rule 4-3 at 22-24) (Doc. No. 1093).

[82]  The Court's prior construction of "Communication Network" is "a connection of computers and/or devices to facilitate the transmission of data between the computers and/or devices, for example, a local area network or wide area network."   See Exhibit G, Report and Recommendation at 35.

**DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF**                    23

used to connect "multiple, physically separate data centers."[83]  Defendants' construction

is also supported by the  extrinsic evidence.   In each definition from the extrinsic

evidence, the WAN is described as having vast coverage and connecting devices that are

separated from each other by some <u>significant physical distance</u>.[84], [85]

DTC improperly ignores the effect of the descriptive words "Wide Area."  The

definitions clearly show that a WAN covers a significantly large geographic area, and

larger area than a LAN does.

> **J.**    **"Remote" as applied to a subsystem or location "refers to a physically separate location or subsystem, not near or immediate, and distant from the central location or subsystem and from any intermediate or collecting location or subsystem."**

This Court previously construed "remote" to mean "at physically separate

locations; not near or immediate; distant."[86]   DTC, however, asserts that the Court

provided not one but <u>three</u> interchangeable definitions of "remote"—each with a unique

scope.  DTC's proposed construction is ambiguous and contradicts the intrinsic evidence.

DTC argues that the prior construction "should be read such that each defining

phrase separated by semicolons can be read <u>exclusive of the other phrases</u>."[87]   DTC

acknowledges that the three phrases "are not identical in <u>meaning or scope</u>," but asserts

---

[83] '988 Patent, Col. 11, ll. 30-43, Col. 14, ll. 34-42, Col. 12:34-61, Col. 16:1-12.  (Ex. D).

[84] The exact phrasing differs but the meaning of WAN is clear - in contrast to the definitions of LAN, above,  each definition of WAN (in relevant part) includes phrases such as "a physical or logical network that…is usually spread over a larger geographic area than that of a LAN,"  "a set of widely separated computers connected together," "a network with communications often over large distances," or "a data communications network designed to serve an area of hundreds or thousands of miles."  See Exhibit C to Joint Claim Construction and Prehearing Statement in Compliance with Patent Rule 4-3 at 24-27.  (Doc. No. 1093).  As with LAN above, in addition to connecting devices and/or terminals over a network (as the term "communication network" dictates ), the descriptive words "Wide Area" express the Wide Area Network's vast coverage and the large *physical* distance of the devices connected to the network.

[85] It should be noted that in arguing against Defendants' construction, one "concern" DTC expressed was the lack of a distinction between the definitions of LAN and WAN.  To be sure, the distinction is present – it is just not the distinction DTC advocates.   The constructions are clear that a WAN covers a geographically wider area than a LAN does.

[86] Report and Recommendation at 7.  (Ex. G).

[87] Plaintiff's Opening Brief on Claim Construction at 13 (emphasis added).

that they should be read in the alternative anyway.[88]  The Federal Circuit holds that such constructions are incorrect <u>per se</u>, noting that the "purpose of claim construction is to 'determin[e] the <u>meaning and scope</u> of the patent claims asserted to be infringed.'"[89]

When determining the meaning and scope of the claims, "[i]t is well settled that . . . the court should look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history."[90] DTC's only support, however, is <u>extrinsic</u> evidence in the form of an after-the-fact, conclusory declaration of its paid consultant.  The Court should give such evidence little or no weight when it is at odds with the intrinsic record as it is here.[91]

The intrinsic record supports Defendants' proposed construction, as <u>Phillips</u> requires.[92]  First, all of the "remote" subsystems and locations shown in the Patents meet Defendants' proposed construction.  For example, Figures 1, 2, and 4 of the Patents indicate, via the use of carrier clouds, that the remote subsystem 200 is physically separate from, not near or immediate to, and distant from the intermediate subsystem 400 and the central subsystem 600.[93]

Second, the specifications explicitly provide for geographic distance between remote, intermediate, and central subsystems and locations as follows: (1) remote subsystems are located "at the customer sites within the [intermediate subsystem's]

---

[88] <u>Id.</u> (emphasis added).
[89] <u>O2 Micro Int'l Ltd.</u>, 521 F.3d at 1360 (emphasis added).
[90] <u>Computer Docking Station Corp. v. Dell, Inc.,</u> 519 F.3d 1366, 1373 (Fed. Cir. 2008) (internal quotations omitted).
[91] <u>Phillips</u>, 415 F.3d at 1318 ("conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court"; "a court should discount any expert testimony that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history . . .").
[92] <u>Id.</u> at 1313.
[93] <u>See</u> Ex. D and E ('988 and '137 patents, respectively).

region;"[94] (2) intermediate subsystems each "support[] a region containing a group of [remote subsystems] . . . [and] are located at key central sites of maximum merchant density;"[95] and (3) central subsystems are assigned a "region" including intermediate subsystems.[96]  The use of "region," "sites," and "located/location" in the specifications indicates a geographic distance between remote, intermediate, and central subsystems and locations.

Third, Ballard argued during prosecution that U.S. Pat. No. 5,187,750 to Behera "lacks any <u>remote</u> image capture" as used in the Patents' claims.[97]  Yet, the image capture device described in Behera would satisfy DTC's construction of "remote" since the device is at a "physically separate" location from other subsystems.[98]  That Ballard distinguished Behera on multiple grounds is irrelevant.[99]  DTC is not free to assert one construction during prosecution and a contradictory construction during litigation.[100]

Finally, the intrinsic record explicitly defines a "remote" subsystem as one that is "many miles or even states away" from a "central computer."[101]  Prior art patents cited during prosecution are intrinsic evidence.[102]  A definition in a "highly pertinent" prior art patent is controlling "unless the specification clearly states an alternative meaning or that

---

[94] <u>See</u> Exh. D, '988 Patent at Col. 5, ll. 26-31; Col. 12, ll. 10-11 (DATs 200).

[95] <u>Id.</u> at Col. 11, ll. 13-19 (DACs 400).

[96] <u>Id.</u> at Col. 20, ll. 13-15; Col. 20, ll. 54-65 (DPCs 600).

[97] <u>See</u> February 16, 1999 Petition to Make Special at 3 ('137 Prosecution History) (Ex. J).

[98] <u>See</u> Exh. K, U.S. Patent No. 5,187,750, Fig. 1A.

[99] <u>See, e.g.,</u> Computer Docking Station Corp. v. Dell, Inc., 519 F.3d 1366, 1377-78 (Fed. Cir. 2008) ("a disavowal, if clear and unambiguous, can lie in a single distinction among many"); Andersen Corp. v. Fiber Composites, LLC, 474 F.3d 1361, 1374 (Fed. Cir. 2007) ("applicants invoked several grounds for distinguishing" the reference, but "that does not undercut the force of the applicants' statement" regarding one of the grounds).

[100] <u>See</u> <u>Computer Docking</u>, 519 F.3d at 1375.

[101] <u>See</u> U.S. Patent No. 5,506,691 to Bednar (Ex. L) at Col. 1, ll. 46-49.

[102] <u>See, e.g.,</u>  L.G.Elecs., Inc. v. Bizcom Elecs., Inc., 453 F.3d 1364, 1375 (Fed. Cir. 2006) (prior art patents are intrinsic evidence).

this meaning was disclaimed during prosecution."[103]   During prosecution, Ballard identified U.S. Patent No. 5,506,691 to Bednar as one "of the references deemed most closely related to the subject matter encompassed by the claims" of his application.[104] Since Bednar defines "remote" as "many miles or even states away," and Ballard did not state any alternative meaning or disclaim this meaning during prosecution, this definition requiring geographic distance should control.

Thus, the Court should hold that "remote," as applied to a subsystem or location, "refers to a physically separate location or subsystem, not near or immediate, and distant from the central location or subsystem and from any intermediate or collecting location or subsystem."

      **K.**    **"Intermediate," as applied to a subsystem or location, "refers to a subsystem or location connected in between a remote and central subsystem(s) or location(s), which is physically separate from, not near or immediate to, and distant from the remote and central subsystem(s) or location(s)."**

Both parties agree that an "intermediate" subsystem or location is one that occurs "between" remote and central subsystem(s) or location(s).  The parties' constructions have two differences: (1) whether the intermediate subsystem(s) or location(s) must be "connected" to the remote and central subsystem(s) or locations(s), and (2) whether the intermediate subsystem(s) must be physically separate from, not near or immediate to, and distant from any remote and central subsystem(s) or location(s).  The intrinsic evidence makes it clear that both are required.

First, an "intermediate" subsystem or location, when read in light of the specification, must be <u>connected</u> in between a remote and central subsystem(s) or

---

[103] <u>See</u> <u>Kumar v. Ovonic Battery Co., Inc.</u>, 351 F.3d 1364, 1368 (Fed. Cir. 2003).
[104] <u>See</u> February 16, 1999 Petition to Make Special at 1 ('137 Prosecution History) (Ex. J).

location(s), instead of simply "existing" in between as DTC's construction provides.[105] For example, Figures 1 and 4 and the text describing these figures show this clearly.[106] As DTC explained during reexamination, the remote "Data Access connects directly to Intermediate and Intermediate connects directly to Central," and the "connection[s] between data access and intermediate subsystems on one hand and between intermediate and central subsystems are explicit" in the claims.[107]   DTC agrees with this point, as is evident from its opening brief where it stated a subsystem could be deemed "intermediate" if it was "physically separated from and connected to both a remote subsystem and a central subsystem."[108]

The second issue is whether the correct construction requires that an "intermediate" subsystem or location be (a) physically separate from, (b) not near or immediate to, and (c) distant from any remote and central subsystem(s) or location(s).  As explained more fully above in support of Defendants' proposed construction of "remote," the specification explicitly provides for geographic distance between each of the remote,[109] intermediate,[110] and central[111] subsystems and locations.

Conversely, there is no support in the specification for DTC's contention that "it would be possible to have remote, intermediate, and central subsystems present in the

---

[105] See, e.g., Ex. D ('988 Patent) at col. 4, ll. 60-65; col. 5, ll.1-19; FIG. 1; FIG.2; FIG. 4; col. 11, ll. 13-19; col. 12, ll. 34-64.

[106] See, e.g., '988 patent, FIG. 1; col. 4, ll. 60 - col. 5, ll. 1-19; Figure 4; col. 11, ll. 13-19; col. 12, ll. 34-64. (Ex. D).

[107] January 30, 2007 DTC Response to Non-Final Office Action at 65-66 ('988 Reexamination Proceeding 90/007,829) (emphasis added) (Ex. A).

[108] Plaintiff's Opening Brief on Claim Construction at 16 (emphasis added).  DTC also states that the term "'remote' applies as equally and correctly to two connected devices in the same room as it would to two connected devices that are many miles away from each other."  Id. at 14 (emphasis added).

[109] See Ex. D, '988 Patent at Col. 12, ll. 10-11 (DATs 200).

[110] Id. at Col. 11, ll. 14-19 (DACs 400).

[111] Id. at Col. 20, ll. 13-15 and 54-65 (DPCs 600).

**DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF**                    28

same room."[112]   DTC's only support is an after-the-fact, conclusory declaration from its

paid consultant.   Given the weight of the intrinsic evidence favoring Defendants'

proposed construction and the lack of intrinsic support cited by DTC in support of its

ambiguous construction, the Court should adopt Defendants' proposed construction, and

hold that "intermediate," as applied to a subsystem or location, "refers to a subsystem or

location connected in between a remote and central subsystem(s) or location(s), which is

physically separate from, not near or immediate to, and distant from the remote and

central subsystem(s) or location(s)."

> **L.**    **"Central subsystem" is "a subsystem that is different from the remote subsystems where the function of capturing an image of the paper transaction data is performed."**

The term "central" is used in the claims to modify both "locations" and

"subsystems."   The dispute is whether "central" has different meanings in the claims,

depending on whether it modifies "location" or "subsystem."   DTC advocates different

meanings.   Defendants assert that the term "central" has the same meaning throughout the

claims.

A claim term is presumed to have the same meaning throughout the claims of a

patent.[113]   This Court previously held that a "central location" is "a location that is

different from the remote locations where the function of capturing an image of the paper

transaction data is performed."[114]  Defendants propose that "central subsystem" should be

construed to mean "a subsystem that is different from the remote subsystems where the

---

[112] Plaintiff's Opening Brief on Claim Construction at 16 (emphasis added).
[113] Microprocessor Enhancement Corp. v. Texas Instruments Inc., 520 F.3d 1367, 1375 (Fed. Cir. 2008) quoting Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1342 (Fed. Cir. 2001) ("a single 'claim term should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent"); see also Phillips v. AWH Corp., 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc) ("claim terms are normally used consistently throughout the patent").
[114] Report and Recommendation at 57 (emphasis added) (Ex. G).

function of capturing an image of the paper transaction data is performed."   Thus, Defendants propose that the term "central" have the same meaning, whether it modifies "subsystem" or "location."

DTC has offered no evidence to overcome this presumption.[115]   Instead, DTC offers a proposed construction that does not provide a meaningful definition of "central subsystem."   The Court should hold that "central subsystem" refers to "a subsystem that is different from the remote subsystems where the function of capturing an image of the paper transaction data is performed.

> **M.**   **"Collecting and Sending the Electronic or Paper Transaction Data at Intermediate Locations" renders claim 36 indefinite.**

The Court previously found the meaning of "electronic transaction data" clear and held that the omission of "the" before "electronic" does not render claim 36 indefinite.[116] Subsequently, however, the applicable legal standard was clarified by the Federal Circuit. Applying the clarified legal standard to claim 36 shows that the claim is indefinite under 35 USC 112 ¶2.

In 2008, the Federal Circuit stated that "a claim could be indefinite if a term does not have proper antecedent basis where such basis is not otherwise present by implication or the meaning is not reasonably ascertainable."[117]   The antecedent basis for the step of "collecting and sending electronic . . . transaction data at intermediate locations" is not present by implication in this instance and its absence prevents one from ascertaining the scope of the claimed method.

---

[115] Pioneer Corp. v. Samsung SDI Co., Ltd., No. 2:06-cv-384 (DF), 2007 WL 5688764, at * 4 (E.D. Tex. Dec. 27, 2007) ("The same terms in [the same or] related patents are presumed to carry the same meaning.").
[116] Report and Recommendation at 49 (Ex. G).
[117] Halliburton Energy Services, Inc. v. M-I LLC, 514 F.3d 1244, 1249 (Fed. Cir. 2008).

Claim 26 (from which claim 36 depends) recites a method "for central management . . . of remotely captured paper transaction data from documents and receipts."[118]   Neither claim 26 nor claim 36 recites capturing <u>electronic transaction data either explicitly or by implication</u>.   Thus, one cannot determine if claim 36 requires an additional capturing step beyond what is set out in the claim in order to perform "collecting and sending the electronic . . . transaction data at intermediate locations," or if claim 36 simply requires collecting electronic transaction data in some undisclosed manner not connected with the other steps of the claims.   Since one of ordinary skill in the art cannot determine what is required to perform the step of "collecting and sending the electronic . . . transaction data," the scope of claim 36 is not "reasonably ascertainable" under the standard recently set forth by the Federal Circuit.[119] Accordingly, claim 36 is invalid under 35 U.S.C. § 112 ¶2.

### N.   "Image" Requires an "Electronic Representation" of an Object to Have a "Pictorial Likeness" of the Object.

The primary difference between the parties' constructions of "image" is that Defendants' construction makes clear that "image" requires that the electronic representation of an object has a "pictorial likeness" of the object.   In contrast, DTC's construction does not clarify whether an "electronic representation of an object" (DTC's construction) encompasses merely the electronic reading of magnetic ink character recognition (MICR) information or other character recognition processes.   As the Court

---

[118] '988 patent Col. 25, ll. 11-13.  (Ex. D).
[119] <u>Halliburton</u>, 514 F.3d at 1249.

previously held, the provision of reading MICR information does not satisfy the image and imaging limitations of the Patents.[120]  Defendants agree with this finding.

Given that DTC has apparently attempted to read the claims on MICR-only capture systems in the past, a clarification of the construction to ensure that image is given its ordinary meaning consistent with the intrinsic evidence is required.  Indeed, during the prosecution of the '988 Patent, DTC specifically distinguished MICR reading from imaging.[121]  DTC cannot now be allowed to conflate the MICR reading (or any similar technologies) with the process of capturing an "image" as claimed.  Further, the specification and ordinary meaning of the term requires that "image" be bounded by the "pictorial likeness" requirement.[122]  Therefore, the Court should construe "image" as requiring an electronic representation of an object to have a pictorial likeness of the object.

> **O.**  **"Capturing an Image of Documents and Receipts and Extracting Data Therefrom" Requires Capturing the Documents and Receipts at a Remote Subsystem, Creating an Image of the Captured Documents and Receipts, and Extracting Data from the Created Image.**

Although this Court has previously construed this claim phrase, DTC's arguments presented to the PTO during the reexamination require the parties to revisit its construction.  Specifically, while distinguishing Campbell,[123] DTC argued that data extracted in the node (item 12) of Campbell "would not lead to 'transmitting data within

---

[120]  Report and Recommendation on First Data Corp.'s Motion for Summary Judgment of Non-Infringement, Data Treasury Corp. v. First Data Corp., No. 5:03CV39 (E.D. Tex. August 29, 2006) (Exh. M).

[121]  See October 23, 1998, Petition to Make Special at 3 ('988 Prosecution History) (Ex. N) (distinguishing the invention from Bednar U.S. Patent No. 5,506,691 (Ex. L), which describes capture of MICR data and transmission of same to a central location – "[i]n substantial contrast, the present application provides a communication network for transmitting images to a central data processing subsystem . . ..") (emphasis added).

[122]  See, e.g., '988 Patent Col. 5:46-57  (Ex. D).

[123]  U.S. Patent No. 5,373,550 to Campbell, et al.  (Ex. O)

the remote locations' as required by present claim 46."[124]  DTC thus argued to the PTO

that claim 46 requires capture <u>and</u> extraction at remote subsystems.  DTC should not be

permitted to distinguish prior art based on a limiting argument while ignoring that same

argument before this Court.

Accordingly, the proper construction for "capturing an image of documents and

receipts and extracting data therefrom," is capturing at a remote subsystem documents

and receipts and creating an image of the documents and receipts.  Extracting means

deriving information from a source.  Thus, data is extracted from the image of the

documents and receipts.

**P.    "Transaction Data" in the Asserted Claims Means "Paper Transaction Data."**

The Court previously found that when the term "transaction data" is used with a

definite article (e.g., "the" or "said"), it should be understood to refer to the type or types

of transaction data for which there is an antecedent in the claim.  In each of the asserted

claims, the term "transaction data" relies for antecedent basis on "paper transaction data."

Thus, to simplify the issues for the jury, Defendants contend that the term "transaction

data" should be construed to have the same meaning as "paper transaction data" in all of

the asserted claims.  Specifically, in the context of the '988 Patent, "transaction data"

must include an image of the paper document and receipt when it is transmitted from the

remote subsystem.[125]   In the context of claims 1 and 26 of the '137 Patent, the term

"transaction data" must include an image of each of "a payer's bank routing number, a

payer bank's routing information, a payer's account number, a payer's check, a payer

---

[124] January 30, 2007 DTC Response to Non-Final Office Action at 67-68 ('988 Reexamination Proceeding 90/007,829) (Ex. A).
[125] Joint Claim Construction and Prehearing Statement in Compliance with Patent Rule 4-3 at A1 (Doc. No. 1093).

bank's draft, a check amount, a payee bank's identification number, a payee bank's routing information, and a payee's account number."  In the context of claims 42 and 43 of the '137 Patent, the term "transaction data" must include an image of a "check."

**Q. "Documents and Receipts" Requires Additional Clarification Consistent with the Intrinsic Evidence.**

To clear up ambiguities and to simplify the issues for the jury, Defendants ask the Court to construe "documents and receipts" as follows:

> "Documents and receipts" must include receipts. "Document" means paper document. "Receipt" means a paper acknowledgement of a transaction given by one who receives payment or other property to one who pays money or delivers property.  The receipt evidences a transaction in which the provider of the document was involved.

**1. "Documents and Receipts" must include receipts.**

"Documents" and "receipts" are separate and distinct items.  DTC's construction overlooks the plain claim language and attempts to redraft the claims to require only a single type of "document," specifically a check, to satisfy the "documents and receipts" limitation.  DTC's construction is improper because the use of the conjunction "and" expressly  requires the capture of "receipts."  Where a "patentee used the term 'and' to separate the categories of criteria, [this usage] connotes a conjunctive list."[126]  DTC's proposed construction ("documents or receipts") render the words "and receipts" unnecessary and superfluous, thereby contravening well-established claim construction principles.[127]

In addition, DTC filed a continuation-in-part application for the '137 Patent specifically to add the term "check" into the patent.  Had a "check" met the "documents

---

[126] See Superguide Corp. v. Directv Enter., Inc., 358 F.3d 870, 886 (Fed. Cir. 2004).
[127] See Bicon, Inc. v. Straumann Co., 441 F.3d 945, 950 (Fed. Cir. 2006) (constructions rendering claim word superfluous are improper).

and receipts" limitation, the need for the continuation-in-part application would have been obviated.  Accordingly, DTC's own actions belie DTC's proposed construction of "documents and receipts."

## 2. **"Documents" and "Receipts" must be paper**.

The intrinsic evidence confirms that "documents and receipts" must be paper records.  Claim 1, for example, specifies that the documents and receipts on which the claimed system operates are paper documents and receipts.[128]  Claim 1 provides that "remote data access subsystems" are "for capturing…paper transaction data" and that, to do so, the remote data access subsystems include an "imaging subsystem for capturing the <u>documents and receipts</u>."[129]  The use of an "imaging subsystem" with "documents and receipts" in the claims only reinforces that "documents and receipts" are on paper. The Patents include multiple examples indicating that "documents and receipts" are paper records.[130]

## 3. **"Receipt" means a paper acknowledgement of a transaction given by one who receives payment or other property to one who pays money or delivers property.  The receipt evidences a transaction in which the provider of the document was involved**.

DTC's construction of "receipts" overreaches and is not "defining" or "clarifying," as is required.[131]  The intrinsic evidence mandates that:  (1) a receipt must be given by one who receives payment or other property to one who pays money or delivers property to acknowledge the transaction; and (2) the original provider (i.e., the writer) of the receipt was involved in the transaction evidenced.

---

[128] '988 Patent, Col. 22, ll. 20-22.  (Ex. D).
[129] <u>Id</u>. at Col. 22, ll. 24-28.
[130] <u>See e.g.</u>, <u>Id</u>. at Col. 25, ll. 11-16; Col. 27, ll. 26-28; Col. 28, ll. 24-25.
[131] <u>See</u> <u>Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.</u>, 442 F.3d 1322, 1330 (Fed. Cir. 2006).

The specifications show that a "receipt" must be given by one who receives payment or other property to one who pays money or delivers property.  The "receipt" described in the specification is a document given by one who receives payment (a merchant, Office Depot) to the one who pays money (the customer).[132]  Moreover, Ballard cited the Higashiyama and the Kamata patents during prosecution.  This intrinsic evidence describes a "receipt" as a document given by the one who receives payment (the merchant or a bank teller) to the person who pays money (the customer, via check),[133] and is thus presumptively controlling.[134]

The plain and ordinary meaning of "receipt" also requires that the original provider (i.e., the writer) of the receipt must have been involved in the transaction evidenced by the receipt and have provided the receipt to another person in the transaction.  Otherwise, a personal diary note about a transaction could qualify as a "receipt" for claim construction purposes.  Or, restaurant receipts given by a person to his accountant or the IRS while transacting business with them could be "receipts" evidencing a transaction between the person and his accountant or the IRS.  Clearly, neither actually constitute receipts.

Extrinsic evidence further supports Defendants' construction.  For example, The Fitzroy Dearborn Encyclopedia of Banking and Finance (1994) provides that "receipt" means "an evidence of payment; a written acknowledgement given by one who receives money or other property to one who pays money or delivers property."[135]

---

[132] See '988 patent (Exh. D) at Figure 3B; col. 9, ll. 9-32.

[133] See '682 patent (Exh. P), col. 4, ll. 61-68; '238 patent (Exh. Q), col. 1, ll. 27-29; col. 5, ll. 29-34.

[134] See Arthur A. Collins, Inc. v. N. Telecom Ltd., 216 F.3d 1042, 1044 (Fed. Cir. 2000); Kumar v. Ovonic Battery Co., 351 F.3d 1364, 1368 (Fed. Cir. 2003).

[135] Charles J. Woelfel, The Fitzroy Dearborn Encyclopedia of Banking and Finance (Exh. M) 978 (10th ed. 1994).

Therefore, Defendants ask the Court to construe "Documents and receipts" as follows:  "Documents and receipts" must include receipts. "Document" means paper document. "Receipt" means a paper acknowledgement of a transaction given by one who receives payment or other property to one who pays money or delivers property.  The receipt evidences a transaction in which the provider of the document was involved.

### R.     "Paper Transaction Data" Requires Inclusion of the Information Set Forth in Claims 1 and 26 of the '137 Patent.

To clarify the issues for the jury, the term "paper transaction data" should be construed to require the inclusion of each of "…a payer's bank routing number, a payer bank's routing information, a payer's account number, a payer's check, a payer bank's draft, a check amount, a payee bank's identification number, a payee bank's routing information, and a payee's account number" as evidenced by the '137 Patent[136] and its prosecution history.[137]

DTC contends that this phrase is not a limitation.  This argument is improper as it would render superfluous the explicit listing of information included within "paper transaction data."[138]  DTC alternatively proposes that the Court only construe the term "paper transaction data" in accordance with its plain and customary meaning.  This approach, however, does not resolve the parties' dispute about the proper scope of the claim.[139]  Accordingly, Defendants ask the court to give meaning to all of the claimed elements comprising the "paper transaction data" as claimed.

---

[136] See '137 Patent (Ex. E), col. 4:48-49, 9:16-10:76, 11:1-9, 22:18-23, Figure 3B.

[137] January 30, 2007 DTC Response to Non-Final Office Action  ('137 Reexamination Proceeding 90/007,830) (Ex. R), February 16, 1999 Petition to Make Special ('137 Prosecution History) (Ex. J), January 18, 2007 Ex Parte Reexamination Interview Summary ('137 Reexamination Proceeding 90/007,830) (Ex. S), January 31, 2007 Statement of Substance of Interview ('137 Reexamination Proceeding 90/007,830) (Ex. T).

[138] See Bicon, 441 F.3d at 950 (constructions rendering claim word superfluous are improper).

[139] See O2 Micro Int'l Ltd.,, 521 F.3d at 1360.

**S.      "Payer Bank's Draft" is a Limitation on the Claim.**

The term "payer bank's draft" appears in the claims of the '137 Patent as one of the claimed requirements for paper transaction data.[140]  The phrase " payer bank's draft," is not an everyday phrase likely to be used or easily understood by the jury.   Thus, Defendants ask that the Court construe "payer bank's draft" to have its ordinary meaning: "a written order by a first bank (drawer bank) instructing another bank to pay a specified sum to another party (payee) on demand."  The drawer bank is the "payer bank."

First, the intrinsic evidence supports Defendants' construction.  The phrase "payer bank's draft" is used only once in the specification.[141]  As the intrinsic evidence confirms, the "payer bank's draft" is part of an electronic transaction associated with a check, but the "payer bank's draft" is different from the "payer's check."

Second, within the framework provided by the intrinsic evidence, the extrinsic evidence provides further evidence of the proper construction.   The <u>Fitzroy Dearborn Encyclopedia of Banking and Finance</u> (1994) provides the definition of "draft" which is:

> A written order drawn by one party (the drawer) ordering a second party (the drawee) to pay a sum of money to a third party (the payee).  A draft differs from a check in that it may be a time instrument drawn on an

---

[140] Claim 1 of the '137 (Ex. E) patent claims a system comprising, inter alia, "remote data access subsystems for capturing and sending paper transaction data including a payer bank's routing number, a payer bank's routing information, a payer's account number, a payer's check, a payer bank's draft, a check amount, a payee bank's identification number, a payee bank's routing information, and a payee's account number."

[141] <u>See</u> Ex. E at col. 22, ll. 23-36 ("[T]he system creates an electronic transaction representing the check at a central location in step 1014.  The electronic transaction representing the check consists of the payer bank's identification number, routing information, the payer's account number, a payer's check, a payer bank's draft, the amount of the check or draft, the payee bank's identification number, the payee bank's routing information, and the payee's account number.  In step 1016, the electronic transaction representing the check is transmitted to the payee bank.  In step 1018, the payee bank transmits the electronic transaction representing the check to the payer bank.  In step 1020, the payer bank verifies the electronic transaction representing the check and determines whether to approve a fund transfer.")

individual, firm, corporation, or bank, and the initiative for payment of the goods is taken by the seller and not the buyer.[142]

DTC's position that the phrase "payer bank's draft" is not a limitation of the claim contradicts case law and the prosecution history.  Claims must be interpreted to give effect to all terms in the claim.[143]  Ignoring the very specific list of "physical structures and characteristics specifically described" in the claims "would render the scope of the patent ambiguous."[144]  The very specific list of physical structures and characteristics of "paper transaction data" in the '137 Patent was one of just a few changes made to the claims between the '988 Patent and the '137 continuation-in-part patent.  The prosecution history clearly confirms that the patentee sought the continuation specifically to include the list as a limitation in the claims.

DTC further disputes Defendants' construction by arguing it impermissibly requires involvement of two banks.  The claimed term, "payer bank's draft," necessarily means the drawer/payer bank—not the payer—wrote the draft.  DTC's argument mistakenly assumes that the term at issue is "payer's bank draft."[145]  DTC's errant arguments against Defendants' construction are based on a false premise, and provide further evidence the term is confusing enough to require adoption of Defendants' construction.

For these reasons, the Court should hold that "payer bank's draft," as used in the claims of the '137 patent, is a written order by a first bank (drawer bank) instructing

---

[142] Charles J. Woelfel, <u>The Fitzroy Dearborn Encyclopedia of Banking and Finance</u> (Ex. M) 315 (10th ed. 1994).
[143] <u>See</u> <u>Bicon</u>, 441 F.3d at 950.
[144] <u>Id.</u>
[145] Plaintiff's Opening Brief on Claim Construction at 45.

**DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF**                                    39

another bank to pay a specified sum to another party (payee) on demand.  The drawer

bank is the payer bank.

> **T.**   **"Processing, Sending, Verifying, and Storing Paper Transaction Data and the Subsystem Identification Information" Requires <u>Both</u> the Paper Transaction Data and Subsystem Identification Information to be Processed, Sent, Verified and Stored.**

DTC's disagreement with Defendants' proposed construction centers on the

meaning of one simple word:  "AND."  Specifically, the phrases "paper transaction data"

and "subsystem identification information" are connected with the "and" connector, also

known as the conjunctive form.  This means that the "processing, sending, verifying, and

storing" applies to *both* "paper transaction data" as well as "the subsystem identification

information."  If the patentee wished it to apply to <u>either</u> the "paper transaction data" <u>or</u>

the "subsystem identification information," <u>or</u> both, the patentee could have separated

those phrases with an "or" or an "and/or" to make that clear.  The use of the word "AND"

cannot be ignored.[146]

DTC cites case law that cautions against limiting the scope of a claim to a

preferred embodiment in the specification.  Although Defendants' proposed construction

is supported by the specification,[147] it is also important to note that the plain language of

the claims requires both the transaction data and the subsystem identification information

to be (1) processed, (2) sent, (3) verified, and (4) stored.

> **U.**   **"Subsystem Identification Information" refers to "information that identifies computer components of the remote data subsystem or a subsystem that is a part of the remote data access subsystem, but does not refer to the name or location of an organization such as a bank."**

---

[146] DTC itself insists that "The words of a claim are generally given their ordinary and customary meaning." Plaintiff's Opening Brief on Claim Construction at 6.

[147] Specifically, the figures and specification  highlight the fact that both the paper transaction data and the subsystem identification information are actually processed, sent, verified, and stored.  See '988 Patent: Col. 7:52-8:40, 8:51-8:65, 9:8-10:67, 21:1-18  (Ex. D); '137 Patent: Col. 4:46-47, 7:59-8:52, 13:42-14:42, 15:9-23, 20:8-23; 137 Patent, Fig. 3A (Ex. E).

The Court previously construed "Subsystem Identification Information" to mean "information that identifies the remote data subsystem or a subsystem that is a part of the remote data access subsystem."[148]   During reexamination, to overcome a prior art rejection, DTC made unambiguous statements further defining the proper scope of "subsystem identification information."[149]   In light of these statements, Defendants ask the Court to add the following modifications to its prior construction: 1) subsystem identification information "identifies computer components of the remote data subsystem or a subsystem that is a part of the remote data access subsystem" and 2) subsystem identification information "does not refer to the name or location of an organization such as a bank."

To help distinguish the claims over Campbell during reexamination,[150] DTC submitted Professor Hiles' statement declaring (with original emphasis) "[b]ecause of the definition of Subsystem, Subsystem Identification Information identifies **computer components** that are or are part of the Remote Data Access Subsystem.  Thus Subsystem Identification Information does not refer to the name or location of an organization such as a bank."[151]

Defendants are entitled to rely on this unambiguous statement made during reexamination; indeed, it is indicative of the proper claim scope.[152]  Thus, Defendants ask the Court to hold DTC to its statements in reexamination and find, as Professor Hiles

---

[148] Report and Recommendation at 18 (Ex. G).

[149] "[A] patentee, after relinquishing subject matter to distinguish a prior art reference asserted by the PTO during prosecution, 'cannot during subsequent litigation escape reliance [by the defendant] upon this unambiguous surrender of subject matter.'"   Spectrum Int'l, Inc. v. Sterlite Corp., 164 F.3d 1372, 1379 (Fed. Cir. 1998) (citation omitted).   "This principle applies with equal force to arguments made by a patentee to sustain the patentability of claims during reexamination."   Id. at 1379.

[150] U.S. Patent No. 5,373,550 to Campbell, et al. (Ex. O).

[151] January 30, 2006 Declaration of John E. Hiles at 5, 20 (submitted as an appendix to DTC's January 30, 2007 Response to Non-Final Office Action ('988 Reexamination Proceeding 90/007,829)) (Ex. I).

[152] Spectrum, 164 F.3d at 1379.

stated, that "subsystem identification information" means "information that identifies computer components of the remote data subsystem or a subsystem that is a part of the remote data access subsystem, but does not refer to the name or location of an organization such as a bank."

> **V.    Defendant HSBC Bank USA, N.A. ("HSBC Bank") and HSBC North American Holdings, Inc. ("HNAH") separately and individually assert "subsystem identification information" should be construed as: "information that identifies the specific machine from which images were transmitted, but does not refer to the name or location of an organization such as a bank."[153]**

> **1.    Defendants HSBC Bank and HNAH's Argument in Support of Their Proposed Construction.**

In a prior action, this Court construed "subsystem identification information" to mean "information that identifies the remote data subsystem or a subsystem that is a part of the remote data access subsystem."[154]   This prior construction must be modified in light of arguments and submissions made by DataTreasury during reexamination of the Ballard patents.

> **a.    Interview at the PTO**

On January 18, 2007, Mr. Ballard and DataTreasury representatives met with PTO examiners.[155]   DataTreasury later submitted an interview summary emphasizing that the claimed invention included "identification of the specific machine from which images were transmitted":

> When Mr. Ballard first conceived of his invention, he recognized that it would be beneficial to include **identification of the specific machine**

---

[153] The other members of Defense Group 1 oppose this construction and believe the construction listed in section U is the correct construction.  HSBC and HNAH's proposed construction is included in this brief only for the convenience of the Court.

[154] Report and Recommendation at 18 (Exh. G).

[155] January 31, 2007 Statement of Substance of Interview at 1-2 ('988 Reexamination Proceeding 90/007,829) (Ex. B) and January 31, 2007 Statement of Substance of Interview at 1-2 ('137 Reexamination Proceeding 90/007,830) (Ex. T).

**from which images were transmitted**.   By having the machines automatically include their own identification - and to encrypt this identification**,** the chance of someone trying to falsify the identity of a subsystem sending data and/or someone mis-entering the identification of the subsystem sending data - that is human error - is eliminated.[156]

Except for changes necessitated by grammar, HSBC Bank and HNAH's proposed construction contains the exact language put forth by DataTreasury during the reexaminations.

### b.      DataTreasury's Arguments to the PTO

During the reexaminations, DataTreasury made arguments to the PTO re-emphasizing the claimed feature requiring identification of the specific machine that transmitted images:

> As Mr. Ballard, the inventor, discussed during the personal interview, when he conceived of his invention, he recognized that it would be beneficial to include identification information of **the specific data access subsystem from which images were transmitted**, and to encrypt this information, so that the identity of the originating subsystem could not be falsified.[157]

DataTreasury clearly disavowed anything other than the identification of the "specific" subsystem.   HSBC Bank and HNAH's proposed construction maintains this requirement.

### c.      DataTreasury's Expert's Submission to the PTO

During the reexaminations, DataTreasury also submitted the "Declaration of

---

[156] January 31, 2007 Statement of Substance of Interview at 8-9 ('988 Reexamination Proceeding 90/007,829) (Ex. B) and January 31, 2007 Statement of Substance of Interview at 9 ('137 Reexamination Proceeding 90/007,830) (emphasis added) (Ex. T).

[157] January 30, 2007 DTC Response to Non-Final Office Action at 54-55 ('988 Reexamination Proceeding 90/007,829) (Ex. A) and January 30, 2007 DTC Response to Non-Final Office Action at 23 ('137 Reexamination Proceeding 90/007,830) (emphasis added) (Ex. R).

Professor John E. Hiles," who DataTreasury described as "a technical expert."[158] DataTreasury told the PTO that "[t]he Hiles Declaration is a helpful document for technical aspects of this case."[159]

In his declaration, Professor Hiles quotes the definitions of "subsystem" and "subsystem identification information" from the Court's prior Markman Order.[160] Professor Hiles then states that:  "Because of the definition of Subsystem, Subsystem Identification Information identifies computer components that are or are part of the Remote Data Access Subsystem.  Thus **Subsystem Identification Information does not refer to the name or location of an organization such as a bank**."[161]  HSBC Bank and HNAH's proposed construction contains this exact language that was put forth in an attempt to distinguish prior art.

HSBC Bank and HNAH's proposed construction also stays true to Professor Hiles opinion that in the context of the Ballard patents, certain information – such as the identity of the sending institution – "did not satisfy the definition for subsystem identification information":

> A person of ordinary skill in the art, who had read the Markman Order definitions of subsystem and subsystem identification information would understand that the [sic] First Data Motion's argument that **information about the identity of sending institution**, item sequence number, cycle indicator (day of the week), processing data, or the initial storage device number (which was in the Archival Unit) constituted subsystem

---

[158] January 30, 2007 DTC Response to Non-Final Office Action at 3-4 ('988 Reexamination Proceeding 90/007,829) (Ex. A) and January 30, 2007 DTC Response to Non-Final Office Action at 3-4 ('137 Reexamination Proceeding 90/007,830) (Ex. R).
[159] Id.
[160] "**Subsystem (p. 8)** 'The Court defines this term as 'an organization of computer components that comprises a functional unit that is part of a larger system.'"  (January 30, 2006 Declaration of John E. Hiles submitted as an appendix to DTC's January 30, 2007 Response to Non-Final Office Action at 5) (Ex. I). "**Subsystem identification information (p. 16)** 'the information that identifies the remote data subsystem or a subsystem that is a part of the remote data access subsystem.'" (Id. at 5).
[161] Id. at 5.

identification information **did not satisfy the definition for subsystem identification information** ….[162]

For the foregoing reasons, HSBC Bank and HNAH respectfully request that the Court enter an order construing the claim term "**subsystem identification information**" as: "information that identifies the specific machine from which images were transmitted, but does not refer to the name or location of an organization such as a bank."

## W.  Means Plus Function Terms 112(6)

Federal Circuit precedent makes clear that a term need not include the word "means" to be construed as a means-plus-function limitation, subject to § 112 ¶6.[163]  In <u>M.I.T.</u>, the court held that the term "colorant selection mechanism" was subject to § 112 ¶6 because "the term 'colorant selection,' which modifies 'mechanism'…, is not defined in the specification and has no dictionary definition, and there is no suggestion that it has a generally understood meaning in the art."[164]  Similarly, the terms at issue here (1) are not defined in the specification, (2) are not defined in the dictionary, and (3) have no generally understood meaning in the art.  When a claim "limitation's language does not provide any structure" and "[t]he limitation is drafted as a function to be performed rather than definite structure or materials," application of section 112 ¶6 is appropriate even though the "means" phrase is not used.[165]

Further, when an element includes a claim term that is immediately followed by subsequent functional language noting that the claim term is "for" performing some

---

[162] <u>Id</u>. at 49-50 (emphasis added).

[163] <u>M.I.T. v. Abacus Software</u>, 462 F.3d 1344, 1354 (Fed. Cir. 2006) (holding that "colorant selection mechanism" should be construed as a means-plus-function limitation); <u>see also Mas-Hamilton Group v. LaGard, Inc.</u>, 156 F.3d 1206, 1213-16 (Fed. Cir. 1998) (holding that a "lack of [traditional 'means']language does not prevent a limitation from being construed as a means-plus-function limitation" while interpreting "lever moving element" and "movable link member" under § 112 ¶6) (emphasis added).

[164] <u>M.I.T.</u>, 462 F.3d at 1354.

[165] <u>Id</u>. at 1213.

function, "[s]uch language is precisely what was intended by the statutory phrase in section 112 ¶6 requiring that means-plus-function limitations provide 'a specified function.'"[166]  When the claim element is cast in such functional language, the element should be construed as a means-plus-function element if it does not have a generally understood structural meaning in the art.

Each of the means-plus-function terms[167] in the Patents represents a nebulous "subsystem" or "controller" and thus fits within the purview of section 112 ¶6.  First, each claimed "subsystem" lacks sufficient structure in and of itself for a person having ordinary skill in the art to determine what is claimed, making the subsystem terms essentially placeholders equivalent to the word "means."  Further, the descriptive element added before each such "subsystem" also does not "have a generally understood meaning in the art,"[168] resulting in subsystem terms that are inherently indefinite elements in and of themselves couched only in terms of the functions they perform.

The following "subsystem" claim elements that should be construed as means-plus-function terms under section 112 ¶6, include the following:

- '988 Patent, Claim 1: "data access subsystems for capturing and sending paper transaction data and subsystem identification information," "imaging subsystem for capturing the documents and receipts," "data processing subsystem for processing, sending, verifying and storing the paper transaction data and the subsystem identification information," "management subsystem for managing the processing, sending and storing of the transaction data"

---

[166] Id. at 1215.
[167] Defendants also incorporate as though fully set forth herein all arguments pertaining to the applicability of Section 112, Paragraph 6, to these terms contained in previous claim construction briefing to the Court, including those filed in the following related cases:
- DataTreasury Corp. v. Ingenico S.A. (Civil Action No. 5:02cv95)
- DataTreasury Corp. v. J.P. Morgan Chase & Co., et al. (Civil Action No. 5:02cv124)
- DataTreasury Corp. v. First Data Corp., et al. (Civil Action No. 5:023cv39)
- DataTreasury Corp. v. MagTek, Inc. (Civil Action No. 2:03cv459)
- DataTreasury Corp. v. Bank of America Corp. et al., (Civil Action No. 2:05cv292)
[168] Mas-Hamilton Group, 156 F.3d at 1213-14.

- '988 Patent, Claim 18:  "data collecting subsystem for collecting and sending the electronic or paper transaction data," "further management subsystem for managing the collecting and sending of transaction data"

- '137 Patent, Claim 1: "data access subsystems for capturing and sending paper transaction data and subsystem identification information," "data processing subsystem for processing, sending, verifying and storing the paper transaction data and the subsystem identification information," "management subsystem for managing the processing, sending and storing of the transaction data," "data access subsystem providing encrypted subsystem identification information and encrypted paper transaction data to the data processing system"

- '137 Patent, Claim 18: "further management subsystem for managing the collecting and sending of the transaction data."

Each of these indefinite "subsystems" is linked with the word "for" to at least one identifiable function.  For example, in Claim 1 of the '988 Patent, the element "data access subsystems for capturing and sending paper transaction data and subsystem identification information" contains the term "data access subsystems" directly connected to a function with the term "for."  The functions described in this element are "capturing and sending paper transaction data and subsystem identification information."  Thus, since the term "data access subsystem" does not provide any known structure in the art and it is immediately coupled with a "for" to at least two functions to be performed, this element is in means-plus-function form and subject to section 112 ¶6, even though the patentee did not use the term "means."  The same is true for each of the other "subsystem" means-plus-function elements listed in Defendants' charts.

Claim elements with the nebulous term "controller" also must be interpreted as means-plus-function claims under section 112 ¶6.  The "controller" claim elements that should be construed as means-plus-function terms under section 112 ¶6, include the following:

- '988 Patent, Claim 1: "data access controller for managing the capturing and sending of the transaction data."

- '137 Patent, Claim 1: "data access controller for managing the capturing and sending of the transaction data."

As an illustrative example, the term "data access controller" from Claim 1 of the '988 Patent does not "have a generally understood structural meaning in the art,"[169] resulting in an inherently indefinite term couched in terms of the function it performs. Additionally, the term "data access controller" is directly connected to a function with the term "for."  The function described in this element is "managing the capturing and sending of the transaction data." Thus, since the term "data access controller" does not provide any known structure in the art and it is immediately coupled with a "for" to a performed function, this element is in means-plus-function form and subject to section 112 ¶6, even though the patentee did not use the term "means."

Section 112 ¶6 also applies to "a combination of … steps in a process claim,"[170] such as the step of "managing the collecting, processing, sending, and storing of the transaction data" at issue in Claim 26 of the '988 Patent.  Even though Claim 26 does not contain explicit step-plus-function language, it is still subject to section 112 ¶6 because it "merely claim[s] the underlying function without recitation of acts for performing that function."[171]  The disputed term "managing the collecting, processing, sending, and storing of the transaction data" describes only the function of "managing" several tasks without ever describing how that function, or any other function in the method claimed

---

[169] <u>Mas-Hamilton Group</u>, 156 F.3d at 1213-14.
[170] <u>O.I. Corp. v. Tekmar Co.</u>, 115 F.3d 1576, 1582 (Fed. Cir. 1997).
[171] <u>Seal-Flex, Inc. v. Athletic Track and Court Construction</u>, 172 F.3d 836, 849 (Fed. Cir. 1999) (Judge Rader, concurring in outcome that construed method claim with words "step of" rather than "step for" as "step-plus-function" limitation subject to section 112 ¶6).

by Claim 26, is to be accomplished.  Thus, this term should be construed as a "step-plus-function" element subject to section 112 ¶6.

Though the patentees artfully avoided use of the terms "means" and "steps for" in drafting these terms, they cannot escape the result of using empty words that are essentially no more than means-plus-function placeholders, having no innate or understood structure in and of themselves.  Thus, each of the "subsystem" and "controller" terms should be construed as means-plus-function claims, and the method term "managing" as a step-plus-function claim, under section 112 ¶6, as laid out in the attached charts showing Defendants' proffered claim constructions.

## III.  ARGUMENTS PREVIOUSLY PRESENTED TO THIS COURT IN EARLIER DTC CASES

In the interest of brevity, the Defendants incorporate by reference the arguments made by defendants (and rejected by this Court)[172] in the earlier DTC cases[173] for the applicable claim terms listed in the Joint Claim Construction and Prehearing Statement In Compliance with Patent Rule 4-3, Doc. No. 1093, <u>DataTreasury Corp. v. Wells Fargo et</u>

---

[172] The Court's ruling to which this chart refers is Ex. A. The prior briefs to which the chart refers are: Responsive Claim Construction Brief Addressing 35 U.S.C. § 112 ¶6 of Defendants, Counterclaim-Plaintiffs, J.P. Morgan Chase & Co. and JPMorgan Chase Bank ("JPMorgan § 112 Response"), Cause No. 5:02-CV-124 (Docket No. 73); Defendants Ingenico S.A.'s And Ingenico, Inc.'s Claim Construction Brief Regarding The Applicability of 35 U.S.C. § 112 ¶6 ("Ingenico Claim Construction Response"), Cause No. 5:02-CV-95 (Docket No. 54); Responsive Claim Construction Brief of Defendants, Counterclaim-Plaintiffs, J.P. Morgan Chase & Co. And JP Morgan Chase Bank ("JP Morgan Claim Construction Response"), Cause No. 5:02-CV-95 (Docket No. 139); Defendant Small Value Payments Company's Responsive Claim Construction Brief ("SVPCo Claim Construction Response"), Cause No. 2:04-CV-85 (Docket No. 49); Defendant Small Value Payments Company's Surreply to Plaintiff DataTreasury Corporation's Reply Brief on Claim Construction ("SVPCo Surreply Brief"), Cause No. 2:04-CV-85 (Docket No. 74); Responsive Claim Construction Brief By Defendant, Counterclaim-Plaintiff, Viewpointe Archive Services, L.L.C. ("Viewpointe Claim Construction Response"), Cause No. 2:05-CV-290 (Docket No. 58); Defendants' Joint Claim Construction Brief ("First Data Claim Construction Response"), Cause No. 5:03-CV-39 (Docket No. 84).

[173] <u>DataTreasury Corp. v. Viewpointe Archive Services, L.L.C.</u>, 2:05-CV-290 (E.D. Tex. 2005); <u>DataTreasury Corp. v. Small Value Payments Co.</u>, 2-04-CV-85 (E.D. Tex. 2004); <u>DataTreasury Corp. v. Magtek, Inc.</u>, 2:03-CV-459 (E.D. Tex. 2003); and <u>DataTreasury Corp. v. Ingenico et al.</u>, 5:02-CV-95 (E.D. Tex. 2004).

al., 2-05-CV-291.   Defendants respectfully request that the Court consider such arguments to be incorporated herein.   If the Court is not inclined to consider these arguments by reference, Defendants respectfully request an opportunity to submit an additional brief expressly setting them forth.[174]

## IV.    CONCLUSION

For the reasons described herein, this Court should adopt Defendants' proposed claim constructions.

Respectfully submitted this the 3rd  day of December, 2008.

---

[174] Defendants expressly reserve the right to present on appeal, as might be necessary or desirable, each of the arguments incorporated by reference herein.

Dated: December 3, 2008

Respectfully submitted,

FISH & RICHARDSON P.C.

By: */s/ Thomas M. Melsheimer*
    Thomas M. Melsheimer
    Texas Bar No. 13922550
    melsheimer@fr.com
    1717 Main Street, Suite 5000
    Dallas, TX  75201
    214-747-5070 (Telephone)
    214-747-2091 (Telecopy)

    Robert E. Hillman
    Fish & Richardson P.C.
    225 Franklin Street
    Boston, MA  02110-2804
    617-542-5070 (Telephone)
    617-542-8906 (Telecopy)

    Robert M. Parker
    Robert Christopher Bunt
    Parker & Bunt, P.C.
    100 E. Ferguson, Suite 1114
    Tyler, Texas 75702
    903-531-3535 (Telephone)
    903-533-9687 (Telecopy)

    Michael E. Jones
    Texas Bar No. 10929400
    E. Glenn Thames, Jr.
    Texas Bar No. 00785097
    Potter Minton
    500 Plaza Tower
    110 North College, Suite 500
    Tyler, TX  75702

**ATTORNEYS FOR DEFENDANTS
BANK OF AMERICA CORPORATION,
BANK OF AMERICA, NATIONAL
ASSOCIATION, LASALLE BANK
CORPORATION, LASALLE BANK N.A.**

By:  */s/ Thomas M. Melsheimer by permission on behalf of the following counsel:*

Danielle Williams
KILPATRICK STOCKTON LLP
1001 West Fourth Street
Winston-Salem, NC  27101

Bill Boice
Audra Dial
KILPATRICK STOCKTON LLP
1100 Peachtree Street, Suite 2800
Atlanta, Georgia  30309-4530

Kenneth Godlewski
Stephen Baskin
KILPATRICK STOCKTON LLP
607 14th Street, NW,  Suite 900
Washington, DC  20005-2018

**ATTORNEYS FOR DEFENDANTS
BB&T CORPORATION, BRANCH
BANKING & TRUST CO., COMERICA
BANK, COMERICA, INC., M&T BANK,
M&T CORPORATION, WACHOVIA
CORPORATION, WACHOVIA BANK,
N.A.**

John G. Flaim
Brian Hurst
Brian C. McCormack
BAKER & MCKENZIE
2001 Ross Avenue, Suite 2300
Dallas, TX  75201-0800

**ATTORNEYS FOR DEFENDANTS
WELLS FARGO & COMPANY,
WELLS FARGO BANK, N.A.**

David L. Ward, Jr.
Donalt J. Eglinton
WARD AND SMITH, P.A.
1001 College Court
New Bern, NC  28562

Larry Carlson
David Taylor
BAKER BOTTS L.L.P.
2001 Ross Avenue
Dallas, TX 75201-2980

**ATTORNEYS FOR DEFENDANTS**
**FIRST CITIZENS BANCSHARES, INC.,**
**FIRST CITIZENS BANK & TRUST CO.**

Preston W. McGee
State Bar No. 13620600
Flowers Davis, P.L.L.C.
1021 ESE Loop 323, Suite 200
Tyler, Texas  75701
(903) 534-8063
pmcgee@tyler.net

Of Counsel:
James H. Carter
James T. Williams
Jane J. Jaang
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004

Lawrence F. Scinto
Ronald A. Clayton
Robert H. Fischer
Stephen E. Belisle
FITZPATRICK, CELLA, HARPER &
SCINTO
30 Rockefeller Plaza
New York, New York  10112-3801
(212) 218-2254

**ATTORNEYS FOR DEFENDANT**
**THE CLEARING HOUSE PAYMENTS**
**COMPANY L.L.C. F/K/A SMALL**
**VALUE PAYMENTS CO., L.L.C.**

Glen Boudreaux
Tim Leonard
Edward J. Nicholas
BOUDREAUX LEONARD HAMMOND
CURCIO
2 Houston Center
909 Fannin Street, Suite 2350
Houston, TX  77010

Irah Donner
WILMER, CUTLER, PICKERING, HALE
& DORR
399 Park Ave.
New York, NY  10022

**ATTORNEYS FOR DEFENDANTS
HSBC NORTH AMERICA HOLDINGS,
INC., HSBC BANK USA, N.A.**

Jerry L. Beane
Texas Bar No. 01966000
jerrybeane@andrewskurth.com
Gerald C. Conley
Texas Bar No. 04664200
geraldconley@andrewskurth.com
Kay Lynn Brumbaugh
Texas Bar No. 00785152
kaylynnbrumbaugh@andrewskurth.com
Tonya M. Gray
Texas Bar No. 24012726
tonyagray@andrewskurth.com
ANDREWS KURTH LLP
1717 Main Street, Suite 3700
Dallas, TX  75201
214-659-4400 (Telephone)
214-659-4401 (Telecopy)

**ATTORNEYS FOR DEFENDANTS
FIRST HORIZON NATIONAL
CORPORATION, FIRST TENNESSEE
BANK, N.A., BANCORPSOUTH, INC.,
BANCORPSOUTH BANK**

Claudia Wilson Frost
State Bar No. 21671300
Jeffrey L. Johnson
State Bar No. 24029638
PILLSBURY WINTHROP SHAW
PITTMAN LLP
909 Fannin, Suite 2000
Houston, TX 77010
(713) 276-7600 (Telephone)
(713) 276-7673 (Fax)
Claudia.Frost@pillsburylaw.com
Jeffrey.Johnson@pillsburylaw.com

Claude E. Welch
LAW OFFICE OF CLAUDE E. WELCH
P.O. Box 1574
Lufkin, TX 75902
(936) 639-3311 (Telephone)
(936) 639-3049 (Fax)
cewelch@consolidated.net

**ATTORNEYS FOR DEFENDANT RBS CITIZENS, N.A.**

William L. LaFuze
Texas Bar No. 11792500
wlafuze@velaw.com
D. Ferguson McNiel
Texas Bar No. 13830300
fmcniel@velaw.com
VINSON & ELKINS LLP
2300 First City Tower
1001 Fannin St.
Houston, TX  77002
713-758-2595 (Telephone)
713-615-5017 (Telecopy)

Scott W. Breedlove
Texas Bar No. 00790361
sbreedlove@velaw.dom
VINSON & ELKINS LLP
3700 Trammell Crow Center
2001 Ross Ave.
Dallas, TX  75201-2975
214-220-7700 (Telephone)
214-220-7716 (Telecopy)

Harry Lee Gillam, Jr.
Texas Bar No. 07921800
gil@gillamsmithlaw.com
Melissa Richards Smith
Texas Bar No. 24001351
melissa@gillamsmithlaw.com
GILLAM & SMITH LLP
110 South Bolivar, Suite 204
Marshall, TX  75670
903-934-8450 (Telephone)
903-934-9257 (Telecopy)

**ATTORNEYS FOR DEFENDANT
UBS AMERICAS, INC.**

Melvin R. Wilcox, III
mrw@yw-lawfirm.com
Yarbrough & Wilcox PLLC
100 E. Ferguson St.
Tyler, Texas 75702
Telephone: (903) 595-1133
Fax: (903) 595-0191

Of Counsel:
John J. Feldhaus
jfeldhaus@foley.com
Anthony H. Son
ason@foley.com
FOLEY & LARDNER LLP
3000 K Street, N.W.
Washington, DC  20007
202-672-5300 (Telephone)

**ATTORNEYS FOR DEFENDANTS
U.S. BANCORP, U.S. BANK,
NATIONAL ASSOCIATION,
NATIONAL CITY CORPORATION,
NATIONAL CITY BANK, ZIONS
BANCORPORATION AND ZIONS
FIRST NATIONAL BANK**

Daniel A. DeVito
SKADDEN ARPS SLATE MEAGHER &
FLOM
4 Times Square
New York, NY  10036
212-735-3210 (Telephone)
917-777-3210 (Telecopy)
ddevito@skadden.com

Philip Philbin
Russ Emerson
HAYNES & BOONE
901 Main St., Suite 3100
Dallas, TX  75202
214-651-5684 (Telephone)
214-200-0672 (Telecopy)

**ATTORNEYS FOR
VIEWPOINTE   ARCHIVE   SERVICES,
LLC**

**DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF**                    57

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on December 3, 2008, on all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Local Rule CV-5(a)(3).


_____/s/ Robert C. Earle_____
Robert C. Earle